**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 25-cr-244 (SLS)** |
| | ) | |
| **SYDNEY REID,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**MOTION TO DISMISS FOR FAILURE TO PRESERVE
AND PRODUCE *BRADY* EVIDENCE**

Ms. Sydney Reid respectfully moves this Court to dismiss the information in this case with prejudice pursuant to Federal Rule of Criminal Procedure 16, Local Criminal Rule 5.1, and the Due Process Clause of the Fifth Amendment to the United States Constitution because of the government's intentional destruction of materially exculpatory video evidence. Ms. Reid respectfully requests an evidentiary hearing on this motion.

**BACKGROUND**

Ms. Reid is charged in this case with Assaulting, Resisting, Impeding Certain Officers in violation of 18 U.S.C. §111(a). The alleged offense in this case occurred on July 22, 2025 at the D.C. Jail. The complainants, FBI Agent Bates and MPD Officer Liang were part of a team that were taking custody of two non-citizens that were being released from the Jail on behalf of Immigration and Customs Enforcement ("ICE"). Ms. Reid saw law enforcement presence and decided to take video footage of the agents, while exercising her First Amendment rights by criticizing the operation. Officer Liang, at one point, grabbed Ms. Reid's wrist in an attempt to take her cellphone. The complainants allege that in the course of this struggle, Ms. Reid assaulted Officer Liang and Agent Bates by forcibly resisting them and by attempting to knee

1

Officer Liang.

Other law enforcement officers were present, including Officer Jason Klepec. Officer Klepec told Ms. Reid that he was filming her, in response to her filming the agents. After Ms. Reid was arrested, she was put into the backseat of a car driven by Officer Dinko Residovic. While Ms. Reid was sitting in the backseat, Officer Residovic viewed a video of the incident, captured by cellphone. Ms. Reid recalls that the video clearly showed what the government has alleged was an attempted knee to the groin. She recalls that the angle of the video shows that the knee was not directed at any law enforcement officer but was a reactive movement.

On September 5, 2025, the defense requested this video from the government, but without knowing the identity of the person who captured the video. The first response, made the same day, stated that Officer John Parodi was wearing bodyworn camera but that the battery had died and no footage was recorded. The government also revealed that Agent Braden Harter was also wearing a body worn camera but did not activate it. Later the same day, the defense sent the government a screen shot of an individual who, on camera, said that he was recording Ms. Reid and asked the government to identify him and produce the video. The government replied that the person in the screenshot was Officer Jason Klepec and produced a photo that he took. The prosecutor relayed: "I am informed he does not have any recording from his phone. I am also informed he did not have his Body worn camera activated at the time the attach photo was taken. I am informed that he left the scene prior to the incident with Ms. Reid and thus did not witness the event on July 22, 2025."

On September 16, 2025, the defense provided the additional details that Ms. Reid had seen the video in question as it had been played by Officer Residovic and apparently had been shared with him. Later that day, the government advised that Agent Residovic had been shown a

video that was still available on social media and sent two links.  One of the links was dead, in that it did not contain a video. The other link showed a different video.  The defense then requested the original video.

The government responded that the link that had been sent was the link to the "video Agent Residovic believes he viewed."  The government also stated that the agent was not sent the video but rather hand been shown the "video/stills from that link."   The government asserted that it was not in possession of the actual video.

The defense requested the identity of the person who shared the link.  The defense told the government that the link that works is not the video that Ms. Reid had previously seen and asked to clarify whether Officer Residovic had only seen one video.  The defense also requested the identity of the social media account from which the first link originated.

The government relayed that Officer Liang had sent Officer Residovic the link but only in response to the defense inquiry – not on the date of the incident; that Officer Residovic believed that he watched the video from that link; and that the government did not know from where the link originated because the link no longer worked and Officer Residovic did not recall the account from which he saw the video.

## ARGUMENT

The video footage captured by the law enforcement officer and shared with others on the team is discoverable under Rule 16, Local Rule 5.1, and *Brady*; and the government's knowing and intentional failure to preserve this exculpatory evidence violates Ms. Reid's right to due process and is fundamentally unfair.

Ms. Reid "has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to [her] guilt . . . or relevant to the punishment to be

imposed." *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This district and this Court construe the government's *Brady* obligations broadly. Under Local Rule 5.1, *Brady* information "includes, *but is not limited to*[,]" "[i]nformation that is inconsistent with or tends to negate the defendant's guilt as to any element" of the offense charged, information probative of "an articulated legally cognizable defense theory or recognized affirmative defense" to the offense charged, and "[i]nformation that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the government anticipates using in its case-in-chief at trial." LCrR 5.1(b)(1), (3)-(4) (emphasis added).

Evidence is "materially exculpatory" if there is any "reasonable probability" that, considering the evidence "collectively, not item by item," the results of trial would be different. *Kyles v. Whitley*, 514 U.S. 419, 433-36 (1995); *see also Bell v. Cone*, 556 U.S. 449, 470 (2009) ("In other words, favorable evidence is subject to constitutionally mandated disclosure when it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (quotation marks and citation omitted)). Significantly, "[t]he question is not whether the defendant would more likely receive a different verdict with the evidence, but whether in its absence he received a fair trial" and sentencing. *Kyles*, 514 U.S. at 434; *see also id.* at 435 ("The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict.").

The government's *Brady* obligations extend to any "others *acting on the government's behalf in the case*." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2009) (emphasis added) (quoting *Kyles*, 514 U.S. at 438); *see also United States v. Linder*, No. 12-cr-22, 2013 WL 812382, at *33 (N.D. Ill. Mar. 5, 2013) ("An 'arm of the prosecution' is any government agent or agency that investigates and provides information specifically aimed at prosecuting a particular

4

accused." (citation omitted)); *United States v. Libby*, 429 F. Supp. 2d 1, 7 n.11 (D.D.C. 2006) (noting the D.C. Circuit's "view that documents will be presumed to be in the government's possession, custody and control" for the purposes of *Brady* and Rule 16 "if the government has both knowledge of and access to the documents").

I.    **THE VIDEO EVIDENCE WAS MATERIALLY EXCULPATORY AND INCOMPARABLE *BRADY* EVIDENCE IN THE GOVERNMENT'S POSSESSION.**

Here, it cannot seriously be disputed that the video constituted materially exculpatory *Brady* evidence in the government's possession.  The video evidence was quintessential *Brady* information because it undermined the government's theory that Ms. Reid intended to assault the complainants in this case and supports Ms. Reid's version of events.  *See In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 877, 893 (D.C. Cir. 1999) (evidence that impeaches a government witness "is almost invariably 'favorable' to the accused, because by making the government's case less credible it enhances the defendant's chances of acquittal").  It was not solely impeachment evidence; it was recorded, video proof of Ms. Reid's innocence, and it would have significantly impacted the jury.

While the government does not have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution," the government's knowing failure to preserve *materially exculpatory* evidence violates due process, regardless of the government's good or bad faith.  *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *cf. Illinois v. Fisher*, 540 U.S. 544, 548 (2004) ("[T]he applicability of the bad-faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence.").  The government has an

affirmative duty to preserve "evidence that might be expected to play a significant role in the suspect's defense," that is, evidence that "possess[es] an exculpatory value that was apparent before the evidence was destroyed" and "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488-89.

Here, the evidence possessed an exculpatory value that was readily apparent before the evidence was destroyed, and Ms. Reid cannot obtain comparable evidence by other reasonably available means, largely because of the law enforcement officer's malfeasance. One officer did not have his bodyworn camera charged and at least two others did not activate their cameras, even though they wore cameras that were ready to record. And although the prosecution team made efforts to recover the evidence, it was thwarted by convenient claims of ignorance as to the origin and source of the video. The government appears to have done little to no independent investigation to verify the officers' claims (even though a forensic examination[1] could recover the video or to see if it was intentionally destroyed).

Moreover, on July 22, the agents appeared to be fully aware of the evidentiary value of the video as they saw it appropriate to share it with other members of the arrest team and even posted it to Instagram. That the video was potentially taken down from Instagram and then apparently disappeared into thin air raises a significant red flag as to why the agents were so careless in preserving direct evidence of the incident.

It is beyond question that the video evidence "might be expected to play a significant role in [Ms. Reid's]'s defense." *Trombetta*, 467 U.S. at 488. Indeed, the evidence would have undoubtedly played a significant role in the government's case-in-chief, if it supported the

---

[1] The government forensically examined Ms. Reid's phone.

government's desired narrative.  If the video evidence had corroborated the complainant's

version of events, rather than Ms. Reid's, the government's agents almost certainly would have

preserved the evidence in its original and usable form immediately, so that it could present this

significant video evidence to the jury at trial.  Instead, those agents effectively destroyed the

*Brady* evidence, removing the video from the Instagram link and claiming that the video was,

somehow, in no one's possession.

      The video files destroyed in this case were not equivalent to the semen samples in

*Youngblood* or the breath samples in *Trombetta*, namely, "evidentiary material of which no more

can be said than that it could have been subjected to tests, the results of which might have

exonerated the defendant."  *Youngblood*, 488 U.S. at 57.  The video is not merely "of

conceivable evidentiary significance" in this prosecution.  *Id*. at 58.  It is not just one piece of

physical evidence that has been subjected to government analysis and destroyed here.  It is video

footage of the incident from a different angle, that exonerates Ms. Reid, in a case where it is the

complainants' word against hers, and the complainants' credibility is potentially the most

important issue.  *See Kyles*, 514 U.S. at 439 (explaining that "the character of a piece of evidence

as favorable will often turn on the context of the existing or potential evidentiary record" in the

case).  The destroyed evidence was favorable and absolutely would have significantly

contributed to Ms. Reid's defense.  *Cf. Trombetta*, 467 U.S. at 488-89 (reasoning that though

"the preservation of breath samples might conceivably have contributed to respondents' defenses

. . . the chances are extremely low that preserved samples would have been exculpatory").  Thus,

it was reasonable for the government, through its agents, to preserve the video evidence and

justice clearly required that the government do so.  *Youngblood*, 488 U.S. at 58 (reasoning that

"the extent of the police's obligation to preserve evidence" should be limited "to reasonable

bounds and confine[d] . . . to that class of cases where the interests of justice most clearly require it").

Ms. Reid cannot obtain comparable evidence by other reasonably available means. The video evidence showed exactly what occurred during the incident which is the focus of this case. Unlike the perspectives of the other videos, it is at some distance and thus shows more. This kind of evidence is irreplaceable.

Ultimately, whether the prosecution "succeeds or fails" to comply with its "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case," "the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is *inescapable*." *Kyles*, 514 U.S. at 437-38 (emphasis added). The government cannot disclaim its knowledge and control of the video evidence. The destruction of such material evidence violated Ms. Reid's constitutional right to due process and entitles her to relief "irrespective of the good faith or bad faith of the prosecution." *Giglio*, 405 U.S. at 153 (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Without this evidence, Ms. Reid cannot have a fair trial.

Under these circumstances, the Court need not find the government acted in bad faith in order to find Ms. Reid's due process rights violated. Nevertheless, the government's "failure to preserve [even] *potentially useful* evidence" "constitute[s] denial of due process of law" when the government acts in bad faith. *Id*. at 58 (emphasis added); *United States v. McKie*, 951 F.2d 399, 403 (D.C. Cir. 1991). Here, the government's bad faith is evident.

The fact that the government's agents initially saw the relevance of the video, shared it amongst each other, only have the video disappear and be removed from Instagram shows bad faith. Multiple agents of the government possessed this video on the day of the incident and the

videos were likely saved to the phone and potentially to the cloud. Yet, after learning that the officers potentially lost or destroyed the evidence, the prosecution team did nothing to investigate what happened to the video. There is no evidence that the agents' phones were even visually examined, much less forensically inspected. The government's inaction ensured that the video would not be preserved.

The government did nothing to ensure that the information—which was clearly relevant and discoverable—was preserved and produced for the criminal litigation that was certain to occur. Indeed, the government's failure to preserve and provide the original video evidence, by itself, "indicate[s] that the evidence could form a basis for exonerating the defendant" and thus constitutes bad faith. *Youngblood*, 488 U.S. at 58.

Moreover, the government's bad faith is evident because of its "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.* ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."). "When the exculpatory value of the evidence the government fails to preserve is apparent at the time of the evidence's loss or destruction, bad faith can be inferred from the nonpreservation itself." *United States v. Taylor*, 312 F. Supp. 3d 170, 177 (D.D.C. 2018) (citing *Youngblood*, 488 U.S. at 56 n.*; *Trombetta*, 467 U.S. at 488-89; and *Magraw v. Roden*, 743 F.3d 1, 8-9 (1st Cir. 2014)). For the reasons discussed above, the exculpatory value of the video evidence was apparent and multiple law enforcement officers saw it. Thus, bad faith on the part of the government can be inferred by the agent's failure to preserve the apparently exculpatory video evidence, particularly in light of active criminal investigation and prosecution that was well under way.

9

The destruction of the video evidence was *not* "mere negligence or oversight." *Taylor*, 312 F. Supp. 3d at 179. Rather, the government was "motivated by improper purposes or tactical considerations when [it] failed to preserve" this evidence. *Id.* at 177. Unlike in other failure-to-preserve cases, the agents here has made a "calculated effort to circumvent the disclosure requirements," *Trombetta*, 467 U.S. at 488, and "engaged in gamesmanship in deciding what evidence to collect and what to leave behind" for this prosecutions, *Taylor*, 312 F. Supp. 3d at 183.

## II.     DISMISSAL IS WARRANTED.

Generally, "when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing . . . the [government]'s most probative evidence." *Trombetta*, 467 U.S. at 487.

Courts have dismissed cases where, as here, the government failed to meet its constitutional obligations to preserve evidence. *See, e.g.*, *United States v. Bohl*, 25 F.3d 904, 914 (10th Cir. 1994) (dismissing indictments where the government allowed steel transmission towers to be destroyed prior to trial and "the actual steel used in the towers was potentially useful for [the] defense because [the defendants'] own tests of the steel might have exonerated them"); *United States v. Cooper*, 983 F.2d 928, 930 (9th Cir. 1993) (affirming dismissal of the indictment where the government failed to preserve tangible evidence that the defense argued could have yielded exculpatory information if tested by its expert, who testified that he could "reach no firm conclusions without examining" the non-preserved evidence in question); *State v. Hannah*, 583 P.2d 888 (Ariz. 1978) (affirming dismissal of the indictment due to negligent failure to preserve where (1) "fingerprints could have been lifted off the [evidence]," (2) it was not clear "whether

exculpatory evidence would have been developed," and (3) "tests were not made which could have been made").

Because of the destruction of evidence in this case, Ms. Reid does not have "a meaningful opportunity to present a complete defense." *Trombetta*, 467 U.S. at 485. The government's failure to preserve and provide materially exculpatory evidence violated Ms. Reid's constitutional right to due process and, as a result, this case should be dismissed. Dismissal is the only sanction sufficient to vindicate Ms. Reid's due process rights and prevent similar violations in the future.

This Court may also exercise its supervisory authority to dismiss this case. "In the exercise of its supervisory authority, a federal court 'may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.'" *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) (quoting *United States v. Hastig*, 461 U.S. 499, 505 (1983)); *see also id.* at 264 (Scalia, J., concurring) ("[E]very United States court has an inherent supervisory authority over the proceedings conducted before it, which assuredly includes the power to decline to proceed on the basis of an indictment obtained in violation of the law."). Dismissal of an indictment is appropriate "in narrow circumstances where[,]" as here "the government engaged in serious misconduct and such misconduct prejudiced the defendant[]." *United States v. McLaughlin*, 910 F. Supp. 1054, 1057 (E.D. Pa. 1995) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)).

At minimum, the government's conduct here was reckless, and both the Third and Ninth Circuits have recognized dismissal as an appropriate sanction for a *Brady* violation resulting from reckless government conduct. According to the Third Circuit, "a constitutional violation that results from a reckless disregard for a defendant's constitutional rights constitutes willful

misconduct" and therefore justifies dismissal, "because . . . cases [involving deliberate misconduct] call for penalties which are not only corrective but are also highly deterrent." *Government of the Virgin Islands v. Fahie*, 419 F.3d 249, 254-56 (3d Cir. 2005). And the Ninth Circuit likewise has held that "reckless disregard for the prosecution's constitutional obligations" qualifies as "flagrant" prosecutorial misconduct justifying dismissal pursuant to the court's supervisory powers. *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008). It has specifically rejected the government argument that dismissal is warranted only in the case of intentional misconduct. *Id.*

If the Court does not order dismissal, the Court should give a missing evidence instruction at trial instructing jurors that the government's failure to preserve and produce evidence permits them to infer that the evidence would have been unfavorable to the government and favorable to Ms. Reid. *See United States v. Vega*, 826 F.3d 514, 532 (D.C. Cir. 2016). To the extent that the government disputes any of Ms. Reid's factual assertions at trial, the jury should draw all inferences and make all material factual findings in favor of Ms. Reid and against the government.

In sum, Ms. Reid cannot receive a fair trial without the video and due process requires dismissal of the indictment or, at a minimum, alternative relief.

## CONCLUSION

For the foregoing reasons, and for any other reasons set forth at a hearing on this motion, and that this Court may deem just and proper, Ms. Reid respectfully requests that the Court grant this motion and dismiss this case.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Tezira Abe
Eugene Ohm
Assistant Federal Public Defenders
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500