UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 25-CR-244 (SLS) |
| | : | |
| SYDNEY LORI REID, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO PRESERVE AND PRODUCE BRADY EVIDENCE

The United States, by and through the United States Attorney for the District of Columbia, hereby responds to the Defendant's motion to dismiss. ECF 44-2. Nearly two months after the alleged criminal conduct in this case, defense counsel informed the Government that two officers watched a brief video on social media that captured a portion of the conduct on the day of its occurrence. In the officers' view, the video did not show any inculpatory or exculpatory information, and its only noteworthiness was simply its presence on social media. However, by the time the website address for the video was re-visited pursuant to the Defendant's inquiry, the address no longer went to a working webpage. In other words, the video was no longer on social media in the location where it was last seen.

The Defendant moves to dismiss for failure to preserve the video and for a violation under *Brady* and its progeny. But this motion is baseless. There is absolutely no indication that the video was ever in the custody or control of the Government as is required under *Trombetta, Youngblood,* or *Brady*, nor is there any evidence suggesting that the video was exculpatory besides the Defendant's bare, self-serving assertion that it is so. For these reasons, the Defendant's motion should be denied.

1

## BACKGROUND

Defendant Sydney Reid is charged by Information with one count of forcibly resisting, impeding, and interfering with two officers of the United States while engaged in the performance of their official duties, in violation of 18 U.S.C. § 111(a)(1). *See* ECF No. 17. The charge arises from an incident on July 22, 2025, when the Defendant interfered with an operation by agents with the Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI"), and the United States Marshals Service ("USMS"), to take two individuals into custody upon their release from D.C. Department of Corrections custody at the D.C. Central Detention Facility ("CDF").

Officers arrived at CDF at approximately 4:00 PM to await the release of the two individuals. The officers waited on scene for multiple hours. As officers awaited the individuals' release from CDF, the Defendant approached law enforcement agents and video recorded the agents with a cell phone. Additionally, the Defendant photographed the make, model, and license plate of several law enforcement vehicles. At no time did agents attempt to arrest the Defendant based on these actions. The Defendant then left the area under her own volition.

About thirty minutes later, agents began detaining the two suspects as they were released from CDF. While detaining the second suspect, the Defendant returned to the area and approached the officers. One of the officers on scene, Officer Vincent Liang, ordered the Defendant to remain beyond the perimeter that he had established, which gave the Defendant an unencumbered view of the agents' operations while maintaining the safety of the agents and the Defendant. However, the Defendant violated officers' orders by attempting to circumvent officers and obstruct the stairway that the agents used to escort the individual to the waiting vehicle. The Defendant tried to push past the perimeter agent, making physical contact with that agent. The Defendant's interference with the inmate transfer and contact with the agent forced the agent to move the Defendant away from the escort path to a nearby wall. As the agent restrained the Defendant near

the wall, the Defendant resisted and struggled with the agent. A second agent came to assist to restrain the Defendant, during which time agents asked the Defendant to calm down. The Defendant continued to resist and instead began raising up her leg as if preparing to strike the agents with her knee. A third agent came to assist. These three agents were able to handcuff the Defendant and place her under arrest.

Counsel for the Defendant, Ms. Abe, emailed the assigned AUSA inquiring about the presence of body worn camera for various officers. The assigned AUSA responded on September 5, 2025, at 10:28 AM:

> Officer John Parodi, was wearing a Mashall vest, is an ERO detention officer who is also a Task Force Officer with the Marshalls. He was wearing a BWC. I am informed that it ran out of power earlier in the day and that it was not on during the incident on July 22, 2025.
>
> FBI Special Agent Braden Harter was wearing a BWC. I am informed that he failed to turn it on during the incident on July 22, 2025. I have attached his report to this email.

At 2:40 PM that same day, Ms. Abe asked for the name of an agent who appeared to be filming the Defendant. At 3:09 PM, the assigned AUSA responded:

> The officer in screenshot is Officer Jason Klepec. I have attached the photo he took. I am informed he does not have any recording from his phone. I am also informed he did not have his Body warn camera activated at the time the attach photo was taken. I am informed that he left the scene prior to the incident with Ms. Reid and thus did not witness the event on July 22, 2025.

In total, there were three officers on scene who did not activate their body worn camera. One of those officers, Officer Parodi, was unable to do so because the device had run out of battery. A second officer, Officer Klepec, did not activate the camera during a brief encounter with the defendant in which no illegal activity occurred. Nevertheless, Officer Klepec's interaction with the Defendant was in fact captured on cell phone video recorded by the Defendant. Officer Klepec

3

was no longer on scene when the alleged criminal conduct occurred. The only officer who did not activate body worn camera during the incident, and who had the ability to do so, was Agent Harter.

On September 16, 2025, at 10:05 AM, Ms. Abe sent the following email to the undersigned AUSA.

> It's our understanding that when Ms. Reid was in the car being transported by Officer Dinko Residovic and another officer, Residovic was watching a video that was either taken by him or sent to him from someone else's phone. Residovic was in the front seat and Ms. Reid, from the back seat, could see the video. The vantage point of the video looked like it was from the parking lot to the right of Ms. Reid, as if it was from the direction where Officer Bates's BWC begins in the government's prelim exhibit. We are requesting this video recording be disclosed to the defense.

Notably, Ms. Abe never claimed in this email "that the angle of the video shows that the knee was not directed at any law enforcement officer but was a reactive movement." ECF 44-2 at 2. The undersigned AUSA replied that the Government would inquire of Officers Residovic and Liang regarding the video.

In response to the Defendant's inquiry, the Government learned the agents had viewed a video that had been posted to social media. Agent Residovic only vaguely recalled viewing the video and never reported to the undersigned AUSA any information that was inculpatory or exculpatory about the video. The only notable attribute about the video was simply its presence on social media. Agent Residovic reported that he viewed the video on Officer Liang's phone. The Government requested that Agent Residovic obtain the URL from Officer Liang. This request was completed. Once the undersigned AUSA received the URL, the undersigned AUSA attempted to view the video by accessing the URL, but received the following message on the Instagram website, "The link you followed may be broken, or the page may have been removed."[1]

---

[1] https://www.instagram.com/reel/DMbhYcyxEE0/?igsh=MXRhOXU0czJrNjVqNQ%3D%3D

Separate and apart from the Defendant's request, the Government, in its investigation, had previously located an Instagram Reel from the Instagram profile "PotomacPressDc.[2]" that contained photographs and video from the incident. The video appeared to be shot from a vantage point consistent with the Defendant's description ("it was from the parking lot to the right of Ms. Reid."). The Government had no intention of utilizing this video in its case-in-chief as it was duplicative and of lower digital quality than body worn camera and video surveillance in this case.

Therefore, just four hours after the Defendant's inquiry regarding this video, the Government provided the following response:

> Good afternoon,
>
> The video that Agent Residovic was shown was a video and/or still that had been posted on social media. This is the link to the video, but it seems like the post has since been removed or the link is incomplete.
>
> https://www.instagram.com/reel/DMbhYcyxEE0/?igsh=MXRhOXU0czJrNjVqNQ==
>
> That being said, based on your client's description, this might be the video you are describing (though possibly from a different Instagram profile/page).
>
> https://www.instagram.com/reel/DMbmys9RJJg/?igsh=Znd4d3podHcxYjIz

Ms. Abe replied that the second link from the above message was not the video that the Defendant had seen and requested the following further information: (1) who sent the link to Agent Residovic and (2) which account the first link was from. The Government replied that Agent Residovic was not sent the link previously - he was shown the video on another agent's phone, and the link was only sent to him in response to this defense request. As to the second request, Agent Residovic did

---

[2] https://www.instagram.com/reel/DMbmys9RJJg/?igsh=Znd4d3podHcxYjIz. As of October 7, 2025, this was a publicly accessible profile with approximately 149,000 followers that, according to its description, posted breaking local and global news.

not recall the identity of the account, and the Government did not have information as to the identity of the account because the link no longer went to a working page. This last communication was sent on September 16, 2025, at 3:30 PM.

The Defendant never previously raised any of these concerns with the Court in any prior motions or at the Pretrial Conference on September 30, 2025.

**ARGUMENT**

I. **The Government Did Not Fail to Preserve the Social Media Video Because its Exculpatory Value was Not Apparent, there was no Bad Faith, and the Video Was Not in the Government's Possession**

The Defendant is unable to show that the Government failed in its duty to preserve the social media video. There are two separate tests determining whether Government's destruction of potentially exculpatory evidence violated the defendant's due process rights. If the exculpatory value is apparent before its destruction, then the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U.S. 479, 489 (1984). However, if the exculpatory value is indeterminate and it can be shown that the destroyed evidence was "potentially useful", then the defendant must show that the Government acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

The only suggestion that the video's exculpatory value was apparent is the Defendant's self-serving, last-minute declaration that it is so.[3] Red Book Criminal Jury Instruction for the District of Columbia, Instruction 2.209 ("[I]n evaluating [the defendant's] testimony, you may consider the fact that the defendant has a vital interest in the outcome of this trial"). But this

---

[3] As stated previously, Ms. Abe never informed the Government of the potential exculpatory value of the evidence in her communication on September 15th.

assertion is contradicted by the Defendant's own statements after the incident, in which she told officers, "The woman came up. She scared the shit outta me [sic], so I lifted the knee because she fucked scared the shit out of me."[4] "Like she came up to me and it's like she put her hands on me, so that was a natural reaction."[5] The woman that the Defendant is referring to is FBI Agent Eugenia Bates, and her body worn camera also contradicts the Defendant's statements. When the Defendant raises her knee at officers, approximately 20 seconds had lapsed since Agent Bates first calmly placed her hand on the Defendant—hardly a knee jerk reaction out of surprise. Finally, the Defendant's assertion is contradicted by the officers who viewed the video, who did not see any inculpatory or exculpatory evidence in the video.

Since the exculpatory value is not apparent, the Defendant is required to show bad faith. But the Defendant cannot meet this burden. All that has been provided by the Defendant is wild speculation that the video's disappearance raises "red flags." ECF 44-2 at 6; *United States v. Hartman*, 194 Fed.Appx. 537, 542 (10th Cir. 2006) (bad faith lacks any foundation other than the defendant's naked assertions). Discounting the defendant's conspiracy theories, a far simpler explanation that comports with the agent's observations is that the agents saw a video that publicized the incident but had little evidentiary value. The agents gave the video no further thought until the defense asked about the video nearly two months after it was posted, and in the interim, the party who posted it made a change in their profile that rendered the URL unusable.

Crucially, even if the video had exculpatory value, the Government does not have a duty to preserve evidence not in its control. *Hartman*, 194 Fed.Appx. at 542 ("Even had the evidence had exculpatory value, it is not clear…that the government has any duty to preserve evidence not

---

[4] Recording from Defendant's cell phone video, time stamp 16:38.
[5] *Id*. at time stamp 17:20.

7

in its control); *United States v. Thomas,* 849 F.3d 906 (10th Cir. 2017) ("*Trombetta* and *Youngblood* are best read as regulating government conduct with respect to the evidence it possesses…"); *United States v. Sherlock*, 962 F.2d 1349, 1355 (9th Cir. 1989) (finding no indication of bad faith from loss of rape kit that was not in the possession or control of the government or its agents); *United States v. McClure,* No. 90-5001, 1990 U.S. App. LEXIS 20371, 1990 WL 180122, at *3 (4th Cir. Nov. 21, 1990) (noting that merely "reviewing the evidence had not amounted to taking possession" of it for *Brady* purposes); *People v. Covington*, 2014 WL 888516 (Bronx Cnty. Sup. Ct. 2014) ('No constitutional or statutory duty to acquire, or prevent the destruction of, evidence generated and possessed by private parties' . . . Temporary access is not necessarily the equivalent of possession for Brady purposes (citations omitted)). As such, the Government did not have any obligations to preserve the social media video in the first instance.

## II. Similarly, the Government's Brady obligations Do not Extend to the Social Media Video Because it was not Within the Government's Custody and Control

Likewise, the Government's constitutional disclosure obligations under *Brady* do not extend to evidence of which the prosecution could not reasonably thought to have imputed knowledge or control. *United States v. Celestin*, 612 F.3d 14, 22-23 (1st Cir. 2010); *United States v. Safavian*, 233 F.R.D. 12, 14 (D.D.C. 2005). In the past, courts have addressed whether evidence possessed by other branches of the federal government[6], foreign governments,[7] and local government agencies[8] were in the possession, custody, or control of the prosecution team to

---

[6] *Id.*

[7] (*United States v. Esquenazi*, 752 F.3d 912 (11th Cir. 2014)); United States v. Norris, 753 F.Supp.2d 492, (E.D.Pa. 2010)

[8] *United States v. Williams,* 2018 WL 1875619 (E.D.C.A. April 19, 2018); *United States v. Marshall*, 132 F.3d 63, 68-69 (D.C. Cir. 1998; *United States v. Collins,* 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019): The Government's "*Brady* obligations extend only to materials within prosecutors' possession, custody or control or, in appropriate cases, that of the Department of Justice, perhaps another part of the Executive Branch, or a comparable state authority involved in

varying results depending on a highly fact-intensive, case-by-case analysis. *United States v. Brazel,* 102 F.3d 1120, 1150 n. 19 (11th Cir.1997). But in all those cases, never before has a court found that a private company's records are in the Government's possession or control. And the fact that the Government may be able to obtain information with a subpoena does not expand the Government's possession or control to that information. *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991) ("the government does not have a duty to obtain and turn over materials under the control of state officials, let alone private parties"); see *also United States v. Rand* 2016 WL 7045714 (D. Nev. 2016). But to find a *Brady violation,* these are precisely the conclusions the Defendant is asking the court to draw in this case.

To be clear, the video at issue in the Defendant's motion is a video that was posted to social media. It was not a video created by any agent or officers with the prosecution team. To the Government's knowledge, it was not created by a state or local law enforcement agency. It was not a video from the Defendant's phone. ECF 44-2 at 6.[9] It was not "shared" amongst the officers. *Cf.* ECF 44-2 at 8. It was not downloaded or saved to cloud storage. *Cf.* ECF 44-2 at 9. One officer viewed the social media video and showed the screen of his device to another officer. Yet the Defendant absurdly argues that when an officer viewed a video on social media, this viewing

---

the federal prosecution." *United States v. Blaszczak*, 308 F. Supp. 3d 736, 742 (S.D.N.Y. 2018) (footnote omitted). A prosecutor's duty to review documents in the possession, custody, or control of another agency arises where the Government conducts a "joint investigation" with another agency. *See United States v. Rigas*, No. 02-CR-1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008) (holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC), *aff'd*, *United States v. Rigas*, 583 F. 3d 108 (2d Cir. 2009); *SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (holding that FBI and SEC did not conduct a joint investigation where they participated in joint interviews but only the FBI took notes).
[9] The defendant incorrectly claims that her phone was forensically examined. The Defendant provided photographs and videos from her device from the incident to the Government upon advice from counsel and in exchange for the return of her phone.

9

somehow placed the video in the Government's control. The consequences of such a holding are breathtaking, essentially creating an obligation for the Government to preserve and disclose every news publication viewed by law enforcement that happens to contain a video of an incident in which they are involved.

In this case, the Government went beyond its disclosure obligations. When Ms. Abe contacted the assigned AUSA regarding the video, the undersigned AUSA promptly inquired of the officers regarding the URL of the video, and provided that URL promptly to the Defense. When the undersigned AUSA viewed the URL and saw that the link was not working, the Government provided another video that seemed to fit the Defendant's description. The first and only information the Government received suggesting that the video was exculpatory was on October 6, 2025, when the Defendant said so in its late-filed motion to dismiss, three weeks after the last interaction on this topic, and just one week before the commencement of trial. "*Brady* provides no refuge to defendants who have knowledge of the government's possession of possibly exculpatory information, but sit on their hands until after a guilty verdict is returned." United States v. Derr, 990 F.2d 1330 (D. C. Cir. 1993).

### III. If the Court Does Find a Violation, Dismissal is an Inappropriate and Severe Sanction

Though it is the Government's position there was no failure to preserve or *Brady* violation in this case, the Court has wide discretion in imposing a sanction for a violation. *United States v. Marshall*, 132 F.3d 63, 69 (D.C. Cir. 1998), as amended (Mar. 6, 1998). A trial judge should impose "the least severe sanction that will accomplish the desired result—prompt and full compliance with the court's discovery orders." *Id*. (citing *United States v. Sarcinelli*, 667 F.2d 5, 7 (5th Cir. 1982); *United States v. Gee*, 695 F.2d 1165, 1169 (9th Cir. 1983)). This sanction should be based on the careful weighing of several factors: 1) the reasons why disclosure was not made;

10

2) the amount of prejudice to the opposing party; 3) the feasibility of curing such prejudice with a continuance of the trial; and 4) any other relevant circumstances." *United States v. Swenson,* 894 F.3d 677, 684 (5th Cir. 2018).

Dismissal is appropriate only as a last resort, where no other remedy would cure prejudice against a defendant. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (holding that district court had no authority to dismiss where lesser remedy was available. *United States v. Pasha,* 797 F.3d 1122, 1139 (D.C. Cir. 2015). Even in the cases of the most egregious prosecutorial misconduct, indictment may be dismissed only 'upon a showing of actual prejudice to the accused.' *United States v. McKenzie*, 678 F.2d 629, 631 (5th Cir. 1982).

Weighing these factors, dismissal is clearly not the appropriate sanction in this case. Looking to the first factor, the Government disclosed the existence of the social media video and its URL the same day the Defendant first alerted the Government that agents had viewed the video. No disclosure was made previously because it is not a typical area of investigation to inquire whether agents had viewed video of the incident on social media shortly after its occurrence. Moreover, once that inquiry was made, the Government learned that the agents did not see any inculpatory or exculpatory value in the video.

The prejudice to the Defendant is minimal. She has ample ability to cross-examine the officers about the contents of the video and the actions agents could have taken to preserve the video, as presenting to the jury other body worn camera and surveillance videos from the incident.[10] There is also feasibility in continuing the trial. At this time, if the Defendant wished to

---

[10] The Defendant argues in passing that the absence of body worn camera from Officer Parodi, Officer Klepec, and Agent Harter is further evidence of malfeasance. ECF 44-2 at 6. As discussed above, Officer Parodi could not record the body worn camera because the battery died earlier in the day, possibly during the hours they spent waiting on scene for the release of the inmates. As such, there is no basis to find bad faith as to Officer Parodi. As to Officer Klepec, he

11

learn the identity of the account which posted the video, the Defendant has the same ability as the Government to issue a subpoena and could conduct its own investigation. Alternatively, a continuance would permit the Government time to obtain a search warrant for the contents of the account and video to provide to the Defendant. As to the final relevant circumstances, the Government would once again reiterate that the first occasion it had to believe that the video was exculpatory was not until October 6, 2025, when the Defendant first raised the argument in her motion to dismiss. For these reasons, the Government would assert that the Court should not dismiss the information as a sanction.

---

had a brief interaction with the Defendant before the incident in which no criminal conduct occurred. Crucially, this interaction was recorded by the Defendant herself, so there is absolutely no prejudice to the Defendant because the recording of the interaction is available by other means. As to Agent Harter, the Government's review of other body worn camera and surveillance video shows that Agent Harter was not involved in the arrest of the Defendant, but whose role was a background one in which he guarded one of the detainees after his release from jail. *See United States v. Weisz*, 718 F.2d 413, 436 (D.C. Cir. 1983) *(*the FBI was under no duty to "preserve" its conversations with the defendant by recording them.); *United States v. Taylor,* 312 F. Supp. 3d 170, 178 (D.D.C. 2018); (finding failure to activate body worn camera does not constitute prima facie evidence of bad faith); *United States v. Alverio-Melendez*, 640 F.3d 412, 424 (1st Cir. 2011) ("the failure to create exculpatory evidence does not constitute a Brady violation); *United States v. Brown*, No. 17-CR-58, 2017 WL 8941247, at *15–16 (D. Nev. Aug. 14, 2017).

## CONCLUSION

For the foregoing reasons, the Defendant's motion should be denied.

                        Respectfully Submitted,

                        JEANINE FERRIS PIRRO
                        United States Attorney

By:    */s/ Travis Wolf*
            Travis Wolf
            Jason Facci
            Assistant United States Attorneys
            N.Y. Bar No. 5483243 (Wolf)
            D.C Bar No. 1027158 (Facci)
            601 D St, NW
            Washington, D.C. 20530
            Travis.Wolf@usdoj.gov
            Jason.Facci@usdoj.gov
            (202) 252-7803 (Wolf)
            (202) 252-7742 (Facci)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| **v.** : | Case No. 25-CR-244 (SLS) |
| : | |
| **SYDNEY LORI REID,** : | |
| : | |
| **Defendant.** : | |

## ORDER

Upon consideration of the Defendant's Motion to Dismiss and Government's Response, it is hereby

**ORDERED** that the Defendant's motion is DENIED