**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 25-CR-244 (SLS)** |
| | **:** | |
| **SYDNEY LORI REID,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**MS. REID'S REPLY TO THE GOVERNMENT'S**
**OPPOSITION TO HER MOTION TO DISMISS**

Sydney Reid respectfully submits this Reply to the points raised by the Government in its Opposition to her Motion to Dismiss for Failure to Preserve and Produce *Brady* Evidence.[1]

The government's opposition concedes important facts about the materiality of the video. Its remaining arguments rely upon the discretion of the very witnesses that the video potentially undermines. In the end, the government's opposition confirms that the video was exculpatory, that it was in the government's (through the officers) possession, and that the officers willfully opted not to save the video. The Court should dismiss this case with prejudice because the officers' actions violated Ms. Reid's Due Process and Rule 16 rights.

First, the government concedes that the officers viewed a video that "looked like it was from the parking lot to the right of Ms. Reid, as if it was from the direction where Officer Bates' BWC begins in the government's prelim exhibit." In other words, the officers, through the government, agree that the video in question was a video of the incident from a different angle. A screenshot of that video showing Officer Bates' BWC vantage point is here:

---

[1] Alternatively, the government violated Rule 16 by not producing the video, if the Court does not find it was potentially exculpatory.



The circled area shows Officer Liang and Ms. Reid ***at the time of the alleged assault***.

Second, the government concedes that the reason that the video was not preserved was because "in the officer's view," ECF No. 47 at 1, the video did not show any inculpatory or exculpatory information.  But the government cannot cede responsibility relating to *Brady* material to its officers.  That is why the Supreme Court has long since warned:

> But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached.  ***This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.***  But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, failure to disclose is in good faith or bad faith, the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles v. Whitley,* 514 U.S. 419, 437 (1995).

The prosecution may not have known about the exculpatory video, but *Kyles* makes clear that the prosecutor assumes responsibility for what the officers know: "But neither is there any serious doubt that "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio v. United States,* 405 U.S. 150, 154 (1972). Since, then, the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a

prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials."

Third, the government takes pains to assign blame on the defense for not specifically advising that the video it had repeatedly requested was not exculpatory. This position belies reason. The defense advised the government that the video captured the incident in question. Defense counsel had obviously not seen the video that was unavailable to it. Still, the request for a video of the incident itself where a defendant is going to trial is obviously a request for potentially exculpatory evidence. (Defense attorneys do not make a habit of asking prosecutors to find more inculpatory evidence.) This point is buttressed by Ms. Reid's repeated exculpatory statements on the scene denying the alleged conduct. Hearing her repeated denials, the officers would have known that any video of the incident was of interest to her.[2]

Fourth, the government contends that Agent Residovic was "shown the video on another agent's phone" and "the link was only sent to him in response to this defense request." In addition, "Agent Residovic did not recall the identity of the account, and the Government did not have information as to the identity of the account because the link no longer went to a working page." ECF No. 47 at 5-6. But the government neglects to represent what the other agent (likely Officer Liang) said about where he received the video, whether he was aware of the identity of the account, and whether he had captured the video.

---

[2] But even this does not matter. "The Court found a duty [in *Brady v. Maryland*] even in [a situation 'where the Government failed to volunteer exculpatory evidence never requested or requested only in a general way'] when suppression of the evidence would be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Kyles*, 514 U.S. at 433.

**Argument**

This evidence constitutes *Brady* material that the defense was prevented from using to its advantage.  The officers possessed the video when they watched and circulated it.  They recognized its exculpatory value and chose not to save it.  The video's exculpatory value, especially in light of Ms. Reid's repeated denials, was immediately apparent.  The officers opted not to preserve it anyway.  Even if the court determines that the video was merely "potentially exculpatory," the officers acted in bad faith.  The video captures the moment that constitutes the factual dispute in this case.  Ms. Reid can no longer get a fair trial and this case should be dismissed.

The government complains that the "only suggestion that the video's exculpatory value was apparent is the Defendant's self-serving, last minute declaration that it is so."  This is an ironic position given that the only suggestion that the video is *not* exculpatory is the officers' self-serving declaration to that effect.  But the government and apparently the officers now agree that the video was of the incident itself and also agree that it is from a slightly different angle than had previously been available to the defense.  The government's obligation cannot end simply because the officers claim that the video is not exculpatory. It is reasonable to assume that the officers were viewing and sharing this video to determine whether it had evidentiary value that would aid their case.  And Ms. Reid can be heard making reference to the video along with her belief that it showed an involuntary knee jerk.

The Ninth Circuit's decision in *United States v. Zaragoza-Moreira*, 780 F. 3d 971 (9th Cir. 2015), is helpful on this point. *Zaragoza-Moreira* similarly involved video footage that captured the incident at issue – the alleged smuggling of drugs across the border on the defendant's person. When the government requested the video from Customs and Border Patrol, the video had already been automatically erased due to the passage of time.  The district court found that the exculpatory

nature of the video was not readily apparent and that the government did not act in bad faith. The Ninth Circuit found clear error in both of these conclusions.

Though the defendant conditionally pleaded guilty in that case, the Ninth Circuit held that the "district court clearly erred in finding that the exculpatory value of the video footage . . . was not readily apparent to [the law enforcement officer]." *Id.* at 978. It noted that the defendant had provided an exculpatory statement to the officer establishing the "potential usefulness of the . . . footage." *Id.* at 979.

The importance of the video is underscored by the complainants' different stories about the very moment the video captures. For example, when Agent Bates was interviewed for the drafting of the criminal complaint, she described Ms. Reid as "flailing her arms and kicking." But when she wrote her Report of Investigation, she described, for the first time, a specific kneeing towards her groin. The government continues to allege that Ms. Reid kneed at Agent Bates and the video shows a different angle of what happened. That is why the defense sought the video in the first place and pressed the government on its answers.

But even if the video may have only been "potentially useful" the Court cannot find that the officers acted in "good faith" just because the government says so. More than one officer made a conscious decision not to download the video from social media when a click of a button would allow them to do so. Officer Liang apparently followed "PotomacPressDc," an independent video journalist who posts ICE arrests and other law enforcement encounters in DC. The Court should hear from Officer Liang and Agent Residovic and the others who had seen and sent the link to the video. Relevant to the Court's inquiry is whether any of the officers had ever downloaded inculpatory videos from social media to determine whether these officers' intentional decision not to capture the video was in good or bad faith.

The Ninth Circuit in *Zaragoza-Moreira* also determined that the government acted in bad faith. There, the defense had requested preservation of the video prior to the video's destruction. Engaged in plea discussions, the government neglected to have the video saved. *Zaragoza-Moreira*, 780 F. 3d at 980–81. The officer's testimony also supported the determination of bad faith.  Here, Ms. Reid watched the video with the officers and commented on its exculpatory nature.  The officers knew the relevance of the evidence and their intentional decision not to preserve the video or mention the video in any of their reports requires evidence, not conclusory government proffer without the ability to evaluate credibility.  The Court should, at minimum, require the officers to testify about their decision *not* to preserve the video.

Moreover, the government rests upon the argument that the video was "never in the Government's control."  ECF No. 47 at 10.  The defense is not alleging that it was ever in the prosecution's control but at least two officers (Officer Liang and the officer who sent him the video) had the video playing in their hands. By the government's reasoning, if the video had automatically downloaded on his phone—as is common on some apps—and he pressed a button to delete it because it was exculpatory, the conduct would violate Due Process rights.  But if the video required the push of a button to download and the officer intentionally decided not to push that button because it was exculpatory, the argument is "absurd."

It is far-fetched to argue that the video at issue was not in the government's possession. "As a matter of law, the prosecution is 'deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant.'" *United States v. Bundy*, 968 F.3d 1019, 1037 (9th Cir. 2020) (quoting *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989)). "The government's attempts to absolve itself of wrongdoing for [the agents'] failures therefore fall flat." *Id.*

More to the point, "*Brady* does not tolerate the government's failure to turn over an easily turned rock." *Vaughn v. United States*, 93 A.3d 1237, 1258 (D.C. 2014) (citing *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).  The same holds true for gaming possession and control of a video literally in one's hands.

None of the cases cited by the government involve evidence that is within "government's" possession, custody and control in the manner that the video in question.  The evidence was not under the control of a third party, like the surveillance videos in *United States v. McClure*, No. 90-5001, 1990 WL 180122, at *3 (4th Cir. Nov. 21, 1990) and *People v. Covington*, 2014 WL 888516 (Bronx Cnty. Sup. Ct. 2014).  There can be no finding that "neither the government nor its agents had possession or control" like the rape kit in *Sherlock*, *United States v. Sherlock*, 962 F.2d 1349, 1355 (9th Cir. 1989). And these were not records that the government collected during trial and immediately disclosed to the defense like in *Celestin*. *United States v. Celestin*, 612 F.3d 14, 22-23 (1st Cir. 2010).

Finally, the government tellingly argues:  "The consequences of such a holding are breathtaking, essentially creating an obligation for the Government to preserve and disclose every news publication viewed by law enforcement that happens to contain a video of an incident in which they are involved."  With this argument, the government seems to suggest that it need not adapt to changing technology with the rest of society.  But that is precisely what the law requires, especially if it is not clear that the evidence at issue, here the video, is publicly available.[3]  In the

---

[3] It is notable that the government seeks to be held to a lower burden than civil litigants, though, Ms. Reid—unlike defendants in civil court—is facing the potential loss of liberty. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("The new rule applies only if the lost information should have been preserved in the anticipation or conduct of litigation and the party failed to take reasonable steps to preserve it. Many court decisions hold that potential litigants have a duty to preserve relevant information when litigation is reasonably foreseeable. Rule 37(e) is based on this common-law duty; it does not attempt to create a new duty to preserve. The rule does not apply when information is lost before a duty to preserve arises.").

unlikely event that there is a news report with video capturing a criminal incident and they come into possession of that video, even through a news publication, they must capture that video. There is no question that if that video was inculpatory, the government would preserve it.

Prosecutors must abide by different standards and rightfully so. "By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model. The Court has recognized, however, that the prosecutor's role transcends that of an adversary: he 'is the representative not of an ordinary party to a controversy, but of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done." *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985). "Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by an prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result." *Kyles*, 514 U.S. at 439.

Ms. Reid faces trial without evidence that would have been helpful to her defense. Officer Liang and Agent Residovic were aware of her view that the footage was exculpatory from the date of the incident. Yet, they effectively destroyed that exculpatory evidence in its possession by deciding not to download video footage of the very incident in question. They did not do so by accident – they made a conscious choice and Ms. Reid is incurably prejudiced as a result. The Court should exercise its authority and dismiss this case.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Tezira Abe
Eugene Ohm

Assistant Federal Public Defenders
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500