UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 25-CR-244 (SLS) |
| | : | |
| SYDNEY LORI REID, | : | |
| | : | |
| Defendant. | : | |

**SUPPLEMENT TO MS. REID'S MOTION TO DISMISS**

Sydney Reid respectfully submits a Supplement to her Motion to Dismiss for Failure to Preserve and Produce *Brady* Evidence.[1]

**Additional Facts**

At the evidentiary hearing on October 10, 2025, Agent Residovic and Officer Liang testified to their recollections of the circumstances around video evidence that they had separately viewed on their individual phones. The testimony was most notable in the degree to which they contradicted each other's accounts as well as their own previous accounts to the prosecution.

**Argument**

1. **Evidence of the videos**

The Court required the testimony based upon the government's previous representation that a link had been sent to Officer Liang and shown to Agent Residovic while they were in the car with Ms. Reid. The defense had proffered that Ms. Reid viewed the video from the backseat, had asserted her innocence prior to and after watching the video, and that the video that the government had produced from the Potomac Press was a different video than the one she had seen on the officers' phone.

---

[1] Alternatively, the government violated Rule 16 by not producing the video, if the Court does not find it was potentially exculpatory.

1

The audio recording submitted to the Court from Ms. Reid's phone includes her multiple and consistent denials. The two moments where she appears to be reacting to seeing a video are just short of the 78th minute, where she says, "That doesn't show anything" and around the 1 hour 38-minute mark where she says something like "just an involuntary knee jerk." Based upon the testimony at the hearing, the defense believes that her first statement (the 78th minute) was in response to Instagram video from Potomac Press that was sent to Agent Residovic's phone. The second statement was in response to the missing exculpatory video.

The Court may recall testimony that the Potomac Press video captured the latter half of the incident and did not include the alleged assaultive conduct which occurred with Agent Bates and Officer Liang. The video that Ms. Reid saw was different because it was from a different angle and did not contain a bright orange vehicle in the middle of the screen.[2] In addition, Ms. Reid's "involuntary knee jerk" statement at the 1 hour 38-minute mark appeared to be describing the assaultive incident itself, in contrast to the Potomac Press video which didn't "show anything."

2. **Since the filing of the Motion, new facts have been disclosed demonstrating that the government's disclosures have been late and inaccurate.**

The defense acknowledges that this Motion was filed on October 7, three weeks after September 16 when the government produced the Potomac Press link to the defense and advised of a second link that was no longer active. As the defense represented in Court, the defense was unable to attempt to get the video from Instagram because the government had not identified the account holder for the dead link. And as the Court has noted, Ms. Reid was intent on keeping the speedy trial date, which had at that point been set, especially given the inordinate unwanted media attention heaped on her by press releases from ICE and the Department of Justice. However, the

---

[2] The defense believes that the angle described by Ms. Reid is consistent with the angle that would have been produced by the individual depicted filming in the surveillance video, whose video has never been recovered.

2

defense's initial Motion focused on the lost evidence, rather than the lateness of the disclosure, because of the defense's understanding that the prosecution's representation that it had shared the information as soon as it was received (prompted by the defense's request).

But at the hearing, Officer Liang testified that he had told AUSA Dernbach of the first video back on August 12 or 13—the dates he testified in front of grand juries. The government then represented that AUSA Dernbach, upon hearing of this video, searched for the video on the internet and found the Potomac Press video. AUSA Dernbach determined that the video was not exculpatory and decided not to disclose it to the defense. The government persists in its position that this was appropriate, though did not address the Court's questions about whether its intentional decision not to disclose violated its discovery obligations.

On October 11, 2025, the government, in an apparent admission that its ***representations to the Court from the prior day were false***, disclosed to the defense, an email from Officer Liang to AUSA Dernbach containing an Instagram link from August 13, 2025. The link is functional to the Potomac Press video.

> From: Liang, Vincent
> Sent: Wednesday, August 13, 2025 7:28 AM
> To: Dernbach, Joseph (USADC)
> Cc: Majeed, Abdul
> Subject: [EXTERNAL] RE: 8/12 grand jury at 10am - US v. Sydney Reid
>
> https://www.instagram.com/reel/DMbmys9RJJg/?igsh=Znd4d3podHcxYjIz
>
> Sent with BlackBerry Work
> (www.blackberry.com)

But what doesn't make sense is that the government, in court, claimed that Officer Liang had never sent the link of the video to the government (key to its claim that the government itself did not have the video in its possession). The Court's questions focused on the unlikely import of

3

the government's representation – that a prosecutor would not take the additional step of receiving that link from the officer to at least inspect it for *inculpatory* evidence. We now know that the prosecution didn't even have to – they had the video in their possession the whole time.

### 3. What AUSA Dernbach told AUSA Wolf

In a conversation with government and defense counsel on Monday, October 13, 2025, Mr. Dernbach informed the defense that, to the best of his recollection, his practice was to include email transmissions related to a case on his network drive. He also believes that he conveyed to his successor prosecutor, Mr. Wolf, that Officer Liang had sent him the link in one of many conversations. He also stated that the primary reason that he did not disclose the Potomac Press video is because he believed it to be a link to a media organization and was thus not discoverable. Rather than receiving the video on August 13, 2025, when the government received it, the defense received the link three weeks before trial.

And in September when the prosecution did actually disclose the link to the video, the government affirmatively represented that *it was not the same link to the video that was viewed in the car by Ms. Reid*. At that point in time, the defense was told: 1) that this was the same link that Officer Liang received; 2) that Officer Liang showed the video to Agent Residovic; and 3) that the link had since been removed. But in important ways, none of those statements now appear to be true.

> From: Wolf, Travis (USADC)
> To: Tezira Abe; Dernbach, Joseph (USADC); Eugene Ohm
> Cc: Facci, Jason (USADC)
> Subject: RE: 25-CR-244 Sydney Reid- BWC information
> Date: Tuesday, September 16, 2025 2:17:58 PM
>
> Good afternoon,
>
> The video that Agent Residovic was shown was a video and/or still that had been posted on social media. This is the link to the video, but it seems like the post has since been removed or the link is incomplete.
>
> https://www.instagram.com/reel/DMbhYcyxEE0/?igsh=MXRhOXU0czJrNjVqNQ==
>
> That being said, based on your client's description, this might be the video you are describing (though possibly from a different Instagram profile/page).
>
> https://www.instagram.com/reel/DMbmys9RJJg/?igsh=Znd4d3podHcxYjIz
>
> Sincerely,
>
> Travis Wolf

4

The Court can see that the second link in the above email matches the link in the disclosure from August 13th.  It also differs from the link for the video that "Agent Residovic was shown."

There can be little doubt that the government failed in its duties, first by failing to collect contemporaneous statements and other information from the officers from the incident and then by neglecting to supervise the collection of that information, by relying on the officers' conclusion as to what is relevant and not relevant.  Still, the government persists in trying to blame the defense. Even at the hearing, the government deflected blame: "The ambiguity, I think, that arises here is that we are trying to construct a very mundane incident three months after it happened involving, I guess for lack of a better word, middle-aged people who just aren't great with technology, just like everyone else in this courtroom." Tr. at 10/10/25 at 14.

In court, AUSA Wolf represented: "When I received the case, AUSA Dernback [sic] communicated to me that there is this post that we found on Potomac Press that shows part of the incident. And that is in the case file and we have had it. But it's also a public post. You can go online right now and look at it yourself." Tr. at 10/10/25 at 89.

But the three-month lapse is entirely the fault of the government, who had possession of at least the knowledge of a video before even the preliminary hearing.  And given Officer Liang's testimony that he told the government about the screenshot and the link and the circumstances of when he viewed them, the government also had knowledge that a second video existed that was sent to Agent Residovic. And the officers' attitude that the incident was "mundane" is a direct result of the government neglecting to properly supervise law enforcement's discovery duties and the agencies' apparent failure to train the agents on preservation of evidence.[3]

---

[3] The government disclosed over the weekend that neither the FBI or ICE have rules or procedures governing the preservation of evidence.  In contrast, MPD has a general order that requires officers to preserve all potentially discoverable material, including any material which "may be favorable to the accused." MPD General Order 602.02 at 4.

The government revealed its lack of understanding regarding its failures, with remarkable petulance, in responding to the Court:

> THE COURT: Mr. Wolf, I assume you did that in this case, that all of the officers who were on the scene and involved in this incident, that you collected their communications and you talked to them.
>
> MR. WOLF: That is not the requirement of Rule 16, Jencks, or Brady or Giglio, Your Honor. The Jencks requirement requires us to collect any statements that relate to the substance of their testimony if they are testifying. We have done those inquiries with every officer.

The government's disclosures over the past week have included dozens of text messages between officers who were on the scene, including officers it intends to call and not call as witnesses. These were materials covered by Rule 16, Jencks and/or *Brady* and should have been disclosed much sooner. That this was not obvious to the prosecution is disturbing and should give the Court pause as to what it must do to ensure that prosecutors understand their obligations.[4]

**4. The testimony elicited by the government only clouds the facts**

The testimony of Agent Residovic did not help the government's cause. He testified that he was driving the car with Officer Liang in the passenger seat and Ms. Reid in the back. During the ride, a link to an Instagram video was sent to his phone by an ICE Agent Johnson and that he briefly watched the video. He said that the video was only a "couple of seconds," Tr. 10/10/25 at 48, a "few seconds long" Tr. 10/10/25 at 46 and that he "barely saw it." Tr. 10/10/25 at 45. He specifically remembered that the contents of the video were

---

[4] It is at least clear that had the Motion to Dismiss not been filed, this discoverable material would have remained hidden in the phones of these agents.

6

unimportant. On cross-examination, he acknowledged that the Potomac Press video was significantly longer than a few seconds and showed a portion of the incident with Ms. Reid.[5]

Agent Residovic also claimed that he was sent the link to the video directly from Agent Johnson and that he momentarily watched the video in the car. He claimed that he had sent the link to the prosecutor "in the last week sometime." Tr. 10/10/25 at 26. He believed that the link was sent to the prosecutor, AUSA Wolf, by email. Tr. 10/10/25 at 26-27. When asked whether he spoke to AUSA Dernbach about the video a few weeks earlier, Agent Residovic acknowledged that he did and that AUSA Dernbach requested that he look into his email. Tr. 10/10/25 at 29. He did not, however, provide a copy of the link to AUSA Dernbach. Tr. 10/10/25 at 31. He did not provide the link because he was "busy" and because the video was "open source that anybody can access, so the video wasn't really relevant and a lot of text messages on my phone, so I didn't think anything of it and just didn't see it." Tr. 10/10/25 at 31.

He was confronted with numerous prior statements to the prosecution contradicting his direct examination. Specifically, he was asked about statements he made around September 16 where he had told the prosecutors that the link had not previously been sent to him, that it had been sent to Officer Liang. He had also told the prosecutors that he did not have the link, that he only received it from Officer Liang in response to the defense's request. Tr. 10/10/25 at 57. He further said that he did not know the account holder of the video because the link was dead. Tr. 10/10/25 at 57. Agent Residovic denied recalling making any of these statements. Tr. 10/10/25 at 57. He also denied ever believing any of the information contained in those statements.

---

[5] Defense Exhibit 1 was 42 seconds. The video recording itself was 30 seconds.

On October 10, 2025, the government provided a text from Officer Liang to Agent Residovic from July 22, 2025 that contained a link to a Potomac Press video.



The link partially matches the link[6] that Officer Liang sent to Mr. Dernbach on August 12 and the second link provided to the defense by the prosecution on September 16.

Agent Residovic was also confronted with statements he made earlier in the week, in response to the prosecution's questions while its lawyers were drafting an opposition. He was confronted with his previous statement that he only vaguely remembered watching the video, that he viewed the video on Officer Liang's phone, and that he was driving and thus only saw the video momentarily. He had also denied that he received the link from Officer Liang or that he told the government that he received the link from Officer Liang. He denied recalling making these statements from earlier that week or believing any of the information contained in those statements. Upon viewing the video, he acknowledged it was about thirty-six seconds long. Tr. 10/10/25 at 54.

---

[6] The first part of the two links, up until the "=" sign, are the same. Counsel don't know the significance of this.

Agent Residovic also acknowledged that he did not recover the video because he "didn't see anything in the video that was criminal." Tr. 10/10/25 at 48. While he first stated that he would not recover an inculpatory video because he didn't know how, he admitted that if he saw strong evidence for the prosecution, he would reach out to others to learn how to preserve the video. He said that he did not try to learn how to preserve the video in question because it was short and because it "didn't show evidence of anything criminal." Tr. 10/10/25 at 49-50. He did not and could not express that he did not think it was possible to capture the video.

Officer Liang's testimony was somehow less illuminating. He testified that he had received only a screenshot of the video and that when he went home later that night, found the video on the internet based upon that screenshot. It was only then that he watched the video. He denied watching the video in the car at all. He said that he only spoke to the government three times about the incident and didn't recall what he had told prosecutors about the incident. But he denied ever receiving a link or showing Agent Residovic the video in the car in Ms. Reid's presence. When the government asked again on redirect whether he could say with 100 percent confidence that he did not view the video in the car, Officer Liang said that he did not remember doing so. Tr. at 10/10/25 at 76.

The Court has a heap of evidence about the Potomac Press link. A screenshot was sent to Officer Liang, Officer Liang found the video and sent it to Mr. Dernbach. The present prosecutor, apparently not having reviewed the entirety of the file and having been told by Agent Residovic that Officer Liang had shown him the video, reached out to Agent Residovic for the video. Agent Residovic solicited the video from Officer Liang. The video thus came to the defense from what appeared was two separate sources when they were both from Officer Liang.

9

The origin of the first "dead" link, which is the video no one has seen since Ms. Reid viewed it in the car, remains a mystery. The link sent from Officer Liang to Agent Residovic was the Potomac Press link and the link sent from Officer Liang to Mr. Dernbach (ostensibly the second link in Mr. Wolf's email) was also the Potomac press link – both found by Officer Liang on the internet. But then what is the source of the first link, which the government had represented was the video "shown to Agent Residovic" and was most likely the video seen by Ms. Reid?

That the government cannot explain this—its initial explanations have proven to be false—even after its repeated objections to the hearing exposing its explanations as false, is entirely the fault of the prosecution. One of the few things made clear by the government are: 1) the government did not take (and does not believe it needs to take) a supervisory role in the discovery materials in this case; 2) the government did not question law enforcement's accounts as to their opinion as to what is discoverable, even while admitting in open court its obligation to do so; 3) the government took no active role in collecting or inspecting the text messages and video in the possession of law enforcement; 4) the government did not make any meaningful efforts to collect or inspect the text messages and video in possession of law enforcement even when advised that a missing exculpatory video had been in law enforcement's possession; and 5) the government had a misunderstanding of at least its Rule 16 and more likely its *Brady* obligations when it failed to disclose the Potomac Press video, which it had in its possession since August 12 but did not produce until September 16.

5. **The government's late disclosure violated Rule 16**

The government should have disclosed the Potomac Press video as potentially exculpatory in August, when it came into its possession. It is a video of the back end of the incident—which is not in discovery—that did not show assaultive behavior by Ms. Reid and showed the officers

forcefully walking her down the stairs. Most simply put, it was information that is "favorable to the defense." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). It is hard to conceive of why a prosecutor would think otherwise.

But even if it was not *Brady*, there is no reasonable argument that the Potomac Press video was not discoverable under Rule 16, which requires production of evidence that is material to the preparation of the defense. The video was of the incident itself, a wider-angled perspective that was not contained in any other footage and focused on Ms. Reid. In *United States v. Safavian¸* Judge Friedman held:

> While it is true that the government must produce items it intends to use at trial and items that it obtained from the defendant, its obligations are not limited to those categories only; it also must disclose items that are 'material to preparing the defense.' And the government cannot take a narrow reading of the term 'material' in making its decisions on what to disclose under Rule 16. Nor may it put itself in the shoes of defense counsel in attempting to predict the nature of what the defense may be or what may be material to its preparation.

*United States v. Safavian*, 233 F.R.D. 12, 15. (D.D.C. 2005).

The D.C. Circuit has held the same, specifically rejecting the argument that inculpatory evidence is not discoverable:

> The rule as written does not compel the conclusion that inculpatory evidence is immune from disclosure. Inculpatory evidence, after all, is just as likely to assist in "the preparation of the defendant's defense" as exculpatory evidence. . . . It is just as important to the preparation of a defense to know its potential pitfalls as to know its strengths.

*United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998).

The failure to timely disclose the video, if the Court finds that it's not potentially exculpatory, is still a discovery violation. "Rule 16 is intended to provide a criminal defendant 'the widest possible opportunity to inspect and receive such materials in the possession of the Government as may aid him in presenting his side of the case.'" S*afavian*, 233 F.R.D. 12, 15. (D.D.C. 2005). The government's actions prevented the defense from doing so here.

**6. The defense was prejudiced by the government's late disclosure**

The government had Potomac Press video *two months* before trial but chose not to disclose it. The government finally provided the link to the video on September 16, four weeks before the trial date, and only because the defense inquired about a video that the defense still believes it does not have. The defense was prejudiced by this late disclosure.

Had the defense known of the Potomac Press video on August 12, 2025, it would have had sufficient time to investigate and potentially find the second exculpatory video that is the subject of the *Brady* motion. The defense only became aware that there was a second video a few weeks ago and upon viewing the video, recognized that a second video existed. Combined with the surveillance video, the defense had an investigative lead, that is a video, albeit a grainy one, of the individual taking video footage during the time Ms. Reid was confronted by Officer Liang.

Finding that individual was not possible in three weeks but two months would have allowed for, at least the possibility.[7] Then, the defense could have interviewed different potential media outlets (like Potomac Press itself) about other individuals they may have recognized at the D.C. Jail. Additional surveillance footage from across the apartment building across the street could have been sought, perhaps shedding light to the person's identity. The person was also standing beside what appears to be a Lime scooter. The defense could have subpoenaed information as to the account holder who used the scooter. But the defense was prevented from doing any of these things because of the late disclosure by the government – a late disclosure that the government did not even attempt to defend when the Court specifically asked.

---

[7] Ms. Reid was not required to choose between asserting her Speedy Trial Rights and her Fifth and Sixth Amendment rights. And given that the government had the link in its possession within the period it was required to return an indictment, the circumstances make it "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968).



### 7. Additional materials provided

In another reminder that the government does not understand its obligations, the Defense was provided additional *Brady,* Rule 16 and Jencks material on Friday, October 10. Relevant to this Motion is a text that refers to Agent Bates' perception about her use of force.



The government provided 35 screenshots of text messages on October 10 that qualified as either *Brady*, Rule 16 or Jencks material – all of which it had claimed to have already produced. What is most alarming is that the government repeatedly said in court that it had met all of its obligations. The government has consistently disavowed its supervisory role in collecting information from law enforcement and appears to distinguish items in the U.S. Attorney's Office possession from items in its agents' possession, despite well-established case law to the contrary.

13

In addition, around noon on October 13, 2025 (the day before trial is set to begin), the government informed the defense of previously undisclosed surveillance video from two cameras at the D.C. Jail. At approximately 3:45pm, the government finally disclosed the missing videos to the defense, each of which is two hours long.[8]

On July 24, 2025, the government's case agent requested DOC surveillance video from the time surrounding Ms. Reid's July 22 arrest. On July 28, a DOC administrator provided the government a USB drive with what was supposed to be the requested footage but was later revealed to be—per the government's representations—unrelated footage from the Central Cell Block. After the government informed DOC of this mistake, DOC uploaded, via USAFx, the correct footage to the government, which was purportedly received by the government on July 28. DOC has represented to the government that all five surveillance video angles were included in this production. Similarly, the government has represented to the defense that—until October 13—it had produced all surveillance footage in its possession. Both, of course, cannot be true given that the defense received these new angles in the late afternoon of October 13. As of the time of this filing, it is still not clear which party is at fault for the failure or whether there is other surveillance footage that is available and still has not yet been disclosed,[9] the government had not clarified who was at fault for this failure.[10]

---

[8] One of the defense team has still been unable to view the videos. Because of the timing of the disclosure, 3:45pm on a federal holiday, defense counsel were no longer in the office and had to attempt to access the video remotely, with limited help from support staff. The video appears to depict the first interaction between Ms. Reid and Officer Liang on the steps. The government has expressed interest in using the video at trial, even though it was before the alleged conduct. Notably, when representing its decision to not even preserve the Potomac Press video, the government claimed that it was entirely irrelevant and not discoverable because it occurred immediately after the incident.

[9] At the preliminary hearing in August, the government represented that there was no other surveillance footage from the D.C. Jail besides what had been provided to the defense.

[10] It is undersigned counsel's understanding that the DOC informed the prosecution that they provided all available surveillance video to the case agent from Homeland Security Investigations via USB drive. But it

8. **The appropriate relief**

The Court has a record for determining that the government possessed apparently exculpatory information (under *Trombetta*), willfully failed to preserve that information (under Rule 16 and *Brady*), acted in bad faith (under *Youngblood*), and prejudiced the defense by its actions (under Rule 16). The Court also has a record that this U.S. Attorney's office does not understand its obligations for collection and disclosure of evidence. This prosecution passes along blame, even when it does not know information that is in *its own* file (Officer Liang's August email about the link). And the prosecution tellingly describes the loss of potentially exculpatory evidence as "mundane," even when that loss was facilitated if not directly caused by its failure to meet its basic obligations. Yet the government still somehow fails (or feigns) to realize the potential importance of a video, with an angle not in discovery, that would have captured the incident that is factually in dispute.

This prosecution repeatedly asserted that it has fulfilled its obligations even as it continues to disclose text messages in law enforcement's possession—over 50 screenshots of text message conversations in the past week—some of which show clear bias and therefore are undoubtedly *Brady* material. And after discovering all of these new text messages, the government still has not inspected the messages on the phones of the agents – relying on their honesty, thoroughness and ability to identify what is discoverable. The prosecutors who seek to constrain Ms. Reid's liberty through this prosecution are obligated, as officers of the court, to ensure that when they say they have fulfilled their discovery obligations, they know that to be true. Indeed, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

---

is not clear whether this footage was actually disclosed or whether the failure happened once it was in the possession of HSI. Either way, this seriously prejudices the defense.

15

This duty extends not only to information in the possession of the Metropolitan Police Department, because of "the close working relationship between the Washington police and the U.S. Attorney for the District of Columbia," but also "the FBI and DEA". *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 896 (D.C. Cir. 1999) (quoting *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992)). Given the U.S. Attorney's increased working relationship with the Department of Homeland Security, and more specifically ICE[11], the Court should extend the *In re Sealed Case* and *Brooks* holdings to this prosecution and hold the government accountable for its failures.

The requirements of the federal rules and *Brady* and its progeny must mean something. "[R]ules are not mere technicalities or legal nonsense . . . but rather serve to bring order, consistency, and predictability to legal proceedings." *Ombe v. New Mexico*, 755 Fed. App'x 754, 759 (10th Cir. 2018). This interest in careful procedure is at its peak when an individual's liberty is at stake. *See Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (When a person's liberty is at stake, "[m]eticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standard of fairness."). The government argues that Ms. Reid was not prejudiced because she inquired about the missing video in September and because the video we now know was in its possession since August was on Instagram and was publicly available. But this fundamentally misunderstands the rationale underlying rules of procedure—the reliance that process creates. "Regular adherence to published rules of procedure best promotes the principles

---

[11] *See, e.g.*, Spencer Hsu, et al., "Interim U.S. attorney in D.C. mandates immigration checks on all defendants" (updated July 29, 2025) https://www.washingtonpost.com/dc-md-va/2025/07/29/pirro-mandates-dc-immigration-checks/ (last visited Oct. 13, 2025) (noting "intensifie[d] cooperation with ICE agents in the District").

of fairness, stability, and uniformity that those rules are designed to advance." *Missouri v. Jenkins*, 495 U.S. 33, 50 (1990).

The government's continuous disregard for procedure infects this case and results in an inability to predict how proceedings will progress. The government's failure to adhere to basic procedural principles should give this Court pause that it will proceed through to trial in a manner that meets essential standards of accuracy and fairness, to say nothing of efficiency.

The government in this case has fallen woefully short of its constitutional, statutory, and professional obligations. The government accused the defense of being conspiratorial in its motion to dismiss because the defense suspected there was missing evidence. *See* ECF 47 at 7. But everything that has occurred since the defense filed its motion on October 7, 2025 has done nothing but substantiate the concerns raised by the motion—that the government has not complied with its obligations. Explaining from the bench the importance of compliance with usual practice and procedure has not worked. Sanctions are not only appropriate but required. Dismissal is a harsh sanction but given the record, it is appropriate here.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Tezira Abe
Eugene Ohm
Assistant Federal Public Defenders
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
