UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,      .
                               .
          Plaintiff,           .  CR No. 25-0244 (SLS)
                               .
     v.                        .
                               .  Washington, D.C.
SYDNEY LORI REID,              .  Tuesday, October 14, 2025
                               .  9:10 a.m.
          Defendant.           .
. . . . . . . . . . . . . . . . Pages 1 through 255
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE SPARKLE L. SOOKNANAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          TRAVIS WOLF, AUSA
                             JASON FACCI, AUSA
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530

For Defendant:               TEZIRA ABE, AFPD
                             EUGENE OHM, AFPD
                             Federal Public Defender Office
                             625 Indiana Avenue NW
                             Suite 550
                             Washington, DC 20004

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

Jury Selection ....................................... 22

Government Opening Statement ........................ 175

Defense Opening Statement ........................... 181

*   *   *

TESTIMONY

EUGENIA BATES:    Direct Examination ..................... 187
                  Cross-Examination ...................... 244

*   *   *

EXHIBITS RECEIVED

Government Exhibit No. 12 ...............................197
Government Exhibit No. 18 ...............................199
Government Exhibit No. 22 ...............................202
Government Exhibit No. 3 ................................205
Government Exhibit No. 1 ................................208
Government Exhibit Nos. 11b, 11k ........................217
Government Exhibit No. 5 ................................223
Government Exhibit No. 6a ...............................234
Government Exhibit No. 9 ................................238
Defendant's Exhibit No. 5 ..............................247

*   *   *

P R O C E E D I N G S

DEPUTY CLERK:  We're on the record in criminal action 25-244, the United States of America versus Sydney Lori Reid. Beginning with counsel for the government, please approach the lectern and identify yourself for the record.

MR. WOLF:  Good morning, Your Honor.  Travis Wolf for the United States.  I'm joined by co-counsel Jason Facci and our paralegal, Manoj Kapilashrami.

THE COURT:  Good morning.

MS. ABE:  Good morning, Your Honor.  Tezira Abe on behalf of Ms. Sydney Reid.  And Mr. Eugene Ohm.  And with us at counsel table is Rhiannon Little.

THE COURT:  Good morning.  Good morning, Ms. Reid.

THE DEFENDANT:  Good morning.

THE COURT:  And who's in the gallery?

MR. WOLF:  Good morning, Your Honor.  That is Gauri Gopal.  She's a supervisor with the U.S. Attorney's Office.

THE COURT:  Okay.  Just to be clear, based on my instruction last week, you should not have a laptop out, no one from the U.S. Attorney's Office should have a laptop in the gallery.

I saw an appearance get entered this morning by someone else from the U.S. Attorney's Office, a Christine Macey.  Does she plan to sit at counsel table?

MR. WOLF:  Not for the trial but perhaps for the

1    purposes of preliminary motions.  She also just worked two

2    24-hour shifts, so she might be on her way.  But she may be

3    appearing at counsel table.

4        THE COURT:  Okay.  I just want to know for purposes of

5    introducing her during voir dire, does she plan to sit there

6    during trial.

7        MR. WOLF:  No, Your Honor.

8        THE COURT:  Okay.  And I am not going to have any

9    laptops -- just to reiterate -- in the gallery by anyone from

10   the government because we have told others attending this

11   trial who have requested to have their laptops that they are

12   not permitted.  So I just want to make sure that that does not

13   happen.

14     Okay.  So we've got our jury next door, so let's try to

15   move through what we need to as quickly as possible.  So let's

16   start with the Brady motion.  I saw the supplement that the

17   defense filed late last night.

18     Mr. Wolf, can you come to the podium?  So last week you

19   told me that when the government learned about the video from

20   Officer Liang, the AUSA searched for it online, found this

21   Potomac Press D.C. video, decided it was not exculpatory and

22   so did not disclose it.  Based on this supplement, that turns

23   out to be false.  Officer Liang actually emailed that link to

24   Mr. Dernbach back in mid-August.

25        So when did you learn that the U.S. Attorney's Office had

1    been sent the video link?

2    MR. WOLF:  Mr. Dernbach received the video link from

3    Officer Liang pursuant to that email.  When I joined the case

4    in mid-September Mr. Dernbach discussed with me just an

5    overview of the case.  He mentioned there was a video from

6    Potomac Press during that conversation.  And I joined the case

7    in around mid-September.

8    THE COURT:  Okay.  You didn't answer my question.  So

9    when did you learn that the U.S. Attorney's Office had been

10   sent the video link?

11   MR. WOLF:  When I personally learned is when -- about a

12   day or two ago when we located that email in our case files,

13   and we provided that to the defense.

14   THE COURT:  So you only searched for that email in

15   response to everything that transpired last Thursday and

16   Friday, and my orders, and you were not aware of that email

17   previously?

18   MR. WOLF:  That's correct.

19   THE COURT:  Okay.  Why did it take me ordering you to

20   go look for texts and emails for you to find that email and

21   know what was going on in a case that you're prosecuting?  You

22   stood up here and made representations to me that turned out

23   to be false.

24   MR. WOLF:  Your Honor, when I spoke with Mr. Dernbach,

25   there are two storage databases that the U.S. Attorney's

1    Offices use.  Based on my practice -- I've been a prosecutor

2    with the U.S. Attorney's Office for about four years -- the

3    bulk of the files are maintained on what's called the W drive.

4    That's what I was looking at.

5        A newer platform, which I have rarely used, is NetDocs.

6    Mr. Dernbach informed us that the emails were stored on

7    NetDocs, and that's where we began looking for them and that's

8    where we found them.  That's my error, Your Honor.  I

9    apologize.

10        THE COURT:  Okay.  Mr. Dernbach told the defense that

11    he believed he conveyed to you personally that Officer Liang

12    had emailed the Potomac Press D.C. Instagram link.  Is that

13    false?

14        MR. WOLF:  No, Your Honor.  I just do not recall that

15    during a conversation, but I do recall him mentioning the

16    Potomac Press article.  I'm not saying Mr. Dernbach didn't

17    mention it, I just don't have recollection of him bringing up

18    Officer Liang in that conversation.

19        THE COURT:  The government didn't send this to the

20    defense until they asked you for it.  Was that intentional by

21    you or by Mr. Dernbach or was that inadvertent and sloppy?

22        MR. WOLF:  I would say it was inadvertent, Your Honor.

23    And once defense counsel flagged the issue, I responded the

24    same day with what I thought they were asking for.  It's --

25    that sort of illustrates that we were not attempting to hide

1    anything from them.  We just didn't find it to be exculpatory,

2    material, or relevant to any investigation in this case, and

3    we also thought it was a public news article that they could

4    find just as easy as we could.

5        THE COURT:  I mean, you didn't even know some of this

6    existed because you didn't do your job by searching the right

7    folders in a criminal case that the government is choosing to

8    prosecute, which I just find stunning.  You stood up here last

9    week before me both on Thursday and Friday and said multiple

10   things that turned out to be false.

11       On Friday, things you told me on Thursday turned out to be

12   false based on the testimony of your own witnesses.  And then

13   over the weekend they turned out to be false based on

14   conversations with the old AUSA who handled this case.

15       And I just do not understand how an AUSA can come to court,

16   stand up here and make representations without doing the due

17   diligence to make sure that what you're telling me is true.

18   Because when we are at the point where I can't believe what

19   you're telling me because you haven't done the work to make

20   sure that they're correct before you make those statements,

21   we're in a really bad place.

22       You can sit down.

23       Mr. Ohm, Ms. Abe, can I ask you one question, please?

24       Okay.  You said you received screenshots of text messages

25   on Friday from the officer's phone, that the government said

1    it had already produced.  I take it you had not received some

2    of these text messages before Friday?

3            MR. OHM:  Correct.

4            THE COURT:  Okay.  Thank you.

5        Okay.  As everyone here knows, it's the defense's burden to

6    establish that there's been a Brady violation.  And among

7    other things, the defense must show that the government has

8    suppressed evidence favorable to the defendant.  I had

9    understood the defense to be relying on the idea that there

10    was a video that the officers viewed in the car, in Ms. Reid's

11    presence, which is the video behind the broken Instagram link.

12        The filing last night suggests that the defense is also

13    arguing that the late disclosure of the Potomac Press D.C.

14    video is a reason to dismiss the information.  I'll address

15    that later on.

16        Let me start with the second video issue.  And I will

17    preface this all by saying the government's conduct in this

18    case is extremely troubling, and I have AUSAs standing up

19    making representations that turn out to be false, which I am

20    stunned by.  And that's met with a cavalier response from the

21    government every time it comes up.

22        But it all boils down to this for me:  The defense has not

23    shown that there's a second video, one other than the

24    Instagram video that we watched in court last week, that has

25    not been given to the defense.  We heard testimony from the

two officers that were in the car with Ms. Reid.  They did not
remember much about the video they watched in the car, but
they indicated that the Potomac Press D.C. Instagram video was
the one they watched that day.

I found the text messages from that day more helpful than
their testimony, and what we saw, and those clearly showed
that both of them texted about one video, which is the Potomac
Press D.C. Instagram video that has been given to the defense.
I didn't see or hear anything during the hearing that
indicates to me that there's another video that the officers
watched in the car on that day on July 22.

Officer Residovic showed us that when you click the link he
sent, it shows that the link is broken.  And given the preview
of the video on Officer Residovic's phone, I don't think
there's any basis to think that he was sent anything other
than the Potomac Press D.C. video.  And on top of that, I saw
in the submission from last night that Officer Residovic asked
Officer Liang on July 22 what videos he had seen of the
incident, and Officer Liang appears to have sent the Potomac
Press D.C. video back in response.  So that is also consistent
with the officers only having seen one video.

I know the defense has said that Ms. Reid believes that
Instagram video was not the one the officers played in the
car.  The supplemental filing mentions two statements by
Ms. Reid on the post-arrest video.  The first is, and I quote,

1    "that doesn't show anything," closed quote, which the defense

2    believes referred to Ms. Reid seeing the Potomac Press D.C.

3    video.  The second is something like, quote, "just an

4    involuntary knee-jerk."  The defense says that this statement

5    was in response to another video the officers were watching,

6    but I don't see anything about that statement indicating that

7    Ms. Reid was responding to seeing a video rather than

8    generally professing her innocence.

9        Now, I understand Ms. Reid believes there is a second

10   video, and I understand you've both looked quite extensively

11   through the officers' text messages, and we have not found any

12   indication that the officers watched another video.

13       At this point, it's just not enough for me to go on the

14   defense's surmise about the existence of this video to agree

15   that there's some other video out there.  So because I don't

16   think there's any undisclosed video out there, based on what

17   we know, I'm not going to dismiss the information on that

18   basis.  But the existence of another video is a question of

19   fact and the jury might disagree with me.

20       If the officers had viewed a video of the incident that was

21   exculpatory, that is surely relevant.  So Mr. Ohm, Ms. Abe, I

22   will let you question witnesses about this if you choose to do

23   that, but you need to keep it within reason.  We are going to

24   start having 403 problems if we spend significant time on

25   this.

1    So next, the defense's filing raised this argument that the

2    government's late disclosure of the video supports dismissal.

3    I said at the outset it is extremely concerning to me that the

4    government had possession of this video for a month before the

5    defense asked for it.  It's also deeply concerning that at two

6    hearings last week Mr. Wolf stood up here and made

7    representations on behalf of the government that turned out to

8    be false.

9    I don't know enough at this point to determine whether

10   those representations were made in bad faith.  But even if

11   they were not, it is shocking that the government is being

12   this careless about issues that are this important in a

13   criminal prosecution.  I shouldn't have to say this.  AUSAs

14   should not stand up in court and make representations before

15   doing due diligence to ensure that those statements are true.

16   At a minimum, I should be able to believe things that the

17   government says to me when they stand up here.  And turnover

18   and case reassignments are not excuses.

19   I am shocked at the conduct of the government in this case

20   and the misrepresentations that have been made.  That said,

21   even a grossly belated disclosure does not violate Brady

22   unless the defendant suffers prejudice from the delay.  And I

23   don't agree that the defense has suffered prejudice here.  The

24   video only starts after the incident had already finished, so

25   it is not especially illuminating.  And the defense itself

1    waited several weeks from when it first became aware of these

2    issues to raise them with the Court.

3        Based on what I know at this point, I think it is probably

4    right that the late disclosure violated Rule 16, so I have to

5    weigh factors including the reasons for the delay, whether the

6    government acted in bad faith, and the degree of prejudice.  I

7    don't know enough at this point to make a finding of bad

8    faith, and like I said, I don't see much prejudice here.

9        I will note that the preferred sanction in most Rule 16

10   violation cases is a continuance of the trial, which I don't

11   think any of us want.  So I am not going to dismiss the

12   information on this basis either.

13       Okay.  Now we're going to move to this new surveillance

14   video that the government emailed about last night.  What does

15   this video show and are you telling me you want to use it at

16   trial today, having only notified me about it yesterday?

17           MR. FACCI:  Good morning, Your Honor.  I'll address the

18   new surveillance video that just came to light.  We were all

19   shocked and surprised yesterday to discover that there are two

20   additional surveillance videos from the D.C. jail in this

21   case.  During witness prep yesterday of the custodian of

22   records at the D.C. jail, we were prepping this person for her

23   testimony today on just the three surveillance videos that we

24   received in this case back on or about July 28th of this year.

25       The previous surveillance video that we received consisted

1    of three overhead angles of the incident in this case.  That

2    is all of the surveillance video that we have ever had.  We

3    served a subpoena in this case to the D.C. jail on July 28.

4    That subpoena was responded to by Correctional Surveillance

5    Center administrator Benjamin Collins.  He provided the

6    government via USAfx, our Dropbox, with the surveillance video

7    we requested, which was all CCTV footage from 6:30 p.m. to

8    8:30 p.m. on July 22.

9        We spoke with the former prosecutor in this case, Joe

10   Dernbach.  He indicated that when he got that USAfx link,

11   there were only three camera angles present in the video,

12   which were the three overhead angles that is Government's

13   Exhibit 1, which was disclosed to the defense a long time ago.

14           THE COURT:  What does the video show?

15           MR. FACCI:  The video shows two additional angles.  One

16   of the videos is from inside of the jail, inside of the staff

17   entrance, and it faces out -- most of the video captures

18   inside the jail where there's nothing going on there that's

19   related to this case, but you can see through the glass

20   window, the glass doors, the interactions between the

21   defendant and Officer Liang, and it shows -- there's no audio

22   but it shows them sort of having some kind of animated

23   conversation, and then it shows the defendant walking away

24   from Officer Liang and then around to where the stairs are in

25   this case where the incident then took place.

1    So it's a different angle of that.  The surveillance video

2    that we previously received in this case showed only a portion

3    of that, so it's just an additional few seconds of that

4    incident.

5    The second video is -- there is a surveillance camera right

6    above the door where the inmates exit the jail.  So it's a

7    shot of the officers -- it's mostly of them standing around

8    waiting for the two individuals inside the jail to exit, and

9    then they place them under arrest.  It doesn't capture really

10   Ms. Reid or anything pertinent to the incident here.  And it's

11   really just -- it's cumulative of -- there's so many officers

12   that were there that were wearing body-worn camera that that

13   shows everything that happened around that door.  So this is

14   just an additional video from slightly above their heads

15   showing what happened.

16   What we have -- through our investigation we looked into

17   this all day yesterday --

18            THE COURT:  We need to keep it moving.  I don't need to

19   understand how we got here.  I've got a jury panel waiting.

20   And again, you're bringing me this issue the night before

21   trial.  Do you plan to use or do you want to use these videos

22   at trial?

23            MR. FACCI:  We would like to, Your Honor, yes.

24            THE COURT:  Okay.  You can sit down.  Let me hear from

25   the defense.

1    Do you have an objection to the government using these

2    videos at trial?

3         MR. OHM:  Your Honor, we actually think this is another

4    Rule 16 violation.  This is video in the possession of law

5    enforcement and the United States.  The United States

6    decided -- or did not do its due diligence in collecting these

7    videos, or the record is not clear that the United States --

8         THE COURT:  You've got to slow down.

9         MR. OHM:  And so I -- I mean, we looked at this

10   video -- or I'll say I just looked at this video because

11   Ms. Abe had to record portions of the video on her iPhone and

12   send it to me because we got it on a holiday, late in the

13   afternoon, and our VPN wasn't working so we were pretty

14   prejudiced just in terms of prep.

15    But when I did see the video, I mean, we do see, it's sort

16   of a row of people walking in and out of the door during the

17   relevant periods of time that we could have interviewed,

18   because they very well could have seen the incident itself.

19   The other angles of the video don't show those individuals, so

20   we didn't know that there were actual potential eyewitnesses

21   out there.

22    We have another discovery violation that we actually -- and

23   I apologize that we couldn't alert the Court to it.  I thought

24   it was a clever strategic move on the government's part to try

25   and say they were going to admit it when, you know, it shows

1    probably less than the Potomac Press video.

2        But we would have used it.  We would have investigated

3    based upon it, and we would have done something with it.  And

4    this is clearly a Rule 16 violation and was material to

5    preparation of the defense and we are certainly prejudiced by

6    it.

7        THE COURT:  Okay.  Well, here we are.  Trial is going

8    to start.  And so the remedy would be me giving you more time

9    to go find those people, and no one wants that at this point.

10    Do you object to the government using these videos at trial?

11        MR. OHM:  I frankly have only seen -- I would like to

12    see what the government wants to use at trial before giving

13    the Court a position on that.  I haven't seen -- they're

14    each -- two hours long?  They're each two hours long so it's

15    not clear to me what the government intends to use.

16        THE COURT:  Okay.  Well, we're about to start jury

17    selection.  If you object to the videos being used, they're

18    not going to be used, because they were turned over the night

19    before trial.  And so I need your position on that because

20    that's going to be determinative.  I'm not going to let the

21    government use videos at trial that the defense got the night

22    before trial on a holiday.

23        Again, I am shocked we are here.  The government chose to

24    prosecute this defendant criminally, and you're repeatedly

25    showing up in court demonstrating to me that you're not doing

1    your jobs, you're not doing due diligence, you're not reading

2    your files, you're not talking to AUSAs when cases get turned

3    over.  Mr. Wolf is here talking about two file systems he

4    didn't understand and could only look in one place.

5        This is a criminal case that the government is choosing to

6    bring.  It's unacceptable.

7        We're going to move forward and pick a jury.  You should --

8    I don't know when you're going to have time to watch two

9    two-hour videos at this point, but I'm not going to let the

10   government put videos into evidence that you haven't even seen

11   because you got them on a holiday the day before trial was

12   supposed to start.

13       So at this point, the videos are not coming in.  You can

14   let me know your position.  And again, I'm sorry, I don't know

15   when you're going to have time to look at it, because we gotta

16   get going.

17           MR. OHM:  I guess, Your Honor, if we want them in, we

18   could try to admit them in our case.

19           THE COURT:  Okay.  That's fine.  The government cannot

20   use the videos.  If you have time to watch them tonight and

21   you want to use them, you can use them.

22           MR. OHM:  Okay.  The only one other issue I wanted to

23   alert the Court to, when we talked to Mr. Dernbach yesterday,

24   he provided evidence we consider exculpatory in terms of

25   impeachment information about Special Agent Bates.  We asked

1    him to provide us anything that we need to do to make sure

2    that we call him to the stand, including *Touhy* regulations and

3    letters and whatnot.  We hadn't heard from either him or the

4    government about that, so our understanding is that he's ready

5    to testify and that there's nothing else we need to do.

6        THE COURT:  Okay.  I will confirm that.  Mr. Wolf,

7    Mr. Facci, is Mr. Dernbach going to be available to testify?

8        MR. WOLF:  Yes.  We had discussions about scheduling,

9    and I think this also came up in a conversation that Mr. Ohm

10    had.  But he could be available.  I also --

11        THE COURT:  Okay.

12        MR. WOLF:  Yes.

13        THE COURT:  Great.  Now, your email last night to me

14    also noted that you wanted to discuss the preliminary jury

15    instructions and the elements, specifically that the jury be

16    instructed on the elements in the dysjunctive rather than the

17    conjunctive.  I've never circulated any instructions to you

18    guys in the conjunctive.  The only document using that is your

19    own superseding information.  So what are you referring to?

20        MR. WOLF:  I'm going to defer to Mr. Facci.

21        THE COURT:  Okay.

22        MR. WOLF:  Court's indulgence.

23        THE COURT:  You filed a superseding information last

24    week that charges this defendant, saying forcibly assault,

25    resist, oppose, impede, intimidate and interfere.  It's the

1    only document in this case, it's your own document, using the

2    conjunctive.  So what's the issue?

3          MR. FACCI:  Your Honor, I'm trying to pull up the

4    instructions that the Court sent to us last night.  But the

5    elements of the offense state that the government needs to

6    prove that, for example, the defendant forcibly assaulted,

7    resisted Officer -- or Ms. Bates and Officer Liang.  And we

8    just want to be able to prove our case.  If we show that there

9    was an assault that occurred with just one of those officers,

10    that that still warrants a conviction --

11          THE COURT:  Why does your information use "and"?  Your

12    information charges her with -- it says:  On or about July 22,

13    2025, within the District of Columbia, Sydney Lori Reid did

14    forcibly assault, resist, oppose, impede, intimidate, and

15    again, *and* interfere -- you're saying she did all of those

16    things -- with an officer and employee of the United States,

17    Special Agent EB, and Officer VL, while such person was

18    engaged in and on account of the performance of official

19    duties.

20          MR. FACCI:  Yes, Your Honor.  That is the way we always

21    draft pleadings.  They're always in the conjunctive to put the

22    defendant on notice that these are all things they should be

23    aware of.  There's a case, *United States v. Haymes*, 1610

24    F.2d --

25          THE COURT:  Why are you bringing this up the night

1      before?  I circulated preliminary instructions last week.  On

2      Friday you showed up and told me you had no issue with them.

3      So if this was about an issue that was in prior drafts, why

4      are you bringing it up the night before?

5              MR. FACCI:  Well, Your Honor, I think it's important

6      that -- we don't necessarily need to change the instruction,

7      but I think the jury needs to know that --

8              THE COURT:  Okay.  If you're not asking me -- are you

9      asking me to change anything in the instructions that I

10     circulated the final version of last night?

11             MR. FACCI:  Yes, Your Honor.  I think it would make --

12             THE COURT:  You just said to me you're not necessarily

13     asking me to change any instruction.

14             MR. FACCI:  Well, the government's preference would be

15     to just change the "and" to an "or" because we do not need to

16     prove that there were two assaults here, that there was just

17     one.  If the Court is not inclined to change the jury

18     instructions, we would just ask that the jury be put on notice

19     that they only need to find that Ms. Reid forcibly resisted,

20     assaulted, interfered with -- either one of the officers would

21     constitute a crime.

22             THE COURT:  So your policy as an office is to write

23     informations in the conjunctive, so charging this defendant

24     with doing all of those things with respect to both officers,

25     even though you're not required to prove that the defendant

1    did all of those things as to both officers.

2              MR. FACCI:  Yes.  That is in the Justice manual, Your

3    Honor.

4              THE COURT:  Okay.  I will take that under advisement.

5    Any other issues with the jury instructions?

6              MR. OHM:  Not on behalf of the defense.

7              THE COURT:  Okay.  I'm just going to go over the

8    process for jury selection, and we're going to get started.

9         So we're going to seat everyone in the gallery.  I will ask

10   the 20 questions we all agreed on.  We'll then bring the first

11   14 jurors to the jury room.  The rest of the jurors will stay

12   next door.  We'll bring the jurors in one at a time.  They

13   will sit in the witness box.  I'll ask them questions.

14        If there is someone I'm inclined to excuse based on their

15   responses, I will say "Any objection?"  That means any

16   objection to excusing a juror.  If you want to try to

17   rehabilitate a juror, you can go ahead, but otherwise say no

18   and we'll excuse that person.

19        If you want to move to strike someone for cause, you need

20   to do it before the next juror comes in, and we'll address it

21   then.  As I said last week repeatedly, I'll give you a chance

22   to ask follow-up questions.  You cannot ask new questions.

23   You cannot ask questions I have already asked.  And if it

24   begins to be too much, I will stop letting you ask questions.

25        When we qualify 22 jurors, I'll bring everyone in.  We'll

1    put 1 through 14 in the box.  You'll do simultaneous strikes,

2    three each.  I will give you 10 minutes to do your strikes.

3    And I will remind you not to strike 5 and 11 because those are

4    the alternates.  We'll then refill the box after the strikes.

5    You'll get your one alternate strike, and you'll have five

6    minutes to do that.  The reason we do it in two steps is

7    otherwise you wouldn't know who the potential alternate

8    replacements are.  Any questions about the process?

9         MS. ABE:  Not from the defense.

10         MR. WOLF:  Not from the government.

11         THE COURT:  All right.  We'll get started.

12      (Jury panel enters.)

13         THE COURT:  All right.  Good morning, everyone.

14    Thank you so much for being here today.  I'm Judge Sparkle

15    Sooknanan, and I'm going to take a minute to introduce you to

16    my courtroom staff, who are the ones who keep everything

17    running around here and help me do my job.

18      So you've already met Nicole Bell-Norwood.  She's my

19    courtroom deputy and will be here with me throughout today and

20    the rest of this week.

21      My court reporter here is Mr. Bryan Wayne.  You'll see him

22    capturing everything that's happening so we have a record

23    during the case.  My law clerk right here is Daniel Lawrence.

24    And you'll see others coming in and out of the courtroom

25    trying to help us.  They are all working to make sure we get

 1    everything done and we get it done correctly.

 2        So the point of this process is to ensure that we get a

 3    fair and impartial jury that can fairly and attentively decide

 4    this criminal case.  You each have index cards and pens.  I'll

 5    ask you again, even though I know Ms. Bell-Norwood just

 6    checked, make sure everyone has an index card and a pen.  If

 7    you don't have both an index card and a pen, raise your hand.

 8        Okay.  So if you haven't done that already, I want you to

 9    write down in the upper right-hand corner of your card the

10    last four digits of your jury number.

11        I'm going to ask you a series of questions, but before I do

12    that, I'm going to have you sworn in.

13        DEPUTY CLERK:  If you could all please raise your right

14    hand.

15        (Jury panel is sworn.)

16        THE COURT:  Thank you.

17        So I'm going to ask you 20 questions.  They're all yes or

18    no questions.  If you have a yes answer to any particular

19    question, I want you to write down just the number of that

20    question on your card.  So I'll say that again:  I will read

21    20 questions, and if the answer to any question that I ask is

22    yes, please just write the number of that question on your

23    card.

24        At the end you may have a bunch of numbers, you may have a

25    couple numbers, or you may have no numbers at all; it all

1    depends on your personal circumstances.  When we're done with

2    that process, I am going to clear the courtroom other than the

3    attorneys and my staff, and I will bring you up here one at a

4    time, and I'll ask you why you've answered certain questions

5    or didn't answer certain questions.  And the reason I clear

6    the courtroom to do this is to protect your personal privacy.

7        So let me tell you what this case is about briefly.  This

8    is a criminal case.  The defendant, Sydney Reid, is charged

9    with one count of assaulting, resisting, or impeding certain

10   officers or employees.  On or about July 22, 2025, law

11   enforcement agents with the Federal Bureau of Investigation

12   and Immigration and Customs Enforcement were present outside

13   of the central detention facility located in the District of

14   Columbia to take into their custody two individuals charged

15   with illegally entering or remaining in the United States.

16       The government alleges that the defendant, Sydney Reid,

17   forcibly resisted, impeded or interfered with FBI Agent

18   Eugenia Bates or Immigration and Customs Enforcement Officer

19   Vincent Liang as the agents were taking the individuals into

20   custody.  The defendant, Sydney Reid, denies that she

21   committed the crime alleged.

22       So now I'm going to read the 20 questions.

23       Question No. 1.  Do you know or have you heard anything

24   about this case?  So if the answer is yes, you just write "1"

25   on the card.

1    Question 2.  Is there anything about the charges or

2    circumstances of this case that might make it difficult for

3    you to be a fair and impartial juror?

4         PROSPECTIVE JUROR:  Would you repeat that, please?

5         THE COURT:  Yes.  Question 2.  Is there anything about

6    the charges or circumstances of this case that might make it

7    difficult for you to be a fair and impartial juror?

8    Question 3.  I am Judge Sparkle Sooknanan.  My courtroom

9    deputy is Nicole Bell-Norwood.  The court reporter is Bryan

10   Wayne.  My law clerk is Daniel Lawrence.  Do you know or

11   recognize me or any member of the court staff?

12   Question 4.  Do you know any of the other members of the

13   jury panel from before today?  So look around the room, if you

14   recognize anyone else on the panel, write down "4."

15   Question 5.  The government is represented by Assistant

16   U.S. Attorneys Travis Wolf and Jason Facci, and they're joined

17   by Manoj Kapilashrami.  The defendant is represented by

18   assistant federal public defenders Eugene Ohm and Tezira Abe,

19   and they are joined by Rhiannon Little.  The defendant is

20   Sydney Reid.  Do you know any of these people?  If the answer

21   is yes, you write "5."

22   No. 6.  I will now ask both the government and the

23   defendant's attorneys to identify the names of people or

24   entities you may hear from or about during this trial.

25   Government, could you please read your list.

1          MR. WOLF:  Good morning.  I am AUSA Travis Wolf.  You

2     may hear from the following people or regarding the following

3     people in this case:  Officer Vincent Liang, Immigration and

4     Customs Enforcement; Special Agent Eugenia Bates, Federal

5     Bureau of Investigation; Special Agent Jason Jankovitz,

6     Federal Bureau of Investigation; Special Agent Charles

7     Craddock, Immigration and Customs Enforcement; Andrea Beverly,

8     monitoring specialist, Department of Corrections; Benjamin

9     Collins, monitoring specialist, Department of Corrections;

10    Special Agent Abdul Majeed, Homeland Security Investigations;

11    Special Agent Michael Molina, Homeland Security

12    Investigations; Agent Dinko Residovic, Immigration and Customs

13    Enforcement; Agent John Parodi, Immigration and Customs

14    Enforcement; Special Agent Braden Harter, Federal Bureau of

15    Investigations; Officer Jason Klepec, Immigration and Customs

16    Enforcement; Special Assistant United States Attorney Joseph

17    Dernbach; Investigator Sean Ricardi; Investigator Neil

18    D'Cunha; Investigator Terrence Hubbard; and Investigator Chad

19    Byron.

20          THE COURT:  Thank you.  Would the defense read its

21    list.

22          MS. ABE:  Good morning.  For the defense you may hear

23    from Jessica Mason, Katie Campbell-Morrison, and/or Daniela

24    Palta.

25          THE COURT:  Okay.  Do you know any of these potential

witnesses?  And if the answer is yes, you just write a "6" on
your card.

Question No. 7.  Have you or one of your close friends or
relatives ever gone to law school, worked as a lawyer or
worked in a law office?

Question No. 8.  Have you or one of your close friends or
relatives worked for any prosecutor's office or law
enforcement?  Working in law enforcement would include working
as a police officer, in a sheriff's office, a federal law
enforcement agency like the Federal Bureau of Investigation or
FBI or any prosecutor's office.

Question No. 9.  Have you or one of your close friends or
relatives worked for the public defender service, the federal
defender office or a criminal defense attorney?

Question No. 10.  Have you or one of your close friends or
relatives ever been arrested for, convicted of, or charged
with a crime or been a victim of or witness to a crime?

Question No. 11.  There will be testimony from law
enforcement personnel in this case, including from agents
employed by Immigration and Customs Enforcement, or ICE, and
the Federal Bureau of Investigation, or FBI.  Do you have
strong feelings about the police, ICE, or the FBI, either
positive or negative, that would make it difficult for you to
be a fair juror in this case?

Question No. 12.  The defendant has entered a plea of not

1    guilty and denied criminal involvement concerning the charge.

2    Do you believe that simply because a charge is prosecuted by

3    the United States Attorney's Office, the charge is probably

4    correct and the defendant is probably guilty?

5        Question No. 13.  The government has the burden of proof in

6    this matter.  The defendant is not required to present

7    evidence or testify.  Do you think that you might hold it

8    against the defendant or infer that she is guilty if the

9    defendant does not present evidence or testify at trial?

10       Question No. 14.  If selected as a juror, would you have

11   difficulty accepting and applying the rule of law that in a

12   criminal case a defendant is presumed innocent unless the

13   government proves guilt beyond a reasonable doubt?

14       Question No. 15.  The law requires that jurors weigh the

15   evidence in a case and reach a verdict based solely on the

16   admitted evidence and instructions of law without regard

17   whatsoever for what the potential punishment may or may not

18   be.  Would you have any difficulty at all following this

19   principle?

20       Question No. 16.  Have you ever served on a grand jury

21   before?

22       Question No. 17.  Have you had an experience as a juror in

23   a prior criminal case that would affect your ability to be a

24   fair juror in this trial?

25       Question No. 18.  This case is expected to last one week.

1    Would serving as a juror in this case be an extreme hardship?

2    And in answering that question, please note that in light of

3    the government shutdown, after tomorrow, October 15, the court

4    will not be able to provide the usual stipend that eligible

5    jurors receive during the trial until funding is restored.

6    Jurors typically receive $50 per day approximately every 10

7    days while trial is proceeding.  And again, after tomorrow,

8    October 15, your payment will be delayed until the government

9    shutdown is over.

10       So with that in mind, would serving as a juror in this case

11   be an extreme hardship to you?  And that's question 18.

12       Question 19.  Do you have a health or physical problem that

13   would make it difficult to serve on this jury?

14       Question No. 20.  My final question is what I call my

15   catch-all question.  Is there any other reason that I have not

16   asked about that might make it difficult for you to sit

17   fairly, impartially, and attentively as a juror?  Perhaps you

18   have a religious, moral, or philosophical reason that you

19   believe would make it hard for you to be fair.  In sum, is

20   there some other reason that would make it difficult for you

21   to sit as a fair and impartial juror in this case?  And that's

22   question 20.

23       Okay.  Thank you.  We'll now collect your cards.  And while

24   we're doing that, let me say one last thing before I send you

25   out of this room.  As you're waiting for your turn to come

1    back and speak with us, you are allowed to use your phones,

2    read or talk quietly with each other, but it is very important

3    that you not talk about or do any investigation about this

4    case.  That means that you can't Google anything about me, the

5    lawyers, the defendant, the case, or anything.

6        You can chat with other members about the weather or

7    anything else unrelated to this case, but you cannot ask

8    questions about this case or talk about your opinions about

9    what is happening.  Those will also be the rules if you're

10   selected for the jury, but I wanted to let you know that now

11   since I'm going to have you leave the room and speak with you

12   one at a time.

13       (Jury panel exits.)

14           DEPUTY CLERK:  All right.  Juror No. 1906 is first up.

15       (Juror 1906 steps up.)

16           THE COURT:  Hello.  Tell me your juror number again?

17           PROSPECTIVE JUROR:  1906.

18           THE COURT:  Okay.  So you marked the hardship question.

19   Tell me why you think sitting will be a hardship.

20           PROSPECTIVE JUROR:  I have appointments, doctor,

21   medical appointments this week and next week.  And then I also

22   have -- I'm a manager at work and we just launched a platform

23   and I feel like there's a lot of stress going on at work at

24   the moment.

25           THE COURT:  So tell me, your appointments for this

1    week, are you able to move them?

2         PROSPECTIVE JUROR:  It's possible.

3         THE COURT:  Okay.  So you would -- they're all

4    appointments that you can reschedule if you get selected?

5         PROSPECTIVE JUROR:  Mm-hmm.

6         THE COURT:  Okay.  And then at work, tell me what you

7    do and why you think it would be especially a hardship for you

8    to not be there this week.

9         PROSPECTIVE JUROR:  Sure.  I'm a program manager.  I

10   work for the District of Columbia.  And I have -- we just

11   launched a new platform last week and we're in the middle of

12   training, getting everybody in compliance with the new

13   platform.  So I work at the District.  I enforce the D.C.

14   code, construction code.  So we're trying to get everybody on

15   board with that.

16        THE COURT:  Okay.  And are there others on your team

17   that are working on the launch as well, or is it only you?

18        PROSPECTIVE JUROR:  I'm the only manager working on it,

19   but I have others on the team.

20        THE COURT:  You have others on your team.  And I'm

21   asking just because often jury service is an inconvenience to

22   everyone work-wise, so I'm just trying to figure out if there

23   are others who can handle it if you were selected.  And it

24   sounds like they can.

25        PROSPECTIVE JUROR:  It's possible, it's possible.  One

1     week is reasonable.

2          THE COURT:  Okay.  And then No. 7 you answered yes to.

3     And that's have you or close friends or relatives ever gone to

4     law school.  Tell me who's a lawyer.

5          PROSPECTIVE JUROR:  Yes.  My brother is a lawyer and my

6     aunt is a lawyer.

7          THE COURT:  Okay.  And does either of them do criminal

8     law?

9          PROSPECTIVE JUROR:  My aunt does criminal law.

10          THE COURT:  What does she do?

11          PROSPECTIVE JUROR:  Honestly, I don't know.

12          THE COURT:  Okay.  So you've never talked to her about

13     her work?

14          PROSPECTIVE JUROR:  Not really.  I mean, she talks

15     about it, but I don't remember.  She deals a lot with like

16     accidents, automobile accidents.  She also deals with I think

17     a level of immigrants or immigration, but I'm not sure.

18          THE COURT:  Does she have her own practice or does she

19     work at a firm?

20          PROSPECTIVE JUROR:  She retired.  She had her own

21     practice in Maryland.

22          THE COURT:  Okay.  Any questions for this witness?

23          MR. WOLF:  No, Your Honor.

24          THE COURT:  Okay.  Thank you.

25          (Juror 1906 steps down.  Juror 2017 steps up.)

```
 1              THE COURT:  Good morning.

 2              PROSPECTIVE JUROR:  Good morning.

 3              THE COURT:  Tell me your juror number again?

 4              PROSPECTIVE JUROR:  2017.

 5              THE COURT:  Okay.  So you marked No. 7.  You or a close

 6         friend or relative is a lawyer.

 7              PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  Tell me who.

 9              PROSPECTIVE JUROR:  I have a couple.  Do you want the

10         names --

11              THE COURT:  No, no.  Just what's their relation to you?

12              PROSPECTIVE JUROR:  I have a few that I went to grad

13         school, and then I have a few that are like in my close circle

14         of friends that I see about once a week.

15              THE COURT:  And do they do criminal law?

16              PROSPECTIVE JUROR:  No.

17              THE COURT:  Okay.  All right.  Any questions for this

18         witness?

19              MR. WOLF:  Just briefly.  It says you're an engineer;

20         is that correct?

21              PROSPECTIVE JUROR:  Yes.

22              MR. WOLF:  Who do you work for?

23              PROSPECTIVE JUROR:  Right now I support the Department

24         of Defense, the Space Force, Space Systems Command.

25              MR. WOLF:  Thank you.
```

1            MR. OHM:  I'm sorry.  I couldn't hear what you said.

2     You support what?

3            PROSPECTIVE JUROR:  As a civilian I support the Space

4     Force, its Space Systems Command.

5            MR. OHM:  How long have you had that job?

6            PROSPECTIVE JUROR:  I would say since 2019, but I've

7     been a DOD contractor since 2006.

8            MR. OHM:  Thank you.

9            THE COURT:  Okay.  And do you believe you can be a fair

10    juror in this case?

11           PROSPECTIVE JUROR:  Yes.

12           THE COURT:  Okay.  Thank you very much.

13        (Juror 2017 steps down.  Juror 1205 steps up.)

14           THE COURT:  Good morning.

15           PROSPECTIVE JUROR:  Good morning.

16           THE COURT:  Can you tell me your juror number.

17           PROSPECTIVE JUROR:  1205.

18           THE COURT:  Okay.  So you marked a couple questions

19    here, including No. 2.  Tell me what you think about this case

20    would make it difficult for you to be fair.

21           PROSPECTIVE JUROR:  You did mention something about

22    customs and immigration.  I have very bad views of them,

23    especially because it affected my life personally.  So I think

24    it's going to make it hard for me to make it a fair case if I

25    get selected.

```
1              THE COURT:  Okay.  And can you share what it is that
2       has happened --
3              PROSPECTIVE JUROR:  Yes.
4              THE COURT:  -- that's led to you having those feelings.
5              PROSPECTIVE JUROR:  So, yeah.  So just last month I had
6       my... I'm so sorry.
7              THE COURT:  Okay.
8              PROSPECTIVE JUROR:  My cousin and my aunt were taken,
9       and it really affected me.  And that's why I also said No. 18
10      as well, because it's affected my mother, my father.  They
11      don't bring the same income as before because they've stopped
12      working because of the fear.
13             THE COURT:  I'm very, very sorry about that.
14             PROSPECTIVE JUROR:  I'm sorry.
15             THE COURT:  No.  And I'm sorry to have you deal with
16      that here in court.  I'm really sorry that has happened.
17         Any objection?
18             MR. WOLF:  No, Your Honor.
19             MS. ABE:  None from the defense.
20             THE COURT:  Thank you for being here.  I am very sorry
21      about what has happened to your family.  And you're excused
22      and you can leave.
23             PROSPECTIVE JUROR:  Thank you.
24         (Juror 1205 steps down.  Juror 1444 steps up.)
25             THE COURT:  Hello.  Good morning.
```

1          PROSPECTIVE JUROR:  Good morning.

2          THE COURT:  Tell me your juror number.

3          PROSPECTIVE JUROR:  1444.

4          THE COURT:  Okay.  So you marked No. 10.  Tell me what

5     led to you marking No. 10 that you or one of your close

6     friends or relatives have been arrested, convicted of, charged

7     with a crime or been a victim or witness of a crime.

8          PROSPECTIVE JUROR:  Yeah.  My house was robbed twice

9     when I was a child.  So I guess I'm the victim of a crime is

10    the reason I...

11         THE COURT:  Okay.  Did they ever apprehend the person

12    who robbed your house?

13         PROSPECTIVE JUROR:  I don't think so.

14         THE COURT:  Okay.  Do you think anything about that

15    incident would make it hard for you to be a fair juror in this

16    case?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Okay.  Tell me what you do for a living.

19         PROSPECTIVE JUROR:  I'm an archivist.

20         THE COURT:  Okay.  Any questions for this juror?

21         MR. WOLF:  Yes.  Very briefly.  Sorry to revisit old

22    memories about a house break-in, I apologize, but how old were

23    you in when this happened?

24         PROSPECTIVE JUROR:  I was in high school one of the

25    times and like eight the other time.

1              MR. WOLF:  Did you have any discussions with the police

2         when it happened?

3              PROSPECTIVE JUROR:  I was interviewed briefly by the

4         police the second time about, like, what was stolen.

5              MR. WOLF:  Do you have any feelings about how the

6         police handled the investigation?

7              PROSPECTIVE JUROR:  No.  I don't remember it super well

8         at this point.

9              MR. WOLF:  Fair enough.  Thank you.

10             THE COURT:  Anything from the defense?

11             MR. OHM:  No, Your Honor.

12             THE COURT:  And again, you think you can be a fair

13        juror in this case notwithstanding the --

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Okay.  Thank you very much.

16          (Juror 1444 steps down.  Juror 1163 steps up.)

17             THE COURT:  Good morning.  Tell me your juror number.

18             PROSPECTIVE JUROR:  1163.

19             THE COURT:  So you marked the hardship question.  Tell

20        me what's the hardship.

21             PROSPECTIVE JUROR:  It's not a financial hardship, but

22        I have been, for my job, I've been studying for my

23        certification, and I have the test next Friday.  I've been

24        studying for the last six months.  So it would really get in

25        the way, appearing on the jury.

1          THE COURT:  What's your job and what's the

2     certification?

3          PROSPECTIVE JUROR:  Interior designer.  And my

4     certification is for the NCIDQ test.  This is one of the three

5     tests I have to study for, and this is the first test and I've

6     been -- I've rescheduled it already just to work around the

7     jury summons, but now it's really getting in the way.

8          THE COURT:  So your test is when?

9          PROSPECTIVE JUROR:  The 24th.

10         THE COURT:  Okay.  So you think serving on the jury

11    this week will impede your ability to take the test next

12    Friday?

13         PROSPECTIVE JUROR:  So the jury -- because I will need

14    to be -- I'm also studying during this time as well, like

15    during the day.

16         THE COURT:  So you think if you sit on the jury this

17    week, you will not be able to take the test next Friday?

18         PROSPECTIVE JUROR:  I actually thought the jury was

19    next week.  I didn't think --

20         THE COURT:  No, no.  So we would start today right

21    after we finish with jury selection, and I expect it will wrap

22    up this week.  So do you think that serving on the jury this

23    week will make it difficult for you to take your test next

24    Friday?

25         PROSPECTIVE JUROR:  I should be -- no, I should be fine

1        in terms of that.

2              THE COURT:  Okay.  Let me see.  So you also marked

3        No. 11 about your feelings about the police, ICE, or the FBI.

4        Tell me about that.

5              PROSPECTIVE JUROR:  I just have some strong feelings

6        about them being in D.C., and I find that it will be very hard

7        for me to be impartial.  And morally I feel like I will

8        struggle with a decision, like, having to serve on the jury

9        for that.

10             THE COURT:  So tell me a little bit more about that.

11       So you have strong feelings about them, them, the law

12       enforcement, being in D.C.  Do you think those feelings would

13       make it hard for you to listen to the evidence in this case,

14       listen to my instructions that I will give about the law, and

15       be fair and impartial in this particular case?

16             PROSPECTIVE JUROR:  I think it will.

17             THE COURT:  Tell me why.

18             PROSPECTIVE JUROR:  I just -- just morally I feel like

19       the ethics that I live by, I feel like that would be something

20       I would struggle with, making that decision.

21             THE COURT:  So when you say the ethics that you live

22       by, if you hear evidence in this case and I instruct you on

23       the law and you decide based on that that this defendant is

24       guilty, are you saying that you would not be able to render a

25       fair verdict because of your moral feeling?

```
 1              PROSPECTIVE JUROR:  I don't think I'll be able to.
 2              THE COURT:  Okay.  Any objection?
 3              MR. WOLF:  No, Your Honor.
 4              MS. ABE:  None from the defense.
 5              THE COURT:  Okay.  You're excused.
 6         (Juror 1163 steps down.  Juror 2136 steps up.)
 7              THE COURT:  Good morning.
 8              PROSPECTIVE JUROR:  Good morning.
 9              THE COURT:  How are you?  Tell me your juror number.
10              PROSPECTIVE JUROR:  2136.
11              THE COURT:  So I don't see anything on your card here.
12         Tell me why you didn't mark any answers.
13              PROSPECTIVE JUROR:  I don't have any reservations.
14              THE COURT:  Okay.  Tell me what you do for a living.
15              PROSPECTIVE JUROR:  I'm a creative.  In terms of
16         artistic.
17              THE COURT:  Okay, great.  And you think you can be a
18         fair juror in this case?
19              PROSPECTIVE JUROR:  I think I can.
20              THE COURT:  Okay, great.  Any questions for this
21         witness?
22              MR. WOLF:  Good morning, ma'am.
23              PROSPECTIVE JUROR:  Good morning.
24              MR. WOLF:  You say you're a creative artist.  What kind
25         of art do you produce?
```

```
 1              PROSPECTIVE JUROR:  Fiber art, collage, painting.  Just
 2        art in general.  Sewing, hand-stitching, mending.
 3              MR. WOLF:  Thank you.
 4              THE COURT:  Anything from the defense?
 5              MS. ABE:  Nothing.  Thank you.
 6              THE COURT:  Okay.  Thank you very much.
 7          (Juror 2136 steps down.  Juror 1309 steps up.)
 8              THE COURT:  Good morning.
 9              PROSPECTIVE JUROR:  Good morning.
10              THE COURT:  Tell me your jury number.
11              PROSPECTIVE JUROR:  1309.
12              THE COURT:  Okay.  You marked the hardship question.
13        Tell me, what's the hardship?
14              PROSPECTIVE JUROR:  It's not a financial hardship but
15        I'm going to a menopause conference that I booked last spring.
16        I'm leaving Tuesday and I booked the registration fees, the
17        hotel, and I'm leaving Tuesday morning.
18              THE COURT:  Next Tuesday morning?
19              PROSPECTIVE JUROR:  Yes.
20              THE COURT:  Okay.  Well, we are expected to wrap up
21        this week.
22              PROSPECTIVE JUROR:  Okay.
23              THE COURT:  So I don't think that should be a problem.
24        Great.  So you also marked question 2.  Tell me what about
25        this case would make it hard for you to be a fair and
```

1    impartial juror?

2        PROSPECTIVE JUROR:  I think you had mentioned that it

3    involved ICE.  I'm just very -- I've lived in this city for

4    two years.  I consider this my home.  And I take care of a lot

5    of D.C. residents.  My three kids were born here.  And since

6    January the city has changed, and I'm very distraught about

7    it, and I would like them to be gone, like most D.C.

8    residents.  And they really changed the culture and I found

9    that the city is very unsafe with them here.  And I moved here

10    because I felt very warm and welcome in this city and just not

11    that anymore.

12        THE COURT:  I understand that.  Would that affect your

13    ability to be fair in this case?  You'll hear evidence about

14    this defendant, you'll hear instructions from me on the law.

15    And would you be able to look at the evidence in this case and

16    be fair as to this defendant?

17        PROSPECTIVE JUROR:  I think I could.

18        THE COURT:  Okay.  You marked No. 7.  Tell me, who are

19    the lawyers in your life?

20        PROSPECTIVE JUROR:  Oh, you had asked if we had worked,

21    it was like in the '90s when I worked in a law firm when I was

22    deciding whether to do medicine or law.  That was it.

23        THE COURT:  What type of law did you do?

24        PROSPECTIVE JUROR:  Oh, I didn't do law.  I was

25    deciding between the two.

1          THE COURT:  And you picked the better course?

2          PROSPECTIVE JUROR:  I quickly learned I was not going

3     to be a lawyer.

4          THE COURT:  Did you work in a criminal law office?  Or

5     do you remember?

6          PROSPECTIVE JUROR:  I've worked for -- I don't even

7     remember.  It was so long ago.  And I didn't even like it.  So

8     I couldn't even tell you.

9          THE COURT:  Okay.  And then you also marked No. 11

10    about strong feelings about the police and ICE.  And is that

11    the same that we talked about earlier?

12         PROSPECTIVE JUROR:  It's the same.

13         THE COURT:  So tell me what you do for a living now.

14    Not law.  Lucky for you.

15         PROSPECTIVE JUROR:  I'm a gynecologist.

16         THE COURT:  And so, you know, you've heard what this

17    case is about and we talked a little about it.  Do you think

18    you can be a fair juror in this case, listen to the evidence

19    from the government, listen to any evidence from the defense,

20    listen to my instructions and be fair in this particular case

21    notwithstanding any feelings you have about presence in D.C.

22    of police?

23         PROSPECTIVE JUROR:  I think I could.

24         THE COURT:  Any questions?

25         MR. WOLF:  Yes, Your Honor.  Very briefly.  Good

1    morning, ma'am.  Do you think that you would be less likely to

2    believe testimony from an ICE agent just because that person

3    is an ICE agent, or would you not feel any way about it?

4          PROSPECTIVE JUROR:  That's a hard question.  Honestly,

5    I've been -- I can't believe I'm saying this in the courtroom,

6    but I don't trust the government like I used to.  So that's

7    become very hard for me in the last 10 months.

8          THE COURT:  Let me ask you this.  If an agent

9    testifies, would you be able to listen to that testimony and

10    decide based only on what happens in this courtroom what you

11    think about this case?  Can you be fair or do you think that

12    the fact that there is an ICE agent testifying or the fact

13    that it's someone testifying on behalf of the government would

14    cloud your ability to look at these facts in this case and be

15    fair?

16          PROSPECTIVE JUROR:  I think I could.

17          THE COURT:  Okay.  Anything else, Mr. Wolf?

18          MR. WOLF:  Nothing further.

19          THE COURT:  Anything from the defense?

20          MS. ABE:  Nothing from the defense.  Thank you.

21          THE COURT:  Okay.  Thank you.

22      (Juror 1309 steps down.)

23          MR. WOLF:  Your Honor, just very briefly, I just want

24    to make a record just about the juror's demeanor, that there

25    was a pause and a lot of consideration in response to my

1    question.  That's it.

2        THE COURT:  Yeah.  And I thought that was noteworthy

3    too.  I think she paused and thought about it, which showed

4    that she was thinking about the questions you were asking,

5    what I was asking, and was very thoughtful about her ultimate

6    response that she can be a fair juror in this case.  And I

7    found that to be equivocal and appreciated that she paused and

8    thought about it and didn't sort of just give a response.  So

9    I don't have concerns, but do you?

10        MR. WOLF:  No.  I just wanted to note that for the

11    record.

12        THE COURT:  Okay.  Anything from the defense?

13        MS. ABE:  No, Your Honor.  Thank you.

14        THE COURT:  Okay.  Let's move on.

15      (Juror 1630 steps up.)

16        THE COURT:  Good morning.

17        PROSPECTIVE JUROR:  Good morning.

18        THE COURT:  Tell me your juror number.

19        PROSPECTIVE JUROR:  1630.

20        THE COURT:  Okay.  So I don't have anything on your

21    card other than your juror number.  Tell me why.

22        PROSPECTIVE JUROR:  None of the questions, I had no yes

23    answers to.

24        THE COURT:  Okay.  What do you do for a living?

25        PROSPECTIVE JUROR:  I'm a data scientist at Fannie Mae.

1          I work in appraisal modernization.

2                  THE COURT:  How long have you been there?

3                  PROSPECTIVE JUROR:  Eight years.

4                  THE COURT:  And you think you can be a fair juror in

5          this case?

6                  PROSPECTIVE JUROR:  I think so.

7                  THE COURT:  Okay.  Any questions?

8                  MR. WOLF:  No, Your Honor.

9                  MS. ABE:  Good morning, Mr. ███.

10                 PROSPECTIVE JUROR:  Yes.

11                 MS. ABE:  How long have you lived in D.C.?

12                 PROSPECTIVE JUROR:  Just about eight years, as long as

13         I've worked here.

14                 MS. ABE:  Awesome.  Thank you so much.

15                 THE COURT:  Okay.  Thank you very much.

16            (Juror 1630 steps down.  Juror 0374 steps up.)

17                 THE COURT:  Good morning.  How are you?

18                 PROSPECTIVE JUROR:  Fine, thanks.  How are you?

19                 THE COURT:  Good.  Tell me your juror number.

20                 PROSPECTIVE JUROR:  My number is 0374.

21                 THE COURT:  Okay, great.  Just wanted to confirm.

22         So you marked No. 7.  Tell me who's a lawyer.

23                 PROSPECTIVE JUROR:  I work at the Center for

24         International Environmental Law.  I work with lawyers.

25                 THE COURT:  Okay.  What do you do?

```
 1            PROSPECTIVE JUROR:  I'm the senior executive assistant

 2       and special projects coordinator there.

 3            THE COURT:  And tell me about how you work with the

 4       lawyers there.

 5            PROSPECTIVE JUROR:  Half of the staff is lawyers, and

 6       so I coordinate them and help them run projects and do their

 7       administration.

 8            THE COURT:  Okay.  And nothing that they do involves

 9       criminal law.  Is that right?

10            PROSPECTIVE JUROR:  That's correct.

11            THE COURT:  Okay.  Can you be a fair juror in this

12       case?

13            PROSPECTIVE JUROR:  Could you repeat that?

14            THE COURT:  Do you think you could be a fair juror in

15       this case?

16            PROSPECTIVE JUROR:  Yes.

17            THE COURT:  Okay.  Any questions for this witness?

18            MR. WOLF:  Yes, Your Honor.

19         Good morning.  Does any of the work that -- I guess this is

20       a nonprofit.  Is that correct?

21            PROSPECTIVE JUROR:  Correct.

22            MR. WOLF:  This nonprofit does touch on immigration law

23       or immigration issues?

24            PROSPECTIVE JUROR:  No.  We're centered on

25       environmental laws.
```

1          MR. WOLF:  Thank you.

2          THE COURT:  Anything from the defense?

3          MS. ABE:  Nothing.  Thank you.

4          THE COURT:  Okay.  Thank you very much.

5      (Juror 0374 steps down.)

6          MR. WOLF:  Your Honor, I apologize.  I just realized

7   that one of the government's potential witnesses is in the

8   courtroom.  I can ask him to step out, and I apologize.

9          THE COURT:  Okay.  Please do that.  And can you please

10  make sure that all of your witnesses know that they should not

11  be in the courtroom.

12         MR. WOLF:  Yes.

13         THE COURT:  And which witness is this?

14         MR. WOLF:  This is Special Agent Charles Craddock.  I

15  directed him to be at courtroom 14.  I did not give specific

16  instructions for him not to enter.  I apologize, Your Honor.

17         THE COURT:  Okay.  And Ms. Abe, just going forward,

18  let's use the juror numbers and not their names in talking to

19  them, please.

20         MS. ABE:  I apologize.  Yes.

21     (Juror 1322 steps up.)

22         THE COURT:  Good morning.  Tell me your juror number.

23         PROSPECTIVE JUROR:  1322.

24         THE COURT:  So you marked No. 4.  You know someone on

25  the jury panel?

1          PROSPECTIVE JUROR:  Yes, I do.  An acquaintance of

2     mine.  They just walked in to -- I think they're a replacement

3     now.  Yes, I do.

4          THE COURT:  And how closely do you know this person?

5          PROSPECTIVE JUROR:  Not super closely, but I've had

6     multiple interactions with them in the last few months.

7          THE COURT:  Okay.  Okay.  Any objection?

8          MR. WOLF:  No, Your Honor.

9          MR. OHM:  Good morning.  The person that you know, do

10    you think that if you ended up on a jury with that person, the

11    fact that you know that person would have an impact on your

12    deliberations or what opinions you might have?

13         PROSPECTIVE JUROR:  I know unsure is not the right

14    answer, but I've never experienced that so I'm not positive

15    how that would impact.

16         MR. OHM:  I guess sort of like a peer pressure kind of

17    situation.  Like, do you feel like the fact that -- most of

18    the times you don't know anybody, right, and you're sitting

19    there with strangers.  The fact that you know one of the

20    people who is going to be in the room with you and you might

21    have to see them again and they might not -- they know what

22    you're going to say and you might have to encounter them

23    again.  Do you think that might have an impact on the way you

24    behave during the deliberations or the way you sort of come

25    out in your decision?

1          PROSPECTIVE JUROR:  I think it could.  I also can't

2    promise I wouldn't see them outside of this in the time of

3    trial.

4          MR. OHM:  I'm sorry.  During the time of trial you

5    said?

6          PROSPECTIVE JUROR:  Yeah.

7          THE COURT:  Do you mind explaining how that would be?

8          PROSPECTIVE JUROR:  I just -- I know them decently well

9    in a very specific way.  So I would -- I have a romantic

10   connection to this person, so I don't know how that would

11   affect...

12         MR. OHM:  Do you mind explaining like how -- like in

13   this next week you might end up encountering the person?

14         PROSPECTIVE JUROR:  I guess I could -- I don't know.

15   I'm not plotting or anything, I just can't promise I would not

16   see them, I guess is what I'm saying, outside of the jury

17   deliberations.

18         MR. OHM:  Okay.  Court's indulgence.

19      (Defense conferring.)

20         MR. OHM:  Would you have a problem avoiding seeing that

21   person during the length of the trial?

22         PROSPECTIVE JUROR:  No.

23         MR. OHM:  I don't think I have anything further.

24         THE COURT:  Okay.  Thank you.

25      (Juror 1322 steps down.)

1          THE COURT:  Okay.  Mr. Ohm, are you objecting to me

2     excusing this juror?

3          MR. OHM:  No.

4          THE COURT:  Okay.

5          MR. WOLF:  Nothing further then, Your Honor.

6          THE COURT:  Okay.

7        (Juror 1974 steps up.)

8          THE COURT:  Good morning.

9          PROSPECTIVE JUROR:  Good morning.

10         THE COURT:  How are you?

11         PROSPECTIVE JUROR:  Good.

12         THE COURT:  Okay.  So tell me your juror number.

13         PROSPECTIVE JUROR:  1974.

14         THE COURT:  Okay.  So you marked question 20, which is

15    my catch-all question.  Tell me what you think would make it

16    difficult for you to be a fair juror in this case.

17         PROSPECTIVE JUROR:  I got sued in federal court in

18    Portland, Oregon last year, and I thought I could do it, but

19    it's really stressing me out to be here.

20         THE COURT:  So what was the lawsuit about in Oregon?

21         PROSPECTIVE JUROR:  Well, it's public knowledge.  My

22    uncle molested me when I was young and then he sued me for

23    defamation in federal court.

24         THE COURT:  Okay.  And you think, based on that lawsuit

25    and what happened to you, it's going to be hard for you to be

1    in a courtroom?

2         PROSPECTIVE JUROR:  It's -- yeah.  It's not the

3    subject.  The subject I'm okay with.  It's just being in a

4    court.  I mean, it was just last year.

5         THE COURT:  Any objection?

6         MR. WOLF:  No, Your Honor.

7         MR. OHM:  No, Your Honor.

8         THE COURT:  Okay.  Thank you.  You're excused.

9         PROSPECTIVE JUROR:  Thank you.

10       (Juror 1974 steps down.  Juror 0284 steps up.)

11        THE COURT:  Good morning.

12        PROSPECTIVE JUROR:  Good morning.

13        THE COURT:  Tell me your juror number.

14        PROSPECTIVE JUROR:  0284.

15        THE COURT:  Thank you.  So you marked No. 7.  Are you a

16   lawyer or someone --

17        PROSPECTIVE JUROR:  My wife is a lawyer.

18        THE COURT:  Okay.  Tell me, what kind of law does she

19   do?

20        PROSPECTIVE JUROR:  She is a hearing examiner in the

21   D.C. traffic court.  So she is a hearing examiner and hears

22   traffic court cases.

23        THE COURT:  Okay.  Tell me, what do you do for a

24   living?

25        PROSPECTIVE JUROR:  I work at the Defense Intelligence

```
1         Agency.
2                THE COURT:  What do you do there?
3                PROSPECTIVE JUROR:  I'm responsible for clandestine
4         operations in Latin America.
5                THE COURT:  Okay.  And is anything about what your wife
6         does in traffic court, would that affect your ability to be a
7         fair juror in this case?
8                PROSPECTIVE JUROR:  No.
9                THE COURT:  Any questions for this witness?
10               MR. WOLF:  Good morning.  Does any of your work touch
11        on immigration policy for this country?
12               PROSPECTIVE JUROR:  No.
13               MR. OHM:  Hi.  Good morning.  I see you're some sort
14        of -- like a supervisor of some sort?
15               PROSPECTIVE JUROR:  Yes.  That's correct.
16               MR. OHM:  Do you have to make -- or do you have any
17        role in interacting with any parts of the administration
18        currently?
19               PROSPECTIVE JUROR:  No, I do not.  No, sir.
20               MR. OHM:  Do you make any policy determinations?
21               PROSPECTIVE JUROR:  No policy.
22               MR. OHM:  Nothing further.
23               THE COURT:  Okay.  Thank you.
24          (Juror 0284 steps down.  Juror 1535 steps up.)
25               THE COURT:  Good morning.
```

1          PROSPECTIVE JUROR:  Hello.

2          THE COURT:  Tell me your juror number.

3          PROSPECTIVE JUROR:  1535.

4          THE COURT:  So you have a couple of questions marked

5     here.  Let's start with 19.  You said that you have a health

6     or physical problem that would make it difficult for you to

7     serve?  Is that right?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Can you tell me what it is?

10         PROSPECTIVE JUROR:  I would just need breaks like every

11    two hours.

12         THE COURT:  You'd need a break every two hours?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Okay.  That's fine.  We usually take a

15    morning break, and then lunch, and then an afternoon break.

16    Would that be satisfactory?

17         PROSPECTIVE JUROR:  Yeah.  I would just need a restroom

18    every two hours.

19         THE COURT:  Okay.  And then you marked No. 20, which is

20    my catch-all question about you not being able to be a fair

21    and impartial juror.  Can you tell me why you marked No. 20?

22         PROSPECTIVE JUROR:  I actually have been watching these

23    ICE videos, and I think they're horrific.  I would probably --

24         THE COURT:  Can you speak into the microphone?

25         PROSPECTIVE JUROR:  Sorry.  I would probably fight for

my life too if someone was coming for me.  And I -- I no

longer believe in this country's impartiality when it comes to

the judicial system and the convictions they're running

through the systems.  And I've seen like the sandwich guy

conviction and I actually think like jurors should not indict

BS charges.

THE COURT:  Okay.  So focusing on this case, you will

hear evidence in this case against this defendant, and I will

give you instructions.  Are you saying that because of those

feelings you would not be able to look at this specific case

and be fair here based on the evidence that you hear?

PROSPECTIVE JUROR:  I'm sorry.  I'm really conflicted.

I mean, there's a principle of it, and I just don't like the

political nature of a lot of these convictions and the

direction our administration's taking this country.

THE COURT:  Okay.  But you're going to hear evidence,

and the question is if the government presents evidence beyond

a reasonable doubt, the defendant is guilty.  And if you hear

evidence from the government that this defendant is guilty,

I'm going to instruct you to convict.  And if the government

doesn't present evidence beyond a reasonable doubt, I'm going

to instruct you to acquit.  Do you think you could do that,

listen to the evidence, listen to my instructions and be fair

in this specific case?

PROSPECTIVE JUROR:  Yes.  In principle, I understand

1    what you're telling me.  Yes.

2         THE COURT:  Okay.  And so -- I mean, everyone brings

3    their own experiences to this.  Every prospective juror brings

4    their own experiences and views, and the question is really

5    are you going to be able to be a fair juror in this case,

6    right?  Are you going to listen to the evidence, are you going

7    to listen to my instructions and be able to render a fair

8    verdict?  Do you think you can do that in this case?

9         PROSPECTIVE JUROR:  I honestly am very conflicted about

10   what my civic duty would be in this case, but I would say yes.

11        THE COURT:  Tell me more about the conflict with

12   respect to, as you say, your civic duty.  If the government

13   presents evidence beyond a reasonable doubt, the defendant is

14   guilty and I will instruct you to convict.  Do you think you

15   can do that?

16        PROSPECTIVE JUROR:  Yes, but I don't think the

17   government is operating from a position of like -- position --

18   I don't know.  I just...

19        THE COURT:  Do you mistrust what the government will

20   argue in this case simply because the charges are being

21   brought by the government?

22        PROSPECTIVE JUROR:  I think they have a political

23   agenda of their own.  I don't think they will necessarily like

24   trump up charges, but I just think the entire principle under

25   like the direction of the judiciary is inherently corrupted by

1    the administration.

2        THE COURT:  When you say the direction of the

3    judiciary, do you mistrust the court system, do you mistrust

4    me --

5        PROSPECTIVE JUROR:  Yes.  It's like indictments like

6    Comey, and New York State's attorney general, I think there is

7    a political motivation from the top down driving a lot of

8    decisions, and I almost think it's like a civic duty to

9    protest and not indict certain charges.

10        THE COURT:  Okay.  And you understand that this is not

11    a grand jury proceeding, this is trial?

12        PROSPECTIVE JUROR:  Yes, I know.  That's why I'm

13    conflicted.  Like I know my duty would be to listen to the

14    facts of the case and address only what is presented and be

15    impartial.  I'm just telling you honestly, I think -- I think

16    that would be difficult.  But...

17        THE COURT:  Okay.  Any objection?

18        MR. OHM:  Your Honor, may I inquire briefly?

19      Ma'am, so just to be clear, recognizing where you're coming

20    from in terms of your positions, if the evidence is

21    unequivocal that Ms. Reid here assaulted someone, it was on

22    video, there was no justification for doing it, and the judge

23    instructed you that you had to convict, and you were also

24    instructed that the punishment is not part of your job, but

25    that's the judge's job, would you have -- would you be able to

 1    convict Ms. Reid on that evidence?

 2        PROSPECTIVE JUROR:  Probably.  I think I could narrowly

 3    focus on only the facts of the case and, like, this action in

 4    this regard.

 5        MR. OHM:  And do you think you could focus on the facts

 6    of the case?

 7        PROSPECTIVE JUROR:  Yes, but I have other issues that

 8    I'm also like stressed about for serving for a week's worth of

 9    time, but yes.

10        MR. OHM:  We're all stressed, but in terms of as a

11    juror, would you be able to focus on the facts of the case and

12    listen to the Court's directions?

13        PROSPECTIVE JUROR:  Yes.

14        MR. OHM:  Nothing further.

15        THE COURT:  Anything from you, Mr. Wolf?

16        MR. WOLF:  Yes, Your Honor.

17      Good morning, ma'am.  You discussed I guess your moral

18    convictions versus like what the instructions would be.  Do

19    you think you would find that your moral convictions on these

20    issues would I guess overmatch or outweigh what the judge will

21    be instructing you and what your duties are in this case?

22        PROSPECTIVE JUROR:  I really don't know.  I'm pretty

23    disgusted.  So -- I think my civic duty as a juror to be

24    impartial would probably override my personal belief system

25    of, like, my political views.

1          MR. WOLF:  And additionally, I understand, like, we all

2     come in here with our beliefs about what's going on in the

3     world, but if you heard in this case from an officer with

4     Immigration and Customs Enforcement, would you be less likely

5     to believe that person's testimony on the basis of just that

6     person being an officer with Immigration and Customs

7     Enforcement?

8          PROSPECTIVE JUROR:  Yeah.  I would have a hard time

9     believing their integrity.

10         MR. WOLF:  Nothing further.

11         THE COURT:  Any objection from the defense?  Okay.

12    You're excused.

13       (Juror 1535 steps down.  Juror 0974 steps up.)

14         THE COURT:  Good morning.  How are you?

15         PROSPECTIVE JUROR:  I'm good.  Yourself?

16         THE COURT:  I'm good.  Thank you.  Tell me your juror

17    number.

18         PROSPECTIVE JUROR:  0974.

19         THE COURT:  Okay.  And you marked yes to question 7.

20    Are you a lawyer or do you have a close family or friend who

21    is a lawyer?

22         PROSPECTIVE JUROR:  I am not.  I do not, but I have

23    worked in a legal office for 20-some years.

24         THE COURT:  Okay.  Do you still work there?

25         PROSPECTIVE JUROR:  No.

1           THE COURT:  Okay.  Tell me when you worked there and

2     what you did.

3           PROSPECTIVE JUROR:  I was there between 1995 through

4     2016, legal assistant in a corporate secretary's office.

5           THE COURT:  Okay.  And did you do any criminal work in

6     the -- no?

7           PROSPECTIVE JUROR:  No.

8           THE COURT:  Okay.  And what do you do now?

9           PROSPECTIVE JUROR:  Retired.

10          THE COURT:  Ah.  That is lovely.

11          PROSPECTIVE JUROR:  It's very lovely.

12          THE COURT:  Okay.  Is there anything about either your

13    work as a lawyer or anything otherwise that would make it

14    difficult for you to be a fair juror in this case?

15          PROSPECTIVE JUROR:  Nothing at all.

16          THE COURT:  Okay.  Any questions for this witness?

17          MR. WOLF:  Just briefly.  I assume that the law office

18    you worked at was not a criminal law office.  Correct?

19          PROSPECTIVE JUROR:  Correct.

20          MR. WOLF:  Okay.  That's it.

21          THE COURT:  Anything from the defense?

22          MS. ABE:  Good morning.

23          PROSPECTIVE JUROR:  Hi.

24          MS. ABE:  May I ask, how long have you lived in D.C.?

25          PROSPECTIVE JUROR:  All my life.

1          MS. ABE:  Awesome.  Thank you.

2          THE COURT:  Thank you very much.

3      (Juror 0974 steps down.  Juror 0003 steps up.)

4          THE COURT:  Good morning.

5          PROSPECTIVE JUROR:  Good morning.

6          THE COURT:  How are you?

7          PROSPECTIVE JUROR:  I'm doing all right.  How about

8  yourself?

9          THE COURT:  Good, thank you.  Tell me your juror

10  number.

11          PROSPECTIVE JUROR:  0003.

12          THE COURT:  Okay.  So let's start with No. 18 and

13  hardship.  Tell me why it would be a hardship for you to serve

14  on the jury.

15          PROSPECTIVE JUROR:  Yeah.  I am currently unemployed

16  and I get unemployment insurance, and part of it is that I

17  have to be able and ready to work.  And by being here that

18  would not classify me as able to work.  And with the courts

19  not being able to pay the stipend, I would have financial

20  hardships from that.

21          THE COURT:  So you're getting paid right now through

22  unemployment insurance, which means on any given day you've

23  got to be ready to work if something comes up?

24          PROSPECTIVE JUROR:  Correct.

25          THE COURT:  So if you're selected on the jury you would

1    have to tell them that you're not available to work this week?

2            PROSPECTIVE JUROR:  I believe so.

3            THE COURT:  Okay.  And what did you do prior to being

4    unemployed?

5            PROSPECTIVE JUROR:  Prior to that I was a federal

6    contractor.  I did environmental policy mainly, but other

7    areas as well.

8            THE COURT:  Okay.  Any objection?

9            MR. WOLF:  No, Your Honor.

10            MS. ABE:  No.  Thank you.

11            THE COURT:  Okay.  Thank you.  You're excused.

12            PROSPECTIVE JUROR:  Thank you.

13         (Juror 0003 steps down.  Juror 2159 steps up.)

14            THE COURT:  Good morning.

15            PROSPECTIVE JUROR:  Good morning.

16            THE COURT:  How are you?

17            PROSPECTIVE JUROR:  I am fine, thank you.

18            THE COURT:  Tell me your juror number.

19            PROSPECTIVE JUROR:  2159.

20            THE COURT:  Okay.  So you've got a bunch of questions

21    marked here.  Let's start with question 2.  Tell me what it is

22    about the case that would make it difficult for you to be a

23    fair juror.

24            PROSPECTIVE JUROR:  Can you repeat that?

25            THE COURT:  Sure.  Tell me what it is about this case

1    that would make it difficult for you to be a fair juror.

2           PROSPECTIVE JUROR:  I just don't think I would be fair

3    because of the political atmosphere and my beliefs.

4           THE COURT:  Tell me a little bit more about that and

5    specifically about your ability to be fair --

6           PROSPECTIVE JUROR:  I just don't think that I would

7    give my -- I would be fair because I believe that the

8    protests -- that she's innocent.  To me.

9           THE COURT:  You believe that who is innocent?

10           PROSPECTIVE JUROR:  The plaintiff?

11           THE COURT:  Ms. Reid, the defendant?

12           PROSPECTIVE JUROR:  Yes, Ms. Reid.

13           THE COURT:  Based on what?

14           PROSPECTIVE JUROR:  Based on my political beliefs.

15           THE COURT:  So you're going to hear evidence in this

16    case, and the question is whether you can listen to that

17    evidence, listen to my instructions and look only at the

18    evidence and make a decision about whether this defendant is

19    guilty.  Are you able to do that?

20           PROSPECTIVE JUROR:  I think from the very beginning,

21    because of my political beliefs and the atmosphere that we're

22    living in today, that Ms. Reid, I believe that's her name, is

23    innocent.

24           THE COURT:  So do you think that every criminal

25    defendant charged by the government now is innocent?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  Any objection?

3          MR. WOLF:  No, Your Honor.

4          MR. OHM:  Good morning.  So the judge is actually going

5    to instruct you that that's correct, that you're supposed to

6    presume that any criminal defendant is innocent at the

7    beginning of the case.  So does that make you feel any better,

8    that that's actually, you're following the law if you're

9    presuming Ms. Reid to be innocent?

10          PROSPECTIVE JUROR:  Yeah.  I mean, that is true.

11    However, because of my political beliefs and how powerful --

12    how I feel about the political atmosphere that we live in

13    today, that I would not be fair to the government.  I would

14    not be fair.  Because automatically in my mind she's innocent.

15          MR. OHM:  So the allegation here is that Ms. Reid

16    assaulted a law enforcement officer.  If you have evidence

17    that Ms. Reid actually hit somebody, hit the law enforcement

18    officer, did so on purpose, would you have any problem finding

19    that the government met its burden?

20          PROSPECTIVE JUROR:  I would have problems finding that

21    to be true because of what I look at on television and what I

22    hear on social media, that automatically, because of all of

23    the negativity with ICE, that I would automatically think that

24    she's innocent.

25          MR. OHM:  Right.  But if you saw video evidence in this

1    case and heard from people testifying under oath in this case

2    and were told that you shouldn't consider any of the other

3    stuff that you saw in the news or whatever, would you be able

4    to consider the evidence that's presented in this courtroom?

5                PROSPECTIVE JUROR:  No.

6                THE COURT:  Okay.  Any objection, Mr. Ohm?

7                MR. OHM:  No.

8                THE COURT:  Okay.  You're excused.

9          (Juror 2159 steps down.  Juror 0323 steps up.)

10                THE COURT:  Good morning.  Tell me your juror number.

11                PROSPECTIVE JUROR:  0323.

12                THE COURT:  Thank you.  Okay.  You marked No. 7.  Are

13    you a lawyer or do you have a close relative or friend who is

14    one?

15                PROSPECTIVE JUROR:  I have a close friend that is one.

16                THE COURT:  Okay.  What type of law does that person

17    practice?

18                PROSPECTIVE JUROR:  Criminal defense.

19                THE COURT:  Okay.  And when you say it's your close

20    friend, how often are you in touch with this person?

21                PROSPECTIVE JUROR:  Probably weekly, every other week.

22                THE COURT:  Okay.  And does that person talk to you

23    about his or her cases or work?

24                PROSPECTIVE JUROR:  No.

25                THE COURT:  Never, okay.  And is there anything about

having a friend who does criminal defense that would make it
hard for you to listen to the evidence in this case and render
a fair verdict?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Tell me, what do you do for a
living?

PROSPECTIVE JUROR:  I work for an embassy.

THE COURT:  For an embassy.  What do you do?

PROSPECTIVE JUROR:  Office manager.

THE COURT:  You're an office manager.  Okay.  And does
any of your work touch on immigration policy?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  And so can you be a fair juror in
this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Any questions for this witness?

MR. WOLF:  Good morning.  Does any of your work touch
on I guess helping people who are facing deportation?

PROSPECTIVE JUROR:  No.  Not at all.

MR. WOLF:  Thank you.

MS. ABE:  Nothing from the defense.  Thank you.

THE COURT:  Okay.  Thank you very much.

(Juror 0323 steps down.  Juror 0051 steps up.)

THE COURT:  Good morning.

PROSPECTIVE JUROR:  Good morning.

1          THE COURT:  How are you?

2          PROSPECTIVE JUROR:  I'm good.

3          THE COURT:  Tell me your juror number.

4          PROSPECTIVE JUROR:  0051.

5          THE COURT:  Okay.  So you have a couple things marked

6     here.  Let me start with No. 10.  Have you or one of your

7     close friends or relatives ever been arrested for, convicted

8     of or charged with a crime, or been a victim or witness to a

9     crime.  Tell me why you marked that question.

10          PROSPECTIVE JUROR:  I've just had cousins who have been

11     convicted of crimes.  Not here in D.C.

12          THE COURT:  Where?

13          PROSPECTIVE JUROR:  In Virginia.

14          THE COURT:  Okay.  And were you involved in their

15     criminal proceedings in any way?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Did you interact with the police at all?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  And based on those criminal cases, do you

20     have a view about the police or the criminal justice system

21     that you think would make it difficult for you to be a fair

22     juror in this case about this particular defendant?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Okay.  And so you think you will listen to

25     the evidence presented in this courtroom, listen to my

1    instructions, and that you can make a decision based on what

2    you hear here in a fair and impartial way?

3              PROSPECTIVE JUROR:  Absolutely.

4              THE COURT:  Okay.  Tell me, what do you do for a

5    living?

6              PROSPECTIVE JUROR:  I work for D.C. city council as a

7    senior policy advisor.

8              THE COURT:  What type of issues do you work on as a

9    policy advisor?

10             PROSPECTIVE JUROR:  I work on mostly health policy

11   issues, behavioral health.

12             THE COURT:  So nothing to do with the criminal justice

13   system?

14             PROSPECTIVE JUROR:  Once in a while I'll do some

15   advising on juvenile issues, juvenile justice issues.

16             THE COURT:  Okay.  So you also marked No. 9, that you

17   or I suppose a close friend or relative worked for a public

18   defender or criminal defense attorney.  Can you tell me who

19   that is?

20             PROSPECTIVE JUROR:  Yes.  When I was in law school, I

21   worked as a law clerk for the Public Defender Service of D.C.

22             THE COURT:  Okay.  And is there anything about that

23   experience and working for that office that you think would

24   make it difficult for you to be fair in this case?

25             PROSPECTIVE JUROR:  No.

1          THE COURT:  Okay.  Then you marked No. 8, knowing

2     someone who worked in a prosecutor's office.  Tell me who that

3     is.

4          PROSPECTIVE JUROR:  I mean, I'm a lawyer so I have a

5     lot of friends who went into prosecution.

6          THE COURT:  Okay.  And so do you know anyone who works

7     in the U.S. Attorney's Office here in D.C.?

8          PROSPECTIVE JUROR:  I have some colleagues.  You know,

9     I worked on some issues around civil commitment and worked

10    with the U.S. Attorney's Office.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR:  They were on the civil side.

13         THE COURT:  They did civil work, not criminal work.

14         PROSPECTIVE JUROR:  Yeah.

15         THE COURT:  And do you ever talk to your friends and

16    former colleagues either at the U.S. Attorney's Office or the

17    federal defenders about their cases or their work?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Okay.  And so looking at all of that, seems

20    like you've got connections both on the prosecutor's side and

21    the defense side and you do some policy work that might touch

22    on criminal issues.  But looking at all of that, is there

23    anything that gives you pause about your ability to be fair in

24    this particular case?

25         PROSPECTIVE JUROR:  No.

 1              THE COURT:  Okay.  Any questions for this --

 2              MR. WOLF:  No, Your Honor.

 3              MS. ABE:  Good morning.  When did you graduate from law

 4      school?

 5              PROSPECTIVE JUROR:  In '08.  2008.

 6              MS. ABE:  Okay.  Great.  Thank you.

 7              THE COURT:  Anything else?

 8              MS. ABE:  Nothing from the defense.

 9              THE COURT:  Okay.  Thank you very much.

10          (Juror 0051 steps down.  Juror 0827 steps up.)

11              THE COURT:  Good morning.

12              PROSPECTIVE JUROR:  Good morning.

13              THE COURT:  Tell me your juror number.

14              PROSPECTIVE JUROR:  0827.

15              THE COURT:  Thank you.  I see your card is blank other

16      than your juror number.  Tell me why.

17              PROSPECTIVE JUROR:  I just didn't feel that I needed to

18      answer yes to anything.

19              THE COURT:  Great.  What do you do for a living?

20              PROSPECTIVE JUROR:  I'm a journalist.

21              THE COURT:  What types of things do you write about?

22              PROSPECTIVE JUROR:  I cover politics.

23              THE COURT:  Do you cover anything related to criminal

24      justice?

25              PROSPECTIVE JUROR:  Our news organization does.  I'm

1          the campaign editor so I primarily cover elections.  So

2          sometimes it might touch on that subject, but most of the

3          stuff that I edit directly, not really.

4                   THE COURT:  Okay.  And can you be a fair juror in this

5          case?

6                   PROSPECTIVE JUROR:  Yes.

7                   THE COURT:  Any questions for this witness?

8                   MR. WOLF:  Yes.  Good morning.  How are you?

9                   PROSPECTIVE JUROR:  Good.  Thank you.

10                  MR. WOLF:  I know you were discussing you write about

11         campaign, elections.  Does that ever touch upon immigration

12         issues as relates to the current administration or I guess in

13         the campaigns?

14                  PROSPECTIVE JUROR:  Yeah, I can't think of a recent

15         example for a story that I've edited, but certainly the

16         subject will come up as we get closer to the mid-terms.

17                  MR. WOLF:  Has that caused you to have -- everyone has

18         views on everything, that's fair, but has it made you have

19         strong views about I guess the current administration's

20         immigration policy that might affect your ability to be fair

21         and impartial in this case?

22                  PROSPECTIVE JUROR:  I wouldn't say so.  I mean, as part

23         of my job, we strive to be objective and fair, and personally,

24         I don't think that it's made my views stronger in either

25         direction.

1          MR. WOLF:  Thank you.

2          THE COURT:  Anything from the defense?

3          MS. ABE:  Nothing from the defense.  Thank you.

4          THE COURT:  Thank you.

5       (Juror 0827 steps down.  Juror 1357 steps up.)

6          THE COURT:  Good morning, sir.  How are you?

7          PROSPECTIVE JUROR:  I'm fine.  Thank you.

8          THE COURT:  Tell me your juror number, please.

9          PROSPECTIVE JUROR:  1357.

10         THE COURT:  Thank you.  Okay.  So you've marked two

11    questions.  No. 10, have you or one of your close friends or

12    relatives ever been arrested for, convicted of, or charged

13    with a crime or been a victim of or witness to a crime.  Tell

14    me why you marked that question.

15         PROSPECTIVE JUROR:  When I was a young person my mother

16    was shot in the leg by someone -- unknown assailant in a

17    community garden.  So she was fine, but I just thought I

18    should indicate that.

19         THE COURT:  Yes.  How old were you?

20         PROSPECTIVE JUROR:  Eight or nine, I think.

21         THE COURT:  Say that again?

22         PROSPECTIVE JUROR:  Eight or nine.

23         THE COURT:  And it sounds like they never caught the

24    person who did it?

25         PROSPECTIVE JUROR:  You know, I don't actually know.

1    We interacted only a little bit with the police and then she

2    was at the hospital.  She may have gone to court, I just was

3    probably too young to remember.

4        THE COURT:  So did you interact with the police at all

5    in connection with what happened?

6        PROSPECTIVE JUROR:  Only a little bit.  They came I

7    think to her -- we were in the ER, and I think they may have

8    came -- I think they actually brought her.  I can't remember

9    exactly how it all went down, but I think they brought her in

10   so I interacted only a little bit with them at that point.

11       THE COURT:  And did you have anything that was notable

12   about those interactions, anything positive or negative?

13       PROSPECTIVE JUROR:  Nothing notable.  I mean, they were

14   friendly and professional.

15       THE COURT:  Okay.  And then you marked No. 7.  Tell me

16   who's the lawyer in your life.

17       PROSPECTIVE JUROR:  I'm thinking of a friend of mine in

18   Seattle who went to law school, and she doesn't actually work

19   in law anymore, but she was a lawyer for a while.

20       THE COURT:  Okay.  And when she did practice, what type

21   of law did she do?

22       PROSPECTIVE JUROR:  I think a year kind of big

23   corporate firm, and then a few years at a women's law center.

24       THE COURT:  Okay.  So she didn't do any criminal work?

25       PROSPECTIVE JUROR:  No.

1          THE COURT:  Or anything touching on immigration?

2          PROSPECTIVE JUROR:  Not that I know of.

3          THE COURT:  And tell me what you do for a living.

4          PROSPECTIVE JUROR:  I'm a data scientist.

5          THE COURT:  Where do you work?

6          PROSPECTIVE JUROR:  An organization called Consumers'

7     Checkbook.

8          THE COURT:  What type of work do you do?

9          PROSPECTIVE JUROR:  A little bit of health policy, a

10    little bit of data analysis, a little bit of consulting

11    business.

12         THE COURT:  Do you think you can be a fair juror in

13    this case?

14         PROSPECTIVE JUROR:  I do.

15         THE COURT:  Any questions for this witness?

16         MR. WOLF:  No, Your Honor.

17         MS. ABE:  Nothing from the defense.  Thank you.

18         THE COURT:  Thank you very much.

19       (Juror 1357 steps down.  Juror 0913 steps up.)

20         THE COURT:  Good morning.

21         PROSPECTIVE JUROR:  Good morning.

22         THE COURT:  How are you?

23         PROSPECTIVE JUROR:  I'm good.  Thank you for asking.

24         THE COURT:  Tell me your juror number.

25         PROSPECTIVE JUROR:  0913.

1          THE COURT:  Okay.  So let me look at your card.  You

2    marked yes to No. 20.  Tell me what you think would make it

3    difficult for you to be a fair and impartial juror in this

4    case.

5          PROSPECTIVE JUROR:  I'm biased.

6          THE COURT:  Which way?

7          PROSPECTIVE JUROR:  It'd be hard to -- with all that's

8    going on in the media and everything and how law enforcement

9    is -- seem like it's doing a little too much, I'm biased.  So

10   I wouldn't be a fair juror.

11         THE COURT:  Okay.  So we all bring our own feelings and

12   experiences into the courtroom, all jurors do.  In this case

13   as a juror if you were selected, you would be asked to listen

14   to the evidence presented in this courtroom, listen to my

15   instructions, and I will instruct you on the law, and my

16   question is, do you think you could do that?

17      Do you think you could put aside your general feelings

18   about law enforcement, listen to the evidence and my

19   instructions in this case and render a fair verdict?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  Tell me why.

22         MR. WOLF:  Again, because what I see in the media and

23   how they're -- they're just doing too much.  And I wouldn't be

24   able to have an objective view.

25         THE COURT:  If there were evidence in this case that

1  this defendant did commit this crime, if it was clear based on

2  the evidence presented that she's guilty, are you saying you

3  would not be able to find her guilty because of your general

4  feelings?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Okay.  Any objection?

7          MR. WOLF:  No, Your Honor.

8          MR. OHM:  No, Your Honor.

9          THE COURT:  Okay.  Thank you.  You're excused.

10     (Juror 0913 steps down.  Juror 2175 steps up.)

11         THE COURT:  Good morning.  How are you?  Tell me your

12  juror number.

13         PROSPECTIVE JUROR:  2175.

14         THE COURT:  Okay.  You marked the hardship question.

15  Tell me what is the hardship that would make it hard for you

16  to serve.

17         PROSPECTIVE JUROR:  I'm a psychotherapist and so I see

18  patients that have mental illness issues.  I only have one

19  person who's suicidal and then I supervise some people.  So

20  that would be it, I guess.  I'm a private practice, so.

21         THE COURT:  Is it just a solo practice?  What do you do

22  when you're unavailable and your patients need to see someone?

23         PROSPECTIVE JUROR:  I usually have someone on call.

24         THE COURT:  Would you be able to have someone on call

25  for this week if you're selected for the jury?

1          PROSPECTIVE JUROR:  Yeah.  If I can afford it, yeah.

2          THE COURT:  When you say if you can afford it, what

3     does that mean?

4          PROSPECTIVE JUROR:  It's just that whole week without

5     any money coming in is not probably --

6          THE COURT:  Yeah.  I understand, and that is always an

7     issue for people coming in.  As I said at the beginning, the

8     juror stipend that you usually receive past tomorrow will be

9     delayed, but you will eventually be paid that money.  But

10    would it be an extreme hardship for you financially to serve

11    on the jury in light of the fact that you will not receive

12    that stipend until later on?

13         PROSPECTIVE JUROR:  No.  I'll be okay.

14         THE COURT:  And tell me a little bit more about what

15    you do.

16         PROSPECTIVE JUROR:  So I'm a therapist.  I see a

17    variety of patients.  Some of them are immigrants to the

18    country, so -- so.  But I'm a -- I help people with anxiety,

19    depression usually, or some other issue.

20         THE COURT:  Okay.  And is there anything about the fact

21    that some of your patients are immigrants that would make it

22    difficult for you to be fair in this case and listen to the

23    evidence and render a verdict based on what you hear in court?

24         PROSPECTIVE JUROR:  Yes.  I think that it would affect

25    how I feel.  I don't think it's right that people are being

1    taken out of the country the way that they are.

2              THE COURT:  Tell me, have you heard anything about this

3    case?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Okay.  Because I just realized you had

6    marked No. 1 on here.  You don't know anything about this

7    case?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Okay.  So just going back to what you just

10   said, if you're selected as a juror in this case, you will be

11   asked to listen to the evidence against this defendant, listen

12   to my instructions, and make a decision based on what you hear

13   here, to put aside your general feelings.  Do you think you

14   can do that?

15     Because we all come at this with our own experiences and

16   our own general feelings.  And what you're asked to do and

17   what I will instruct you to do as a juror is to put that

18   aside, to listen to the evidence, listen to my instructions

19   and make a decision based only on what you hear in this

20   courtroom.  Do you think you can do that?

21             PROSPECTIVE JUROR:  No.  I don't think it's right.

22             THE COURT:  What don't you think is right?

23             PROSPECTIVE JUROR:  The way that ICE is being used to

24   take people out of the country and the process of it.

25             THE COURT:  Okay.  So this case is about whether this

 1    defendant assaulted a police officer, agent, law enforcement.

 2    That's the only issue here.  And understanding that you have

 3    general feelings about ICE removing people from the country,

 4    do you think you could listen to this evidence and if it's

 5    clear that this defendant assaulted the agents in question,

 6    could you find this defendant guilty?

 7            PROSPECTIVE JUROR:  I think I would be biased.

 8            THE COURT:  You think you would be biased?

 9            PROSPECTIVE JUROR:  Yeah.

10            THE COURT:  Okay.  Any objection?

11            MR. WOLF:  No, Your Honor.

12            MS. ABE:  No.

13            THE COURT:  Okay.  You're excused.

14        (Juror 2175 steps down.  Juror 1603 steps up.)

15            THE COURT:  Good morning.  How are you?

16            PROSPECTIVE JUROR:  Good.  How are you?

17            THE COURT:  Good, thank you.  Tell me your juror

18    number.

19            PROSPECTIVE JUROR:  1603.

20            THE COURT:  Okay.  So you've marked No. 7.  Tell me

21    who's the lawyer in your life.

22            PROSPECTIVE JUROR:  I have a lot of close friends that

23    are lawyers.  So two of my best friends in D.C., one works as

24    a pro bono lawyer at a law firm, the other works in the

25    Archives, prom date also works at the same agency where I

1    work, a lawyer there.  And finally, my best friend from

2    college, he also is a lawyer working in D.C.  Fairly close

3    with all four.

4            THE COURT:  Does anyone do criminal law?

5            PROSPECTIVE JUROR:  No.

6            THE COURT:  And tell me what you do.

7            PROSPECTIVE JUROR:  I work for the Federal Reserve.

8            THE COURT:  What do you do there?

9            PROSPECTIVE JUROR:  I manage.  Manager.

10           THE COURT:  What kind of things do you manage?

11           PROSPECTIVE JUROR:  Monetary policy and operations.

12           THE COURT:  Okay.  And so is there anything either

13   about your job or your friends who are lawyers that you think

14   would make it difficult for you to be a fair juror in this

15   case?

16           PROSPECTIVE JUROR:  Not particularly, no.  There is

17   nothing.

18           THE COURT:  Okay.  And you answered that you served on

19   a grand jury before.  Is that right?

20           PROSPECTIVE JUROR:  Correct.

21           THE COURT:  And do you understand the difference

22   between a grand jury and petit or trial jury and the burden of

23   proof being reasonable doubt as opposed to probable cause?

24           PROSPECTIVE JUROR:  I do.

25           THE COURT:  And is there anything about the grand jury

experience that would affect your ability to be fair in this
case if you were selected?

PROSPECTIVE JUROR:  I don't believe so.  The grand jury
experience itself was not a great experience, but I don't
think it would impact my ability to use reason and judgment in
this case.

THE COURT:  Okay.  And tell me what was it that made it
not great?

PROSPECTIVE JUROR:  We were lectured multiple times
because of our failure -- perceived failure to indict.  So it
was a very contentious group and just not a pleasant
experience.

THE COURT:  And when you say you were lectured, were
you lectured by your fellow grand jurors or by the government
or --

PROSPECTIVE JUROR:  The judges.  Lawyers and judges
about our collective ability to uphold the oath that we took.

THE COURT:  Okay.  Do you think that that will have any
impact on your ability to be fair in this case?

PROSPECTIVE JUROR:  Not particularly, but I raise it
just so you know.

THE COURT:  Okay.  No, I understand, and thank you for
doing that.  When you say not particularly, I just want to be
clear.  Evidence will be presented here, and I will give you
instructions on the law.  Is there anything about that

1    experience that you think will make it difficult for you to

2    follow my instructions?

3            PROSPECTIVE JUROR:  No.

4            THE COURT:  Okay.  So you'll hear evidence, and the

5    question is if the government presents evidence beyond a

6    reasonable doubt the defendant is guilty, and I'm going to

7    instruct you to convict, is that something that you would find

8    difficult to do?

9            PROSPECTIVE JUROR:  No.

10            THE COURT:  Okay.  Any questions?

11            MR. WOLF:  No, Your Honor.

12            MR. OHM:  Where did you serve as a grand juror?

13            PROSPECTIVE JUROR:  D.C. Superior Court last fall.

14            MR. OHM:  Nothing further, Your Honor.

15            THE COURT:  Okay.  Thank you very much.

16        (Juror 1603 steps down.)

17            MR. WOLF:  Your Honor, may we have a short break?

18            THE COURT:  Yes.  Five minutes.

19            MR. WOLF:  Yes.  That's fine.  Thank you.

20        (Recess from 11:19 a.m. to 11:27 a.m.)

21            MR. WOLF:  Your Honor, just to make a complete record,

22    back when I noticed Agent Craddock was in the courtroom,

23    another officer also got up.  I'd actually never seen that

24    officer before today.  I have spoken with him.  I learned that

25    was Special Agent Abdul Majeed who was with Agent Craddock.

1          THE COURT:  Okay.  Anything from the defense on that?

2          MS. ABE:  Well, Your Honor, we haven't formally done

3     it, but we of course invoke the rule on witnesses.

4          THE COURT:  Yes.  I didn't think we needed to, and I

5     don't think it was intentional on the government's part.

6     Hopefully we will not have that happening again.

7          MR. WOLF:  Sorry about that, Your Honor.

8          THE COURT:  Okay.  All right.  So are we up to 0435?

9          DEPUTY CLERK:  Yes.

10          THE COURT:  Great.

11       (Juror 0435 steps up.)

12          THE COURT:  Good morning.  How are you?

13          PROSPECTIVE JUROR:  Good morning, Judge.

14          THE COURT:  So tell me your juror number.

15          PROSPECTIVE JUROR:  0435.

16          THE COURT:  Thank you.  You marked the question about

17     hardship.  Tell me what is the hardship that would make it

18     difficult for you to serve.

19          PROSPECTIVE JUROR:  Well, it's hard to explain.  Only

20     problem I have is that when I sit for long periods of time, my

21     back.  And I'm always fidgeting, you know.  And I had a weight

22     loss done, but I still sleep.  It's hard for me to stay awake

23     during long periods of time.

24          THE COURT:  Did you say it's hard for you to stay awake

25     a long period?

1          PROSPECTIVE JUROR:  Yes.  Even if I'm sitting down

2     watching TV, it's hard for me to stay -- as they say focus, I

3     guess, on certain things.

4          THE COURT:  Yeah.

5          PROSPECTIVE JUROR:  So basically, I don't think I'd be

6     good at that.

7          THE COURT:  Okay.  And so if you had to sit and listen

8     to evidence for a day, with breaks -- we would break for

9     lunch, I'd break in the morning and in the afternoon for about

10    10 minutes.  But do you think it would be hard for you to sit

11    for a full day and listen to what's happening in the courtroom

12    and stay focused and pay attention?

13         PROSPECTIVE JUROR:  To me I would say yes.

14         THE COURT:  Okay.

15         PROSPECTIVE JUROR:  Because I don't think I'll -- I

16    just don't think I'll be good at it.

17         THE COURT:  Okay.  Any objection?

18         MR. WOLF:  No, Your Honor.

19         MS. ABE:  None from the defense.

20         THE COURT:  Okay.  Thank you very much for being here

21    today.  You're excused.

22         PROSPECTIVE JUROR:  Thank you, Judge.

23       (Juror 0435 steps down.  Juror 1097 steps up.)

24         THE COURT:  Good morning.

25         PROSPECTIVE JUROR:  Good morning.

1          THE COURT:  Tell me your juror number.

2          PROSPECTIVE JUROR:  1097.

3          THE COURT:  Okay.  I see your card is blank other than

4     your juror number.  Tell me why.

5          PROSPECTIVE JUROR:  I didn't have a yes answer to any

6     of the questions.

7          THE COURT:  Okay.  Good answer.  I always check.  Tell

8     me what you do for a living.

9          PROSPECTIVE JUROR:  I work at the patent office as an

10    examiner.

11         THE COURT:  And do you think you can be a fair juror in

12    this case?

13         PROSPECTIVE JUROR:  I do.

14         THE COURT:  Okay.  Any questions?

15         MR. WOLF:  Yes.  Very briefly.  Good morning.  As a

16    patent examiner, do you have an engineering background, a

17    legal background?

18         PROSPECTIVE JUROR:  Mechanical engineering.

19         MR. WOLF:  Thank you.  Nothing further.

20         MS. ABE:  Good morning.  Could you just please tell us

21    how long you've lived in the area?

22         PROSPECTIVE JUROR:  I moved to D.C. in 2007.

23         MS. ABE:  Great.  Thank you.

24         THE COURT:  Okay.  Thank you very much.

25       (Juror 1097 steps down.  Juror 2179 steps up.)

```
 1              THE COURT:  Good morning.  How are you?

 2              PROSPECTIVE JUROR:  Good morning.  Fine.  Yourself?

 3              THE COURT:  Good.  Thank you for asking.  Tell me your

 4      juror number.

 5              PROSPECTIVE JUROR:  2179.

 6              THE COURT:  Okay.  You've marked a couple things down.

 7      Let me start with No. 10.  Have you or one of your close

 8      friends or relatives ever been arrested for, convicted of, or

 9      charged with a crime or been a victim of or witness to a

10      crime.  Tell me why you marked that question.

11              PROSPECTIVE JUROR:  I marked that question because I

12      was a victim of a armed robbery, I guess.

13              THE COURT:  When did that happen?

14              PROSPECTIVE JUROR:  About 10 years ago.

15              THE COURT:  Did it happen here in the District?

16              PROSPECTIVE JUROR:  Yes, it did.

17              THE COURT:  Okay.  And was the person ever caught?

18              PROSPECTIVE JUROR:  I do not believe so, no.

19              THE COURT:  And did you interact with the police during

20      that process?

21              PROSPECTIVE JUROR:  I was with a friend.  We both

22      immediately went to the police and we reported the crime and

23      gave information at that time.

24              THE COURT:  Okay.  And so someone came up to you with a

25      gun.  And what did they take from you?
```

1    PROSPECTIVE JUROR:  They wanted I guess money, whatever

2    cash we had on us.  So we turned over the cash.  I actually

3    didn't give them all my cash, but we did give them money, and

4    then they went away.  So it wasn't really -- and we were able

5    to get in a cab and get away.

6    THE COURT:  Okay.  And in your interactions with the

7    police and reporting the crime, do you have any positive or

8    negative reactions or responses to how they handled it?

9    PROSPECTIVE JUROR:  I mean, we reported the information

10   that we had.  It was limited.  I had a sense that they might

11   have been aware of what was going on.  There were some other

12   odd occurrences that happened after we got in the cab in terms

13   of another car and -- so I don't know.  I mean, they never

14   shared with us what the outcome was, but my sense was is that

15   they were monitoring the area and that they were aware.  But

16   again, we never had any follow-up.

17   THE COURT:  Okay.  Is there anything about that

18   experience that you think would make it hard for you to be a

19   fair juror in this case?

20   PROSPECTIVE JUROR:  I mean, I guess generally I'm aware

21   of the difficulty it is to locate -- I mean, basically --  I

22   mean to build a case and to bring it and to collect the

23   evidence, it's difficult.  I mean, but I'm generally aware of

24   that.  So I felt that they were doing what they needed to do.

25   But -- and at the same time, I felt like I was stupid for

1     walking up that street myself.

2              THE COURT:  Well, I can assure you you were not.

3              PROSPECTIVE JUROR:  Yeah.

4              THE COURT:  Not at all.  But I understand.  I guess we

5     all bring our life experiences, feelings with us here.  Do you

6     think there's anything about that experience that would make

7     it hard for you to listen to the evidence in this case that

8     you hear in this courtroom and be fair in deciding this case?

9              PROSPECTIVE JUROR:  I mean, the only thing I will say

10    is that that was -- it was a serious crime.  There was a

11    weapon involved.  So, I mean, I do -- I do view -- I mean in

12    terms of crime, like, I have a pretty high standard.  I don't

13    trivialize it.  That's the only thing I would say, is that I

14    don't think it would prejudice me in any way except that I

15    think that the justice system should be used to prosecute

16    serious crimes.

17             THE COURT:  Okay.  And in this case, if you hear

18    evidence -- the question will be if the government presents

19    evidence beyond a reasonable doubt the defendant is guilty and

20    I'm going to instruct you to convict.  And if the government

21    doesn't present evidence beyond a reasonable doubt, I'll

22    instruct you to acquit the defendant.  Do you think you can

23    listen to the evidence and my instructions in this case and do

24    that?

25             PROSPECTIVE JUROR:  Yes.  I mean, yes, I can do that.

1          THE COURT:  Okay.  You marked No. 8 about having close

2     friends working at a prosecutor's office.  Can you tell me

3     more about that?

4          PROSPECTIVE JUROR:  It's not -- I'm -- I prosecute

5     fraud.

6          THE COURT:  Are you a lawyer?

7          PROSPECTIVE JUROR:  I am a lawyer.

8          THE COURT:  Where do you work?

9          PROSPECTIVE JUROR:  I work for the Federal Trade

10     Commission.

11          THE COURT:  Okay.  And tell me a little bit more about

12     what you do.

13          PROSPECTIVE JUROR:  Well, I investigate deceptive and

14     unfair practices against the American people, you know,

15     consumer protection law.  So, you know, basically conduct

16     investigation, collect the facts, write recommendations, bring

17     cases to court.  I mean, that's basically.  But it's consumer

18     fraud.

19          THE COURT:  Okay.  And you're a lawyer.  You have --

20     you come here with all of that training.  Are you going to be

21     able to, if selected in this case, listen to the evidence,

22     listen to my instructions, and decide this case fairly based

23     only on what you hear in this courtroom?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Do you have any questions about your

1    ability to do that?

2        PROSPECTIVE JUROR:  No.

3        THE COURT:  Okay.  Any questions for this witness?

4        MR. WOLF:  No, Your Honor.

5        MR. OHM:  Hi.  Good morning.  So as somebody who works

6    as a prosecutor essentially, do you think that your mind sort

7    of, I guess intentionally or unintentionally, relates to the

8    side of the prosecution in a criminal case?

9        PROSPECTIVE JUROR:  I wouldn't necessarily say that.  I

10   take my job seriously, and I believe in facts and the law.  So

11   I mean, I don't have a bias towards the prosecution.  If

12   anything, I apply a high standard because I apply a high

13   standard to myself.  If that makes sense.

14       MR. OHM:  And obviously the standard in a criminal case

15   is beyond a reasonable doubt.  I don't know if you've ever

16   served in a criminal trial jury as a juror before, but do you

17   think you'll have any problem applying that standard even

18   though it's different than the standard you work in?

19       PROSPECTIVE JUROR:  I mean, I don't think so.  It's a

20   higher standard, so... I mean, that's -- that's the only --

21       THE COURT:  And let me try it this way.  I'm going to

22   instruct you on the law what the standard is.  You're going to

23   hear the evidence.  Do you think you would have any trouble

24   following my instructions and applying the law based on the

25   evidence you hear in this courtroom?

1       PROSPECTIVE JUROR:  I don't think so, no.  I mean...

2       THE COURT:  Okay.  Anything else?  Okay.  Thank you

3  very much.

4       (Juror 2179 steps down.  Juror 1655 steps up.)

5       THE COURT:  Good morning.  How are you?

6       PROSPECTIVE JUROR:  Good.  How are you?

7       THE COURT:  Good.  Tell me your juror number, please.

8       PROSPECTIVE JUROR:  1655.

9       THE COURT:  Thank you.  Okay.  You marked the question

10  for hardship.  Tell me, what is the hardship.

11       PROSPECTIVE JUROR:  I have medical things I need to do

12  with my family.

13       THE COURT:  Could you repeat that?

14       PROSPECTIVE JUROR:  I have medical appointments on

15  Friday that I can't miss.

16       THE COURT:  Okay.  You have medical appointments this

17  Friday?  Are those appointments your appointments or for

18  others?

19       PROSPECTIVE JUROR:  For others.

20       THE COURT:  And are they appointments that someone else

21  can cover or that can be rescheduled if you got selected on

22  the jury?

23       PROSPECTIVE JUROR:  I don't know.  I haven't tried

24  because I rescheduled them because I was here Monday last

25  week.

1          THE COURT:  Sorry.  Say that again?

2          PROSPECTIVE JUROR:  I rescheduled them once already

3     because I was here Monday.

4          THE COURT:  You rescheduled those appointments before,

5     so you're not sure if they can be rescheduled again?

6          PROSPECTIVE JUROR:  Yeah.  I don't know.

7          THE COURT:  Is there another family member who can

8     attend the appointments if you're selected on the jury and

9     we're still sitting on Friday?

10         PROSPECTIVE JUROR:  Perhaps.  I haven't asked them.

11         THE COURT:  Okay.  But potentially someone else could

12    accompany whoever has these appointments?  Is that right?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  All right.  You marked question 11 about

15    testimony from the police, ICE, or the FBI.  Tell me a little

16    bit more about that.

17         PROSPECTIVE JUROR:  It's just my occupation and where I

18    work.

19         THE COURT:  Tell me where you work.

20         PROSPECTIVE JUROR:  U.S. Customs and Border Protection.

21         THE COURT:  What do you do there?

22         PROSPECTIVE JUROR:  Staffing, mission support, back end

23    type of HR-related things.

24         THE COURT:  And so what about your job --

25         MR. OHM:  I'm sorry, Your Honor.  I missed that last

1    answer.  It sounded important.

2            THE COURT:  She said she works at U.S. Customs and

3    Border Protection, staffing, mission support, back end type of

4    HR-related things.

5        And so tell me why that would make it difficult for you to

6    be a fair juror in this case.

7            PROSPECTIVE JUROR:  I just thought I should have said

8    that.  That's all.

9            THE COURT:  Okay, yeah.  Do you have strong feelings

10    about ICE, for example, given that you work at CBP, that would

11    make it difficult for you to be a fair juror in this case?

12            PROSPECTIVE JUROR:  No.

13            THE COURT:  If I have testimony from an ICE agent, do

14    you think that you're more likely to believe that agent

15    because of where you work or not?

16            PROSPECTIVE JUROR:  No.

17            THE COURT:  Okay.  You marked No. 8 about having you or

18    close friends or relatives working in a prosecutor's office.

19    Tell me more about that.

20            PROSPECTIVE JUROR:  That's No. 7, isn't it?

21            THE COURT:  You marked 7 and 8.  7 is about whether you

22    or one of your close friends or relatives is a lawyer or

23    worked in a law office, and then 8 is about whether they

24    worked in a prosecutor's office or law enforcement.

25            PROSPECTIVE JUROR:  My roommate just finished taking

1    the bar exam.

2             THE COURT:  Just finished the bar exam?

3             PROSPECTIVE JUROR:  She doesn't find out for months.

4             THE COURT:  I know that is a tough period.  Okay.  And

5    do you know -- does she have a job lined up, or what's she

6    doing?

7             PROSPECTIVE JUROR:  Not that I'm aware of.

8             THE COURT:  Okay.  So what about No. 8 about working in

9    the prosecutor's office or law enforcement --

10             PROSPECTIVE JUROR:  I think I put a question mark next

11    to No. 7 because I wasn't sure if she counted for that because

12    she's not -- she doesn't know if she passed yet so she's not a

13    lawyer yet.

14             THE COURT:  Got it.  So you have your roommate who is

15    waiting for results of the bar exam, but otherwise, you don't

16    have any close friends or relatives who's a --

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  -- lawyer or working for a prosecutor's

19    office.

20      Okay.  And so just going back to your earlier testimony,

21    understanding that there will be testimony here from law

22    enforcement personnel, from ICE, from FBI, do you have any

23    strong feelings about ICE or the police or the FBI, either

24    positive or negative, that would make it hard for you to be a

25    fair juror in this case?

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  And you can listen to the evidence in this

3     courtroom, listen to my instructions, and follow those

4     instructions and decide this case based only on what you hear

5     in the courtroom?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Okay.  Any questions?

8              MR. WOLF:  Yes.  If you learned that one or more of the

9     folks in this case had a background at Customs Border

10    Protection, would that affect whether you think that person is

11    more or less believable?

12             PROSPECTIVE JUROR:  No.

13             MR. OHM:  Hi.  Good morning.  So I don't want to delve

14    too much into the medical situation, but did you say that you

15    had to move it before because you had to serve last week on

16    jury duty?

17             PROSPECTIVE JUROR:  We were called, we sat in that

18    room, and then they sent some of us home.

19             MR. OHM:  Okay.

20             PROSPECTIVE JUROR:  That was the 6th.

21             MR. OHM:  And then you moved that same medical

22    appointment because of that?

23             PROSPECTIVE JUROR:  Other medical appointments but the

24    same --

25             MR. OHM:  So even if you were able to find a

1    substitute, do you think it would impact you in terms of,

2    like, being able to focus on what's going on in the courtroom

3    because you're worried about the medical appointment of your

4    family member?

5              PROSPECTIVE JUROR:  No.

6              MR. OHM:  Okay.  And going back to the law enforcement

7    question, so -- are you like a HR person at Customs and Border

8    Patrol, or do you do like -- like, are you an officer, or

9    what's your title?

10             PROSPECTIVE JUROR:  Management program analyst.  I work

11   with staff that's going overseas, to make sure they have all

12   of their qualifications to do so.

13             MR. OHM:  Okay.  Did you ever work on any sort of

14   immigration enforcement, removal, anything like that?

15             PROSPECTIVE JUROR:  No.

16             MR. OHM:  How long have you worked for CBP?

17             PROSPECTIVE JUROR:  18 months?  Yeah.

18             MR. OHM:  What did you do before that?

19             PROSPECTIVE JUROR:  I worked at FEMA.

20             MR. OHM:  Thank you.

21             THE COURT:  Thank you very much.

22        (Juror 1655 steps down.  Juror 1464 steps up.)

23             THE COURT:  Good morning.

24             PROSPECTIVE JUROR:  Good morning.

25             THE COURT:  How are you?

1          PROSPECTIVE JUROR:  I'm doing well.  How are you?

2          THE COURT:  Good.  It's still morning, briefly.  I was

3     looking at the time.  Tell me your juror number.

4          PROSPECTIVE JUROR:  1464.

5          THE COURT:  Okay.  And I don't see anything on your

6     card other than your juror number.  Tell me why.

7          PROSPECTIVE JUROR:  Correct.  Oh, I had nothing to

8     report.

9          THE COURT:  Okay, good.  Tell me, what do you do for a

10    living?

11         PROSPECTIVE JUROR:  I work at the Department of Defense

12    as a policy advisor.

13         THE COURT:  What kind of issues do you work on?

14         PROSPECTIVE JUROR:  Stabilization and peacekeeping.

15         THE COURT:  Okay.  And do you work on any type of

16    immigration policy issues?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  How long have you worked there?

19         PROSPECTIVE JUROR:  Two months.

20         THE COURT:  Okay.  What did you do before?

21         PROSPECTIVE JUROR:  I was at the State Department.

22         THE COURT:  What did you do there?

23         PROSPECTIVE JUROR:  I worked in the cyberspace and

24    digital policy bureau.

25         THE COURT:  Okay.  That sounds very, very interesting.

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Do you think you can be a fair juror in

3    this case, or is there anything preventing you from being a

4    fair juror in this case?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Any questions?

7          MR. WOLF:  Your State Department job, I guess in

8    layman's terms, can you explain what you did day-to-day.

9          PROSPECTIVE JUROR:  I was a policy advisor there.  I

10    worked in an office that worked at the intersection of

11    technology and human rights.  So we worked on a range of

12    issues internationally to kind of make sure that technology

13    wasn't facilitating human rights abuses and human rights

14    abuses were not being facilitated online.

15          MR. WOLF:  Thank you.

16          MS. ABE:  Good morning.  I might have missed this.  How

17    long have you lived in the D.C. area?

18          PROSPECTIVE JUROR:  I've been here six years.

19          MS. ABE:  Thank you.

20          THE COURT:  Okay.  Thank you very much.

21       (Juror 1464 steps down.  Juror 0157 steps up.)

22          THE COURT:  Good morning.  How are you?

23          PROSPECTIVE JUROR:  Good morning.  Good.

24          THE COURT:  Tell me your juror number, please.

25          PROSPECTIVE JUROR:  0157.

1          THE COURT:  Thank you.  Okay.  So you've marked two

2     questions here.  One, whether you or a close friend or

3     relative is a lawyer, and then whether someone worked in a

4     prosecutor's office.  So tell me who that is.

5          PROSPECTIVE JUROR:  So my best man's father is a lawyer

6     and so I know him well, talk to him a lot.

7          THE COURT:  What does he do?

8          PROSPECTIVE JUROR:  He's a JAG, I think, so he's an

9     army lawyer.  Yeah.  He lives in California.

10         THE COURT:  Okay.  Do you ever talk to him about work?

11         PROSPECTIVE JUROR:  Sometimes.  I recently got married

12    and so we talked a lot around that time.  So he talked to me a

13    little bit about his work, but not like case specifics.  Just

14    about being a lawyer and his time in the Army.

15         THE COURT:  Okay.  And then do you have someone else

16    who works in a prosecutor's office?

17         PROSPECTIVE JUROR:  I don't know someone in the

18    prosecutor's office.  I might have missed --

19         THE COURT:  That's okay.  So the only lawyer is your

20    best man's dad who we talked about?

21         PROSPECTIVE JUROR:  And then I have a friend,

22    Marguerite.  I don't know what law office she works in but she

23    just graduated from law school and she's now in D.C. as a

24    lawyer.  But I don't know exactly where.

25         THE COURT:  Do you know if she does criminal law?

1          PROSPECTIVE JUROR:  I don't believe so.  I think it's

2     like white-collar law.

3          THE COURT:  And you think she's at a law firm doing

4     that?

5          PROSPECTIVE JUROR:  Yeah, on K Street.

6          THE COURT:  Is that criminal defense?

7          PROSPECTIVE JUROR:  I don't think so.  And then I'm a

8     reporter, so I talk to lawyers often, but not in like a

9     friendly way.  Mostly like as a journalist trying to figure

10    stuff out.  I don't know if that qualifies for any of those

11    questions.

12         THE COURT:  Well, it's okay.  I was going to ask you

13    what you do for a living, so that's a nice segue.  So tell me

14    what you write about.

15         PROSPECTIVE JUROR:  So I used to be a local reporter

16    here in D.C. so I covered crime a lot.  But now I work at

17    National Public Radio, so I cover national stories, but I do

18    cover things from the White House to Congress, and I have

19    covered stories like pertaining to increased immigration

20    enforcement around the country.

21         THE COURT:  Okay.  And so sounds like you've covered

22    criminal issues before.

23         PROSPECTIVE JUROR:  That's right.

24         THE COURT:  And now you're covering issues including

25    touching on immigration.  Do you think anything about that

1    would make it difficult for you to be a fair juror in this

2    case?

3        PROSPECTIVE JUROR:  No.  I mean, I just know a lot

4    about it.  I know -- yeah -- a lot about the issues and the

5    parties.  Yeah.  I just have a lot of information.

6        THE COURT:  And everyone brings a lot of experiences

7    and prior knowledge with them.  Do you think in this case

8    you'll be able to put that to the side, listen to the evidence

9    and make a decision based on what you hear in the courtroom?

10        PROSPECTIVE JUROR:  Yeah.  What do you mean by put to

11    the side?

12        THE COURT:  So if you have general views on crime or

13    immigration --

14        PROSPECTIVE JUROR:  Like personally held opinions

15    rather than like --

16        THE COURT:  Correct.

17        PROSPECTIVE JUROR:  -- objective information.

18        THE COURT:  Yeah.  Or things you learned in your job,

19    for example, will you be able to be fair in this case, meaning

20    you're going to hear evidence and the question is if the

21    government presents evidence beyond a reasonable doubt this

22    defendant is guilty, and I'm going to instruct you to convict,

23    and if the government doesn't present evidence beyond a

24    reasonable doubt I'm going to instruct you to acquit, do you

25    think you could do that and make a decision here based on what

1    you hear in the courtroom?

2        PROSPECTIVE JUROR:  To the best of my ability, yeah.  I

3    would do my best to do that.

4        THE COURT:  Okay.  And you have no doubt about your

5    ability to do that in light of whatever you have written about

6    or investigated with respect to either crime or immigration

7    policy or the administration generally?

8        PROSPECTIVE JUROR:  It would be a task, but I would

9    work to be as objective as possible.

10       THE COURT:  Right.  Would you listen to the evidence,

11   listen to my instructions and follow my instructions?

12       PROSPECTIVE JUROR:  Yes.

13       THE COURT:  Any questions for this witness?

14       MR. WOLF:  Good morning.  You said you reported locally

15   on crime in D.C.  Was that with NPR or someone else?

16       PROSPECTIVE JUROR:  That was with WTOP news.  So it was

17   a lot of, like, homicides and shootings.

18       MR. WOLF:  What time frame did you work with WTOP?

19       PROSPECTIVE JUROR:  WTOP I worked from 2000 to -- I

20   think it was late 2023.  So I worked at WTOP for three years,

21   and then I've been at NPR for two years.  Before that I

22   covered crime in San Diego for the San Diego Union-Tribune,

23   and covered a couple court cases there.

24       MR. WOLF:  In covering crime, local issues, have you

25   formed -- I mean, obviously everyone has personal beliefs, but

1    having those personal beliefs, would that override your

2    ability to be objective about the evidence in this case and

3    hear from law enforcement officers?

4         PROSPECTIVE JUROR:  I don't think so.  I mean, as a

5    reporter I do my best to be as objective as possible and just

6    kind of stick to the story.

7         MR. WOLF:  Thank you.

8         MR. OHM:  So assuming that a journalist feels like a

9    journalist's role is to figure out what happened and find the

10   truth, your role would be different here.  It essentially

11   would be to figure out whether the government has proven its

12   case beyond a reasonable doubt.  Given that it's sort of like

13   a different thought process, do you think that would pose any

14   problems for you?

15        PROSPECTIVE JUROR:  Yeah, it would definitely be -- I

16   guess I'd have to switch that wiring in my brain a little bit.

17        MR. OHM:  You think you could do that, though?

18        PROSPECTIVE JUROR:  I think I could, yeah, if I tried.

19   I feel like I could.

20        THE COURT:  And I'm going to instruct you on the law

21   and what you're supposed to do.  And so your job will be

22   listening to my instructions, listening to the evidence,

23   following my instructions based on what you hear in the

24   courtroom.  Do you have any concerns about your ability to do

25   that?

```
 1              PROSPECTIVE JUROR:  I can follow instructions.
 2              THE COURT:  Great.  Thank you very much.
 3          (Juror 0157 steps down.  Juror 1973 steps up.)
 4              THE COURT:  Good morning.  How are you?
 5              PROSPECTIVE JUROR:  Good morning.  How you doing?
 6              THE COURT:  Good.  Tell me your juror number.
 7              PROSPECTIVE JUROR:  1973.
 8              THE COURT:  Thank you.  So you've marked the question
 9      about hardship.  Tell me why it would be a hardship for you to
10      serve on the jury.
11              PROSPECTIVE JUROR:  Because I got court tomorrow.
12              THE COURT:  Say that again?
13              PROSPECTIVE JUROR:  I have court tomorrow.
14              THE COURT:  You have court tomorrow.  For what?
15              PROSPECTIVE JUROR:  A simple assault.
16              THE COURT:  Are you testifying, are you a defendant, or
17      do you know someone in the case?
18              PROSPECTIVE JUROR:  No.  I have court tomorrow.
19              THE COURT:  You have court tomorrow?
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  Okay.  Are you the defendant in that case?
22              PROSPECTIVE JUROR:  I don't even know what a
23      defendant -- what do you mean?
24              THE COURT:  Are you being charged with something?
25              PROSPECTIVE JUROR:  Yes.
```

```
 1              THE COURT:  Okay.  Any objection?
 2              MR. WOLF:  No, Your Honor.
 3              MR. OHM:  No, Your Honor.
 4              THE COURT:  Okay.  Thank you.  You're excused.
 5              PROSPECTIVE JUROR:  All right.  Thank you.
 6         (Juror 1973 steps down.  Juror 0838 steps up.)
 7              THE COURT:  Good morning.
 8              PROSPECTIVE JUROR:  Good morning.
 9              THE COURT:  Tell me your juror number.
10              PROSPECTIVE JUROR:  0838.
11              THE COURT:  Okay.  Thank you.  So you've marked 7, 8,
12      and 9 about knowing lawyers or people working in the
13      prosecutor's office and the defense -- on the defense side.
14      Tell me about that.
15              PROSPECTIVE JUROR:  I'm an attorney and a former
16      assistant district attorney for Kings County, Brooklyn,
17      New York.
18              THE COURT:  Let me get all that.  So you used to work
19      at the district attorney's office in New York?
20              PROSPECTIVE JUROR:  Yes, ma'am.
21              THE COURT:  How long did you work there?
22              PROSPECTIVE JUROR:  Three years.
23              THE COURT:  Three years.  Okay.  And where do you work
24      now?
25              PROSPECTIVE JUROR:  I'm self-employed.  I'm a
```

1      consultant for nonprofits.

2              THE COURT:  You got out of the practice --

3              PROSPECTIVE JUROR:  I escaped.

4          (Laughter.)

5              THE COURT:  Okay.  So you did that for three years, and

6      now tell me what you do.

7              PROSPECTIVE JUROR:  So I consult with nonprofits on

8      their social media strategy as well as running my own social

9      media, like, web pages.

10             THE COURT:  Okay.  And so it has nothing to do with --

11             PROSPECTIVE JUROR:  The nonprofit does deal with law.

12     They advocate for retired federal judges and Article III

13     positions, but I just handle their social media.  I don't do

14     any litigation or anything.

15             THE COURT:  Okay.  And tell me whether your prior

16     service as an ADA would make it difficult for you to be a fair

17     juror in this case.

18             PROSPECTIVE JUROR:  No, ma'am.

19             THE COURT:  So you have legal training and you've

20     prosecuted cases and did that for three years.  Do you think

21     that will have any impact at all on your ability to listen to

22     the evidence here, listen to my instructions, and be fair in

23     this case?

24             PROSPECTIVE JUROR:  No, ma'am.

25             THE COURT:  Okay.  Do you think it's more likely that

1    you are going to believe the government's witnesses, having

2    been a prosecutor yourself, or will you leave that and those

3    experiences to the side and be fair in this case?

4         PROSPECTIVE JUROR:  No, I can leave it and be fair.

5         THE COURT:  Okay.  Any questions?

6         MR. WOLF:  Good morning.

7         PROSPECTIVE JUROR:  Good morning.

8         MR. WOLF:  When did you work for Brooklyn DA's office?

9         PROSPECTIVE JUROR:  I was there 2017 to early pandemic,

10   so 2020.

11        MR. WOLF:  Do you keep in touch with anyone there

12   still?

13        PROSPECTIVE JUROR:  Just my husband, who was also an

14   assistant district attorney.

15        MR. WOLF:  Sorry to pry, but what is your husband's

16   name?

17        PROSPECTIVE JUROR:  Joseph Gookin.

18        THE COURT:  Defense?

19        MR. OHM:  In like law school or in any other sort of

20   capacity, did you ever do any defense work?

21        PROSPECTIVE JUROR:  Yes.  In law school I assisted my

22   professor who was pro se doing the penalty appeals for the

23   California State Supreme Court.

24        MR. OHM:  And was your prosecutor job your only legal

25   job?

1      PROSPECTIVE JUROR:  No.  I then did civil litigation.

2   I was a plaintiff's attorney representing adult survivors of

3   CSAM and child sexual abuse.

4      MR. OHM:  And in law school did you have any other like

5   internships or jobs or anything like that.

6      PROSPECTIVE JUROR:  I had one unfortunate summer at big

7   law and quickly realized that was not my vocation.

8      MR. OHM:  And all of these things, do you find it

9   difficult for you to sort of think -- obviously, it's

10   different being a prosecutor than being a juror and applying

11   the reasonable doubt standard.  Do you think you would have

12   any difficulty following the judge's instructions in applying

13   the burden of proof and the presumption of innocence?

14      PROSPECTIVE JUROR:  No.

15      MR. OHM:  I don't have anything else.

16      THE COURT:  Okay.  Thank you very much.

17   (Juror 0838 steps down.  Juror 1024 steps up.)

18      THE COURT:  Hi.  Good afternoon.

19      PROSPECTIVE JUROR:  Hi.  Good afternoon, Your Honor.

20      THE COURT:  How are you?

21      PROSPECTIVE JUROR:  Good.  How are you?

22      THE COURT:  Good.  Thank you.  Tell me your juror

23   number.

24      PROSPECTIVE JUROR:  1024.

25      THE COURT:  Okay.  So you've marked 7, 8, and 9.  Are

1          you a lawyer?

2                    PROSPECTIVE JUROR:  Yes.

3                    THE COURT:  Okay.  Tell me, what do you do, where do

4          you work?

5                    PROSPECTIVE JUROR:  So I practice national security law

6          at a firm right here in D.C. on economic sanctions.

7                    THE COURT:  So you do economic sanctions work?

8                    PROSPECTIVE JUROR:  Yeah.

9                    THE COURT:  Have you ever done any criminal work?

10                    PROSPECTIVE JUROR:  Yeah.  It's involved with that.

11                    THE COURT:  Related to economic sanctions?

12                    PROSPECTIVE JUROR:  Yeah.

13                    THE COURT:  So tell me what you've done.

14                    PROSPECTIVE JUROR:  So we've had clients that have been

15          indicted for money laundering concerns, but that's about it.

16          We've only done one case.

17                    THE COURT:  Okay.  How long have you been there?

18                    PROSPECTIVE JUROR:  Eight years.

19                    THE COURT:  Eight years.  Okay.  And have you had any

20          other legal jobs?

21                    PROSPECTIVE JUROR:  No.  Or I guess during law school,

22          yes.

23                    THE COURT:  What did you do during law school?

24                    PROSPECTIVE JUROR:  I worked at Senate Finance

25          Committee and then I worked for an attorney doing death row

 1    work, and then I worked at Department of Labor.

 2              THE COURT:  What did you do at Labor?

 3              PROSPECTIVE JUROR:  I helped out the international --

 4    like their trade agreement office, so -- I mean, I guess it

 5    wasn't litigation, but it was advising on countries' labor

 6    laws.

 7              THE COURT:  Okay.  And so at your firm now are you

 8    representing defendants who have been indicted on money

 9    laundering charges?

10              PROSPECTIVE JUROR:  That's correct.

11              THE COURT:  Okay.  So you've got legal training and

12    you're on the defense side now in practice.  Do you think you

13    can be a fair juror in this case?  Do you think you can put

14    your legal training aside and focus on my instructions and the

15    evidence presented in this courtroom and render a fair

16    verdict?

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  Do you have any concerns about your ability

19    to follow my instructions and listen to the evidence and be a

20    fair and impartial juror in this case?

21              PROSPECTIVE JUROR:  No.  No concerns.

22              THE COURT:  Okay.  You also marked No. 10, which is

23    have you or one of your close friends or relatives ever been

24    arrested for, convicted of, or charged with a crime or been a

25    victim of or witness to a crime.  Tell me about that.

1          PROSPECTIVE JUROR:  So I'm familiar with a few people

2     that have been charged with crimes.  One related to

3     trespassing, one related to DUI, so things like that.

4          THE COURT:  These are friends or acquaintances of

5     yours?

6          PROSPECTIVE JUROR:  Yeah.

7          THE COURT:  Okay.  And is there anything about that

8     that you think would make it hard for you to be fair in this

9     case?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Okay.  And so, you do defense work.  Do you

12     know someone who has worked in a prosecutor's office as well?

13          PROSPECTIVE JUROR:  I'm friends with a few people who

14     work for the FBI.  So I don't know if they're actively

15     prosecuting cases or what the details are.  I just know

16     they're involved with that work.

17          THE COURT:  So just to recap and make sure I have all

18     of this right, so you work at a firm now doing criminal

19     defense work.  You've had various jobs throughout law school,

20     you have friends who work for the FBI, and you have friends

21     who have been arrested for various charges.  So you've got

22     lots of interactions --

23          PROSPECTIVE JUROR:  Yeah, pretty much everything.

24          THE COURT:  -- with the criminal justice system.  You

25     are confident that you can be a fair juror in this case?

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Okay.  Any other questions?

 3              MR. WOLF:  No, Your Honor.

 4              MS. ABE:  None from the defense.  Thank you.

 5              THE COURT:  Thank you very much.

 6          (Juror 1024 steps down.  Juror 0734 steps up.)

 7              THE COURT:  Good morning.  Actually, good afternoon.

 8      Time ticked over.  How are you?

 9              PROSPECTIVE JUROR:  Good.  How are you?

10              THE COURT:  Good.  Thank you.  Tell me your juror

11      number.

12              PROSPECTIVE JUROR:  0734.

13              THE COURT:  Thank you.  Okay.  So you've marked two

14      questions.  Are you a lawyer?

15              PROSPECTIVE JUROR:  I am not, just classic D.C. --

16              THE COURT:  You know --

17              PROSPECTIVE JUROR:  -- yeah, father-in-law --

18              THE COURT:  It's hard to find people here who don't

19      know a lawyer.  So tell me, who's the lawyer in your life?

20              PROSPECTIVE JUROR:  My father-in-law, and then I would

21      say like most of my husband's college roommates who are dear

22      friends of mine as well.

23              THE COURT:  Okay.  And let's start with your

24      father-in-law.  What type of law does he practice?

25              PROSPECTIVE JUROR:  Good question.  I think it was
```

1    primarily like estate.  Not interesting law.

2            THE COURT:  Not criminal.

3            PROSPECTIVE JUROR:  No.

4            THE COURT:  And then what does your husband do?  You

5    mentioned that a lot of his friends are lawyers.

6            PROSPECTIVE JUROR:  Yeah, he's a data scientist.

7            THE COURT:  So data scientist with lots of lawyer

8    friends?

9            PROSPECTIVE JUROR:  Yeah.

10            THE COURT:  Do any of them do criminal law?

11            PROSPECTIVE JUROR:  No.  None of them do criminal law.

12            THE COURT:  Okay.  Then you marked No. 10:  Have you or

13    one of your close friends or relatives ever been arrested for,

14    convicted of, or charged with a crime or been a victim or

15    witness to a crime?  Tell me about that.

16            PROSPECTIVE JUROR:  I was just at the funeral yesterday

17    for a dear friend who was killed in the mass shooting in North

18    Carolina on September 27.

19            THE COURT:  I'm very sorry.

20            PROSPECTIVE JUROR:  Thank you.  Sorry.

21            THE COURT:  No, that is a lot.  I am very sorry for

22    your loss, and I know that must be incredibly difficult.

23            PROSPECTIVE JUROR:  Thanks, I appreciate it.

24            THE COURT:  Do you think there's anything about having

25    been through that that will make it hard for you to serve on

1       this juror and to be a fair juror if you were selected?

2               PROSPECTIVE JUROR:  No.

3               THE COURT:  Did you have any interactions with the

4       police or with law enforcement in connection with that

5       directly?

6               PROSPECTIVE JUROR:  No, I did not.

7               THE COURT:  Tell me what you do for a living.

8               PROSPECTIVE JUROR:  I'm a consultant and executive

9       coach.

10              THE COURT:  Where do you work?  Do you have your own

11      practice?

12              PROSPECTIVE JUROR:  Yeah.

13              THE COURT:  So what types of things do you do?  Who do

14      you coach and consult for?

15              PROSPECTIVE JUROR:  Mostly senior leadership teams of

16      small to midsize organizations.  So that can be here in D.C.

17      or elsewhere.

18              THE COURT:  Okay.  And I know I've asked you this

19      before, but I just want to be sure.  In this case, do you have

20      any concerns about your ability to be fair?

21              PROSPECTIVE JUROR:  No.

22              THE COURT:  Okay.  So you can listen to the evidence,

23      listen to my instructions, and make a decision in this case if

24      you are selected based on the evidence and my instructions?

25              PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Any questions?

2          MR. WOLF:  No, Your Honor.

3          MS. ABE:  None from the defense.  Thank you.

4          THE COURT:  Thank you.

5       (Juror 0734 steps down.  Juror 2108 steps up.)

6          THE COURT:  Good afternoon.  How are you?

7          PROSPECTIVE JUROR:  I'm doing well.  Thank you, Judge.

8   How are you?

9          THE COURT:  I am good.  Tell me your juror number.

10         PROSPECTIVE JUROR:  2108.

11         THE COURT:  Thank you.  Okay.  So you marked No. 7.

12  Are you a lawyer?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Tell me what you do and where you work.

15         PROSPECTIVE JUROR:  I work for the U.S. Department of

16  Veterans Affairs.  I'm actually an EEO investigator, so I

17  investigate EEO claims filed by job applicants and also VA

18  employees.  However, I'm on a detail and I'm the assistant

19  acting district manager for the Office of Resolution

20  Management.  We process EEO claims mostly.

21         THE COURT:  Okay.  And these are all civil claims?

22         PROSPECTIVE JUROR:  Administrative stuff.  Yeah.  No

23  criminal stuff.

24         THE COURT:  Have you ever done any criminal work?

25         PROSPECTIVE JUROR:  No.

1          THE COURT:  How long have you been at the VA?

2          PROSPECTIVE JUROR:  I've been at the VA for five years,

3     but I have 21 years of experience as a federal employee.

4          THE COURT:  Okay.  What did you do before you were at

5     the VA?

6          PROSPECTIVE JUROR:  I did some -- I took about, I don't

7     know, five years off or something.  I did some document

8     review, and I did some contract EEO investigations with the

9     United States Postal Service.  And before then -- well, part

10    of my career I did do some private work, but again, that was

11    usually before the EEOC or the MSPB.  I haven't practiced law

12    probably in like seven years, and my license is inactive for

13    health reasons.

14       But before then I also worked for the FCC as a -- first I

15    was a law clerk and then I did some audits for their media

16    bureau at the time with EEO-related stuff.  I did some

17    employee and labor relations work with HHS.  I was with HUD in

18    the Office of General Counsel where I did EEO and MSPB work.

19    And I think that's about it.

20         THE COURT:  Okay.  That's plenty.  So you've had legal

21    training and various jobs, noncriminal, but you have done work

22    as a lawyer in various capacities.  Is there anything about

23    that that you think would make it difficult for you to be a

24    fair juror if you were selected in this case?

25         PROSPECTIVE JUROR:  No.

1          THE COURT:  And you can listen to the evidence, listen

2     to my instructions and follow those instructions and decide

3     this case based on what you hear in the courtroom?

4          PROSPECTIVE JUROR:  Yes, ma'am.

5          THE COURT:  Okay.  Any questions?

6          MR. WOLF:  No, Your Honor.

7          MS. ABE:  None for the defense.  Thank you.

8          THE COURT:  Okay.  Thank you very much.

9        (Juror 2108 steps down.)

10         THE COURT:  Okay.  So I have 23 qualified.  Does anyone

11    have something different?

12         MR. OHM:  That's what we have, Your Honor.

13         MR. WOLF:  Agreed from the government, Your Honor.

14         THE COURT:  Okay.  So we will -- we'll bring in --

15    okay.  So we will bring in the first 14 in the box.  Everyone

16    else will be in the gallery.  And you'll have 10 minutes to do

17    your peremptories for each.  Any questions before we bring the

18    jurors in?

19         MR. OHM:  Your Honor, I think there were a couple of

20    people who said they needed to check to reschedule?  Could we

21    make sure that that's happened, since we do have a little bit

22    more of a cushion than what we thought we would?

23         THE COURT:  What are you referring to?

24         MR. OHM:  I know 1655 was one person who said she had

25    to check to make sure either the medical appointment could be

1     rescheduled or another family member could to it.

2         THE COURT:  I didn't ask her to check.  I think she

3     said she believed someone could cover the appointment.  And

4     she also said she -- you know, I believe you questioned her

5     about whether she would be stressed about that and she said

6     no.  I don't recall asking her to check on that.

7         MR. OHM:  I just don't want to lose a juror in the

8     middle if it could be preventable.  I thought she said that

9     she hadn't tried, was my recollection.

10        THE COURT:  Okay.  I asked her whether someone else

11    could cover or whether it could be rescheduled and she said

12    probably.

13        MR. OHM:  Okay.

14        THE COURT:  So that is good enough for me at this

15    point.

16        MR. OHM:  Your Honor, my request would be, just given

17    the fact that she already had rescheduled once because of jury

18    duty, to put her in the back of the group of --

19        THE COURT:  I'm not going to do that.

20        MR. OHM:  Okay.

21        THE COURT:  Okay.  Anything else?

22        MR. WOLF:  No, Your Honor.

23        THE COURT:  All right.  So we'll bring them in.

24      (Jury panel enters.)

25        THE COURT:  All right.  Thank you all for your

1    patience.  The lawyers are going to spend about 10 minutes

2    making decisions on striking some of you.  So you can read or

3    speak quietly -- though not about the case -- while they

4    consider their positions.

5        Go ahead, counsel.

6        MR. OHM:  Your Honor, may we approach?  Or get on the

7    phones?

8        (Bench conference.)

9        MR. OHM:  Your Honor, it occurred to me that the way

10   that we're doing it this way, with the three concurrent

11   strikes, that neither side would have an opportunity to make a

12   strike with knowing who is in the jury box.  I would ask if we

13   could do two and two concurrently and then each do -- and then

14   do the final strike separately so that we would have some

15   sense of who we're actually striking, because otherwise we

16   wouldn't know who we were actually impaneling on the jury.

17       THE COURT:  No, we're going to do all three at once.

18   You can make your three, pass them up to me, and then I will

19   let you see them.  We're going to do three, and then we'll do

20   your alternate after.

21       MR. OHM:  We would object.  Just because if we're doing

22   that, then we have no idea who is actually going to be on the

23   panel at the end of all that.

24       THE COURT:  Mr. Ohm, I told you this is how I was going

25   to do it last week.  I told you that this morning when we

1    first came into the courtroom.  And you're waiting until we're

2    doing it to object to it.  Your objection is noted, but I gave

3    you sufficient notice about how I was going to do this.

4         MR. OHM:  Just for the record, Your Honor, I don't

5    believe the Court said concurrent until today.  But

6    understood.

7         THE COURT:  Okay.  Go ahead.

8       (End of bench conference.)

9     (Counsel exercising strikes)

10        THE COURT:  Okay.  Thank you for waiting.  We're going

11   to do what I like to call musical chairs here.  We're going to

12   move some people out of the box and some people in.

13        DEPUTY CLERK:  When I call your name, just have a seat

14   on my right-hand side, your left-hand side of the gallery.

15   Juror 1906, 1309, 2179, 1655, 2017, 1464.

16     So in seat 1 can I please get 0157.  Seat 2, can I please

17   get 1097.  Seat 5, can I please get 0838.

18        THE COURT:  Okay.  So now we're going to have another

19   shorter round of strikes.  You can read or speak quietly --

20   again not about the case -- while the lawyers consider their

21   positions.

22     You've got five minutes, counsel.

23     (Counsel exercising strikes.)

24        THE COURT:  All right.  Juror No. 0838, if you could

25   please stand and have a seat on the other side of the gallery.

1          And Juror No. 1024, if you could come have a seat in seat

2     No. 5.

3          THE COURT:  Okay.  Thank you, and congratulations.  You

4     have all been selected for jury service.  To everyone else in

5     the audience, thank you for being here.  Thank you for your

6     service.  You are now excused and your service has concluded.

7     We'll show you out, and enjoy the rest of your day.

8          (Excused jurors exit.)

9          THE COURT:  Okay.  So thank you again for your patience

10    throughout this process.  We're going to swear you in, and

11    then after that we'll break for lunch and we'll come back in

12    about an hour at 1:45.  I'm going to swear you in before you

13    go out to lunch.

14          DEPUTY CLERK:  If each of you could raise your right

15    hand.

16          (Jury is sworn.)

17          THE COURT:  Okay.  Thank you all.  So again, we'll

18    break for lunch now.  Please be back and ready to start by

19    1:45.  And while you're out for lunch, please do not discuss

20    the case with anyone, including your fellow jurors.  Don't do

21    any investigation about the case online or anywhere else.  And

22    we will see you in about an hour when we'll begin and I'll

23    give you some preliminary instructions.  Thank you, everyone.

24          (Jury out at 12:46 p.m.)

25          THE COURT:  All right.  Counsel, anything else?  Any

 1      objection to the jury?

 2              MR. WOLF:  Not from the government.

 3              MS. ABE:  Not from the defense.

 4              THE COURT:  Okay.  Anything else?  We'll come back,

 5      I'll do preliminary instructions and openings.  And then is

 6      your first witness ready?

 7              MR. WOLF:  Yes, Your Honor.  There is one evidentiary

 8      issue that I've been discussing with the defense and I wanted

 9      to bring up as to one of the exhibits.

10              THE COURT:  Okay.  Let's deal with that now.

11              MR. WOLF:  So regarding Exhibit 5, it's a body-worn

12      camera from police officer Eugenia Bates.  There's a portion

13      right after the incident where defendant is being transported

14      or escorted to a police vehicle, where Officer Residovic says

15      that you were assaultive.  I've redacted those words out

16      pursuant to the Court's instructions.

17          In response to that, Agent Bates said something to the

18      effect of "you kicked your knee up" or "kicked your foot up at

19      me" or something to that effect.  The government would be

20      seeking to admit that evidence as a present sense impression.

21      This statement was rendered about one minute after the

22      incident, and it's describing an incident that just recently

23      occurred.  And it's during the course of like an unrehearsed

24      spontaneous conversation.

25          So we would be looking to admit that statement as part of

1    her body-worn camera.  It's my understanding that the

2    defendant may object to that statement coming in.

3              THE COURT:  Okay.  Let me hear from the defense.

4              MR. OHM:  That's correct, Your Honor.  We would object.

5              THE COURT:  What's the basis for your objection?

6              MR. OHM:  It's hearsay.  It's a self-serving statement.

7    I think there was sufficient time in between where the

8    Court -- it doesn't have that additional indicia of

9    reliability.

10             THE COURT:  How long was it between the incident and

11   when she said it?

12             MR. OHM:  I think Mr. Wolf just said it was a minute?

13             MR. WOLF:  That's correct.

14             MR. OHM:  But, you know, at the time she was already

15   engaged in conversation with Ms. Reid.  They were essentially

16   arguing about what was happening.  And so I don't think we

17   would be able -- be allowed to put in our statements that were

18   immediately afterwards just because -- to get around a hearsay

19   problem.  I don't think the government should be able to get

20   agents' statements in either.

21             THE COURT:  So on the footage I assume Ms. Reid is

22   saying "I didn't do anything," and in response to that, Agent

23   Bates talks about the knee.  Is that right?

24             MR. OHM:  Right.

25             THE COURT:  Okay.  Mr. Wolf, would you argue that the

statement that led to the Bates statement is inadmissible as
well, or would that also come in as a present sense impression
in your view?

MR. WOLF:  While it is hearsay, I think we would elicit
it -- I mean, it's hearsay as to the defendant eliciting it.
But for us it's a statement of party opponent.  Obviously we
could argue it's a self-serving statement.

THE COURT:  So is the other one, right?

MR. WOLF:  I agree.  So I think just capturing the full
interaction just would be helpful for the jury to have the
context.  So I believe that we would elicit both statements.

THE COURT:  So let me ask you, if the defense wants to
introduce these statements, and I think there are a bunch of
them with the defendant saying immediately or shortly after
the incident, "I didn't do anything, it was, you know, a
knee-jerk.  See, I didn't do anything, I didn't do anything to
you," would you argue that that can't come in because it's
hearsay and self-serving?

Because I thought that's what you were saying at our
pretrial conference, that all of those statements, you had
preserved your hearsay objections to them.  So tell me why
those are different to this statement by Agent Bates.

MR. WOLF:  So they have the hallmarks of a present
sense impression, whereas the defendant's subsequent
statements, let's say in the vehicle that were made an hour,

1    half hour afterwards, do not --

2         THE COURT:  What about -- sorry.  Only one of us can

3    speak at a time.  I assume Ms. Reid said something on or

4    around that time that prompted Agent Bates to say what she did

5    about the knee.  So where are you drawing the line?  Because

6    before you seemed to be saying it was temporal; in the car it

7    was too long after for it to be a present sense impression.

8    Do you think if it was said around the same time as the Bates

9    statement, that it's hearsay, or that it's also a present

10   sense impression?

11        MR. WOLF:  So under case law, *United States v. Willis*,

12   2018 WL 6716096 at 4 -- this is a District Court in D.C.

13   case -- it discusses how the statements that's made, it's

14   either immediate or -- it's either during or immediately after

15   the event or condition.  It usually is a highly factual

16   finding about how close in time it is, but I'm aware of no

17   case that says a statement made a half hour or an hour

18   afterwards is considered a present sense impression.  So for

19   the defendant to elicit the defendant's own statements under

20   that theory I think would not apply.  But the government --

21        THE COURT:  Let's back up and take them one at a time.

22   She said something that prompted Agent Bates to make the

23   statement about the knee.  Is that a present sense impression?

24        MR. WOLF:  Her statement could be.  I mean, it's

25   also -- if the government elicits it, it's a statement by a

1    party opponent -- while it is exculpatory --

2         THE COURT:  I understand.  But you're standing here

3    telling me that the Bates statement is a present sense

4    impression.  I want to figure out if you're arguing that her

5    statement around the same time would not be a present sense

6    impression.

7         MR. WOLF:  No, I don't think I would be arguing it's

8    not a present sense impression, Your Honor.

9         THE COURT:  So you draw the line in time.  So if she

10   says something around the same time as Agent Bates did, you

11   think neither of those is hearsay because they're present

12   sense impressions.  But what she said in the vehicle

13   afterwards is too far from the incident for the exception to

14   apply?

15        MR. WOLF:  Yes, Your Honor.

16        THE COURT:  Okay.  All right.  I will look at the case,

17   see if it says anything different than how I understand the

18   law, and I'll let you know my ruling on this when we come

19   back.  Are there any other evidentiary issues like this one

20   that you expect will come up that we can clear up now before

21   I've got officers on the stand and you're objecting?

22        MR. OHM:  Your Honor, I understand that the

23   government's first witness might be the DOC -- the person that

24   they're putting the video in through.  And I just wanted to

25   make sure that we are all on the same page here.  My

1    understanding from Mr. Wolf's notes that he provided within

2    the last day or two is that she is saying that the way that

3    she could tell whether footage was being recorded or existed

4    was based basically on whether footage existed when she looked

5    into the system?  This -- we still haven't sort of resolved

6    the factual issue of whether the DOC had put these other two

7    videos onto USAfx and it was their fault, or if it was the

8    U.S. Attorney's fault because they didn't then download them

9    properly.  All we know is we just received them yesterday.

10         One of the issues is, there's a video camera like directly

11    above the door where the folks work and the noncitizens were

12    coming out, and it's been previously represented to us that

13    that video camera itself was not working.  But sort of I guess

14    processing everything that's happened since that

15    representation was made, now that we know that that

16    representation might have been based just on the fact that

17    they don't have that video, and now that we know that two

18    other videos have been produced since that video had been

19    made, I just want to make sure that we're all -- that we know

20    what the lay of the land is when this witness testifies, and

21    since she's going to come up first, I just was hoping we can

22    get some clarity on that.

23         THE COURT:  So are you expecting objections with

24    respect to this witness's testimony, or are you wanting

25    confirmation about the camera above the door and whether there

1    was any video there?  Is your argument that because other

2    videos were missing or may still be missing, you're going to

3    challenge this witness's ability to bring the existing videos

4    in?

5              MR. OHM:  I mean potentially -- I mean, I don't know

6    what her testimony is going to be, but if she testifies, for

7    example, I know that that video right above the door doesn't

8    exist because it wasn't in our system and that must mean that

9    the camera didn't work, then I might be -- you know, it would

10   make sense for me to inquire as to how she reached that

11   conclusion, and sort of try to disrupt the basis for that

12   conclusion based on what I know.  But because what I know has

13   shifted considerably, I don't want to just, you know, say that

14   and then have her respond differently.

15             THE COURT:  Okay.  Mr. Wolf, what is the current status

16   of the video above the door?

17             MR. WOLF:  It exists.  It's been turned over to the

18   defense.  Obviously, it was turned over yesterday and we

19   understand the government is precluded from using it based on

20   the defense's objection.

21             THE COURT:  So the videos that you turned over last

22   night, one is the camera above the door?

23             MR. WOLF:  Yes.

24             THE COURT:  And prior to yesterday, why did you think

25   that it didn't exist?

1          MR. WOLF:  So going back to Mr. Facci's discussion

2     earlier today, so in the initial stages we, the government,

3     provided a subpoena to DOC requesting all CCTV from July 22

4     between 6:30 p.m. and 9 -- 8:30 p.m.  Excuse me, Your Honor.

5     In connection with that request, DOC provided three elevated

6     video surveillance camera feeds.

7          AUSA Dernbach and Special Agent Majeed followed up with DOC

8     to inquire whether any of the ground level cameras -- and in

9     fact, AUSA Dernbach emailed Special Agent Majeed, who sent the

10    email to DOC with I guess a still shot of the camera above the

11    door and a camera down the stairs, asking is there any video

12    from these two cameras.

13         In correspondence, the point of contact from DOC, Ben

14    Collins, spoke with Special Agent Majeed, and said these were

15    dead cameras, and that information was relayed to AUSA

16    Dernbach, and that correspondence was turned over to the

17    defense.  And so that was our basis for believing the video

18    did not exist, which turned out to be incorrect when we spoke

19    with the custodian yesterday.

20         THE COURT:  Okay.  And are those the agents who are

21    going to be testifying to put these videos into evidence, the

22    person who gave incorrect information to AUSA Dernbach?

23         MR. WOLF:  No.  The person who would be testifying is

24    Andrea Beverly.  She's a monitoring specialist with the

25    Department of Corrections.  She'd be testifying as a custodian

1    of records and that she reviewed the video surveillance that

2    we're going to be putting in today, the elevated videos, and

3    checked on her system as to the videos that were produced in

4    connection with our request, and can confirm that the videos

5    appear to be an exact copy and those videos were kept in the

6    ordinary course of business and so on and so forth under the

7    business records exception.

8         THE COURT:  Okay.  Is there going to be a challenge to

9    the videos coming in, either...

10        MR. OHM:  The Court's already excluded the two videos

11   that he's talking about, right?

12        THE COURT:  No.  They're not going to introduce those

13   two videos, right?

14        MR. OHM:  Right.

15        THE COURT:  I assume they are putting this witness on

16   to introduce the videos that are on their exhibit list which

17   you already have.

18        MR. OHM:  The one -- yes.  The surveillance video that

19   the Court I think has seen from last --

20        THE COURT:  Right.

21        MR. OHM:  Yeah.

22        THE COURT:  And so are you going to -- is there a

23   challenge to those videos coming in?  What's the issue --

24        MR. OHM:  There is not --

25        THE COURT:  -- we're trying to resolve?  I'm trying to

1    work through this as quickly as I can so my staff has time to

2    have lunch as well.  What is the dispute I'm trying to resolve

3    here?

4         MR. OHM:  Okay.  We're not challenging the first video.

5    What I wanted to do on cross-examination, however, was to talk

6    about the universe of videos, but we are -- I mean, frankly, I

7    guess this -- our request is is that the Court instruct the

8    jury that the government had previously represented to us that

9    there was no videos; that they turned over -- in violation of

10   their discovery obligations, turned over video late, and give

11   an adverse instruction based upon that, because up until --

12        THE COURT:  But Mr. Ohm, I'm not going to let them use

13   the video because they turned it over late, so what would I be

14   instructing -- do you want me to let them use the video and

15   tell the jury that they turned it over late and now here's the

16   video that they're seeing.  If they're not using the video,

17   what am I instructing the jury about?

18        MR. OHM:  We were -- I frankly don't care if the

19   government -- well, we object because we have to at this point

20   because I haven't had an opportunity to sit down and

21   process -- and I still haven't even seen the whole video, but

22   we -- there's nothing on the video that's really particularly

23   helpful to the government, but it's frustrating that we are

24   relying on the fact that there was no video up until about 18

25   hours ago, and that we had had a hearing where we discussed

1       this video and an agent testified at the preliminary hearing

2       that there was no video on that video when I pointed it out,

3       and I think he actually testified he wasn't even sure it was a

4       video camera.  So we've sort of been misled up until this

5       point.  And I apologize that I'm bringing this up now but we

6       really haven't had time to work through this issue.

7               THE COURT:  I understand that, and that's what we

8       talked about before we started jury selection.  Assuming they

9       violated Rule 16 by not giving you this video, what are my

10      options?  I could give you more time to go investigate the

11      people on this video, which we're not doing and you don't want

12      me to do.  I could bar them from using it, which is what I

13      did, because they didn't turn it over until last night.  But

14      otherwise I'm not sure what you want me to do.

15         And I agree that it's pretty egregious that the government

16      is turning over videos the night before trial starts, but I

17      don't know what you want me to do beyond what I've already

18      done.

19              MR. OHM:  Sure.  And I guess to us it's worse than a

20      Rule 16 violation because it's not just late disclosure.  It's

21      because they gave us an affirmatively opposite disclosure up

22      until this point.  And we were preparing for trial in reliance

23      on that disclosure.  So it's not just they've turned over

24      videos, it's that up until yesterday we thought that there was

25      no video.  We were reasonable in believing that, reasonable in

1   relying upon that.  We heard it both from the government and

2   from sworn testimony.

3       And so I probably need a few minutes to think about what we

4   think the sanctions should be.  But there should be a sanction

5   beyond, you know, this is just a run-of-the-mill discovery

6   violation of we just got it and they're not allowed to use it,

7   because frankly, I don't know that they would have used it

8   anyway.

9       THE COURT:  Okay.  Well, I'm not sure what else you

10  want me to do, and I don't know that there's anything else I

11  would tell the jury about a video that sounds like doesn't

12  show anything additional, that the government isn't going to

13  use.  If you want to use it, you can, but I'm -- you can come

14  back and tell me if there's something else you want me to do,

15  but I'm not going to give the jury an instruction that they

16  violated their obligations about a video that no one's going

17  to see that doesn't actually show anything.

18      Again, it's shocking that the government waited this long

19  to give you the video.  They have their story about why that

20  happened.  Based on what I know, I don't have enough to make a

21  finding that they acted in bad faith.  But assuming there is

22  some violation of their obligations, which I agree there

23  probably is, the remedy is am I going to delay the trial to

24  have you go investigate, which I'm not going to do, and if the

25  video doesn't show anything and they're not going to use it, I

1   just don't know what else you want me to do.

2       But why don't we come back at 1:40 and you can tell me if

3   there's something else that you want me to do, which I will

4   take under advisement.

5           MR. OHM:  Thank you.

6           THE COURT:  And then with respect to the videos that

7   are coming in, I assume there are no objections from the

8   defense on those?

9           MR. OHM:  Correct.  Your Honor, I guess maybe we could

10  start with this.  Because I feel like if this witness

11  testifies, then we are not -- and she's going first -- that

12  that puts us a little bit more of a disadvantage because it

13  won't give us sort of time to figure it out.  We would ask

14  that somebody else be called first so that we can at least

15  have a little bit more time to breathe and try to figure this

16  out.  In the alternative we would ask for a couple hours or

17  the rest of the day and adjourn until tomorrow morning so that

18  we can have -- figure out our options.

19          THE COURT:  I'm not going to lose half the day and send

20  the jury home.

21      Mr. Wolf, do you have another witness you can put on first?

22          MR. WOLF:  I do, Your Honor, but the witness would be

23  testifying based on the video that -- that this is video

24  surveillance -- discussing that video surveillance.  It could

25  be admitted subject to connection obviously, but we would then

1    call the video surveillance custodian second.  That's our plan

2    for the day.

3        THE COURT:  Mr. Ohm, how would having a witness testify

4    about these videos that are coming in, how would that prevent

5    you from looking at the new videos and figuring out whether

6    you want to use them?  I mean, do you have some basis to

7    question this witness's credibility because of the fact that

8    the government turned over these videos late?

9        MR. OHM:  I really don't know.  I mean, the

10    government's putting it on them.  They're not taking

11    responsibility for it.  So in a sense, yes.  But the whole

12    point of a custodian is to show that it's authentic and to

13    show that the process is reliable.

14        THE COURT:  And do you dispute the authenticity of the

15    video?

16        MR. OHM:  No.  And they can bring that in through the

17    officer.  The officer could authenticate the video.  But the

18    point of the custodian of records is to talk about the system

19    and why the jury can rely upon this as reliable evidence and

20    the lack of evidence that's produced to the jury based upon

21    what this person is saying.

22    I have to be able to cross-examine that person, and I

23    really don't have the full picture at this point.  And it's

24    not our fault; it's their fault.  And so they're not

25    prejudiced at all.  We're not going to object to the

1    authenticity of video 1.  They can do it through their

2    witness, the officer, and we can just hold off on the

3    custodian.  I think it's a reasonable request.  And if we

4    don't do it that way, I do think that defense is handicapped

5    in terms of being able to challenge whatever procedures they

6    had.  I mean, it's essentially just going to be asking

7    open-ended questions to try and figure out what's going on.

8        And the reason that we don't know what's going on is

9    because they haven't figured it out yet.  They still haven't

10   told us -- I think it was yesterday that they would figure out

11   the USAfx problem, whether it was on the DOC end or on the

12   USAO end.  We still don't have an answer to that.  And that's

13   what I would be cross-examining about.

14       It's somebody's responsibility at the DOC to get the U.S.

15   Attorney's Office the video.  And somebody's responsible in

16   the U.S. Attorney's Office to download that video and make

17   sure it's presented to the defense.  Somewhere in that line

18   that broke down and so we were prejudiced.

19       The only reason that I'm asking the Court to assist here is

20   because we still don't know and the government hasn't given us

21   a position or a theory other than we don't think it's our

22   fault, that we've heard before, that -- where the system broke

23   down.  So I shouldn't be required to cross a DOC -- the only

24   person who's going to be a witness who I would be able to

25   elicit this information from, I shouldn't be required to

1    cross-examine that person as our first witness in front of

2    this jury without all the information.

3         THE COURT:  Mr. Wolf, do you have anything to say in

4    response?  You still don't know what happened here?

5         MR. WOLF:  I'm afraid I can't say that for sure, no.

6    I'm being candid with the Court, Your Honor.  I have

7    information from the DOC that says they uploaded items to this

8    USA Box.  We have the prior AUSA who was I believe diligent in

9    following up on specifically the cameras at the ground level,

10   and he was told by DOC that those were dead cameras.  I don't

11   have an explanation as to what the miscommunication was.  I'm

12   sorry, Your Honor.

13        THE COURT:  When do you plan to have those answers?

14   DOC is saying we put it in the box.  You don't know whether

15   the AUSA did not download it or whether DOC didn't actually

16   put it in the box, and I have you saying that the AUSA heard

17   that they were dead cameras, which they obviously were not

18   dead cameras, so someone is giving incorrect information or

19   misrepresenting what they learned.

20        How do I resolve that, and how do we move forward?  You

21   don't have an explanation for me, and I assume you don't know

22   when and whether you will ever have an explanation about what

23   happened here.

24        MR. WOLF:  I don't know if there will ever be a

25   for-certain explanation, you're right, Your Honor.  What I

will say is that the government was attuned to the fact that

there were cameras by this door, and we specifically asked our

office, and HSI Agent Majeed specifically emailed with Ben

Collins inquiring about these cameras.  And what the

investigation has revealed is that Agent Majeed had an oral

conversation with Mr. Collins in which he relayed to Agent

Majeed that these were dead cameras.

THE COURT:  So you're saying that your agent -- who is

testifying; is that right?

MR. WOLF:  I actually don't think he will testify in

the case-in-chief at this point.  No, Your Honor.

THE COURT:  Okay.  You have an agent who claims that

DOC told him that the cameras were dead.

MR. WOLF:  Yes.

THE COURT:  And is Collins a witness?

MR. WOLF:  No.  We're not planning on calling

Mr. Collins.  He wasn't part of our witness list.

THE COURT:  So Collins is the one who allegedly told

Mr. Majeed that the cameras were dead?

MR. WOLF:  Yes.

THE COURT:  And who does Andrea Beverly work for?

MR. WOLF:  She works for DOC as well.

THE COURT:  Does she work for Mr. Collins?

MR. WOLF:  I believe Mr. Collins is her supervisor,

yes.

1          THE COURT:  So if the defense wants to ask her whether
2     DOC told this agent that they were dead cameras or not, and
3     that of course now turns out to be false, how does that play
4     out?  I mean you hear their concern, which is an extremely
5     valid one, which is they don't even know what's going on
6     because you don't know what's going on.  You're telling me
7     that DOC told this agent that they were dead cameras.  That
8     turns out to be false.

9       So either someone from DOC is lying or had a
10    misunderstanding or the agent is lying or had a
11    misunderstanding.  How do they probe on that?

12         MR. WOLF:  So I don't -- Ms. Beverly was not firsthand
13    involved in this conversation.  And so I don't know if she'd
14    be able to answer questions about Mr. Collins's
15    representations to Agent Majeed or vice versa because she just
16    wasn't party to that conversation.

17         THE COURT:  So what is she testifying about?  Why is
18    she testifying and why isn't Collins testifying?

19         MR. WOLF:  So she is a custodian of the video, and she
20    is someone who frequently testifies as a custodian of video
21    for DOC, so she's testifying in that capacity in saying that
22    the three aerial videos, so to speak, are fair and accurate
23    copies of the videos that were extracted from the system and
24    so forth.  And we wouldn't elicit any testimony about the
25    camera over the door at all.

1          THE COURT:  Yeah, but you understand that they want to

2     do that, and that's very reasonable.  If they were told there

3     was no video, that was a dead camera, and now that turns out

4     to have been false, they want to be able to bring that before

5     the jury.  Again, this is incredibly frustrating that we're

6     here.  We're now half an hour into what was supposed to be a

7     lunch break for my staff and we're still talking about this

8     video that you still don't have answers about.

9          MR. WOLF:  And, Your Honor, honestly I share your

10     frustrations in that --

11          THE COURT:  Okay.  So how do I fix it?  Understanding

12     where they are, and understanding their very reasonable

13     concerns, what do you propose?

14        Because Mr. Ohm is right, if the proposal is just you don't

15     get to introduce videos you wouldn't have introduced anyway,

16     they are prejudiced, and you're not putting any witnesses on

17     the stand who they can actually use to bring out this issue,

18     what do you propose I do?

19          MR. WOLF:  I think -- I mean, I fully understand the

20     defense's position regarding the late disclosure of these

21     videos.  I think the remedy could be a missing evidence

22     instruction regarding the video over the door and inside.  And

23     I think that could solve the issue.  Just because regarding

24     Ms. Beverly's testimony, I don't think she'd be making any

25     affirmative affirmations as to what communications happened.

1    It's just that video in their system, this is what it was.

2    Checking the video that's going to be in court, that is an

3    exact copy of that video.  And I think she'd also provide,

4    just because she knows the DOC building, just a visual for the

5    jury about, like, here's this street, here's that street.  So

6    her testimony should be very simple.

7         THE COURT:  No, I understand that.  Their point is

8    she's the only one testifying about these videos, and they are

9    trying to figure out how and whether they are able to elicit

10   testimony that highlights what happened here.

11     So I'm going to ask you to confer over what's left of the

12   lunch break and see if you can come to an agreement on a

13   missing evidence instruction, as you suggested, that would

14   satisfy the defense and get at this.  Because I don't think

15   the defense is going to use -- be able to use this witness to

16   elicit the testimony that they want to about these videos.

17        MR. WOLF:  Understood.

18        THE COURT:  Okay.  Mr. Ohm, is that satisfactory for

19   now?  I do think something along the lines of a missing

20   evidence instruction is probably the only thing I can do at

21   this point, which sounds like the government is offering.  So

22   I'm going to ask you to confer on that in what's left of

23   lunch.

24        MR. OHM:  Understood.  Thank you.

25        THE COURT:  Okay.  So let's come back five minutes

1    before the jury comes back, so that if there's anything else

2    we need to resolve before we get started, we can do that.

3        (Recess from 1:17 p.m. to 1:49 p.m.)

4        THE COURT:  Okay.  Let us do a couple things quickly

5    before we bring the jury in.

6        Okay.  On the Bates statement, I went back and I watched

7    the video again, and I read your case, Mr. Wolf.  I am not

8    going to let that come in as a present sense impression.  As I

9    said, I watched the video.  The incident was over, they were

10   walking down the stairs.  As you noted, one officer said

11   something to the effect that this is assault, the defendant

12   says no, Bates then says, you raised your knee at me.  I think

13   this is -- even though it's close in time, it's after the fact

14   where everyone's sort of coming up with their side of things,

15   and I don't think that's what this exception is intended to

16   let in.

17       It wasn't happening at the time of the actual incident.  So

18   I'm not going to let in any of those statements that happen

19   outside the vehicle as a present sense impression.  Any

20   questions on that?

21       MR. WOLF:  No, Your Honor.

22       THE COURT:  Okay.  And then on the elements of the

23   offense in the preliminary instructions, I'm going to read you

24   what I have edited based on your request this morning, and let

25   me know if there are any objections.

1          First, Ms. Bates and Mr. Liang were officers or employees

2     of the United States; second, Ms. Reid forcibly assaulted,

3     resisted, opposed, impeded, intimidated or interfered with an

4     officer or employee of the United States; third, that act

5     constituted simple assault, as I will define that term for

6     you; fourth, Ms. Reid so acted while that officer was engaged

7     in or on account of their performance of official duties;

8     fifth, Ms. Reid acted with what the law calls general intent.

9          And then the rest of that instruction.  Any objection from

10    the government?

11               MR. WOLF:  No, Your Honor.

12               THE COURT:  Okay.  Anything from the defense?

13               MS. ABE:  If I may have just one moment, Your Honor?

14               THE COURT:  Yeah.

15          (Defense conferring.)

16               MS. ABE:  Your Honor, we wouldn't object but we would

17    note that we would be asking for a unanimity instruction as to

18    the victim.

19               THE COURT:  Yeah, and we can do that in the final

20    instructions.

21               MS. ABE:  Thank you, Your Honor.

22               THE COURT:  All right.  We'll bring the jury in and get

23    started.

24          Hang on.  Sorry.  One second.  Is there anything that we

25    should talk about about this video now?  Have you guys somehow

1    come to an agreement in the last 30 minutes?

2         MR. OHM:  We did send a proposed instruction to the

3    government, and then I think we just sent it to chambers as

4    well.  So I don't know if the government's had a chance to

5    look at it yet.

6         MR. WOLF:  Sorry, my Outlook is not working.

7       (Parties conferring.)

8         THE COURT:  Did you say that you sent that to chambers

9    as well?

10        MR. OHM:  Yes.

11        THE COURT:  Oh, I don't see it in our inbox.

12        MR. WOLF:  Your Honor, I don't think we would agree to

13   this language at this point.  I think we need further

14   discussion on this issue.

15        THE COURT:  Okay.  And how do you propose to proceed

16   then since we're about to get started?

17        MR. WOLF:  Your Honor, I don't think the Court needs to

18   give the missing evidence instruction right now.  That's

19   something that could be given at the end of this case.  And so

20   I don't know if we need to resolve the text of the instruction

21   right now before we call the witness.

22        THE COURT:  Well, I want to make sure that we are in

23   agreement about where we're headed before we have this witness

24   here, because otherwise the defense would like to elicit

25   testimony from this witness or some government witness about

1    this issue with the video.  So I do think we need to figure

2    out if we are on a path to resolving this.

3         MR. OHM:  We just sent a copy to Ms. Bell-Norwood as

4    well.  Hopefully she'll get it and can print it out for

5    everybody.

6         THE COURT:  And I do not like keeping the jury waiting.

7    It is a disregard for their time.  And again, we're here

8    because the government seems to disregard everyone's time.

9    But I don't want to prejudice the defense by moving forward

10   until we have a sense of where we are going, because you're

11   going to put your witness on and they want an opportunity to

12   figure out how to raise this issue.

13        MR. WOLF:  I mean, it occurs to me that they could call

14   Mr. Collins as a witness to explain what happened regarding

15   these cameras, and then the jury could decide.  But regarding

16   the missing evidence instruction, I just don't know if we need

17   to decide that right now just because that's something that

18   would be given presumably at the end of trial along with the

19   rest of the instructions.

20        THE COURT:  I'm aware that that would be given at the

21   end of the trial, counsel.  What we're trying to figure out is

22   what's the remedy for what the government has done here, and

23   that's one remedy that you proposed to me, which is why we're

24   talking about it, and so I'm trying to figure out if that

25   fixes the problem, because if it doesn't, then we need to come

1    up with something else.  And to the extent that something else

2    has something to do with the witnesses you're about to call, I

3    want to figure that out now.

4         MR. WOLF:  So I think the approach could be -- and this

5    is what we anticipate will be -- is that Ms. Beverly will

6    discuss authenticating the aerial videos.  We would not

7    inquire as to the video over the door or inside at all.

8         THE COURT:  But that's not what matters to them.  What

9    matters to them is you told them that that video was dead, was

10   not working.  Either your agent lied or DOC lied or someone

11   was sloppy.  I mean, you saying I'm not going to inquire about

12   that doesn't help them.  They want to make the point that

13   whenever it happened, your agent or DOC or someone on behalf

14   of the government falsely reported to them that that camera

15   was dead and that turns out to be wrong.

16        MR. WOLF:  And I think the resolution could be that the

17   defense could call Mr. Collins to address what he saw and why

18   this video was not -- did not end up in the government's

19   hands.

20        THE COURT:  Have you spoken to Mr. Collins?  Because

21   you before lunch told me you don't know the answer to that

22   question.  So how is some witness going to have an answer?  Am

23   I right that you standing here today still don't know why the

24   defense was told that that camera was dead and that's actually

25   false?  You don't know if it's DOC that made a mistake or your

1    agent lied or -- you don't know what happened, right?

2              MR. WOLF:  So there's a few different questions, if I

3    can address them --

4              THE COURT:  Go ahead.

5              MR. WOLF:  Regarding Mr. Collins, I did speak with him,

6    and I asked him about this issue, and what his explanation was

7    is that he does hundreds of these requests like a week, it's

8    something that happens all the time.  But his pattern and

9    practice would be to upload all the videos to this USA box

10    which was used.  However, there's no paper trail as to what

11    made it into the box itself.

12        We spoke also with AUSA Dernbach, who said I took what was

13    in the box and downloaded it from that folder directly into

14    the U.S. Attorney's Office's folders and viewed those

15    surveillance videos and noted that there was nothing at ground

16    level.  And the correspondence indicates that AUSA Dernbach

17    and Agent Majeed followed up with DOC asking specifically

18    about these cameras, and Agent Majeed, based on oral

19    conversations with Mr. Collins, said Mr. Collins represented

20    those were dead cameras.

21        It is possible -- I don't want to speculate, Your Honor.  I

22    have a speculative explanation but --

23              THE COURT:  I would encourage you not to speculate

24    because all of your speculation last week turned out to be

25    false.

1          MR. WOLF:  Yes.

2          THE COURT:  But at this point you have DOC saying they

3     uploaded it, and I have the government saying we downloaded it

4     and it wasn't there.

5          MR. WOLF:  Yes.

6          THE COURT:  I asked you earlier what you thought the

7     remedy should be.  You're the one who brought up the missing

8     evidence instruction.  What's the problem with what's proposed

9     which I'm looking at here now?

10          MR. WOLF:  So, Your Honor, I think the -- because of

11     discovery violations, I think that is a legal determination

12     that just -- it's going to lead to a lot of speculation and

13     confusing the issues.  I think we can simplify the language.

14     "You will not see the footage from these cameras because the

15     government did not timely produce it."  I think that is

16     appropriate.

17          And I would also say that whether it was in the power and

18     possession of the government, we had to subpoena the

19     information from the Department of Corrections, and so we

20     would dispute that it was within the government's possession,

21     but we could say that the DOC video --

22          THE COURT:  The DOC thinks it was in your possession.

23     Mr. Collins, as you told me, said that DOC uploaded the files.

24          MR. WOLF:  He believes all the files were uploaded, but

25     there is no corroboration --

1          THE COURT:  Okay.  But, that's what we've got.  I mean,

2     I've got DOC saying he believes he uploaded the files.  So

3     unless Mr. Collins is lying, then it was in the possession of

4     the government.  Correct?

5          MR. WOLF:  It's not just lying or not lying.  He could

6     be mistaken or he may not be certain are the other options

7     here.  Those are different things.

8          THE COURT:  Go ahead.  Tell me the instruction that you

9     would propose, then.

10          MR. WOLF:  So "the DOC video in this case was in the

11     possession of the Department of Corrections."  I would

12     dispense with the second sentence, I think --

13          THE COURT:  But you don't --

14          MR. WOLF:  Proper procedures were followed, Your Honor.

15          THE COURT:  Sorry.  Stop for a minute.  You say

16     Mr. Collins said he believes it was uploaded.  If that's true,

17     then it was in the possession of the government.  So why would

18     I be telling the jury that it was within the possession of

19     DOC?

20          MR. WOLF:  Well, Your Honor, there's two different

21     representations --

22          THE COURT:  Where'd you find the videos?  Were they in

23     that box that was downloaded?

24          MR. WOLF:  Yes, Your Honor.

25          THE COURT:  So who put it there after the fact if it

1          hadn't been there all along?  You said Collins uploads it to a

2          website or some box, that the government downloads it.  You

3          found it in the government's box.

4                   MR. WOLF:  That's -- the three videos, the aerial

5          videos were downloaded from that box.  We only learned about

6          these two new --

7                   THE COURT:  Where were the two videos, the two that

8          were missing that you just found last night?

9                   MR. WOLF:  They were on DOC's systems.

10                  THE COURT:  Okay.  So they were on DOC's system, and so

11         your -- one theory of yours is that DOC put it there after the

12         fact?

13                  MR. WOLF:  No.  Those two new videos never made it into

14         the box, like, when we were learning about this.  How this

15         works --

16                  THE COURT:  No.  They never made it into the U.S.

17         Attorney's Office box, but was it always in the DOC box?  DOC

18         uploads it someplace, right, and then you need to take a step

19         to move it from there into the U.S. Attorney's Office box.  Is

20         that right?

21                  MR. WOLF:  So -- yes.

22                  THE COURT:  And so then the videos were in the DOC box.

23         Is that right?

24                  MR. WOLF:  That I don't know.

25                  THE COURT:  Where did you find them?

1           MR. WOLF:  So these two videos, we found them when we

2   were doing trial prep with Ms. Beverly.  We were asking about

3   the videos in this case and she brought up, hey, I see two

4   additional videos, and she shared her monitor screen, like

5   from her system, so we could see it, and she showed it and her

6   physical system at DOC showed these two new videos.

7           THE COURT:  So are they in the DOC box that you

8   downloaded things from?

9           MR. WOLF:  We do not know because that box

10   automatically deletes within I believe at most 60 days.

11   That's just a server requirement in order to make space for

12   the server.  Your Honor, I am as frustrated as you are.

13           THE COURT:  Yeah, but you're prosecuting a defendant

14   here in a criminal case, so your frustration rings a little

15   hollow compared to hers and to mine.

16           MR. WOLF:  I understand, Your Honor.

17           THE COURT:  So DOC believes that they put it in a box

18   that has now been deleted.  The government downloaded files

19   from that box and did not download those videos.  And you

20   think then that those videos are not in the possession of the

21   government.

22           MR. WOLF:  No, Your Honor.  I think given the

23   follow-up, given the attention that was paid to the presence

24   of these videos and being told those were dead cameras, I

25   don't think they were ever given over to the government.

1          THE COURT:  Based on what?  And again, I do not want

2     you to speculate because you speculated a lot last Thursday

3     and Friday, and after hearing from your own witnesses and the

4     new information, your speculation turned out to be false.  I

5     never want you speculating when you're up here telling me

6     things to be true because I think it's quite reasonably --

7     quite reasonable for me to believe representations from the

8     government and you should never be speculating.

9        So I don't want speculation.  You don't know what happened.

10         MR. WOLF:  No, I don't.

11         THE COURT:  Okay.  So how can I then instruct the jury

12    that the video was only within the possession of DOC if you

13    don't know that to be true?  Because if in fact DOC did upload

14    it to that folder and you guys just forgot to download it to

15    your own files, then it was in your possession if you had

16    access to it.

17         MR. WOLF:  I think the Red Book instructions on this

18    issue are appropriate, under instruction 2.300, and I think

19    that reflecting that terminology would be -- that would lead

20    to the least amount of speculation and confusing the issues

21    for the jury.

22         THE COURT:  Okay.  So the government is willing to

23    agree to an instruction that is the equivalent of 2.300.

24         MR. WOLF:  Yes, Your Honor.

25         THE COURT:  Okay.  Mr. Ohm, we don't need to work out

1    exactly what that's going to say if I have the government

2    agreeing to some version of 2.300.  I'm not quite sure how

3    that works in the case given that we have the videos, they're

4    not missing, but if I have the government and the defense

5    agreeing to some instruction along these lines, then I will

6    give it.  But this is an extremely odd situation where

7    evidence isn't missing, it was just missing for some time, and

8    now has been recovered on the eve of trial.

9         MR. OHM:  So, Your Honor, we did review 2.300 and we

10   sort of tailored it to our facts because we didn't want -- I

11   think the government's proposal sort of invites the jury to

12   think that there is evidence out there that they're just not

13   being shown, so it's harder for them to draw an inference when

14   it's like we all know what it is but you don't.  The way that

15   it's written now, it makes it seem like -- it leaves it

16   ambiguous as to whether the evidence is available or not.  So

17   unavailable at least --

18        THE COURT:  Right.  That's why this doesn't quite fit.

19   We have the videos.  It's available to be used based on -- I

20   mean, I haven't seen it, probably you haven't yet either.  It

21   sounds like the videos are not favorable to either side.  It

22   doesn't help one or the other.  Is that your general sense?

23        MR. OHM:  There's one aspect that's not the central

24   issue of the case where it is helpful.  I've explained that to

25   the government.  But it would really depend on whether their

1      officer would agree -- it would be helpful for impeachment

2      purposes for one of the officers.

3              THE COURT:  Okay.  Then what we have here is a video

4      that doesn't really help either side.  You want me to tell the

5      jury that the government did not meet its obligations by

6      turning it over on a timely basis, and that maybe if you had

7      it you could have done further investigation that you didn't

8      have a chance to do.

9          Mr. Wolf, do you object to some instruction along those

10     lines?  Because I agree, 2.300 is sort of assuming something's

11     actually missing, and it's not missing.

12             MR. OHM:  So, Your Honor, we don't want -- the problem

13     with saying that the government didn't produce it on a timely

14     basis sort of implies to the jury that it otherwise would have

15     been used if it had been.  And we don't want the jury to be

16     speculating on that.  So the way that we constructed our

17     proposed instruction is to leave it vague enough so that the

18     jury could assume -- and the jury doesn't -- I mean --

19             THE COURT:  But Mr. Ohm -- I'm sorry to cut you off,

20     but we've now had the jury waiting almost half an hour.  I

21     mean, your instruction also says you may infer that the

22     evidence, if presented to you, would have been unfavorable to

23     the government, and we all know that not to be true.  So why

24     would I instruct the jury of something that I know to be

25     false?

1          MR. OHM:  So that language actually does come from

2     2.300.

3          THE COURT:  I know, but that's because in 2.300 we're

4     talking about evidence that's actually missing, and this --

5          MR. OHM:  Because the Court has discretion to sanction

6     the government, and this is really the only way to do it

7     unless the Court wants to continue this case and figure out

8     what the heck happened with this video.

9          THE COURT:  First of all, you don't want me to do that.

10          MR. OHM:  I mean, at this point, we need to --

11          THE COURT:  Why does it matter?  We have the video.

12     I'm not going to instruct a jury that they can infer that the

13     video would be unfavorable to the government when I know that

14     that's not true.  And so -- I mean, I said this to you at the

15     beginning before we picked a jury, the only remedy that would

16     seem to make sense is continuing the trial so you can do

17     whatever investigation you wanted to do.  And you told me --

18     as I was of the same view -- that that was not a path that we

19     wanted to take, that we needed to move forward.

20          So in the absence of that, I'm just not quite sure what it

21     is that I can do.  And I understand that it's frustrating, as

22     I said, frustrating for you.  I'm not really sure why it's

23     frustrating for the government because it's their fault and

24     this isn't hurting them in any way.  But I can't instruct the

25     jury -- like, 2.300 doesn't fit this case, and I can't

1    instruct the jury that evidence is missing that would have

2    been unfavorable to the government when I know that not to be

3    true.

4       If you want to call these witnesses and cast doubt on the

5    entire video process because of what happened, then you can do

6    that.  I don't think you're going to have much luck doing that

7    with this witness that's coming given that she doesn't know

8    the Collins-Majeed interaction.

9       MR. OHM:  Well, number one, the situation from last

10   week is different from this week.  I didn't obviously know

11   about these videos --

12            THE COURT:  Of course.

13            MR. OHM:  -- we said we didn't want a continuance --

14            THE COURT:  No, no, but I'm talking about this morning.

15   I'm talking about this morning when we talked about this.  I

16   think you were up here and you agreed that you wanted to move

17   forward.  I'm not talking about last week because -- and to be

18   fair, I said that, I'm not inclined to continue, and you --

19   you shook your head.  I understood you to be saying the same

20   thing, that you wanted to move ahead today with jury selection

21   rather than taking time to go investigate this new video.

22            MR. OHM:  Well, I think the first part is true.  The

23   whole sentence, I'm not saying that, Your Honor.  We certainly

24   would rather go forward today and we are not happy that we're

25   in this situation.  But I do want to make sure that I am

1    fulfilling my obligations to my client, and right now the

2    state of the evidence -- well, let me say this.  Our

3    alternative request is for the Court to just preclude that

4    witness, the custodian of evidence.  They can authenticate the

5    video.  We should be able to point out the video cameras in

6    the video footage that the jury doesn't get to see, and we can

7    just leave it at that.

8         THE COURT:  So which witness do you want me to

9    preclude?

10        MR. OHM:  Beverly.

11        THE COURT:  And why do you want me to do that?  Because

12   you can't really cross-examine her about what happened with

13   this video?

14        MR. OHM:  Correct.

15        THE COURT:  And Mr. Wolf, remind me, what is the

16   purpose of her testimony and is there another way to do it?

17        MR. WOLF:  It would be to authenticate the video that

18   is not in dispute and just to give a general layout of the

19   DOC, since she works there and is familiar with the area.  The

20   other agents are not as familiar.  And so just to shed a

21   little bit of light on that.

22        THE COURT:  And I assume you're not disputing the

23   authenticity of the videos that are coming in?

24        MR. OHM:  Correct.

25        THE COURT:  So if the only other reason for calling her

1    is to give a layout of the DOC, then I'm inclined to agree

2    with Mr. Ohm that you don't need that witness just for that,

3    given that what's going to happen otherwise is you're going to

4    put her up here, he can't cross-examine her about what

5    happened with this video, and she works for Mr. Collins, who's

6    directly involved with this, and he quite reasonably wants to

7    cross-examine her about that, except he can't really do that.

8          MR. WOLF:  So I don't think -- I think that's just

9    the -- I don't think that's the correct sanction here,

10   precluding her testimony as to just the authentication of --

11         THE COURT:  But he's not going to dispute authenticity.

12   So why do you need her otherwise?

13         MR. WOLF:  Even though he's not in dispute, it would be

14   helpful for the jury to also know, like, where these specific

15   cameras are, to paint a picture for the jury of what

16   they're -- they don't know this building, they don't know this

17   area, we have to provide evidence of that.

18         THE COURT:  And it would also be helpful for the jury

19   to have the full evidence, and it would be helpful for the

20   defense to have had those videos prior to yesterday, again,

21   videos that you told them did not exist because the cameras

22   were dead, and that turned out to be false.

23       So you have not come up with another way for me to address

24   that other than this.  And so in the absence of some other

25   option, I think what Mr. Ohm is proposing seems quite

1    reasonable, because they are hamstrung in their ability to

2    question a DOC witness about the videos.

3         MR. WOLF:  So this particular witness, yes, but

4    Mr. Collins can be made available and the defense can call him

5    and call Agent Majeed to cross-examine them about what

6    happened.  Precluding Ms. Beverly's testimony --

7         THE COURT:  How is that hurting you in any way?  She

8    can't say this is the layout?  I mean, you've got officers

9    there.  You're going to show videos about what happened at the

10   DOC.  Why does it matter that she set the stage?

11        MR. WOLF:  So these officers, frankly, most of them had

12   never been to D.C. jail before.  So while they can testify

13   generally that's where they were, I think it's helpful for

14   someone who knows the area to say okay, this road's here, this

15   camera shows this area, this camera shows that area.

16        THE COURT:  And at the point that you're talking about

17   which areas which cameras show, if this witness is asked, what

18   about that camera that's right there and where's the video,

19   what does she say?

20        MR. WOLF:  I mean I think her truthful testimony would

21   be that the camera would show X area, and regarding whether

22   there's video --

23        THE COURT:  What would she say, because she knows there

24   to be video, because you told me you were prepping her and she

25   had the videos on her computer.  And then she says yes, there

1    is video, I have it.  And what happens then?

2         MR. WOLF:  And I think that's where there's some sort

3    of instruction here about where is the video that would go

4    towards a missing evidence instruction.

5         THE COURT:  But what does that say?

6         MR. WOLF:  But what she can't testify to is -- and what

7    could be testified to by Mr. Collins and Mr. Majeed would be

8    what happened with the videos and what was represented.

9         THE COURT:  Mr. Wolf, I am stunned and shocked that we

10   are here, we've now kept the jury waiting for over a half an

11   hour again because of the government's conduct in this case.

12   What is the missing evidence instruction that you would want

13   me to give?  You put her up there and she testifies that there

14   was video from that camera.  And then, what, the defense is

15   supposed to call Agent Majeed and Mr. Collins, who will say we

16   thought -- no, Mr. Collins wouldn't say it actually -- there

17   to call Agent Majeed who will say we thought the camera was

18   dead and so we didn't give them any video.  And then

19   Mr. Collins says oh, yeah, we did give the video to the

20   government, I believe that we did -- I mean, this trial is

21   turning into a sideshow about the government's lack of

22   disclosures and video evidence that everyone agrees doesn't

23   help either side.

24        MR. WOLF:  Your Honor, I think I would like an

25   opportunity to be able to draft this when I've had a chance --

1    when I'm not on my feet in the court trying to wordsmith this.

2    THE COURT:  Okay, but we've got a jury waiting.  And

3    whether or not you put on that witness depends on your ability

4    to reach some agreement with the defense on that.  So do you

5    have other witnesses you want to start with and deal with

6    Ms. Beverly tomorrow?

7    MR. WOLF:  Your Honor, I do have another witness

8    available who can testify.  It would be Ms. Bates.

9    THE COURT:  Mr. Ohm, any objection to starting with

10    Agent Bates and then you guys can try to sort this out

11    overnight?

12    MR. OHM:  No, Your Honor.

13    THE COURT:  Okay.  Let's do that.

14    (Jury in at 2:20 p.m.)

15    THE COURT:  Okay.  Ladies and gentlemen of the jury,

16    first of all, I want to apologize for keeping you waiting

17    longer than I promised.  I will endeavor to keep us on track

18    throughout this trial.  I very much value your time.  We had

19    to sort out some issues with the lawyers, which is why we were

20    delayed, and I will do my best to avoid those delays going

21    forward.

22    So before we begin the trial I want to explain some of the

23    legal rules that will be important in this trial.  I want to

24    emphasize that my remarks now are not meant to be a substitute

25    for the detailed instructions I will give you at the end of

the trial just before you start your deliberations.  These preliminary instructions are intended to give you a sense of what will be going on in the courtroom and what your responsibilities as jurors will be.

When you took your seats, you noticed that each of you had a notebook and a pen waiting for you.  During the trial jurors who want to take notes are permitted to do so.  Whether or not you take notes is entirely up to you.  You may take your notebooks with you to the jury room and use them during deliberations if you wish to do so.  Your notes are only to be an aid to your memory.  They are not evidence in the case, and they should not replace your own memory of the evidence.

Those jurors who have not taken notes should rely on their own memory of the evidence.  The notes are intended to be for the note-taker's own personal use.  Other than during your deliberations, the notebooks will remain locked in the courtroom during recesses and overnight.  You will not be able to take the notebooks with you as you come and go, and you will not be permitted to take them home with you overnight.

At the end of the trial, when you come back to the courtroom to deliver your verdict, your notebooks will be collected and the pages will be torn out and destroyed.  No one, including myself, will ever look at any notes you have taken, so you may feel free to write whatever you wish.

You have probably noticed that there are 14 of you sitting

in the jury box.  Only 12 of you will retire to deliberate in this matter.  Before any of you even entered the courtroom today we randomly selected the alternate seats.  I will not disclose who the alternate jurors are until the end of my final instructions just before you begin deliberations.  As any seat might turn out to be an alternate seat, it is important that each of you think of yourselves as regular jurors during this trial and that all of you give this case your fullest and most serious attention.

At the beginning of the jury selection process, you were introduced to some witnesses by name.  If at any time during this trial you suddenly realize that you recognize or might know a witness, lawyer, someone who is mentioned in the testimony or evidence, or anyone else connected with this case in any way, you should raise your hand immediately and ask to speak with me.

Now let me briefly explain some of the procedures we will follow and some of the rules of law that will be important in this case.

This is a criminal case that began when the United States Attorney filed a charging document called an information with the court.  The information alleges that on or about July 22, 2025, within the District of Columbia, Sydney Lori Reid did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of the United States,

Special Agent Eugenia Bates and Officer Vincent Liang, while such person was engaged in and on account of the performance of official duties.

You should understand clearly that the information I just read is not evidence.  The information is just a formal way of charging a person with a crime in order to bring her to trial.  You must not think of the information as any evidence of the guilt of the defendant or draw any conclusion about the guilt of the defendant just because she has been formally charged.

At the end of the trial, you will have to decide whether or not the evidence presented has convinced you, beyond a reasonable doubt, that the defendant committed the offense with which she has been charged.  The defendant has been charged with assaulting, resisting, or impeding certain officers or employees.  To prove assaulting, resisting, or impeding certain officers or employees, the government must prove beyond a reasonable doubt each of the elements of this offense.

The elements of assaulting, resisting, or impeding certain officers or employees are as follows:

First, Ms. Bates or Mr. Liang were officers or employees of the United States.  Second, Ms. Reid forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer or employee of the United States.  Third, that act constituted simple assault as I will define that term for you.

1      Fourth, Ms. Reid so acted while that officer was engaged in or

2      on account of their performance of official duties.  Fifth,

3      Ms. Reid acted with what the law calls general intent.  To

4      show general intent, the government must prove beyond a

5      reasonable doubt that Ms. Reid intentionally committed an act

6      which that law makes a crime.

7          An act is done intentionally if done voluntarily and

8      purposely and not because of mistake, inadvertence or

9      accident.  This general intent may be inferred from the doing

10     of the act.

11         Every defendant in a criminal case is presumed to be

12     innocent.  This presumption of innocence remains with the

13     defendant throughout the trial unless and until she's proven

14     guilty beyond a reasonable doubt.  The burden is on the

15     government to prove the defendant guilty beyond a reasonable

16     doubt, and that burden of proof never shifts throughout the

17     trial.

18         The law does not require a defendant to prove her innocence

19     or to produce any evidence.  If you find that the government

20     has proven beyond a reasonable doubt every element of the

21     offense with which the defendant is charged, it is your duty

22     to find her guilty of that offense.  On the other hand, if you

23     find that the government has failed to prove any element of

24     the offense beyond a reasonable doubt, you must find the

25     defendant not guilty of that offense.

As I explain how the trial will proceed, I will refer to "the government" and to "the defense" or "the defendant." When I mention "the government," I am referring to Assistant United States Attorneys Travis Wolf and Jason Facci.  When I mention "the defendant" or "the defense," I am referring either to the defendant, Ms. Sydney Reid, or her attorneys, Mr. Eugene Ohm and Ms. Tezira Abe.

As the first step in this trial, the government and the defendant will have an opportunity to make opening statements. The defendant may make an opening statement immediately after the government's opening statement, or she may wait until the beginning of the defendant's case, or she may choose not to make an opening statement at all.  You should understand that the opening statements are not evidence.  They are only intended to help you understand the evidence that the lawyers expect will be introduced.

After the opening statement or statements, the government will put on what is called its case-in-chief.  This means that the government will call witnesses to the witness stand and ask them questions.  This is called direct examination.  When the government is finished, the defense may ask questions. This is called cross-examination.  When the defense is finished, the government may have brief redirect examination.

After the government presents its evidence, the defendant may present evidence, but she is not required to do so.  The

law does not require a defendant to prove her innocence or to produce any evidence.  If the defense does put on evidence, Mr. Ohm or Ms. Abe will call witnesses to the stand and ask questions on direct examination.  The government will cross-examine and Mr. Ohm or Ms. Abe may have brief redirect examination.

When the defense is finished, the government may offer a rebuttal case which would operate along the same lines as its case-in-chief.  At the end of all the evidence, I will instruct you once more on the rules of law that you are to apply in your deliberations when you retire to consider your verdict in this case.  Then each side will have a chance to present closing arguments in support of its case.  The statements of the lawyers and their closing arguments, just as their questions and their opening statements, are not evidence in this case.  They are intended only to help you understand the evidence and what each side claims the evidence shows.

Finally, at the end of the closing arguments, I will have a few additional instructions for you before you begin your deliberations.

I want to briefly describe my responsibilities as the judge and your responsibilities as the jury.  My responsibility is to conduct this trial in an orderly, fair, and efficient manner, to rule on legal questions that come up in the course of the trial, and to instruct you about the law that applies

to this case.  It is your sworn duty as jurors to accept and apply the law as I state it to you.

Your responsibility as jurors is to determine the facts in this case.  You and only you are the judges of the facts.  You alone determine the weight, the effect and the value of the evidence, as well as the credibility or believability of the witnesses.  You must consider and weigh the testimony of all the witnesses who appear before you.  You alone must decide the extent to which you believe any witness.

You must pay very careful attention to the testimony of all the witnesses because you will not have any transcripts or summaries of the testimony available to you during your deliberations.  You will have to rely entirely on your memory and your notes if you choose to take them.

As human beings, we all have personal likes and dislikes, opinions, prejudices and biases.  Generally, we are aware of these things, but you also should consider the possibility that you have implicit biases, that is, those of which you may not be consciously aware.  Personal prejudices, preferences or biases have no place in a courtroom, where the goal is to arrive at a just and impartial verdict.

All people deserve fair treatment in the legal system regardless of race, national or ethnic origin, religion, age, disability, sex, gender identity or expression, sexual orientation, education, income level, or any other personal

1 characteristic.  You should determine the facts solely from a

2 fair consideration of the evidence presented in this case.

3     During this trial I may rule on motions and objections by

4 the lawyers.  I may make comments to the lawyers, question the

5 witnesses and instruct you on the law.  You should not take

6 any of my statements or actions as any indication of my

7 opinion of how you should decide the facts.  If you think that

8 somehow I have expressed or even hinted at any opinion as to

9 the facts in this case, you should disregard it.  The verdict

10 in this case is your sole and exclusive responsibility.

11     You may consider only the evidence properly admitted in

12 this case.  That evidence includes the sworn testimony of

13 witnesses and the exhibits admitted into evidence.  Sometimes

14 a lawyer's question suggests the existence of a fact.  But the

15 lawyer's question alone is not evidence.  If the evidence

16 includes anything other than testimony and exhibits, I will

17 instruct you about these other types of evidence when they are

18 admitted during the trial.

19     During the trial if the court or a lawyer asks a question

20 or makes a statement that refers to evidence that you remember

21 differently, you should rely on your own memory of the

22 evidence during your deliberations.

23     The lawyers may object when the other side asks a question,

24 makes an argument, or offers evidence that the objecting

25 lawyer believes is not properly admissible.  You must not hold

1  such objections against the lawyer who makes them or the party

2  they represent.  It is the lawyer's responsibility to object

3  to evidence that they believe is not admissible.  If I sustain

4  an objection to a question asked by a lawyer, the question

5  must be withdrawn and you must not guess or speculate what the

6  answer to the question would have been.  If a question is

7  asked and answered and then I rule that the answer should be

8  stricken from the record, you must disregard both the question

9  and the answer in your deliberations.  You should follow this

10  same rule if any of the exhibits are stricken.

11      You're not permitted to discuss this case with anyone until

12  the case is submitted to you for your decision at the end of

13  my final instructions.  That means that until the case is

14  submitted to you, you may not talk about it even amongst

15  yourselves, with your fellow jurors.  That is because we don't

16  want you making decisions until you've heard all the evidence

17  and the instructions of law.

18      In addition, you may not talk about the case with anyone

19  else.  It should go without saying that you also may not write

20  about the case electronically, through any blog posting or

21  other communication, including social networking sites such as

22  Facebook or Twitter or Instagram or any of the other ones

23  until you have delivered your verdict and the case is over.

24  This is because you must decide the case based on what happens

25  here in the courtroom, not on what someone may or may not tell

1    you outside the courtroom.

2        I'm sure that when we take our first recess, you will call

3    home or work and tell them that you've been selected for a

4    jury and the case has started.  They will undoubtedly ask what

5    kind of case you're sitting on.  You may tell them that it is

6    a criminal case but nothing else.  Now, when the case is over,

7    you can discuss any part of it with anyone you wish, but until

8    then, you may not do so.

9        Although it is a natural human tendency to talk with people

10   with whom you may come into contact, you must not talk to any

11   of the parties, their attorneys or any witnesses in this case

12   during the time you serve on this jury.  If you encounter

13   anyone connected with the case outside the courtroom, you

14   should avoid having any conversation with them, overhearing

15   their conversation, or having any contact with them at all.

16       For example, if you find yourself in a corridor outside the

17   courtroom, in an elevator, or any other location where the

18   case is being discussed by attorneys, parties, witnesses or

19   anyone else, you should immediately leave the area to avoid

20   hearing those discussions.  If you do overhear a discussion

21   about the case, you should report that to me as soon as you

22   can.

23       Finally, if you see any of the attorneys or witnesses

24   involved in the case and they turn away and walk away from

25   you, they are not being rude, they are merely following the

same instruction that I gave to them.

It is very unlikely, but if someone tries to talk to you about the case, you should refuse to do so and immediately let me know by telling my deputy clerk.  Do not tell the other jurors; just let me know and I will bring you in to discuss it.  Between now and when you are discharged from jury duty, you must not provide to or receive from anyone, including friends, coworkers, and family members, any information about your jury service.

You may tell those who need to know where you are that you've been picked for a jury and how long the case may take, but you must not give anyone any information about the case itself or the people involved in the case.  You must also warn people not to try to say anything to you or write to you about your jury service or the case.  This includes face-to-face, phone, or online computer communications.

In this age of electronic communication, I want to stress that you must not use electronic devices or computers to talk about the case, including texting, blogging, emailing, tweeting, posting information on a website or a chat room or any other means at all.  Do not send or accept messages, including email and text messages, about your jury service. You must not disclose your thoughts about your jury service or ask for advice on how to decide any case.

You must decide the facts based on the evidence presented

1    in court and according to the legal principles about which I

2    will instruct you at the end.  You are not permitted during

3    the course of the trial to conduct any independent

4    investigation or research about the case.  That means, for

5    example, you cannot use the internet to do research about the

6    facts or the law or the people involved in the case.

7        Research includes something as simple or seemingly harmless

8    as using the internet to look up a legal term or view a photo

9    of the scene of the alleged crime.

10       Now, I want to explain why you should not conduct your own

11   investigation.  All parties have a right to have the case

12   decided only on the evidence and legal rules that they know

13   about and that they have a chance to respond to.  Relying on

14   information you get outside the courtroom is unfair because

15   the parties would not have a chance to refute, correct, or

16   explain it.

17       Unfortunately, information that we get over the internet or

18   from other sources may be incomplete or misleading or just

19   plain wrong.  It is up to you to decide whether to credit any

20   evidence presented in court, and only the evidence presented

21   in court may be considered.  If evidence or legal information

22   has not been presented in court, you cannot rely on it.

23       Moreover, if any of you do your own research about the

24   facts or the law, this may result in different jurors basing

25   their decisions on different information.  Each juror must

1    make his or her decision based on the same evidence and under

2    the same rules.

3        In some cases there may be reports in the newspaper or on

4    the radio, internet or television concerning the case while

5    the trial is ongoing.  If there should be any such media

6    coverage in this case, you may be tempted to read, listen to,

7    or watch it.  You cannot.  You must not read, listen to, or

8    watch any such reports because you must decide this case

9    solely on the evidence presented in this courtroom.

10       If any publicity about this trial inadvertently comes to

11   your attention during trial, do not discuss it with the other

12   jurors or anyone else.  Just let me or my deputy clerk know as

13   soon after it happens as you can, and I will then discuss it

14   with you.

15       After I submit the case to you, you may discuss it only

16   when I instruct you to do so, and only in the jury room and

17   only in the presence of all your fellow jurors.  It is

18   important that you keep an open mind and not decide any issue

19   in this case until after I submit the entire case to you with

20   my final instructions.

21       Finally, we have a court reporter here taking down

22   testimony, but you will not have a transcript with you during

23   deliberations.  You must rely on your memory, and if you take

24   them, your notes, as an aid to that memory.

25       So I ask you to please pay close attention, and we will

1    begin with an opening statement from the government.

2         MR. WOLF:  Permission to proceed?

3         THE COURT:  Go ahead.

4              GOVERNMENT OPENING STATEMENT

5         MR. WOLF:  Good afternoon.  Back on July 22nd of this

6    year, agents with the FBI and Immigration and Customs

7    Enforcement went to D.C. jail for a straightforward operation,

8    to detain two individuals who were being released from the

9    jail for immigration violations.

10        The defendant, Sydney Reid, had a right to be there too.

11   She can observe, she can record, she can protest, but what she

12   could not do, she could not forcibly assault, resist, impede,

13   or interfere with law enforcement officers engaged in their

14   lawful duties.  But that is what the defendant did that day,

15   and that's why we are here.

16        So on July 22, 2025, the agents with the FBI and the

17   Immigration and Customs Enforcement proceeded to the D.C.

18   jail at about 4, 4:30 p.m.  They got there, they weren't sure

19   exactly when these two individuals who were going to be

20   detained, when they were going to be released.  So they got

21   there and they waited.

22        The area was pretty empty, not much going on, and they

23   didn't know exactly when the inmates were going to be released

24   so they just waited out by the entrance.  Several of them had

25   official FBI tactical vests on, clearly identifying themselves

1   as law enforcement.

2       And while waiting, about two and a half hours after they

3   arrived, the defendant arrived.  And when she arrived, she

4   began to take action.  She started photographing vehicles,

5   their license plates that were parked outside the jail.  She

6   began recording the law enforcement officers.  All these

7   things are within her right.  And the agents didn't react,

8   didn't intervene, let her do what she wanted to do.

9       The defendant even hurled some profanities at the agents.

10  They didn't react.  She was free to go about her business.

11  That is her right.  And that's what the defendant did, she

12  went about her business and she in fact left the scene.  This

13  was about 6:40 p.m. on July 22.  She walked away and went down

14  the street.

15      And what you'll learn is that while she was gone, the first

16  person who was going to be arrested on immigration violations

17  was released from the D.C. jail.  And you'll see body-worn

18  camera from this process.  The agents waited by the door where

19  they expected the person to be released.  And when the person

20  came out, three agents arrested that person.  The arrest is

21  smooth, there's no resistance, it goes very smoothly.

22      The agent's operation was:  Arrest these individuals, move

23  them through a pavilion that's outside the D.C. jail, down a

24  flight of steps, which you'll see in this case, into a waiting

25  vehicle where they would be secured until all inmates were in

1    fact arrested.

2        And that's what happened here.  The whole process took

3    basically a minute or two.

4        After that person was arrested, as they were waiting for

5    the second person to be released from D.C. jail, the defendant

6    returned to the scene and the whole dynamic changed.  She

7    approached the officers as they were waiting and as they were

8    about ready to be expecting these people to be released, and

9    approached the perimeter officer, who was essentially securing

10   the area.  His name is Officer Vincent Liang.  He was an

11   Immigration and Customs Enforcement officer.

12       And what he was doing, he was keeping a zone of operation

13   clear so the agents could arrest these people safely, both

14   safely for themselves, for the inmates and for the public,

15   because they had information that these people could

16   potentially fight or flee from officers.  So they wanted to

17   make sure everyone was safe.

18       So when the defendant approached Officer Liang, she

19   approached trying to record the situation.  She was allowed

20   to.  But when she couldn't get close enough, she then tried to

21   circumvent Officer Liang, walking around a bannister, down a

22   walkway, trying to go up the steps and approaching the agents

23   in their zone of operation.

24       Officer Liang had no choice but to use his hands to move

25   the defendant away from the zone of operation where they were

going to be moving this person.  And Officer Liang moved the
defendant up against the wall and held her there, restraining
her with his hands, and she struggled with Officer Liang.  And
you'll see that on video in this case.  And as this struggle
was happening, that second inmate was released from the D.C.
jail, and three to four agents arrested that inmate by the
entrance of the D.C. jail.

And the defendant continued struggling.  And she continued
forcibly resisting, forcibly impeding their operation.  And
what you'll see is just as the inmate is being walked from the
door down toward the steps, right past the defendant, the
defendant escalates her actions from forcible resistance,
impeding and interfering, to acts that constitute a simple
assault.

Now, at the end of this case, you'll be instructed on what
simple assault means.  But I'll tell you what it doesn't mean.
It doesn't mean something that we use in normal common
parlance about the use of punching someone, for example, or
hitting someone.  That's not what simple assault requires.
All that's required is a threat, a threat to injure someone,
coupled with the apparent ability to do so.

And what you'll learn in this case is that as this inmate
is being walked down, Agent Eugenia Bates is down in the
parking lot waiting with the first detainee, and she sees this
situation happening and she starts approaching.  And when she

1    approaches -- you'll see body-worn camera of this.  She

2    approaches methodically, walking up to the scene, taking a

3    tactical pause, assessing what's going on with Officer Liang

4    and the other agents, and deciding that Officer Liang needs

5    assistance.  And so she approaches the defendant.  And when

6    she approaches the defendant, she calmly but firmly tells the

7    defendant, while holding her arm, "Ma'am, once we're done

8    you'll be good to go," meaning that she'll be released once --

9    as soon as they're done.

10    But the defendant is not interested in deescalating the

11    situation.  So as the inmate starts being walked past her, the

12    defendant engages in this simple assault.  She kicks her knee

13    up toward Agent Bates's groin area.  You'll see this in the

14    body-worn camera in parts and pieces.  And this act, this

15    intentional act, meant to threaten Agent Bates, is what

16    created the simple assault.

17    And as part of the simple assault, the government has to

18    show threat of injury.  What you'll learn, though, is that we

19    don't need to show the threat to injure someone causing a

20    broken bone or a black eye.  That's not what's required.

21    What's required is only that the person who was on the

22    receiving end of this threat had offensive touching to a

23    person of reasonable sensibility.  Offensive touching to a

24    person of reasonable sensibility.

25    So when the defendant kicked up her knee at Agent Bates's

1    groin area, that was the injury.  And you will see on the

2    body-worn camera and from Agent Bates's testimony how the

3    defendant's behavior, her criminal act changed the whole

4    dynamic of the situation.  Whereas before, they were prepared

5    to release the defendant, let her go about her way, now at

6    this point she's being placed under arrest.

7        So multiple agents come and turn the defendant around and

8    cuff her and place her under arrest.

9        That's what happened on July 22.  In the aftermath what

10   you'll learn is that Agent Bates sent text messages in a

11   private group chat that were pejorative toward the defendant,

12   made fun of her political beliefs.  These text messages are

13   not in the best traditions of the Department of Justice or

14   what we've come to expect with professional law enforcement.

15       And you'll likely learn in this case that agents on scene

16   used denigrating language about the defendant, also not in the

17   best keeping of the traditions of the Department of Justice.

18       But members of the jury, we're not here for a popularity

19   contest, and the law doesn't say that the law applies and it

20   protects only federal law enforcement officials that we like.

21   It is plain and clear:  The defendant is not allowed to

22   forcibly assault, resist, impede or interfere with law

23   enforcement officials during the course of their duties,

24   period.

25       And the evidence will show that is exactly what the

1    defendant did.  And that is why at the end of this case my

2    colleague and I will come before you and ask you to find the

3    only fair and reasonable jury that's consistent with the

4    evidence in this case.  We'll ask you to find the defendant

5    guilty.  Thank you.

6        THE COURT:  Thank you, Mr. Wolf.  Does the defense wish

7    to give an opening statement?

8        MR. OHM:  Yes, Your Honor.

9        THE COURT:  Please proceed.

10                   DEFENSE OPENING STATMENT

11        MR. OHM:  Good afternoon, everybody.

12    "You couldn't have just minded your own business."  Those

13    are the words the ICE agent said to Ms. Reid after they

14    falsely arrested her.  "You couldn't have just minded your

15    business."  They used those words because they were mad,

16    because Ms. Reid had decided to participate in our democracy,

17    to exercise her freedoms, and to come out and monitor and to

18    record their actions.

19    Ladies and gentlemen, make no mistake:  Ms. Sydney Reid was

20    right.  And the agents, they were wrong.  Ms. Reid has every

21    right to come out and monitor and record and to share with her

22    community, with our city, with our country, all of the things

23    that the ICE agents are doing.  And these agents?  They are

24    not allowed to arrest somebody just because they're no longer

25    in the mood to put up with somebody who had different

political beliefs.  These agents?  They're not allowed to arrest somebody because they feel like they're being challenged, because they feel like somebody's questioning them.

Now, Mr. Wolf was much more gracious than these agents would ever have been to Ms. Reid.  But that doesn't mean that the agents didn't have a line.  Eventually, they got fed up.  Eventually, they didn't like the yelling, they didn't like the questioning, they didn't like the challenging, they sure didn't like the cursing.  So they made up a charge.

Members of the jury, Sydney Reid is innocent.  Now, how are you going to know that Ms. Reid is innocent?  Well, first, you're going to know because all of the witnesses that matter that testify for the government are going to be law enforcement witnesses.  Witnesses that have an interest in the outcome of the case, witnesses that are already slanted in their view of the facts.

You're going to hear about these witnesses.  You're going to hear that they were individuals, that they were actually regular law enforcement officers, that they decided to join the deportation efforts.  Agent Liang, the person that he talked about, he was an MPD officer for five years.  But he decided to go join ICE five years ago.

Special Agent Bates, the other so-called victim in this case, you're going to hear that she was exchanging text

messages with her partner right after the incident, calling

Ms. Reid a libtard.  Because that was the lasting impression

from this interaction for Agent Bates.

Agent Bates was making light of -- and you'll see these

text messages yourself -- was making light of this so-called

assault.  She called them booboos.  She made fun of the fact

that she's all of a sudden involved in a federal assault

charge against Ms. Sydney Reid.

You're going to learn from the evidence that these agents

behind a badge are exactly the kind of activists that you

would expect them to be.  You're going to hear that they brag

about how they are -- I don't want to get the words wrong

here -- showing their cop side in their interaction with

Ms. Reid.  Brag about how they went 6D, to the 6th District,

when they were interacting with Ms. Reid.

These are the primary witnesses that the government is

going to bring you.  And you're not going to be able to trust

their account.  Not their opinion, not their reporting of what

they say are facts.

How else are you going to know that Ms. Reid is innocent?

Well, you're going to see video.  Now, there were a whole

bunch of agents and officers out there, but a couple of them

actually followed the rules and their regulations and had

body-worn camera on them.  And you're going to see what

happened, you're going to see what Ms. Reid did and what she

didn't do.  You're going to see that she never approached the
individuals who were being taken into custody.  We're going to
call them noncitizens.

Now, you're also going to see Ms. Reid's video, because
remember, that was the whole point that she was out there.
She was holding her own cell phone taking video of what was
going on.  She was monitoring so she could report.  That was
her whole purpose.  It wasn't so she could commit a crime.
That's ridiculous.

You will see footage from her own video, and you'll see
what she did, you'll see what she said.  And yes, she did
curse.  Yes, she was disgusted by these individuals.  You'll
see that she never assaulted anybody.

How else are you going to know?  Well, remember what
Ms. Reid's goals were when she's monitoring people who are
taking into custody individuals who she is concerned about,
individuals who don't necessarily have resources, who don't
necessarily speak English, who don't know their rights.  That
was her point.  And that's why she pressed "record."

Now, this kneeing thing.  This kneeing thing is what they
call the assault.  And it's extremely important because as the
Court just instructed you, regardless of the name of this law
that Ms. Reid is accused of violating, the law requires that
the government prove an assault beyond a reasonable doubt.
We're going to show you this sort of kicking motion that they

say occurred, or the kneeing motion that they say occurred, and you're going to know by the end of that that that wasn't an aggressive or assaultive move.  It was reactive.  It was reactionary because of what was happening to her, because of the aggression that these officers were showing against her.

Ladies and gentlemen, these officers decided that they had enough of Ms. Sydney Reid that day.  They decided to tap into the power that they thought that they had been granted.  But that doesn't mean that they were right.  Because in this city, in this courtroom, in this community, they don't get to decide who commits a crime.  When the United States government charges somebody with a crime, the people, the United States, that's not them, it's you, a jury of our peers.  You are the ones that get to decide whether Ms. Reid committed a crime beyond a reasonable doubt.

And the same way that Ms. Reid wasn't bullied and intimidated by ICE and by the FBI, we know you won't be intimidated either.  Because ladies and gentlemen, that's what this is about.  Ms. Reid was arrested because she stuck her head out and they wanted to pound it back in.  That's what this case is about, sticking your head out, standing up to bullies, making determinations.  But please don't be fooled. Please don't cower.  The United States, this government, these prosecutors, they don't have the final say.  That's your role in our democracy.

1      They call themselves the United States.  It's an

2   interesting time to be in this courtroom.  We're not asking

3   you to function on emotion, we're asking you to look closely

4   at the evidence.  Because when you do, you'll see she never

5   assaulted anybody, she wasn't trying to assault anybody.

6   You're going to hear her own words.  She wasn't trying to

7   break a perimeter.

8      When they present Officer Liang, the perimeter guy, look

9   for the perimeter.  See if you can see the perimeter.  There

10   was none.  The perimeter was in Officer Liang's mind.  And if

11   Ms. Reid violated the imaginary perimeter in Officer Liang's

12   mind, Officer Liang was going to act.  He was going to take

13   her down.  He was going to bully her.

14      Ms. Abe and I are exceptionally honored and privileged to

15   represent Ms. Sydney Reid before you today.  What she did that

16   day was brave, it was courageous, and it was 100 percent

17   legal.  We know that when you hear all the evidence and you

18   carefully apply it to the law, that you're going to reach the

19   only conclusion that makes sense in this case: not guilty.

20   Thank you.

21          THE COURT:  Thank you, Mr. Ohm.

22      Is the government prepared to call its first witness?

23          MR. WOLF:  Yes, Your Honor.  The government calls Agent

24   Eugenia Bates.

25          THE COURT:  And while we wait for the government's

1    witness, in terms of our schedule, we'll go until 5:00.  We

2    will break at 5:00.  We will not go past 5:00 any day, and

3    we'll come back at 9:30 in the morning.  I'll take two

4    10-minute breaks, one in the morning, one in the afternoon,

5    and we'll do lunch.  So you can plan on leaving here by 5:00.

6              EUGENIA BATES, WITNESS FOR THE GOVERNMENT, SWORN

7                          DIRECT EXAMINATION

8    BY MR. WOLF:

9    Q.    Good afternoon.  Could you please introduce yourself to

10   the jury, spelling your first and last name for the record.

11   A.    Yes.  Eugenia Bates.  E-U-G-E-N-I-A, B-A-T-E-S.

12   Q.    Agent Bates, by whom are you employed?

13   A.    FBI.

14   Q.    How long have you been with the FBI?

15   A.    About three years now.

16   Q.    What unit are you with currently with the FBI?

17   A.    We are named CR00.

18   Q.    And what does the name CR00, what is that unit?

19   A.    We primarily do immigration cases, investigations of all

20   varieties.

21   Q.    How long have you been in that unit?

22   A.    Around May of this year.

23   Q.    So approximately five months, give or take?

24   A.    Yeah.

25   Q.    And what led you to be in that unit?

1    A.   It was a brand-new unit.  They needed people to work so I

2    was assigned to that squad.

3    Q.   So you said you -- you testified that you were in the FBI

4    for three years and you've been in this unit for five months.

5    Is that correct?

6    A.   That's correct.

7    Q.   What unit were you in in the FBI prior to joining this

8    unit?

9    A.   I did national security casework, so like classified

10    casework on national security.

11    Q.   I know it's -- can you be more specific as to what entity

12    or what you were doing, if you can?

13    A.   Most of my work was classified, but just the umbrella

14    that we are under, it's national security in general.

15    Counterintelligence, national security.

16    Q.   And for that position, do you have any language skills?

17    A.   I do.

18    Q.   What language skills?

19    A.   Russian.

20    Q.   And how did you learn Russian?

21    A.   I was born in Ukraine.  I immigrated to the United States

22    at a young age with my mom.

23    Q.   And prior to joining the FBI, did you have any other law

24    enforcement experience?

25    A.   Yes.  I initially began working with law enforcement in

1    the United States Coast Guard.  I joined when I was 18 years

2    old.  I joined the military.  And then I, at around 21 years

3    old, I joined with Fairfax County Police Department as a

4    police officer.  So both of those roles I worked in a law

5    enforcement capacity.

6    Q.   So starting with the Fairfax County police officer role,

7    how long were you a police officer there?

8    A.   From 2015 to 2022, around seven years.

9    Q.   Did you go straight from essentially Fairfax County

10   police to the FBI?

11   A.   That's correct.

12   Q.   What did you do at the Fairfax County police?  What was

13   your job duty and assignment?

14   A.   Patrol officer.  For all of those years.

15   Q.   What area of Fairfax County if you recall?

16   A.   Mt. Vernon.  Mt. Vernon district for the whole time.

17   Q.   And regarding your service in the Coast Guard, can you

18   describe what you were assigned to, what you were doing there

19   in the Coast Guard?

20   A.   Yes.  I was in the Coast Guard for 10 years --

21        So I was in the Coast Guard for 10 years, predominantly

22   as a reservist.  I did do some active duty time as well.  But

23   my main role I was trained in as a maritime enforcement

24   specialist, which is where our primary role we do in law

25   enforcement on the water, like boarding, stuff like that.

```
 1        During that time, I did a lot of port security as well.  So
 2        port security, law enforcement on the water, to make it
 3        simple.
 4   Q.   Okay.  So I'd like to go and direct your attention to
 5        July 22nd of this year.  Were you working that day?
 6   A.   I was.  Yes.
 7   Q.   Did you assist in an arrest of an individual, a U.S.
 8        citizen on that day?
 9   A.   Yes.
10   Q.   That person, what was that person's name?
11   A.   Ms. Sydney Lori Reid.
12   Q.   When you arrested that person, did you see that person's
13        physical appearance?
14   A.   Yes.
15   Q.   Did you see that person's face?
16   A.   Yes.
17   Q.   If you saw that person again, would you recognize that
18        person?
19   A.   Yes.
20   Q.   Do you see that person in the courtroom today?
21   A.   Yes.  She's sitting behind you.
22   Q.   I'm sorry.  Can you please indicate where that person is
23        and an article of clothing that person is wearing?
24   A.   Yes.  She's wearing a brown sweater, green shirt, with
25        her hair up in a bun.
```

1          MR. WOLF:  May the record reflect indicating the

2     defendant.

3          MS. ABE:  No objection.

4          THE COURT:  So reflected.

5     BY MR. WOLF:

6     Q.   All right.  So I'd like to talk to you about the

7     background leading up to that arrest.

8     A.   Okay.

9     Q.   On July 22, 2025, can you take the grand jury through

10    essentially just how you started your day and sort of what

11    happened as the day went on?

12    A.   I don't recall exactly what my morning held, however, at

13    the time we got called to our initial arrest, it was about

14    2:00, 3:00 in the afternoon.  I was sitting in our squad area

15    when one of the supervisors for another squad asked for

16    assistance to make an apprehension in D.C. of -- to assist ERO

17    in an apprehension in D.C.

18    Q.   When you say ERO, what is that?

19    A.   Enforcement and removal operations.  That is the ICE wing

20    of ERO.  Like ERO is a wing of ICE.

21    Q.   And when you say ICE, that's obviously Immigration and

22    Customs Enforcement?

23    A.   Yes.

24    Q.   So when you received this information, where were you,

25    what city, state?

1    A.    I was in Manassas.

2    Q.    And when you received this information, what did you do?

3    A.    My supervisor asked us to help, and I did as I was

4    instructed.

5    Q.    Did any other agents from your unit also accompany you?

6    A.    Yes.  There was one individual that was in the squad area

7    with me.  We both responded.  And there was another individual

8    that was somewhere else, I don't remember where he was, and he

9    also responded.

10    Q.    And who are the other agents who responded to the best of

11    your recollection?

12    A.    From my squad it was Braden Harter and Jason Jankovitz.

13    There was another FBI agent that responded as well.  His name

14    is Neil -- Parot?  But he was an agent with the supervisor

15    that asked us to help.  He was not part of our squad.

16    Q.    Okay.  And you were told or asked to go to D.C. and

17    apprehend individuals; is that correct, essentially?

18    A.    Yes.

19    Q.    And how many individuals?

20    A.    Two.

21    Q.    And what was the location where this apprehension was

22    supposed to take place?

23    A.    I don't remember the address, but it was the D.C.

24    Department of Corrections.  They were being released from the

25    jail.

Q.   Was this apprehension being done pursuant to an immigration detainer?

A.   What I was told at the time is ERO needed assistance. I'm not sure what paperwork ERO had filed at the time.

Q.   Okay.  So during the course of responding to this or even on scene, did you receive information that these two individuals who would be apprehended may pose a risk of fighting or fleeing with officers?

A.   Yes.  That's why they asked for more assistance than what they initially had there.

Q.   Okay.  So in terms of what the agents who -- number of agents who assisted, had that information not been given, for example, how many agents would have gone compared to how many agents were actually sent?

A.   I'm not sure, but as law enforcement officers, we want to be safe and make sure that we have the numbers there in case something happens.  So we wanted to make sure that we had the numbers there rather than leaving two or three officers there by themselves making the arrest.

Q.   And when you went to the location, did you wear any apparel identifying yourself as law enforcement officers?

A.   Yes.

Q.   What apparel did you wear?

A.   The same thing that I wear on every at-large arrest, which is my body armor that has "FBI" clearly marked on the

1    front and back, and then my duty belt, which has all my other

2    law enforcement...

3    Q.   And the agents from your squad, did they also wear

4    similar -- I guess body armor and tactical vest?

5    A.   Yes.  That's what we typically wear on any arrest in a

6    public space.

7    Q.   During the course of this operation, did you don a mask?

8    A.   I did, yes.

9    Q.   Was that for the entire time or just a portion of the

10   time?

11   A.   As soon as we got word that the two individuals were

12   being released, I put my mask on.

13   Q.   And why was that?

14   A.   Our leadership has advised us for any ERO operations to

15   wear a mask to protect our identity.

16   Q.   And why would you want to protect your identity?

17   A.   Because we've gotten a lot of law enforcement bulletins

18   that indicate that individuals want to harm people or law

19   enforcement officers that are involved in ICE ERO operations.

20   Q.   And so about what time did you get to the location?  And

21   what location was that, by the way, you were going to?

22   A.   I have the exact address in my notes if you need that

23   specifically, but to the Department of Corrections.  I would

24   say got there around 4:00 maybe in the afternoon.

25   Q.   Would it refresh your recollection to see a copy of what

1    appears to be the 302?

2    A.   Yes.

3    Q.   I'm going to mark this for identification purposes as

4    Government's Exhibit 23.  I'm going to show defense counsel.

5         Showing you what's been marked for identification as

6    Government Exhibit 23.  Please review the first page to

7    yourself and when you've reviewed it, please look up at me.

8         (Witness complies.)

9    Does Government Exhibit 23 refresh your recollection as to

10   the location of the address?

11   A.   Yes.  If I can recall it again.  I believe so, yes.  1901

12   D Street.

13   Q.   So what's at that location?

14   A.   Yes.  That's the D.C. central facility of corrections.

15   Q.   Is that a jail?

16   A.   Yes.  I guess that's a simpler term.

17   Q.   Before that day, had you ever been to D.C. jail?

18   A.   No.

19   Q.   So going back to when you arrived, what time about did

20   you get there?

21   A.   About 3:00 or 4:00 in the afternoon.

22   Q.   And this being July, I assume it was light out.  Correct?

23   A.   Yes, it was.

24   Q.   How busy was it there in the area when you guys arrived?

25   A.   Not very.  Not a lot of pedestrian traffic.

1    Q.   And when you arrived there, were you -- and these two

2    individuals, going back to the people who were being

3    apprehended, were they being released from the D.C. jail?

4    A.   That's what I was told, yes.

5    Q.   Did you know what time these people were being released

6    from D.C. jail?

7    A.   When we were initially told to respond, they said the

8    release was imminent.

9    Q.   So when you got there, you testified about the other FBI

10   agents who were going with you or joined you there.  Were

11   there other ICE agents who also arrived on scene?

12   A.   Yes.

13   Q.   Do you remember their names?

14   A.   I think so.

15   Q.   Okay.  What names do you remember?

16   A.   Charles Craddock, John Parodi, Vincent Liang.  See who

17   else was there.  Klepec, Dinko -- I can't say his last name.

18   Q.   Do your best?

19   A.   Resovich, something like that.

20   Q.   Okay.  And so when you arrived out there, what if

21   anything did you do once you arrived?

22   A.   We approached where the ERO officers already were on the

23   kind of vestibule of the -- where they were releasing

24   individuals.  We approached to see kind of what was going on,

25   what they needed from us, stuff like that.

1    Q.   All right.  I'm going to show you what's been premarked

2    as Government Exhibit 12.

3         All right.  Agent Bates, I have shown you Government

4    Exhibit 12.  Do you recognize Government Exhibit 12?

5    A.   Yes.

6    Q.   What is Government Exhibit 12?

7    A.   That is the entryway where, when we showed up, we saw the

8    ERO officers, but that is also where we stood and waited for

9    the individuals to be released.

10   Q.   So just taking kind of a metaphysical step back, is this

11   a photograph?

12   A.   Oh.  Yes.

13   Q.   So this is a photograph of that location.  Is that

14   correct?

15   A.   Yes, that's correct.

16   Q.   Does it fairly and accurately show the layout of the area

17   where you were staging at?

18   A.   Yes.  It does.

19        MR. WOLF:  At this time the government would move to

20   admit and publish Government Exhibit No. 12.

21        THE COURT:  Any objection?

22        MS. ABE:  No objection.

23        THE COURT:  Admitted.

24                              (Government Exhibit No. 12

25                               received into evidence.)

1    BY MR. WOLF:

2    Q.   So when you and the other agents arrive, can you

3    indicate -- and I think you actually can use your finger and

4    make a circle -- where everyone's staged at approximately?

5    A.   Around right there.

6         MR. WOLF:  May the record reflect the witness made a

7    blue circle in the bottom center of the screen.

8    BY MR. WOLF:

9    Q.   And at that time, like, were you standing, were you

10   sitting, were you walking around?

11   A.   Yeah, we were -- when we initially approached they were

12   all standing.  We stood for a long time, but the body armor is

13   really heavy so at some point we did sit down.

14   Q.   All right.  And in this exhibit do you see the entrance

15   about where you expected the inmates to come out?

16   A.   Yes.  So you see the white square kind of right outside

17   the circle, so it's to the left?  Yeah, right where it's

18   circled.  That's the door.  So to the right is kind of the

19   main entrance.  A lot of employees were going in and out.  And

20   then to the left is where we were told that the individuals

21   would be released out of.

22   Q.   Okay.  I'm going to stop publishing Government Exhibit

23   12.  I'm going to show the witness Government Exhibit 18.

24   Agent Bates, do you see Government Exhibit 18?

25   A.   Yes.

Q.   Does this show the area where you and other agents were

essentially staging by the door from the jail?

A.   Yes.

Q.   Does it fairly and accurately show the layout from July

22, 2025?

A.   Yes.

      MR. WOLF:  At this time the government would move to

admit Government Exhibit 18.

      THE COURT:  Any objection?

      MS. ABE:  No objection.

      THE COURT:  Admitted.

                          (Government Exhibit No. 18

                             received into evidence.)

BY MR. WOLF:

Q.   So while on scene, did anything unusual happen while you

and the other officers were on scene?

A.   Yes.

Q.   All right.  Can you explain what if anything unusual

essentially happened while you and the other officers were on

scene?

A.   Yeah.  Ms. Reid at one point, after a couple hours of us

being there, she walked up, clearly noticed we were there for

a law enforcement reason, and she began recording us and --

yeah.

Q.   And so did the defendant say anything to you during this

1    point that you recall?

2    A.   I don't recall specifically.  I remember she did say some

3    curse words, that she was yelling at us, she was taking

4    pictures of some of the ERO vehicles.

5              MR. WOLF:  One moment.  Should I proceed?

6              THE COURT:  Let's keep going, and when you come to a

7    good stopping point we'll take a break so we can fix the

8    screens in the back, and we'll have that be our afternoon

9    break.

10             MR. WOLF:  Okay.

11   BY MR. WOLF:

12   Q.   And so you testified this happened a couple hours after

13   you guys arrived?

14   A.   After we arrived, yes.

15   Q.   And you testified that defendant took pictures of some

16   ERO vehicles; is that correct?

17   A.   Yes.

18   Q.   How do you know she was taking pictures of the vehicles?

19   A.   It appeared as if she was.  She walked up to -- what I

20   remember is she walked up to one of the trucks, took a picture

21   of the front license plate, and she had her phone up talking

22   and taking pictures or video, I'm not sure, of us and the

23   vehicles.

24   Q.   And where were you when this was going on?

25   A.   During that time I think is when I was already seated on

1    the ledge right there.

2    Q.   And so actually you're referencing Government Exhibit 18.

3    When you say the ledge, can you indicate about where you were?

4    A.   Right there.

5         MR. WOLF:  May the record reflect the witness has drawn

6    a blue circle on the center right portion of the screen.

7    BY MR. WOLF:

8    Q.   All right.  I'm going to show you what's been

9    premarked --

10        THE COURT:  Mr. Wolf, if you're going to show

11   additional exhibits, why don't we take a 10-minute break now

12   to get the screens resolved.  And that'll be our afternoon

13   break and then we'll go till 5:00.

14        MR. WOLF:  Perfect.  Thank you, Your Honor.

15     (Jury out at 3:24 p.m.)

16        THE COURT:  Agent Bates, you can step outside.  You're

17   still under oath.  Please do not discuss your testimony with

18   anyone during the break.

19        THE WITNESS:  Yes, Your Honor.

20        THE COURT:  Thank you.  And we'll come back in 10

21   minutes.

22     (Recess from 3:24 p.m. to 3:37 p.m.)

23        THE COURT:  Okay.  Welcome back, everyone.  You may be

24   seated.  We will resume with the government's direct

25   examination of Agent Bates, who is still under oath.

1          MR. WOLF:  Thank you, Your Honor.

2      BY MR. WOLF:

3      Q.   So just a quick question:  So the D.C. jail, 1901 D

4      Street Southeast, is that in the District of Columbia?

5      A.   Yes.

6      Q.   So going back into this situation where you saw defendant

7      come there, I'm going to show you an exhibit -- I'm showing

8      you what's been premarked as Government Exhibit 22.  Do you

9      recognize Government Exhibit 22?

10     A.   Yes.

11     Q.   What do you recognize it to be?

12     A.   It looks like an aerial view of the jail and the

13     surrounding road and parking lot.

14     Q.   And based on you being there that day, does this fairly

15     and accurately show just a general layout of the jail and

16     surrounding parking lot?

17     A.   Yes, it does.

18          MR. WOLF:  At this time the government would move to

19     admit Government Exhibit 22.

20          THE COURT:  Any objection?

21          MS. ABE:  No objection.

22          THE COURT:  Admitted.

23                         (Government Exhibit No. 22

24                          received into evidence.)

25          MR. WOLF:  And permission to publish.

1    BY MR. WOLF:

2    Q.    So Agent Bates, looking at Government Exhibit 22, can you

3    indicate -- I'm going to zoom in a little bit here.  Can you

4    indicate by using the circle function approximately where you

5    and other agents were when you were waiting for the inmates to

6    be released?

7          MR. WOLF:  May the record reflect the witness has made

8    a circle in the -- basically the center of the screen on the

9    top corner of the building.

10   BY MR. WOLF:

11   Q.    And then when you say you saw the defendant appearing to

12   photograph or record ERO vehicles, where was that happening?

13   A.    The vehicles were located -- I'm not specifically sure

14   which parking spot, but for example, like right there and

15   right there.  They were kind of off to the side from where we

16   were.

17         MR. WOLF:  And may the record reflect the witness made

18   a circle and a line in the parking lot area that's I guess

19   just slightly upward and to the right of the I guess top

20   corner of the building.

21   BY MR. WOLF:

22   Q.    And then when the defendant, you testified she came by

23   and was recording or something like that, where was the

24   defendant when she did that?

25   A.    Well, she was at the vehicles at one point, but she also

1    walked kind of down this path as well, recording us, but when

2    she was taking pictures of the vehicles, I noticed her there.

3         MR. WOLF:  And may the record reflect the witness has

4    made two lines, one on the -- appears to be the sidewalk just

5    up and to the right from the building, and another line in

6    the, I guess, center median of the parking lot, upper right

7    from the building.

8    BY MR. WOLF:

9    Q.    I'm going to show the witness what's been premarked as

10   Government Exhibit 3.  All right.  I am showing the witness

11   what's been premarked as Government Exhibit 3.

12        I'm going to play for a few seconds, and I'll ask you

13   some questions.  May the record reflect I started from time

14   stamp 00:00.

15        (Video played.)

16        I paused at 12 seconds.  Do you recognize the area

17   depicted in this video?

18   A.    Yes.

19   Q.    And are you present -- have you watched this video prior

20   to testifying today?

21   A.    Yes.

22   Q.    Are you present in portions of this video?

23   A.    Yes.

24   Q.    And the video, does it fairly and accurately show the

25   area outside the D.C. jail while you were there that day?

 1    A.   It does, yes.

 2         MR. WOLF:  At this time the government would move to

 3    admit Government Exhibit 3.

 4         THE COURT:  Any objection?

 5         MS. ABE:  No objection.

 6         THE COURT:  Admitted.

 7                        (Government Exhibit No. 3

 8                         received into evidence.)

 9    BY MR. WOLF:

10    Q.   I'm going to bring this back to the beginning, and I'm

11    unmuting.  So I'm going to play from 00:00.

12         (Video played.)

13         All right.  I've paused at 21 seconds on the video.

14         What were you and the other agents doing at this point in

15    time, if you can recall?

16    A.   We were waiting for the subjects that we were there to

17    pick up to be released.

18    Q.   And does this show the tactical vests that you and the

19    other agents were wearing?

20    A.   Yes.

21    Q.   Did you see the defendant engaging in this behavior as it

22    was happening?

23    A.   Yes.

24    Q.   At this point, in this freeze-frame at 21 seconds, it

25    kind of looks like you're turned away.  How could you see what

1    the defendant was doing?

2    A.    I mean, I saw her coming out of the periphery.  At one

3    point I did turn my head so she wouldn't record me.  But I saw

4    her coming up from the side.

5    Q.    Now, the words that were said on the video, did you hear

6    that at the time?

7    A.    I did not hear what she said there specifically, but I do

8    recall she was saying -- that she was cursing at us, but I do

9    not remember specifically what was stated.

10    Q.    I'm going to resume play at 21 seconds.

11          (Video played.)

12          I'm going to go back to 25 seconds.  All right.  I've

13    paused at 25 seconds.

14          These two ladies, did you see them while you were there

15    that day?

16    A.    Yes.

17    Q.    Did you have any interactions with them?

18    A.    I did not, no.

19    Q.    Have any issues with these folks sitting there at that

20    time?

21    A.    No.

22    Q.    Why not?

23    A.    Because they didn't at all try to interact with us, they

24    didn't come up to us, at least from what I remember.

25    Q.    Resume play at 25 seconds.

 1          (Video played.)

 2          I'm pausing at 49 seconds.  Do you recognize who's

 3     depicted at 49 seconds?  You know who that is?

 4     A.   Yes.

 5     Q.   Who is that?

 6     A.   Officer Liang.

 7     Q.   Resuming play at 49 seconds.

 8          (Video played.)

 9          I've paused at 1:05.  Did you hear what the defendant

10     said at the time while you were on scene?

11     A.   I don't know.  I don't recall that.

12     Q.   All right.  I'm going to stop publishing and I'm going to

13     present another exhibit.  I'm going to show that to the

14     witness.  Let me know when the Court is ready.

15          DEPUTY CLERK:  Ready.

16          MR. WOLF:  Okay.

17     BY MR. WOLF:

18     Q.   All right.  I am bringing up what's been premarked as

19     Government Exhibit No. 1.  And showing the witness.  Do you

20     see that, Agent Bates?

21     A.   Yes, I do.

22     Q.   Just looking at the exhibit globally, does this appear to

23     be a video surveillance player of some kind?

24     A.   Yes.

25     Q.   Have you watched video from this video surveillance

1    player prior to testifying today?

2    A.    Yes.

3    Q.    Does this video surveillance appear to show the external

4    areas of the D.C. jail from like an elevated perspective?

5    A.    Yes.

6    Q.    Are you present in one of the videos?  I guess it would

7    be video camera 137.

8    A.    Yes.

9    Q.    And so does this video fairly and accurately show the

10    layout outside the jail back on July 22, 2025?

11    A.    Yep.

12    Q.    Does it fairly and accurately capture the incident to the

13    extent it shows it to the best of your knowledge?

14    A.    Yes.

15         MR. WOLF:  At this time the government would move to

16    admit Government's Exhibit 1.

17         MS. ABE:  No objection.

18         THE COURT:  Admitted.

19                           (Government Exhibit No. 1

20                            received into evidence.)

21         MR. WOLF:  So Madam Clerk, if you don't mind, if you

22    could hold publishing for one second, I'm going to bring up

23    two exhibits at the same time.  Thank you.  All right.  Madam

24    clerk, you can go ahead and publish again.

25         DEPUTY CLERK:  Is the second exhibit you put up

1     admitted?

2              MR. WOLF:  Yes.

3              THE COURT:  Which number is that?

4              MR. WOLF:  Exhibit 22.

5              THE COURT:  Okay, so you're publishing --

6              MR. WOLF:  Publishing 22 and 1 at the same time.

7              THE COURT:  Okay.

8     BY MR. WOLF:

9     Q.    Agent Bates, can you see that?

10    A.    Yes.

11             MR. WOLF:  And can the members of the jury see that?

12    Okay.  I'm seeing no.

13             THE COURT:  The back row is up and the front row is out

14    this time?  That's less helpful.

15        (Laughter.)

16             DEPUTY CLERK:  Same thing?  Back row is out --

17             THE COURT:  Okay.  Bear with us.  Sorry about that.

18        Okay.  So everyone can see what's on the screen?  Great.

19             MR. WOLF:  All right.  Sorry about that, everybody.

20    BY MR. WOLF:

21    Q.    So I am bringing up camera 137 and showing Exhibit 22.

22    So camera 137, can you indicate the area of the jail where

23    this appears to show?

24    A.    So indicate on the aerial map what the video camera's

25    showing?

1    Q.   Well, just this area, yes.  And you can make a circle as

2    best you can.

3         MR. WOLF:  All right.  May the record reflect the

4    witness made a circle, a blue circle on the top corner of the

5    jail in basically the center of the screen.

6    BY MR. WOLF:

7    Q.   All right.  And showing camera 144, can you generally see

8    what area of the jail is being shown from camera 144?

9    A.   Yes.

10   Q.   What area, if you could describe it, or I guess make a

11   circle?

12   A.   Yeah.  Right there.  That's the path.

13        MR. WOLF:  Okay.  And may the record reflect the

14   witness has made a blue line going along the center left

15   portion of the screen.

16   BY MR. WOLF:

17   Q.   And as to the video feed, this area where I'm

18   highlighting on the upper right area, is that sort of the

19   patio or pavilion by the parking lot?

20   A.   Yes.  That's correct.

21   Q.   And then looking at camera 145, do you know what area

22   this appears to show?

23   A.   Yes.  It's the apartments across the street right here.

24   Q.   All right.  Okay.  Perfect.

25        All right.  So going into camera 1.  So I pulled up --

1      sorry, Exhibit 1, camera 137.  I'm actually going to change it

2      to 144.

3          So on the day of the incident, did you see what the

4      defendant was wearing?

5      A.   Yes.

6      Q.   Did you see her physical appearance?

7      A.   Yes.

8      Q.   And was that during one interaction or multiple

9      interactions?  Or say one sighting or multiple sightings?

10     A.   Multiple sightings.

11     Q.   If you saw her on video surveillance from that day would

12     you recognize her?

13     A.   Yes.

14     Q.   So I pulled up time stamp 6:38:19 p.m. on 7/22/2025.  And

15     just zooming in here on the center of the screen, do you

16     recognize any of the individuals in this still?

17     A.   Yes.

18     Q.   Who do you recognize?

19     A.   Ms. Reid is the one wearing the khaki pants.

20     Q.   All right.  And if you could clear the previous circles.

21     And may the record reflect the witness has indicated or

22     circled the individual -- I guess I would describe it as being

23     on the video above the other individual with the dark pants.

24         Now I'm going to play from 6:38:19.

25         (Video played.)

1        And as this is playing, the area where the two

2    individuals including Ms. Reid appear to be walking towards,

3    is that the area where you and other agents are?

4    A.   Yes.

5    Q.   I'm pausing at 6:38:54 and I guess 918 seconds.  I'm

6    pulling up camera 137 at that same time stamp and I'm going to

7    play from that point.

8        (Video played.)

9        And as this is playing, for the jury's orientation, are

10   you down in the bottom right corner with other agents at this

11   time?

12   A.   Yes.  I'm wearing the tan ball cap.

13   Q.   All right.  I'm pausing at 6:39:59.  Do you see the

14   defendant at this point?

15   A.   Yes.

16   Q.   Where is she?

17   A.   Right there.

18        MR. WOLF:  May the record reflect the witness has

19   identified an individual in the bottom right center of the

20   screen.

21   BY MR. WOLF:

22   Q.   Resuming play at 6:39:59.

23        (Video played.)

24        As this is playing, as -- when the video showed the

25   defendant walking by agents, was there any interaction to your

1    recollection at that point?

2    A.   I don't recall in that first pass-by if there was.

3    Q.   And as this is playing, you testified that there was some

4    ERO or some government vehicles, part of your team, parked in

5    the area.  Is that correct?

6    A.   Correct.

7    Q.   Do you recognize -- I'm going to pause at 6:41:03 -- do

8    you recognize any of the vehicles that are parked in the, I

9    guess the lot, just adjacent to the jail?

10   A.   Yeah, that was an ERO vehicle, and both of these.

11        MR. WOLF:  May the record reflect the witness made

12   three circles identifying three vehicles.

13   BY MR. WOLF:

14   Q.   One was a pickup truck.  Is that correct?

15   A.   Yes.

16   Q.   And one appears to be a black SUV.

17        MS. ABE:  Objection, Your Honor, leading.

18        MR. WOLF:  Just making a record of what was circled.

19        THE COURT:  Sustained.

20        MR. WOLF:  Let me rephrase.

21   BY MR. WOLF:

22   Q.   Looking at the far right corner, the blue circle there,

23   is that a pickup truck?

24   A.   Yes.

25   Q.   Was that with ERO or FBI?

1    A.    That was an ERO vehicle, yes.

2    Q.    And the second vehicle you circled, the one in the

3    handicapped spot in the middle of the screen, what was that

4    vehicle?

5    A.    The black SUV.

6    Q.    And the other vehicle, the third vehicle in the center of

7    the screen, the white vehicle, what was that vehicle?

8    A.    That is a white SUV.

9    Q.    Resuming play at 6:41:03.

10        (Video played.)

11        All right.  And I'm going to pause at 6:41:13 and switch

12    to camera 144.

13            THE COURT:  Can you clear all of the circles before --

14            MR. WOLF:  Sorry about that.  And I'm resuming play at

15    6:41:13.

16        (Video played.)

17    BY MR. WOLF:

18    Q.    All right.  I'm pausing at 6:42:03.  At this point in

19    time when you were there on scene, do you remember seeing the

20    defendant and knowing where she went as she walked away?

21    A.    Yes.  I assumed she walked that way because I was facing

22    the opposite direction.  I did not see her walk that way.  She

23    didn't walk the way that I was facing.

24    Q.    All right.  So you were facing the opposite direction

25    from where this video is showing?

1   A.   Correct.

2   Q.   Okay.  Resuming play at 6:42:03.

3        (Video played.)

4        And as this is playing at 6:42:15, when you were on the

5   scene, did you see the defendant walking in this direction

6   where this is being depicted on the video?

7   A.   Yes.

8   Q.   Did you see what the defendant was doing at this point in

9   time when you were on scene?

10   A.   Not right there, no.

11   Q.   In the interest of efficiency, starting at 6:42:35, I'm

12   going to play at double speed.

13        (Video played.)

14        MR. WOLF:  May the record reflect that starting at

15   6:47:30, I'm pulling up camera 137 and playing from there.

16        (Video played.)

17   BY MR. WOLF:

18   Q.   I'm pausing at 6:47:44.  At about this point in time, do

19   you recall seeing the defendant in the area of the parking

20   lot?

21   A.   I recalled seeing her come back.  I'm not sure if it was

22   right at this time.  But yes, I recall seeing her come back

23   this way.

24   Q.   Understood.  I'm resuming play on Government Exhibit 1,

25   camera 137, at 6:47:44.

1          (Video played.)

2          I'm pausing and zooming in at Government Exhibit 1,

3     camera 137, at 6:48:01.

4          Now, you testified previously that you saw the defendant

5     taking photos and that one of the vehicles that was an ERO

6     vehicle was a pickup truck.  Did you see what -- when you were

7     there what was transpiring at this point?

8     A.   I noticed at one point she was taking pictures of the

9     front tag, yes.

10    Q.   And would you recognize a photograph of that front tag if

11    you saw it again?

12    A.   I don't know the license plate to that vehicle.

13    Q.   All right.

14    A.   I would recognize the vehicle, yes.

15    Q.   I'm going to pause sharing.  I'm going to show the

16    witness what's been previously marked as Government Exhibit

17    11b and 11k.

18         Agent Bates, do you see 11b and 11k?

19    A.   Yes.

20    Q.   All right.  11b and 11k, what are these photographs of?

21    A.   Of the pickup truck.

22    Q.   And how do you know it's that pickup truck?

23    A.   Because I've worked with the ERO officer on multiple

24    occasions and he has driven that truck every time.

25    Q.   And do you know, like -- I guess do you have personal

1    knowledge of the brand of the truck?

2    A.   Yes.

3    Q.   Is the brand of the truck that's depicted in this picture

4    the brand of your colleague's truck?

5    A.   Yes.

6         MR. WOLF:  All right.  At this time the government

7    would move to admit Government Exhibit 11b and 11k.

8         MS. ABE:  No objection.

9         THE COURT:  Admitted.

10                      (Government Exhibit Nos. 11b, 11k

11                       received into evidence.)

12         MR. WOLF:  Permission to publish.

13    BY MR. WOLF:

14    Q.   And I'm resuming play of Government Exhibit 1, camera

15    137, at 6:48:01.  Playing from there.

16         (Video played.)

17         I'm pausing at 6:48:57.  I know you identified the three

18    vehicles that you recognized, but any of these vehicles to the

19    far right corner of the screen, are those ERO or FBI vehicles?

20    A.   I don't believe so.

21    Q.   And these vans on the far middle right, are these FBI or

22    ERO vehicles to the best of your knowledge?

23    A.   I don't think so.

24    Q.   Resuming play at 6:48:57.

25         (Video played.)

1        All right.  I'm pausing at 6:49:13 on camera 137.  At

2    this moment in time, what are you doing?

3    A.    Just sitting on the ledge.

4    Q.    Where are you looking?

5    A.    I'm looking towards the door, away from her.

6    Q.    Why is that?

7    A.    Again, I didn't have my mask on.  I know she had been

8    taking pictures and videos previous, so it was just my intent

9    to not be in whatever video or picture she may be taking.

10   Q.    Okay.  Resuming play at 6:49:13.

11        (Video played.)

12        And I'm bringing up camera 144, Government Exhibit 1 at

13   6:49:29, and resuming play from that point.

14        (Video played.)

15        I'm pausing at 6:49:52.  Did you see the defendant walk

16   away from where you were prior to this?  Actually, let me

17   rephrase it.  Did you see the defendant walk away from your

18   position?

19   A.    Yes.

20   Q.    The direction that she walked, is it consistent with this

21   video that we're watching?

22   A.    Yes.

23   Q.    Resuming play at 6:49:52.

24        (Video played.)

25        When she walked away, did you know to what destination or

1    what area she went to?

2    A.    Again, I was sitting down, so I had assumed it was in the

3    opposite direction of the way I was looking, because I did not

4    see her walk past me.

5    Q.    I'm pausing at 6:50:24 on camera 144.  Did you see the

6    defendant walking this far away?  Did you see that on scene?

7    A.    I don't recall if I looked or not.

8    Q.    Resuming play at 6:50:24.

9        (Video played.)

10        All right.  And I'm going to pause and stop sharing at

11    6:50:48.

12        So after that interaction, what happened next while you

13    were on scene?

14    A.    We waited for about another 30 minutes, and then we got

15    notice that the two individuals that we were there to arrest

16    were about to be released.

17    Q.    So going into, like, I guess the arrest plan, so to

18    speak, how was that going to happen?  What were the agents

19    going to do, how many agents and where were they positioned,

20    and where were the inmates going to be brought to?

21    A.    So what I knew at the time was that both of these

22    individuals were going to be released at the same time, so we

23    had the whole contingent that was there set up around the door

24    to make sure that the arrest went smoothly.

25    Q.    And when the person was arrested, what was the plan to do

1    with that person?

2    A.    ERO was going to be transporting them to their holding

3    facility.

4    Q.    Taking a step back and kind of looking at more minutiae,

5    but like physically where was the person going to be moved on

6    scene?

7    A.    To one of the ERO vehicles.

8    Q.    And where were those ERO vehicles?

9    A.    Parked along where I indicated the ERO vehicles were.

10    Q.    Were there any actions taken by you or other officers to

11    kind of secure this area at all?  I guess establish a

12    perimeter of some kind?

13    A.    If I'm not mistaken, I think there were a couple of other

14    federal vehicles in the vicinity that were not involved.  But

15    I had no knowledge of them.  I had no communication with them,

16    so I don't know specifically.

17    Q.    Regarding your team, so to speak, was anyone watching

18    sort of the perimeter?

19            MS. ABE:  Objection.  Leading.

20            THE COURT:  Overruled.

21    BY MR. WOLF:

22    Q.    Was anyone watching the perimeter?

23    A.    Yes.  If I recall correctly, Officer Liang was kind of

24    hanging back, observing, to make sure nobody walked up on us.

25    Q.    Were you wearing body-worn camera for this inmate arrest?

1    A.    Yes.

2    Q.    And have you reviewed that body-worn camera prior to

3    testifying today?

4    A.    Yes.

5    Q.    Does it fairly and accurately show the events of that

6    day?

7    A.    Yes.

8    Q.    All right.  I'd like to show just the witness what will

9    be premarked as Government Exhibit 5.

10         For the record, I've just muted it.  I'm going to play --

11   apologies, Your Honor.  It was working earlier today.

12   BY MR. WOLF:

13   Q.    All right.  While that's coming up, let's discuss what

14   happened.  Did you participate in the arrest of the actual

15   individual who was released from D.C. jail?

16   A.    Yes.

17   Q.    And what door, so to speak, did that person come out of?

18   A.    The door I indicated earlier.  That's the only door that

19   inmates get released from.

20   Q.    All right.  I'm bringing back up Government Exhibit 18.

21         And so the inmate who was coming out, which door was the

22   person coming out of?

23   A.    (Indicating.)

24   Q.    And how many officers were involved in arresting that

25   inmate to the best of your knowledge?

1      Going back to the previous question, the witness circled
2  the door in the upper right corner of the exhibit.
3      To go back to the next question, if you recall how many
4  officers.
5  A.   Eight, I believe.
6  Q.   Did eight officers physically put hands on that person,
7  or was it less than that?
8  A.   Eight officers were present at the door.  I don't know
9  specifically how many actually put hands on the first
10  individual.
11  Q.   Understood.  So going back to Government Exhibit 5, with
12  the body-worn camera, I am playing the first few seconds
13  muted, starting from the internal time stamp of 00:00, and
14  I'll play a few seconds.
15      (Video played.)
16      And pausing at 7 seconds, does this appear to be a copy
17  of your body-worn camera?
18  A.   Yes.
19  Q.   And it fairly and accurately captured the incident that
20  day?
21  A.   Yes.
22      MR. WOLF:  At this time the government would move to
23  admit Government Exhibit 5.
24      MS. ABE:  No objection.
25      THE COURT:  Admitted.

```
 1                        (Government Exhibit No. 5

 2                         received into evidence.)

 3           DEPUTY CLERK:  Being published.

 4   BY MR. WOLF:

 5   Q.   I'm bringing the time stamp forward to 1:23.  Okay.

 6        And so just in this image here, who is the agent on the

 7   front right, or I guess the right side of the screen that we

 8   see here?

 9   A.   That is Officer Craddock.

10   Q.   Who is the agent on the left side of the screen?

11   A.   Officer Parodi.

12   Q.   I'm going to play at 1:23.

13        (Video played.)

14        I am pausing at 2:06 on the video.  Did the person who

15   was arrested struggle at all during the course of this arrest?

16   A.   No.

17   Q.   It looks like in this video there was someone else who

18   walked out of that area.  Do you know anything about that

19   person?

20   A.   No.  They weren't at all involved.

21   Q.   Any reason why agents didn't stop that person at all?

22   A.   No.  They weren't involved.

23   Q.   Were agents allowed to be inside of this door?

24   A.   No.

25   Q.   Would agents have been allowed to I guess stop anyone
```

1    from exiting that door?

2    A.    No.

3    Q.    I'm going to resume play at 2:06.

4         (Video played.)

5         I'm pausing at 2:37.

6         Does this show just the process of moving that person to

7    the car?

8    A.    Yes.

9    Q.    And what was going to be done with the person?  Was he

10   going to be put in the car?

11   A.    Yes.

12   Q.    And I'm going to pause sharing at 2:37.

13        So after this person was put in a car, what happened

14   next?

15   A.    Me and my partner stood next to the vehicle to make sure

16   he was safe, make sure he didn't leave the vehicle.

17   Q.    And while you were standing with your partner at the

18   vehicle, what in the area happened?

19   A.    I heard and saw Ms. Reid come back to the scene.

20   Q.    And where were you standing when this happened?

21   A.    Back at the rear door right there.

22   Q.    And did you see where she came from?

23   A.    From what I believed at the time was from the area that

24   she left from, because she didn't walk past me.  So that was

25   my assumption.

1    Q.   Was she alone or with someone else at the time, to the

2    best of your recollection?

3    A.   I don't recall.

4    Q.   What was the defendant doing when she returned, if you --

5    A.   What drew my attention to look that way is I heard her

6    voice or heard yelling or some kind of ruckus.  That's when I

7    noticed that Officer Liang was on the path with Ms. Reid

8    having -- exchanging words or having -- I don't know what he

9    said specifically, but.

10   Q.   All right.  And specifically with regard to -- is it

11   Officer Liang?

12   A.   Yes.

13   Q.   What was he doing with his hands if you can recall?

14   A.   If I recall correctly, he had his hands up, but I'd have

15   to see on camera --

16   Q.   I'm sorry.  Can you repeat the last sentence?

17   A.   Yeah.  It shows in the body-worn camera but from what my

18   recollection is, he had his hands up, basically to indicate

19   like hey, back up, like, give some space.  That's what I

20   recall.

21   Q.   And in terms of his location, let me -- this is paused

22   sharing right now, right, Madam Clerk?

23        DEPUTY CLERK:  It's paused sharing.

24   BY MR. WOLF:

25   Q.   Showing Government Exhibit 12, which is already in

1    evidence and can be published to the jury, do you see

2    Government Exhibit 12?

3    A.    Yes.

4    Q.    So zooming in here towards this area in the middle of the

5    screen, about where was Officer Liang when you saw him

6    engaging with the defendant?

7    A.    Somewhere right there.

8         MR. WOLF:  All right.  May the record reflect the

9    witness has drawn a circle on the lower center of the screen.

10   It's somewhat I guess sort of parallel to the bannister on the

11   center of the screen.

12        THE WITNESS:  Yeah.

13   BY MR. WOLF:

14   Q.    Could you hear any words that were being exchanged at

15   that point?

16   A.    Not what the specific words were.  I just heard kind of

17   yelling coming from that way.

18   Q.    And who was yelling?

19   A.    Ms. Reid.

20   Q.    What about Officer Liang?  Did you hear his voice?

21   A.    No.

22   Q.    Could you hear what the defendant was yelling?

23   A.    Not specifically, no.

24   Q.    Could you see what she was doing with her hands, if

25   anything, at that point?

1    A.    I don't recall.

2    Q.    Did you see her holding anything at all?

3    A.    I do remember her videotaping, so her cell phone.  I

4    don't recall in that moment if it was up or not, but she was

5    recording during the interaction.

6    Q.    All right.  And so you testified that you saw the

7    interaction where this blue circle is.  What happened next?

8    A.    After the initial interaction with Officer Liang, I saw

9    Ms. Reid kind of coming down, down this way, along kind of

10   that path.

11          MR. WOLF:  And may the record reflect the witness has

12   drawn a line, a curved line going from the bottom of the

13   circle that she previously drew, going along the sidewalk,

14   past the, I guess the two light posts or flagpoles, towards

15   the stairs.

16   BY MR. WOLF:

17   Q.    Is that accurate?

18   A.    Yes.

19   Q.    And what happened next?

20   A.    I saw her walk that way.  Since I had a prisoner I was

21   kind of focused more on him.  But out of the corner of my eye

22   I was paying attention to what was happening with Officer

23   Liang.  I saw at one point Ms. Reid made her way up to kind of

24   this area, and then Officer Liang at one point made contact

25   with her and pushed her up against the wall in an attempt to

1   stop her from progressing further to the arrest team.

2   Q.   All right.  I'm going to show you what's been previously

3   admitted into evidence -- I'm showing Government Exhibit 5.

4   I'm going to play from time stamp 8:08.

5        (Video played.)

6        Pausing at 8:13.  Did you hear what -- did you hear

7   anything during that clip I just played?

8   A.   I stated, "Yeah, she's coming."

9   Q.   And what were you referring to at that point?

10  A.   Ms. Reid was walking towards our direction.

11  Q.   So in terms of this point in time, was this before,

12  during, or after you saw the -- I guess the interaction up on

13  the walkway with Officer Liang, I guess the -- the raised

14  voices?

15  A.   This was after the initial interaction but not the second

16  interaction.

17  Q.   And when you say she was coming on this, you say she was

18  walking towards, like what was she doing at that point?

19  A.   Yeah, she was walking down that path that I drew.  At the

20  time I was concerned that she was going to walk towards us

21  since there was only two of us present there as opposed to six

22  officers present for the other arrest.

23  Q.   All right.  I'm resuming play at 8:13.

24       (Video played.)

25       Pausing at 8:23.  Did you close that door?

```
1    A.    Yes.

2    Q.    Why did you close the door?

3    A.    Again, I feared that she would try to get involved, maybe

4    potentially intervene and release our arrested subject.

5    Q.    Resuming play at 8:23.

6          (Video played.)

7          I'm going to go back a couple of seconds to 8:24.

8          (Video played.)

9          And so I paused at 8:25.  Do you see your reflection in

10   this image?

11   A.    Yes.

12   Q.    And are you wearing a mask at this point?

13   A.    Yes.

14   Q.    Why were you wearing a mask at this point?

15   A.    As I said earlier, our management, our leadership has

16   advised us to wear masks during ERO operations for our safety.

17   Q.    I'm going to play frame by frame from 8:25.

18         (Video played.)

19         And I'm pausing at 8:25.

20         Just a background question:  Where on your body is your

21   body-worn camera mounted?

22   A.    Middle of my chest.

23   Q.    And so I guess does the body-worn camera always look the

24   same direction where you are looking?

25   A.    No.
```

1    Q.   I know at this point the body-worn camera picks up one

2    thing.  What did you see during the last second or so or last

3    couple seconds that we played?

4    A.   I saw Officer Liang put his hands on Ms. Reid and start

5    walking her towards the wall.

6    Q.   Did you see how Ms. Reid got to the position where she is

7    at this point?

8    A.   No.

9    Q.   Playing at 8:25.

10        (Video played.)

11        I'm pausing at 8:29.  Do you know what was happening in

12   the background with the other agents at this point in time?

13   A.   I did not focus on the agents at the time.  I was

14   concerned about Ms. Reid's actions.

15   Q.   Okay.  And I'm playing at 8:29.

16        (Video played.)

17        Pausing at 8:47.  In the last 20 seconds or so, what were

18   you doing during this time?

19   A.   In the last 20 seconds I was at the vehicle, I observed

20   Ms. Reid and Mr. Liang have this interaction, and then as I

21   walked up, I took a pause to kind of assess the situation in

22   its totality, and that's when I realized that they were in the

23   process of making the second arrest.

24   Q.   All right.  And when you say you paused, is that depicted

25   in the body-worn camera?

1    A.   Yes.  It was a couple-second pause to assess.

2    Q.   And if you don't mind, I'm going to roll back to 8:36,

3    and if you can indicate where that pause happens, just let me

4    know and I'll pause it.  I'm playing at 8:36.

5        (Video played.)

6    A.   Stop right there.  And I look around to the arrest team,

7    and then I looked at Officer Liang and observed that he was

8    the priority to assist.

9    Q.   And for the record, I've paused at 8:44.  All right.  And

10    I'll resume play at that moment.

11        (Video played.)

12    A.   That's when I --

13    Q.   Sorry.  I paused at 8:50.  You were about to testify to

14    something.

15    A.   No, that's when I approached at that time.

16    Q.   I'm going to go back a couple seconds, 8:45, and play

17    from there.

18        (Video played.)

19        Paused at 8:56.  What were you doing during this time?

20    A.   I walked up, I grabbed her arm initially to help Officer

21    Liang.  I tried to deescalate the situation.  I called her

22    "ma'am."  I said, "let them finish and you'll be good."  Just

23    trying to calm her down from what was an elevated situation at

24    the time.

25    Q.   What did you mean by "you'll be good"?

A.    Once -- if the arrest team was able to complete the arrest without her continued interference, then she would be free to go.

Q.    Why did you grab her arm?

A.    Because Officer Liang was clearly struggling with her at the time.  So to gain control.

Q.    Resuming play at 8:56.

      (Video played.)

      Paused at 9:04.

      What are you doing with your hands at this point?

A.    I'm putting my -- I had my hands on her arm, and I'm kind of pressing up against her because she keeps trying to push her way off the wall.

Q.    What do you feel when you --

A.    I feel her trying to push her arm away from her body.

Q.    Playing at 9:04.

      (Video played.)

      I'm pausing at 9:10.  What's happening around you as this is happening?

A.    They're actively moving the individual that they had just arrested.  The arrest team was moving them past us from behind myself and Officer Liang.

      MR. WOLF:  Madam Clerk, if you don't mind, can you pause publishing?

      DEPUTY CLERK:  Sure.

1          MR. WOLF:  Thank you.

2    BY MR. WOLF:

3    Q.    I'm going to show you what's been previously marked as

4    Government Exhibit 6a.  Agent Bates, do you see this?

5    A.    Yes.

6    Q.    I'm going to play for a few seconds on mute.  Actually,

7    I'm going to play for about a minute on mute, and then I'll

8    ask further questions.

9          (Video played.)

10          I'm going to go forward to 1:38.

11          Agent Bates, I'm playing from 1:38 forward.

12          (Video played.)

13          And I paused just for the record at 1:44.  Agent Bates,

14    from 1:38 to 1:44, do you see yourself depicted in the

15    body-worn camera that we're watching here?

16    A.    Yes.

17    Q.    Does it fairly and accurately show the area as we just

18    discussed in reference to Government Exhibit 5 what you were

19    doing at the time?

20    A.    Yes.

21          MR. WOLF:  At this time the government would admit

22    Government's Exhibit 6a from 1:38 forward.

23          MS. ABE:  No objection.

24          THE COURT:  Admitted.

25

1              (Government Exhibit No. 6a

2                   received into evidence.)

3    BY MR. WOLF:

4    Q.   For the record, I'm going back to 1:38, and I'm going to

5    play from that point on.

6         (Video played.)

7         May the record reflect I paused at 1:51.

8         And Madam Clerk, if you can stop sharing for a moment.

9         And going back to Government Exhibit 5 at 9:07.  We can

10   publish now.  And resuming play from 9:07.

11        (Video played.)

12        I paused at 9:15.  What happened here?

13   A.   Ms. Reid kicked up at my groin at that time.

14   Q.   All right.  And can you describe I guess how -- did she

15   actually hit you when she kicked up towards your groin?

16   A.   No.  Not that I recall.

17   Q.   How close if at all did she get to kicking up at you?

18   A.   I mean, she was very close.  I was surprised she didn't

19   kick me.  I had to put my hand on her knee to prevent her from

20   making contact with me.

21   Q.   Was that depicted in the body-worn camera?

22   A.   Yes.

23   Q.   That we just saw?

24   A.   Yep.

25   Q.   All right.  I'm going to go back a couple seconds.  I've

1    gone back to 9:09.  And I'm playing from there and I'll try

2    and be quick.  Let me know when it kind of happens.

3        (Video played.)

4    A.    Right there, and I go to push her knee back down.

5    Q.    All right.  And may the record reflect I've paused at

6    9:12.  Which hand did you use to --

7    A.    My left.

8    Q.    All right.  And what are you doing with your right hand?

9    A.    I still had positive contact of Ms. Reid's arm.

10   Q.    And I don't know if you can demonstrate or kind of show

11   the jury, but are you able to show the jury kind of the motion

12   that the defendant made if you recall?

13   A.    Would you like me to stand up?

14           MR. WOLF:  With the Court's permission, can the witness

15   stand?

16           THE COURT:  Ms. Abe?

17           MS. ABE:  Objection.  The video speaks for itself.

18           MR. WOLF:  Your Honor, I don't think the video speaks

19   for itself.

20           THE COURT:  I'll permit it.  Go ahead.

21           MR. WOLF:  All right.  You can exit the stand.

22           THE WITNESS:  She was pushed up against the wall like

23   this.  I had her arm, and she kicked up like that, and I was

24   very close to her because I was pressing her up against the

25   wall, so I was no more than a foot from her, from what I

1    recall, but she kicked up like that.

2         MR. WOLF:  And may the record reflect, when the witness

3    said "kicked up like that," she made a motion with her right

4    leg kicking up with her knee.

5         THE COURT:  Okay.  You can take the stand.

6      (Witness resumes the stand.)

7    BY MR. WOLF:

8    Q.   And that demonstration of the knee raise, was that the

9    speed that was used, or was it slower or faster?

10   A.   I showed how I perceived it at the time.

11   Q.   So that speed in which you kicked up, that was the speed

12   you believe the defendant used?

13   A.   Yep.  That's how I perceived it.

14   Q.   I'm going to resume play at 9:12.

15        (Video played.)

16        So at this point, what's happening here?

17   A.   Me and Officer Liang turned her around to prevent her

18   from further kicking at me or him.

19   Q.   And is your intent at this point to place her under

20   arrest?

21   A.   At this time I didn't have intent to place her under

22   arrest, but the decision was made by ERO to then place her

23   under arrest, yes.

24   Q.   I'm going to resume play at 9:24.

25        (Video played.)

1    All right.  We hear another officer come in.  Who is that

2    other officer?

3    A.    Dinko Resovich.  I'm not sure if that's the exact way to

4    say his last name, but.

5    Q.    Now, as a Fairfax County police officer who was on patrol

6    and who's done arrests, is that how you would speak with a

7    person whom you were arresting?

8    A.    No.  That is why I did not speak that way with her.

9    Q.    All right.  And so during the course of the incident, did

10   you suffer any marks, scrapes, bumps, bruises, anything like

11   that?

12   A.    Yes.  I got abrasions.

13   Q.    Okay.  And where did you get those abrasions?

14   A.    On my left hand.

15   Q.    Okay.  Madam Clerk, if you don't mind, pause sharing to

16   everyone.  Thank you, ma'am.

17        Madam Clerk, if we can publish just for the witness,

18   please.

19        Showing the witness what's been premarked as Government

20   Exhibit 9.

21   A.    Yep.

22   Q.    Agent Bates, do you recognize Government Exhibit 9?

23   A.    Yes.

24   Q.    What is Government Exhibit 9?

25   A.    That is the injury that I sustained.

1    Q.   Does this fairly and accurately show what it looked like

2    on the day of the incident?

3    A.   Yes.

4         MR. WOLF:  At this time the government would move to

5    admit Government Exhibit 9.

6         MS. ABE:  No objection.

7         THE COURT:  Admitted.

8                         (Government Exhibit No. 9

9                          received into evidence.)

10        MR. WOLF:  And publish.

11   BY MR. WOLF:

12   Q.   Do you know how you got this, I guess, abrasion during

13   the course of this incident, if at all?

14   A.   Yes.  It was when Ms. Reid was trying to -- I had her

15   back at the time when she pushed back up against my hand,

16   which got pinned between her body and the wall when she

17   actively pushed up against my arm.

18   Q.   And did Ms. Reid appear to suffer some abrasions as well?

19   A.   Yes.  She did.

20   Q.   And now, to this day, do you have any marks on your hand

21   from this?

22   A.   I do, yes.  I have scars.

23   Q.   Now, after the incident did you describe this abrasion as

24   a "booboo"?

25   A.   I did.

1    Q.    Why did you refer to it as a booboo?

2    A.    I have a two- and a three-year-old at home.  Every injury

3    in my house is a booboo.

4    Q.    All right.  Madam Clerk, if you can pause sharing.  And

5    so after the incident -- actually, let me just bring up

6    Government Exhibit 5.

7         All right.  I'm playing the video from 10:20.  Madam

8    Clerk, if you could publish now.

9              DEPUTY CLERK:  It's up.

10   BY MR. WOLF:

11   Q.    I'm playing from 10:20.  This still, does this appear to

12   show abrasions to Ms. Reid's arms as well?

13   A.    Yes.

14   Q.    Playing from 10:20.

15        (Video played.)

16        At 10:28 I paused.  What are you doing with the backpack?

17   A.    I'm cutting the straps.

18   Q.    Why is that?

19   A.    Standard practice with law enforcement.  It's easier and

20   faster to just cut the straps off to prevent the individual

21   from potentially fleeing while you're trying to unstrap the

22   straps or even taking them out of handcuffs, which poses

23   another risk.  So the standard practice is just to cut the

24   straps.

25   Q.    I'm playing from 10:29.

1          (Video played.)

2          I'm pausing at 11:06.  During the incident that happened

3     over by the stairs by the wall, did you notice whether

4     defendant had a phone?

5     A.   Yes, she did.

6     Q.   What happened with that phone?

7     A.   I think in the act of her being arrested somehow she

8     dropped the phone.

9     Q.   So was the phone on the ground?

10    A.   I did not see the phone on the ground, but based on what

11    she said, I assume that it was dropped during the arrest.

12    Q.   Resuming play at 11:06.

13         (Video played.)

14         I paused at 11:34.  What happened during this clip we

15    just watched?

16    A.   She was concerned about her phone so I wanted to make

17    sure she got her property.  We searched some of her pockets,

18    again just consolidating her property, making sure it all came

19    with her.

20    Q.   Let me go back a couple seconds.  I went back to 11:11.

21         (Video played.)

22         All right.  I'm pausing -- computer's freezing but what

23    agent was that?

24    A.   That was Agent Jankovitz that grabbed the phone.

25    Q.   And what did Agent Jankovitz do with the phone?

1    A.    He handed it to me and I put it in the bag.

2    Q.    And what did you do with the bag?

3    A.    I think I put it in the front seat.

4         (Video played.)

5         MR. WOLF:  May the record reflect I played from 11:37

6    to 11:39.  And resume play to the end.

7         (Video played.)

8    Q.    After the incident, what did you do next?

9    A.    I walked to my car.

10   Q.    Okay.  As you were walking to your car, did you see

11   anyone in the area observing or what appeared to be video

12   recording you?

13   A.    Yeah.  I remember seeing someone kind of at the front of

14   the vehicle, either taking pictures or recording, one of

15   those.

16   Q.    What was your concern at that point?

17   A.    I didn't have concern for them videoing or recording.

18   Q.    Okay.  So let's address after this incident.  So after

19   this incident, did you have a text conversation with other

20   people in which you referred to the defendant in a pejorative

21   way?

22   A.    Yes.

23   Q.    That text message conversation, without saying exactly

24   who was in the conversation, but, like, how do you know these

25   people?

1    A.    Both of those individuals I knew from the Coast Guard.

2    We were in service together for like -- I've known them for

3    almost probably 10 years at this point.

4    Q.    In that conversation, did you refer to the defendant as a

5    libtard?

6    A.    Yes, I did.

7    Q.    That stands for liberal retard?

8    A.    Yes.

9    Q.    As you sit here today, how do you feel about the language

10   that you used?

11   A.    Not good.  I should listen to the advice I give my

12   children is to use kind words, and I did not.

13   Q.    How long after the incident did you say that?

14   A.    I don't remember specifically, but maybe a week?

15   Q.    Did you arrest -- or did you assist in the arrest of the

16   defendant based on her political beliefs?

17   A.    No.

18   Q.    Did you assist in the arrest of the defendant because she

19   had recorded you?

20   A.    No.

21   Q.    Did you assist in the arrest because she had yelled some

22   profanities at least in the video?

23   A.    No.

24   Q.    Up to even the point, as you testified, of the kneeing,

25   did you have any intent to arrest the defendant whatsoever?

1    A.    No.

2    Q.    Did you go there to arrest the defendant or any other

3    protesters or anyone who was trying to record you guys?

4    A.    No.

5              MR. WOLF:  One moment, Your Honor.

6         (Government conferring.)

7              MR. WOLF:  No further questions at this time, Your

8    Honor.

9              THE COURT:  Okay.  Thank you, Mr. Wolf.  Can we just

10   get on the phones for a minute?

11        (Bench conference.)

12             THE COURT:  Can you both hear me?

13             MS. ABE:  Yes, Your Honor.

14             THE COURT:  It seems like a good time to stop since

15   we're breaking at 5:00.  Ms. Abe, are you fine with that?

16             MS. ABE:  I mean, Your Honor, we would prefer to start

17   our cross if the Court would let us.

18             THE COURT:  Okay.  We can do that.

19             MS. ABE:  If we could do five minutes.

20             THE COURT:  Okay.  That's fine.  But we're going to

21   stop at 5:00.  Okay?  I do not want to keep them late.

22             MS. ABE:  Understood.

23             THE COURT:  Okay.

24        (End of bench conference.)

25

1                         CROSS-EXAMINATION

2      BY MS. ABE:

3      Q.   Good afternoon, Agent Bates.  So first I would like to

4      start from where the government left off on your body-worn

5      camera.  I believe it's Government's Exhibit 5.  If we can

6      start at 9:15.

7                  DEPUTY CLERK:  Are you asking the government to pull it

8      up?

9                  MS. ABE:  I apologize.  If Ms. Little from our...

10                 THE COURT:  Ms. Abe, do you want to try to connect your

11     computer at the podium since that's what worked earlier?

12                 MS. ABE:  Yes, Your Honor.  I'll do that in the

13     alternative.  I assume that it's not published to the jury.

14     Correct?

15                 DEPUTY CLERK:  I can see it.  So right now we're just

16     on your screen.

17     BY MS. ABE:

18     Q.   Agent Bates, I will play from where I believe the

19     government left off, at 9:15.

20                 DEPUTY CLERK:  Is this Government's 5?

21                 MS. ABE:  This is Government's 5.  And if the court

22     would publish it to the jury.

23                 DEPUTY CLERK:  Yes, ma'am.

24                 MS. ABE:  Thank you.

25        (Video played.)

```
 1        BY MS. ABE:
 2        Q.    Who was that who's yelling at Ms. Reid?
 3        A.    Dinko.
 4        Q.    I believe his name is Residovic.
 5        A.    There you go.  Yes, ma'am.  Thank you so much.  Someone
 6        has finally told me what his name was.
 7        Q.    And for the record -- I apologize.  This I played from
 8        Government Exhibit 5, from 9:15 to 9:43.
 9             So at the end, Agent Residovic tells Ms. Reid, "You
10        should have just minded your own fucking business"?  Is that
11        what he said?
12        A.    Yes.  That's what he said.
13        Q.    And then you also testified on direct that you were --
14        that you made some statements that you regretted after this
15        incident.  Is that correct?
16        A.    That's correct.
17        Q.    But they weren't just one-off statements, were they?
18        A.    They were.
19        Q.    They were?  If I could -- do you recall a group chat
20        labeled "Operation"?
21        A.    Yes.
22        Q.    Okay.  Who was in that group chat with you?
23        A.    As I testified before.
24             MR. WOLF:  Your Honor, may I be heard?
25             THE COURT:  Sure.
```

 1          (Bench conference.)

 2              THE COURT:  Go ahead.

 3              MR. WOLF:  Can everyone hear me?

 4              THE COURT:  Yes.

 5              MR. WOLF:  Your Honor, the only reason I'm objecting is

 6      I don't think it's appropriate to elicit names of these

 7      people.  I would just ask if defense counsel could describe

 8      generally who these people are without going into the names of

 9      the people.  It's not relevant.

10              THE COURT:  Ms. Abe?

11              MS. ABE:  I mean, I don't understand why it's

12      irrelevant.  I mean, I don't know -- the government has not

13      disclosed to us who is in this chat, whether it's other people

14      who were at the -- out at the scene on July 22.  So I think

15      we're within our rights to cross-examine on this issue and

16      inquire of Agent Bates.

17              THE COURT:  Okay.  I'm going to allow it.  Thank you.

18          (End of bench conference.)

19      BY MR. WOLF:

20      Q.   So Agent Bates, you are in a group chat labeled

21      "Operation."  Do you remember that chat?

22      A.   Yes.

23      Q.   And who was in that chat with you?

24      A.   As I said, those were two of my Coast Guard friends from

25      back when I was in the military.

```
 1      Q.   So were they at the jail with you and your colleagues on
 2      July 22?
 3      A.   No.
 4      Q.   I am going to show just you what will now be marked as
 5      Defense Exhibit 5.  Do you recognize this photo?
 6      A.   Yes.
 7      Q.   Did you take this photo?
 8      A.   I did.
 9      Q.   What does it depict?
10      A.   The conversation that you are referencing.
11      Q.   The conversation in this Operation group chat?
12      A.   Yes.
13      Q.   Do you believe this is a fair and accurate representation
14      of the conversation that you had shortly after the arrest of
15      Ms. Reid?
16      A.   About a week after, yes.
17               MS. ABE:  I would like to publish Defense Exhibit 5 to
18      the jury.
19               MR. WOLF:  No objection to admission and publishing.
20               THE COURT:  Okay.  Admitted.  Go ahead.
21                              (Defendant's Exhibit No. 5
22                               received into evidence.)
23      BY MS. ABE:
24      Q.   So we're looking at a group of messages.  The messages
25      that are purple, are those you?
```

1    A.    Yes.

2    Q.    Okay.  So could you please read your messages.

3    A.    Yep.  "There's my claim to fame.  Being assaulted by this

4    libtard."  Smiley face.  "I'm still waiting for my week off

5    due to my PTSD.  My hand still has booboos on it."

6    Q.    And the response, so someone named Tom HM responds,

7    "You're so brave for being a victim."  And what is your

8    response?

9    A.    "I totally am.  I sacrificed life and limb for the

10   mission.  I think it's worth a Trump coin."

11   Q.    And Tom responds "TYFYS" with an emoji that looks like

12   it's saluting?

13   A.    Yes.

14   Q.    What does TYFYS mean?

15   A.    Thank you for your service.

16   Q.    And what is your response?

17   A.    "You are welcome.  Finally someone recognizes."

18            THE COURT:  Ms. Abe, do you want to ask a couple more

19   questions, or can we break for the day?

20            MS. ABE:  We can break for the day, Your Honor.

21            THE COURT:  Okay.  Thank you.  I promised the jury I

22   wouldn't keep them past 5:00.

23            MS. ABE:  Yes, Your Honor.  Understood.

24            THE COURT:  Okay.  Members of the jury, thank you very

25   much.  I know it was a long day that started very early this

1    morning.  We will begin tomorrow at 9:30 a.m.  Please be ready

2    a little bit in advance so that we can start at 9:30.  And as

3    I instructed you earlier, please do not discuss the case with

4    anyone overnight, even with each other.

5         Thank you again, and I will see you all in the morning.

6         Agent Bates, you're still under oath, so please don't

7    discuss your testimony with anyone overnight.  And we'll pick

8    up tomorrow morning.

9              THE WITNESS:  Yes, Your Honor.

10        (Jury out at 5:04 p.m.)

11             THE COURT:  Thank you.  You may be seated.  Agent

12   Bates, you're excused.  As I said, you're still under oath.

13   Please don't discuss your testimony with anyone.  And we'll

14   pick up in the morning.

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  Thank you.

17        (Witness steps down and exits.)

18             THE COURT:  All right.  Anything else we need to

19   discuss before we break?  I know you were going to confer

20   before tomorrow morning on this issue with the video and

21   whether there's an instruction you can agree to.  Is that

22   right?

23             MR. WOLF:  Yes.  We'll confer with defense.

24             THE COURT:  Okay.  Mr. Wolf, you were asking a fair

25   number of leading questions, and I saw Ms. Abe resisting the

1    urge to jump in.  I didn't want to interrupt your examination

2    but please be mindful of that tomorrow with your witnesses.

3            MR. WOLF:  Yes, Your Honor.

4            THE COURT:  Okay.  Anything else?

5            MS. ABE:  Yes, Your Honor.  Over the weekend, I believe

6    it was on either late Sunday or on Monday, the government

7    disclosed a number of text messages between Agent Residovic

8    and a contact inside of the D.C. -- actually, Your Honor, I

9    think this actually might be something that we should discuss

10    under seal because I think it's subject to the protective

11    order, and we would like to impeach on it.  But I believe we

12    have to ask permission or get the Court's ruling on it.  So

13    that's what I wanted to discuss now.

14            THE COURT:  Okay.

15            MR. WOLF:  Yes, Your Honor.  Can the parties approach?

16            THE COURT:  Yeah.  Come on.

17    (Bench conference.)

18            MS. ABE:  So, Your Honor, the government disclosed a

19    series of text messages between Agent Residovic and a member

20    of -- so the government disclosed a series of messages between

21    Agent Residovic and his contact inside of the D.C. jail who

22    was alerting to him when these noncitizens were being

23    released.  This is my understanding I think a violation of at

24    least D.C. policy, and I believe -- well, I think that --

25    well, the government says that this is sensitive material

1    under the protective order and we need permission to

2    cross-examine the government witnesses on it to use as

3    impeachment.

4        I believe that we should be able to properly use these text

5    messages as impeachment against government witnesses, but we

6    need a ruling from the Court.

7            THE COURT:  So this is someone who works at the D.C.

8    jail who is breaking protocol and notifying Officer Residovic

9    about people being released?

10           MR. WOLF:  Yes.

11           MS. ABE:  Yes, Your Honor.

12           THE COURT:  Do you disagree that this is proper

13   impeachment?

14           MR. WOLF:  No.  I don't disagree.

15           THE COURT:  So what do you propose in terms of having

16   this come up during cross?  Do you want me to seal the

17   courtroom or --

18           MS. ABE:  I mean, I've never been in this situation

19   before.

20           MR. WOLF:  I don't think clearing the courtroom would

21   be necessary.  I think our concern is that this is a

22   confidential human source who could face loss of job and other

23   public ramifications for his conduct.  As far as I've been

24   told, as I've been told, this person was not outside when this

25   incident happened.  So if the defense plans on eliciting the

1    name of the confidential human source, we would strenuously

2    object to that, but regarding the cross-examination about the

3    existence of this source and what goes with it, I don't think

4    we have an objection.

5         THE COURT:  So you would be fine with them examining

6    Officer Residovic about receiving these text messages that he

7    shouldn't have, that he received them from someone who worked

8    there and shouldn't have sent them to him, everything except

9    this person's name.  Is that right?

10         MR. WOLF:  Yes.  I think that's fair game for cross.

11         THE COURT:  Okay.  Is there any reason you need his

12    name?

13         MS. ABE:  We don't need the name, Your Honor.  We're

14    not requesting that.  The name has been redacted from the text

15    messages.  But our understanding -- we asked the government

16    about a number of materials that they disclosed to us that

17    they said are sensitive under the protective order, and I

18    believe it was yesterday we reached out to them saying we

19    would like to use some of them as impeachment, and this was

20    the only one that they said they would object to, so we just

21    wanted to approach the Court and --

22         THE COURT:  Okay.  And so you're fine with them using

23    the text messages even though they were previously disclosed

24    as sensitive as long as the name is redacted?

25         MR. WOLF:  Yes.  And it is redacted.

1          THE COURT:  And that can be done in open -- without the

2     name, I don't see any reason to seal that testimony.

3          MR. WOLF:  I think Ms. Abe was just being very

4     cautious, and I appreciate it.

5          THE COURT:  No, I just want to make sure we're all on

6     the same page; no one thinks that without the name there's a

7     need to -- okay.

8          MS. ABE:  No, Your Honor.  But I would just clarify

9     that we would like to use these to impeach Agent Bates as

10    well, not just Agent Residovic, because I mean, it's our

11    position that it goes to credibility.

12         THE COURT:  I think it seems like fair game for --

13         MR. WOLF:  I'm not objecting.

14         THE COURT:  -- impeachment.  She can answer as to

15    what's within her knowledge.  Okay.  Thank you.

16       (End of bench conference.)

17         THE COURT:  Okay.  Anything else?  Okay.  Let's come

18    back at 9:00 tomorrow so we can try to sort out this video

19    issue.  If there's something you want me to look at overnight

20    or before 9 a.m., just send it to me and then we can talk

21    about that, so that we can begin at 9:30.

22       Mr. Wolf, what's your plan for tomorrow after Agent Bates

23    is finished testifying?  How many more witnesses do you have

24    and how long do you think it will take?

25         MR. WOLF:  For the government's case-in-chief, the only

 1    other witness would be Ms. Beverly.

 2            THE COURT:  So other than Agent Bates, the only other

 3    witness is the custodian?

 4            MR. WOLF:  Yes.

 5            THE COURT:  All right.  Well, we'll resolve that in the

 6    morning.  You guys have work to do overnight, then, and then

 7    we'll see where we are after the government rests.

 8            MR. WOLF:  All right.  Thank you, Your Honor.

 9            THE COURT:  All right.  Thank you all.  See you

10    tomorrow.

11        (Proceedings adjourned at 5:13 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

\*    \*    \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne