UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       .
                                .
            Plaintiff,          .   CR No. 25-0244 (SLS)
                                .
      v.                        .
                                .
                                .   Washington, D.C.
SYDNEY LORI REID,               .   Thursday, October 16, 2025
                                .   9:08 a.m.
            Defendant.          .
. . . . . . . . . . . . . . . .  Pages 454 to 543



TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE SPARKLE L. SOOKNANAN
UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Government:              TRAVIS WOLF, AUSA
                                 JASON FACCI, AUSA
                                 U.S. Attorney's Office
                                 601 D Street NW
                                 Washington, DC 20530


For Defendant:                   TEZIRA ABE, AFPD
                                 EUGENE OHM, AFPD
                                 Federal Public Defender Office
                                 625 Indiana Avenue NW
                                 Suite 550
                                 Washington, DC 20004


Court Reporter:                  BRYAN A. WAYNE, RPR, CRR
                                 U.S. Courthouse, Room 4704-A
                                 333 Constitution Avenue NW
                                 Washington, DC 20001



Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

Jury Instructions ................................. 475

Government Closing Argument ...................... 492

Defendant Closing Argument ....................... 506

Government Rebuttal Argument ..................... 516

Closing Instructions ............................. 527

Verdict .......................................... 541

*   *   *

1                    P R O C E E D I N G S

2          DEPUTY CLERK:  Good morning.  We're back on the record

3     in United States versus Lori Reid.  Beginning with the

4     government, please introduce yourselves for the record.

5          MR. WOLF:  Good morning, Your Honor.  AUSA Travis Wolf

6     for the United States.  I'm joined by co-counsel Jason Facci,

7     and our paralegal, Manoj Kapilashrami, will be here shortly.

8          THE COURT:  Okay.  Good morning.

9          MR. FACCI:  Good morning.

10          MS. ABE:  Good morning, Your Honor.  Tezira Abe and

11     Mr. Eugene Ohm on behalf of Ms. Sydney Reid, who's present in

12     the courtroom, and we're joined at counsel table with Rhiannon

13     Little, our paralegal.

14          THE COURT:  Okay.  When I say I'm starting at 9:00 in

15     a jury trial, I'm starting at 9:00.  Because while you think

16     it's five or ten minutes, there are 14 people back there who I

17     told to get here ready to start at 9:30, who have been waiting

18     a lot throughout this trial because of everything that's been

19     happening here.  And I was up at 1:30 reading your filings and

20     also here well before 9:00 to get started.

21          So if you're before me again and we're in trial, I ask you

22     to come at 9:00 so we can start at 9:30 because that's the

23     time I've asked them to show up.  Okay?  Every time I have

24     asked that, we have not started at 9:00, and here we are

25     starting at 9:10.

 1          Okay.  We're going to work through these issues with the

 2     instructions as quickly as we can so we can start at 9:30.

 3     I have handed you, I think, the instructions that are in

 4     dispute, or at least the ones we need to talk about.

 5          Elements of the Offense is the same instruction I read to

 6     you yesterday that no one had objections to, but you have it

 7     here in writing and you should let me know if you have any

 8     objection.

 9          On the defense theory instruction, I am going to instruct

10     on the first paragraph, which the government did not object

11     to, and Mr. Ohm, you can use the second in your closing.  I

12     did not include it here, and I understood you to be fine with

13     that.  I'm not objecting to me removing that second paragraph.

14     Let me know if I misunderstood.

15          MR. OHM:  Just so the court knows, Ms. Abe's closing.

16     We would certainly prefer it to be in the instructions but --

17          THE COURT:  You're not objecting?

18          MR. OHM:  We're not objecting.

19          THE COURT:  So that one, 24, I assume we are in

20     agreement on.  Does the government have any objection to 24?

21     Based on our conversation yesterday, I think the answer is no,

22     but please confirm for me?

23          MR. WOLF:  We are in agreement.

24          THE COURT:  Can you say that again?

25          MR. WOLF:  Sorry.  We are in agreement.

1          THE COURT:  Okay.

2          MR. WOLF:  And are not objecting.

3          THE COURT:  Okay.  The self-defense instruction, I

4    got something last night that was titled Parties' Proposed

5    Instruction.  Is that to mean that you guys agree on that?

6    Because it wasn't very clear from your filing, and then the

7    defense filed a supplement after the fact.

8          MR. WOLF:  The parties were in agreement as to that

9    proposed instruction, yes.

10          THE COURT:  Okay.  So what you have in front of you now

11    is an instruction that started with some tweaks from me that

12    you should review, and those -- I read your instruction, I

13    read the Red Book instruction, and I also read *Celentano* and I

14    made this closer to *Celentano*.  I don't think I changed much

15    in terms of substance, but please take a minute and review

16    that now and let me know if there are any objections to this

17    instruction.

18       (Counsel reviewing instruction.)

19          THE COURT:  Mr. Wolf, are you ready?

20          MR. WOLF:  Assuming the court is going to instruct

21    self-defense, the government does not object to the court's

22    proposed instruction.

23          THE COURT:  Okay.  And obviously you guys agreed on

24    this.  I was inclined to give one for this reason:  They're

25    going to argue in their closing this is self-defense; you're

1    going to argue it wasn't.  If that's going to be something

2    you're going to be arguing to the jury, I think it's better to

3    give the jury instructions on the law; otherwise, they're sort

4    of left wondering, what does that mean?  Everyone has their

5    own view of what self-defense is, and if that's going to be an

6    argument you're both making, I should tell them what the law

7    is.  So I was inclined to give one anyway.

8         Are you objecting to me giving one at all or not?

9              MR. WOLF:  Not at this time.  No, Your Honor.

10              THE COURT:  Okay.  So you're fine with this as drafted?

11              MR. WOLF:  Yes.

12              THE COURT:  Okay.  Mr. Ohm, Ms. Abe, do you have any

13    objection to the current instruction?

14              MR. OHM:  Still going through it, Your Honor.

15      I see one objection we would have is the inclusion of this

16    third person under the officer's -- the excessive force

17    defined, lines 6 and 7.

18              THE COURT:  What are you referring to?  Read me the

19    sentence you're referring to.

20              MR. OHM:  "The reasonableness of a particular use of

21    force depends on the circumstances of each case including

22    whether a defendant" -- though we would object to that or the

23    third-person part -- "posed an immediate threat to the safety

24    of the officers, a possibility that a defendant" -- we would

25    object to that.

1          THE COURT:  What are you objecting to specifically?

2          MR. OHM:  The third person.  So I think it should just

3     say "defendant posed an immediate threat" and then defendant

4     was armed, violent, and dangerous and whether the defendant

5     was active resisting.

6       We would also object to the number of persons with whom the

7     officer was contending at the time.  There's no evidence that

8     Liang and Bates were contending with anyone other than one.

9     And then I think the rest of it is fine.

10          THE COURT:  So you want me to strike "or a third

11     person" in the fifth sentence, "or a third person" in the

12     sixth sentence, "or a third person" in the seventh sentence.

13     And then what else do you want me to strike?

14          MR. OHM:  And on the eighth line, there's another third

15     person.  So there's three third persons --

16          THE COURT:  Right.  I've got those.

17          MR. OHM:  The number of persons after the semicolon --

18          THE COURT:  You want me to strike the clause "the number

19     of persons with whom the officers were contending at the time"?

20          MR. OHM:  Yes.

21          THE COURT:  Okay.  All of that is from *Celentano*.

22          MR. OHM:  Right.

23          THE COURT:  Is your argument that it's not applicable

24     here because there's not a third person?

25          MR. OHM:  Correct, Your Honor.  And *Celentano* I think

 1    actually --

 2         THE COURT:  Was there a third person in *Celentano*?

 3         MR. OHM:  Yes.  It was a third-party defense claim.

 4         THE COURT:  Okay.  Give me one minute just to look at

 5    the case.  And you don't think that the individuals being

 6    released from the D.C. jail who the officers were there to

 7    apprehend are potential third persons?

 8         MR. OHM:  Not in the cases of officers Liang and Bates.

 9         THE COURT:  Okay.  Mr. Wolf, do you have any objection

10    to what the defense is proposing, removing "third person" from

11    Liang's 5, 6, and 7, and removing the clause "the number of

12    persons with whom the officers were contending" on line 8?

13         MR. WOLF:  As to the third persons, the government has

14    no objection.  As to the number of persons, we would object.

15    I think it's relevant that the officers were also engaging

16    with another arrestee, which may be a relevant factor for the

17    officers' activity.  So we would ask that that be part of the

18    instruction.

19         THE COURT:  Okay.  I agree.  I will strike "or a third

20    person" from lines 5, 6, and 7.  I'm going to leave the clause

21    "the of persons with whom the officers were cop tending with

22    at the time."  Even though Liang wasn't contending with one

23    of those inmates, he was there, obviously, as part of that

24    same operation and they were fairly close, and in the

25    government's theory, that's part of why he intervened with

1    Ms. Reid is because of the arrest that was happening right at

2    the exact same time.

3        MR. OHM:  And, Your Honor, just from our perspective,

4    that situation is covered by the rest of the other examples

5    that are in here because it says the officer -- I mean, it

6    does seem to assume that there's a factual basis that the

7    officer, either Officer Liang or Agent Bates, was contending

8    with a number of people, at least in the context of this

9    alleged assault --

10        THE COURT:  Okay.  You can argue to the jury that he

11    was only contending with her, and I am going to leave this

12    clause in over your objection.

13        MR. OHM:  Okay.  And, Your Honor, just so the court

14    knows, the supplement was in response to the question of

15    whether the instruction is going to be delivered at all, but

16    what we submitted was a joint proposal that the parties worked

17    out.

18        THE COURT:  I understand, but I still need to make sure

19    I'm complying with D.C. Circuit case law, which is why I made

20    edits.  Okay.

21      You're requesting an inconsistent statement instruction.

22    Who made an inconsistent statement?

23        MR. OHM:  Agent Bates.

24        THE COURT:  What's the inconsistent statement?

25        MR. OHM:  So she had testified that she -- the stuff

1    about the complaint and the kneeing, and then she was

2    impeached with the stipulation with AUSA Dernbach.

3        THE COURT:  So she testified that she didn't mention

4    the kneeing, and then you put in the Dernbach stipulation?

5        MR. OHM:  Correct.

6        THE COURT:  Mr. Wolf, do you have a disagreement there?

7    I mean, the whole point of that stipulation was to impeach

8    Agent Bates.

9        MR. WOLF:  I understand that.  I just don't think that

10   actually constitutes an inconsistent statement by Agent Bates.

11   I'm just looking at the pattern jury Red Book instruction

12   2.216.

13       THE COURT:  You've heard evidence that the witness made

14   a statement on an earlier occasion, that statement being

15   during the complaint drafting where she did not mention the

16   kneeing.  That is inconsistent with her testimony about the

17   kneeing?

18       MR. WOLF:  So I guess the issue is that she's being

19   impeached by someone else's statement, not that she testified

20   that the light was green one day and then testified the light

21   was red the other day.  I mean, obviously there's impeachment

22   from a secondary witness, but I don't think this is a prior

23   inconsistent statement as to Agent Bates.  So that's why we'd

24   object.

25       THE COURT:  I mean, the stipulation is evidence that

1    she made a statement to Dernbach, without the kneeing, and

2    that is inconsistent with what she said at trial.  Right?

3        MR. WOLF:  There is an argument -- yes.  I do concede

4    that there is an inconsistency, yes.  I just don't know -- I

5    agree it's impeachment, a hundred percent.  I just don't know

6    if that actually constitutes an inconsistent statement as to

7    Agent Bates.

8        THE COURT:  Well, why isn't it?  If she said one thing

9    to AUSA Dernbach and then she's saying something else at

10   trial, why isn't that an inconsistent statement?  I understand

11   it's Dernbach representing what she said, but that's a

12   stipulation from the government, from an AUSA, saying that's

13   what she said.  And so she made a statement to him earlier and

14   said something different at trial.  Why doesn't it fit?

15       MR. WOLF:  I'm just looking at the kind of power

16   dynamic from the instruction.  Usually this goes to what the

17   particular witness said on one occasion versus two different

18   witnesses.  So that's why I think --

19       THE COURT:  It's not the classic example.  I'm just

20   trying to understand why it's nonetheless appropriate, because

21   it does seem to fit even if that's not the classic use of this

22   instruction.  I mean, she did make a statement earlier that's

23   inconsistent with her statement at trial.  I mean, I'm not

24   saying is.  I would use the Red Book that says that that may

25   be inconsistent; it's for you to decide.  Yeah.  I agree it's

1    not the classic use of this, but it does seem like she made an

2    inconsistent statement.  I mean, you agree with that.

3            MR. WOLF:  I agree.

4            THE COURT:  Okay.  So I'm going to give this, and I'm

5    going to give the -- I'm just going to give the Red Book

6    instruction: "You've heard evidence that Agent Bates made a

7    statement on an earlier occasion and that this statement may

8    be inconsistent with her testimony here at trial.  It is for

9    you to decide whether the witness made such a statement and

10    whether in fact it was inconsistent with the witness's

11    testimony here.  If you find such an inconsistency, you may

12    consider the earlier statement in judging the credibility of

13    the witness, though you may not consider it as evidence that

14    what was said in the earlier statement was true."

15      Okay.  And then we have this curative instruction that was

16    filed at 1:27 a.m.  I have given you a redraft of that.  I

17    agree that the video being disclosed on the eve of trial

18    warrants some type of curative instruction.  What I've drafted

19    is sticking more closely to what's in the Red Book.  Let me

20    know your reactions to that, please.

21            MR. OHM:  I think my initial reaction is that it is too

22    cabined because it's just about the video evidence, and we're

23    also --

24            THE COURT:  What's the other evidence?

25            MR. OHM:  The text messages.

1          THE COURT:  But I dealt with the text messages.  I kept

2     them from rehabilitating that witness, and you had the messages

3     and they were used on cross.  So I don't know what you want.

4          MR. OHM:  I agree.  I guess it just occurred to us that

5     the jury still has no idea what the heck happened, and it all

6     happened during our presentation of the case.

7          THE COURT:  Yeah, but Mr. Ohm, what the jury was left

8     with was here are text messages from the Residovic phone, here

9     are text messages from your phone that you turned over this

10    morning, and he got out of his own witness on redirect that

11    she hadn't turned it over after multiple attempts.  It was a

12    little bit of turning her into a hostile witness on his

13    redirect.

14        And then you said, "Did you delete the messages?"  And she

15    said, "I didn't delete them this morning."  I mean the jury is

16    left with a message is missing, a suggestion that she deleted

17    them.  And again, you can't argue that in closing, but I don't

18    know how that's unfavorable to you given that I did not let

19    them rehabilitate that witness.

20         MR. OHM:  I would agree if this were a bench trial, and

21    on the cold transcript it probably looks great for us.  But

22    the way it played out before the jury and the way the jury

23    might perceive the situation, Ms. Abe was stunned and there

24    was a long period of silence where she was trying to figure

25    out what had happened.  And they all saw it.

1          THE COURT:  I know.

2          MR. OHM:  And if we had that information, we would have

3     presented it and crossed on it in a different manner because

4     we would have known that --

5          THE COURT:  No, if you had had it the week before,

6     you would have gone to the government, presumably, and you

7     guys would have sorted out that the text was actually there.

8     I just -- I don't want to give a general instruction that

9     certain evidence is missing, because then the jury's going to

10    be left wondering what's missing.  And so --

11         MR. OHM:  If the court just wants to add "text

12    messages," but we do feel like something that refers them to

13    -- well, says that says they shouldn't fault us and they should

14    fault them is appropriate given the way that it played out.

15         THE COURT:  Yeah.  Okay.

16       Mr. Wolf, let me hear your thoughts on this.

17         MR. WOLF:  Your Honor, the government agrees with the

18    court that the instruction that has been suggested under Red

19    Book 2.322 I think sorts out the issue, and I think --

20         THE COURT:  So let me -- just in the interest of time,

21    so I get your reactions to everything, it sounds like the

22    defense is fine with my instruction, which is 2.322, they just

23    want me to add in the first sentence, "The Court has found

24    that the government made late disclosures of certain video

25    evidence and text messages to the defendant," which is

certainly accurate.  I think you've admitted to me that those
were late.  So do you have an objection to the instruction I
drafted but inserting "and text messages "in the first sentence?

MR. WOLF:  No, Your Honor.

THE COURT:  Okay.

Mr. Ohm, is that satisfactory to the defense?

MR. OHM:  Your Honor, we would still request that there
be additional language, something to the effect that nothing
that you saw should be -- you should not fault the defense for
any of the things that occurred at this trial in relation to
the video evidence or the text messages.  You are free to or
you may fault the government for --

THE COURT:  Where are you getting that?  Because I have
said, you may consider the government's failure to timely
disclose that evidence and give it as much weight.  That all
comes from 2.322.  I have said that you didn't have the
opportunity to investigate that evidence, which covers the
video and the text messages, which the government is not
objecting to.

MR. OHM:  The instruction itself, Your Honor --
obviously, curative instructions are very situational and
circumstance-based.  All I can say is that the court has broad
discretion to try and cure any of the prejudice that the
defense suffers from late disclosures.  So it's just in
response to what we view --

1          THE COURT:  Okay.  Let's take it one at a time.  The

2     video evidence they don't know anything about.  It never came

3     in.  I prohibited the government from using it.  And I'm now

4     saying it was late, you couldn't investigate it, and I think

5     that takes care of the video.  The interruptions during trial

6     were not just because of the text messages, it was because you

7     guys have disagreements about everything.

8        With respect to the text messages, I prohibited them from

9     rehabilitating their witness, which I think went a long way to

10     deal with the prejudice to the defense.  I'm now adding it to

11     this instruction.  I'm not going to instruct the jury that the

12     defense is not at fault and the government is at fault for any

13     interruptions during trial, or something like that.

14          MR. OHM:  The way that we framed our proposal in terms

15     of the presentation is the prejudice that we felt like we

16     suffered.

17          THE COURT:  "You should in no way fault the defense

18     for your wasted time or for any aspect of the defense's

19     presentation"?

20          MR. OHM:  I think that's correct.  Their waste of time

21     wasn't on us.  It was entirely on them.

22          THE COURT:  Mr. Ohm, some of the delays in the trial

23     was the result of the two of you, not just them.  And I agree

24     and I have said repeatedly throughout this trial that the

25     government's conduct has gotten us here, but I've also done a

1    lot to minimize and eliminate the prejudice to defense through

2    my evidentiary rulings.  I am giving this instruction.  Your

3    instruction that "you should in no way fault the defense for

4    your wasted time or for any aspect of the defense's

5    presentation," I mean, every morning when you're late and I

6    have to have the jury not start on the time that I tell them,

7    that's their wasted time.  That's not your fault either --

8         MR. OHM:  I don't want to get into an --

9         (Overspeaking)

10         THE COURT:  Stop talking, okay, because he can't write

11    down what both of us are saying at the same time.  And it's

12    now past 9:30.

13    "You should in no way fault the defense for your wasted

14    time or for any aspect of the defense's presentation.  You

15    may, however, hold such weight against the government, who

16    I have found to be singularly responsible."

17    I don't think that's true.  You can object and I will note

18    your objection.  I have written a curative instruction that

19    tracks the Red Book and that I think deals with what I have

20    seen with respect to the late disclosures.

21    Do you have anything else you want to put on the record

22    before I go back and try to finalize this and print it?

23    Because, by the way, we had a charging conference yesterday.

24    You didn't raise this.  You didn't raise the inconsistent

25    statements.  The only thing you raised were the self-defense

1    and the defense theory.  So I'm dealing with all of this for

2    the first time this morning, when we started at 9:10 and I

3    asked to start at 9:00, when it should have been raised

4    yesterday at the charging conference.

5              MR. OHM:  I understand the court -- I was here before

6    9:00.  Ms. Reid and I walked in before nine o'clock.

7              THE COURT:  At 9:00 I was told everyone was not here.

8              MR. OHM:  Okay.  Nine o'clock I was here --

9              THE COURT:  Okay.  Do you want to put anything else on

10   the record about these two sentences that you would like me to

11   add that I am not going to add?

12             MR. OHM:  I mean -- no.

13             THE COURT:  Okay.  I am going to go back and print --

14             MR. WOLF:  I'm sorry, Your Honor.  I apologize.

15       Defense put on character evidence for the defendant, and I

16   think there would be an applicable instruction under 2.213 of

17   the Red Book.  The government has no objection --

18             THE COURT:  I'm sorry.  Would you repeat that?

19             MR. WOLF:  I'm sorry, Your Honor.  So the defense put

20   on character evidence yesterday.

21             THE COURT:  Yes.

22             MR. WOLF:  There is an instruction in the Red Book,

23   2.213, regarding how that evidence should be used.  The

24   government has no objection to that instruction.  I just

25   wanted to preserve that because I think that's something that

1    defense is obligated to perhaps suggest, and I don't know if

2    that came up in the quick succession of events yesterday.

3            THE COURT:  You want me to give that instruction?

4            MR. WOLF:  I think just for preservation of the record.

5    There was character evidence.  The defense hasn't asked for

6    it, but I think it's necessary given that evidence has been

7    brought.

8            THE COURT:  Are you asking me to insert 2.213?

9            MR. WOLF:  Yes, Your Honor.

10           THE COURT:  Mr. Ohm, do you have an objection to that?

11           MR. OHM:  No.

12           THE COURT:  Okay.  So I will add 2.213.

13       I have removed 18, which is the defendant as a witness

14   because it's inapplicable.  Has everyone now read the defense

15   theory, the elements instruction that I read to you yesterday

16   but just gave to you in writing?

17       (Counsel reviewing instruction.)

18           THE COURT:  Any objections to the elements instruction?

19           MR. WOLF:  None from the government.

20           MR. OHM:  No, Your Honor.

21           THE COURT:  Okay.  Have you guys agreed on exhibits?

22           MR. WOLF:  Yes, Your Honor.

23           DEPUTY CLERK:  I'll go over it with them.  If you want

24   to do it on the record, we can, Your Honor.

25           THE COURT:  Yeah, go ahead.

1          DEPUTY CLERK:  Okay.  So for the government, I have

2     1, 3, 5, 6, 6a, 9, 11b, 11k, 12, 18, 22.  You all mentioned

3     23, but I never heard anything further about it.  24 was a

4     stipulation, and 25 was a stipulation.

5          MR. WOLF:  That's correct.  23 was refreshing

6     recollection report.  That was not admitted.

7          DEPUTY CLERK:  Okay.  And for defense I have 5, 7a, 7b,

8     8, 9, 10, 11, 12, 5b, 5c, 5d, 5f, 15, 16, and 17, which was a

9     stipulation.

10          THE COURT:  Is everyone in agreement?

11          MS. ABE:  Your Honor, I believe that -- well, I don't

12     believe that 5f was actually admitted.

13          DEPUTY CLERK:  I'm sorry.  That was just shown.  Correct.

14          MS. ABE:  Did Ms. Bell-Norwood mention whether 5e was

15     admitted?

16          THE COURT:  No.

17          DEPUTY CLERK:  That was published to impeach.

18          THE COURT:  That was not admitted.  I allowed you to

19     publish.  That was the email.  That was the email from the

20     government to Bates.

21          MS. ABE:  Okay.  We just need to make sure -- I believe

22     that it did end up on the flash drive, so we just need to

23     correct that.  Thank you, Your Honor.

24          THE COURT:  Okay.  Anything else on exhibits?

25          MR. WOLF:  Not from the government.

1          MR. OHM:  No, Your Honor.

2          THE COURT:  Okay.  So I'm printing off the instructions

3     now.  I am going to read the substantive instructions through

4     the defendant's theory of the case.  Then I will let you do

5     closings, and then after closings I will give redacted

6     exhibits, selection of a foreperson, possible punishment not

7     relevant, unanimity, verdict-form explanation, furnishing the

8     jury with a copy of the instruction, the cautionary instruction

9     on publicity, communication and research, communication between

10    court and jury during jury deliberations, attitude and conduct

11    of jurors during deliberations, excusing alternate jurors.

12        Any objections to that course?

13          MR. WOLF:  No, Your Honor.

14          MR. OHM:  No, Your Honor.

15          THE COURT:  So after I read the substantive

16    instruction, I will ask if there's anything from counsel.

17    That's your cue if you have any objections to my reading of

18    the instructions, and if you do we'll get on the phones.  If

19    not, we'll move to closings and I'll read the remaining

20    instructions.  Okay?

21        Let's get this printed off, and then we'll get the jury in.

22    Okay.  We're going to bring the jury in.  I've got the final

23    instructions.

24        (Jury in at 9:46 a.m.)

25          THE COURT:  Good morning, everyone.  I hope you all had

1    a good evening, and sorry for the small delay again this

2    morning.  So I am now going to read you my final instruction.

3    You should pay attention, but you will get a copy of this; so

4    you don't have to try to write down everything I'm saying.

5                        JURY INSTRUCTIONS

6        The time has now come when all the evidence has been

7    presented and you're about to hear closing arguments from the

8    lawyers.  You are about to enter your final duty in this case,

9    which is to decide the issues of fact and to return a verdict.

10   It is up to me to instruct you on the law, and I ask you to

11   listen carefully, just as you have throughout this trial.

12       Before we talk about the specific charges alleged here and

13   some of the specific issues in the case, however, I want to take

14   a few minutes to talk to you about some general rules of law.

15   Some of this may repeat what I told you in my preliminary

16   instructions at the start of the case.

17       My function is to conduct this trial in an orderly, fair, and

18   efficient manner, to rule on questions of law, and to instruct

19   you on the law that applies in this case.  It is your duty to

20   accept the law as I instruct you.  You should consider all the

21   instructions as a whole.  You may not ignore or refuse to follow

22   any of them.

23       Your function as the jury is to determine what the facts are

24   in this case.  You are the sole judges of the facts.  While it

25   is my responsibility to decide what is admitted as evidence

1    during the trial, you alone decide what weight, if any, to

2    give to that evidence.  You alone decide the credibility or

3    believability of the witnesses.

4        As I explained earlier, as human beings we all have personal

5    likes and dislikes, opinions, prejudices, and biases.

6    Generally, we are aware of these things, but you also should

7    consider the possibility that you have implicit biases, that is,

8    biases of which you may not be consciously aware.  Personal

9    prejudices, preferences, or biases have no place in a courtroom,

10   where the goal is to arrive at a just and impartial verdict.

11       All people deserve fair treatment in the legal system

12   regardless of any personal characteristic such as race, national

13   or ethnic origin, religion, age, disability, sex, gender

14   identity or expression, sexual orientation, education or income

15   level, or any other personal characteristic.  You should

16   determine the facts solely from a fair consideration of the

17   evidence.

18       You may not take anything I have said or done to indicate

19   what I think should be decided in this case.  If you think I

20   have expressed or indicated any such opinion, you should ignore

21   it.  The verdict in this case is your sole and exclusive

22   responsibility.  If any reference by me or the attorneys is

23   different than your memory of the evidence, it is your memory

24   that should control during your deliberations.

25       During trial I have permitted those jurors who wanted to do

so to take notes.  You may take your notebooks with you to the
jury room and use them during your deliberations if you wish.
As I told you at the beginning of the trial, your notes are only
to be an aid to your memory.  They are not evidence in the case,
and they should not replace your own memory of the evidence.
Those jurors who have not taken notes should rely on their own
memory of the evidence.  The notes are intended to be for the
note-taker's own personal use.

During your deliberations you may consider only the evidence
properly admitted in this trial.  The evidence in this case
consists of the sworn testimony of the witnesses, the exhibits
that were admitted into evidence, and the facts and testimony
stipulated to by the parties.  During the trial, you were told
that the parties had stipulated — that is agreed — to certain
facts.  You should consider any stipulation of fact to be
undisputed evidence.

When you consider the evidence, you are permitted to draw
from the facts that you find have been proven such reasonable
inferences as you feel are justified in the light of your
experience.  You should give any evidence such weight as in your
judgment it is fairly entitled to receive.

The statements and arguments of the lawyers are not evidence.
They are only intended to assist you in understanding the
evidence.  Similarly, the questions of the lawyers are not
evidence.

1    The information is merely the formal way of accusing a person

2    of a crime.  You must not consider the information as evidence

3    of any kind.  You may not consider it as any evidence of Sydney

4    Reid's guilt or draw any inference of guilt from it.

5    Every defendant in a criminal case is presumed to be

6    innocent.  The presumption of innocence remains with the

7    defendant throughout the trial unless and until the government

8    has proven she is guilty beyond a reasonable doubt.  This burden

9    never shifts throughout the trial.

10    The law does not require Sydney Reid to prove her innocence

11    or to produce any evidence at all.  If you find that the

12    government has proven beyond a reasonable doubt every element of

13    the offense with which Sydney Reid is charged, it is your duty

14    to find her guilty of that offense.  On the other hand, if you

15    find the government has failed to prove any element of the

16    offense beyond a reasonable doubt, it is your duty to find

17    Sydney Reid not guilty of that offense.

18    The government has the burden of proving Sydney Reid guilty

19    beyond a reasonable doubt.  In civil cases it is only necessary

20    to prove that a fact is more likely true than not, or in some

21    cases that its truth is highly probable.  In criminal cases such

22    as this one, the government's proof must be more powerful than

23    that.  It must be beyond a reasonable doubt.

24    Reasonable doubt, as the name implies, is a doubt based on

25    reason, a doubt for which you have a reason based upon the

1    evidence or lack of evidence in the case.  If, after careful,

2    honest, and impartial consideration of all the evidence, you

3    cannot say that you are firmly convinced of the defendant's

4    guilt, then you have a reasonable doubt.

5        Reasonable doubt is the kind of doubt that would cause a

6    reasonable person, after careful and thoughtful reflection, to

7    hesitate to act in the graver or more important matters in life.

8    However, it is not an imaginary doubt, nor a doubt based on

9    speculation or guesswork.  It is a doubt based on reason.  The

10   government is not required to prove guilt beyond all doubt or to

11   a mathematical or scientific certainty.  Its burden is to prove

12   guilt beyond a reasonable doubt.

13       There are two types of evidence from which you may determine

14   what the facts are in this case: direct evidence and

15   circumstantial evidence.  When a witness, such as an eyewitness,

16   asserts actual knowledge of a fact, that witness's testimony is

17   direct evidence.  On the other hand, evidence of facts and

18   circumstances from which reasonable inferences may be drawn is

19   circumstantial evidence.

20       Let me give you an example:  Assume a person looked out a

21   window and saw that snow was falling.  If he later testified in

22   court about what he had seen, his testimony would be direct

23   evidence that snow was falling at the time he saw it happen.

24   Assume, however, that he looked out a window and saw no snow on

25   the ground and then went to sleep and saw snow on the ground

1    after he woke up.  His testimony about what he had seen would be

2    circumstantial evidence that it had snowed while he was asleep.

3        The law says that both direct and circumstantial evidence are

4    acceptable as a means of proving a fact.  The law does not favor

5    one form of evidence over another.  It is for you to decide how

6    much weight to give to any particular evidence, whether it is

7    direct or circumstantial.  You are permitted to give equal

8    weight to both.  Circumstantial evidence does not require a

9    greater degree of certainty than direct evidence.  In reaching

10   a verdict in this case, you should consider all of the evidence

11   presented, both direct and circumstantial.

12       One of the questions you were asked when we were selecting

13   this jury was whether the nature of the charge itself would

14   affect your ability to reach a fair and impartial verdict.  We

15   asked you that question because you must not allow the nature

16   of a charge to affect your verdict.  You must consider only the

17   evidence that has been presented in this case in reaching a fair

18   and impartial verdict.

19       The weight of the evidence is not necessarily determined by

20   the number of witnesses testifying for each side.  Rather, you

21   should consider all the facts and circumstances in evidence to

22   determine which of the witnesses you believe.  You might find

23   that the testimony of a smaller number of witnesses on one side

24   is more believable than the testimony of a greater number of

25   witnesses on the other side, or you might find the opposite.

The lawyers in this case sometimes objected when the other side asked a question, made an argument, or offered evidence that the objecting lawyer believed was not proper.  You must not hold such objections against the lawyer who made them or the party they represent.  It is the lawyer's responsibility to object to evidence that they believe is not admissible.

If, during the course of the trial, I sustained an objection to a lawyer's question, you should ignore the question and you must not speculate as to what the answer would have been.

If, after a witness answered a question, I ruled that the answer should be stricken, you should ignore both the question and the answer, and they should play no part in your deliberations.

Likewise, exhibits as to which I've sustained an objection or that I ordered stricken are not evidence, and you must not consider them in your deliberations.

In determining whether the government has proved the charges against Sydney Reid beyond a reasonable doubt, you must consider the testimony of all the witnesses who have testified.  You are the sole judges of the credibility of the witnesses.  You alone determine whether to believe any witness and the extent to which a witness should be believed.

Judging a witness's credibility means evaluating whether the witness has testified truthfully and also whether the witness accurately observed, recalled, and described the matters about

1    which the witness testified. As I instructed you at the

2    beginning of trial and again just now, you should evaluate

3    the credibility of witnesses free from prejudices and biases.

4    You may consider anything else that in your judgment affects

5    the credibility of any witness.

6        For example, you may consider the demeanor and behavior

7    of the witness on the witness stand, the witness's manner of

8    testifying, whether the witness impresses you as having an

9    accurate memory, whether the witness has any reason for not

10   telling the truth, whether the witness had a meaningful

11   opportunity to observe the matters about which he or she

12   testified, whether the witness has any interest in the outcome

13   of this case, stands to gain anything by testifying, or has

14   friendship or hostility toward other people concerned with this

15   case.

16       In evaluating the accuracy of a witness's testimony, you may

17   consider the circumstances surrounding the event including the

18   time that elapsed between the event and any later recollections

19   of the event and the circumstances under which the witness was

20   asked to recall details of the event.  You may consider whether

21   there are any consistencies or inconsistencies in a witness's

22   testimony or between the witness's testimony and any previous

23   statements made by the witness.

24       You may also consider any consistencies or inconsistencies

25   between the witness's testimony and any other evidence that you

credit.  You may consider whether any inconsistencies are the result of lapses in memory, mistake, misunderstanding, intentional falsehood or differences in perception.  You may consider the reasonableness or unreasonableness, the probability or improbability of the testimony of a witness in determining whether to accept it as true and accurate.  You may consider whether the witness has been contradicted or supported by other evidence that you credit.

If you believe that any witness has shown him or herself to be biased or prejudiced for or against either side in this trial or motivated by self-interest, you may consider and determine whether such bias or prejudice has colored the testimony of the witness so as to affect the desire and capability of that witness to tell the truth.  You should give the testimony of each witness such weight as in your judgment it is fairly entitled to receive.

A police officer's testimony should be evaluated by you just as any other evidence in the case.  In evaluating the officer's credibility, you should use the same guidelines that you apply to the testimony of any witness.  In no event should you give either greater or lesser weight to the testimony of any witness merely because she's a police officer.

Every defendant in a criminal case has an absolute right not to testify.  Sydney Reid has chosen to exercise this right. You must not hold this decision against her, and it would be

improper for you to speculate as to the reason or reasons for her decision.  You must not assume the defendant is guilty because she chose not to testify.

Motive is not an element of the offense charged, and the government is not required to prove motive in this case.  You may, however, consider evidence of motive or lack of evidence of motive in deciding whether or not the government has proved the charge beyond a reasonable doubt.

The information charges that the offense of Assaulting, Resisting, or Impeding Certain Officers or Employees was committed on or about July 22, 2025.  The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near to the date alleged.

Someone's intent and/or knowledge ordinarily cannot be proved directly because there's no way of knowing what a person is actually thinking, but you may infer someone's intent and/or knowledge from the surrounding circumstances.  You may consider any statement made or acts done by Sydney Reid and all other facts and circumstances received in evidence which indicate her intent and/or knowledge.

You may infer, but are not required to infer, that a person intends the natural and probable consequences of acts she intentionally did or intentionally did not do.  It is entirely

up to you, however, to decide what facts to find from the evidence received during this trial.  You should consider all the circumstances in evidence that you think are relevant in determining whether you think the government has proved beyond a reasonable doubt that Sydney Reid acted with the necessary state of mind.

The defendant is charged with Assaulting, Resisting, or Impeding Certain Officers or Employees, which is a violation of federal law.  At the beginning of this case, I instructed you that the defendant has been charged with violating the statute as to both Officer Liang and Agent Bates.  At this point in the case, you should focus only on the allegation of criminal conduct with respect to Agent Bates.  In doing so, please focus on the elements of the offense as I am about to lay them out.

To find the defendant guilty of Assaulting, Resisting, or Impeding Certain Officers or Employees, you must find the following elements beyond a reasonable doubt:

1)  Ms. Bates was an officer or employee of the United States.

2)  Ms. Reid forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with Ms. Bates.

3)  That act constituted simple assault as I will define that term for you.

4)  Ms. Reid so acted while Ms. Bates was engaged in or on account of her performance of official duties.

5)  Ms. Reid acted with what the law calls general intent. To show general intent, the government must prove beyond a reasonable doubt that Ms. Reid intentionally committed an act which that law makes a crime.  An act is done intentionally if done voluntarily and purposefully and not because of mistake, inadvertence, or accident.  This general intent may be inferred from the doing of the act.

Definitions.  The defendant acted forcibly if she used force or attempted to use force or threatened to use force against the law enforcement officers.  All of the acts — resisting, impeding, interfering with — are modified by the word "forcibly."  Thus, before you can find the defendant guilty, you must find beyond a reasonable doubt that she acted forcibly.

The term *forcibly* means by use of force.  Physical force is sufficient, but actual physical contact is not required. A person acts forcibly if she threatens or intends to inflict bodily harm on another with the present ability to inflict bodily harm.  Therefore, a threat to use force at some unspecified time in the future does not satisfy the "forcibly" element.

The terms *resisted, impeded,* and *interfered with* carry their everyday, ordinary meanings.

The term *simple assault* means any intentional attempt or threat to inflict injury upon someone else when coupled with an apparent present ability to do so.  The use of force alone is

not sufficient to constitute assault unless the defendant
intended to inflict on threaten injury with that force.

*Injury* means any physical injury, however small, including
a touching offensive to a person of reasonable sensibility.
You are instructed that an agent of the Federal Bureau of
Investigation is a federal officer, and it is the part of the
official duty of such officer to assist Immigration and Customs
Enforcement in arrests of noncitizens who are considered
unlawfully present in the United States.

*Engaged in performance of official duties* is simply acting
within the scope of what the agent is employed to do.  The
test is whether the agent is acting within that compass or is
engaging in a personal frolic of his or her own.  It is not
sufficient that the defendant knew the alleged victim was at the
time a federal officer carrying out an official duty, so long as
it is established beyond a reasonable doubt that the victim was
in fact a federal officer carrying out an official duty.

Every person has the right to use a reasonable amount of
force in self-defense if she (1) actually and reasonably
believes that the use of force is necessary to defend herself
against the immediate use of excessive force, and (2) uses no
more force than was reasonably necessary in the circumstances.

The question is not whether, looking back on the incident,
you believe that the use of force was necessary.  The question
is whether Ms. Reid, under the circumstances as they appeared to

her at the time of the incident, used no more force than was reasonably necessary to defend against what Ms. Reid actually and reasonably believed to be excessive force by Officer Liang and Agent Bates.

You should evaluate the reasonableness of Ms. Reid's belief based both on what she knew and what she reasonably could have determined from the surrounding circumstances.  Self-defense can provide a complete defense to the charge here.

I will now define *excessive force*.  A law enforcement officer may use force in performing their duties as long as the force is not excessive.  An officer's use of force is excessive when, under the surrounding circumstances, the officer uses an amount or type of force that is more than reasonably necessary to effectuate a seizure, arrest, detention, or other lawful action.

The reasonableness of a particular use of force depends on the circumstances of each case including whether the defendant posed an immediate threat to the safety of the officers, the possibility that the defendant was armed, violent, or dangerous; whether the defendant was actively resisting the officer; the number of persons with whom the officer was contending at the time; the duration of the officer's action; the amount of time the officer had to determine the type and amount of force that reasonably appeared necessary and any changing circumstances during that period; the relationship between the need for the use of force and the amount of force used, whether the physical

force applied and was likely to lead to unnecessary injury and the extent of the defendant's injury.

Burden of proof.  If you find that Ms. Reid actually and reasonably believed that she was in imminent danger of bodily harm and that Ms. Reid had reasonable grounds for that belief, then Ms. Reid has a right to self-defense, even if Ms. Reid had other possible motives such as feelings of anger toward law enforcement or the desire for revenge.

Ms. Reid's other possible motives do not defeat an otherwise valid claim of self-defense but can be considered in evaluating whether Ms. Reid actually and reasonably believed that she was in imminent danger of bodily harm.

Self-defense is a defense to the single count of the information.  Ms. Reid is not required to prove that she acted in self-defense.  Where evidence of self-defense is present, the government must prove beyond a reasonable doubt that Ms. Reid did not act in self-defense.  If the government has failed to do so, you must find Ms. Reid not guilty.

The court has found that the government made late disclosures of certain video evidence and text messages to the defendant. As a result, the defendant did not have the opportunity to investigate that evidence and possibly present additional evidence related to that video evidence and text messages.  You may consider the government's failure to timely disclose that evidence and give it as much weight as in your judgment it

1    deserves.

2    You have heard that Agent Bates made a statement on an

3    earlier occasion and that this statement may be inconsistent

4    with her testimony here at trial.  It is for you to decide

5    whether the witness made such a statement and whether in fact it

6    was inconsistent with the witness's testimony here.  If you find

7    such an inconsistency, you may consider the earlier statement in

8    judging the credibility of the witness, but you may not consider

9    it as evidence that what was said in the earlier statement was

10   true.

11   Ms. Reid has introduced testimony that she has a good

12   reputation in the community for nonviolence and that in the

13   witnesses' opinion, Ms. Reid is a nonviolent person.  Such

14   evidence may indicate to you that it is unlikely that a

15   nonviolent person would commit the crime charged, or it may not.

16   You may consider this evidence along with other evidence in the

17   case and give it as much weight as you think it deserves.

18   Notwithstanding the evidence of character, if, after weighing

19   all the evidence, you are convinced beyond a reasonable doubt

20   that Ms. Reid is guilty of the crime charged, it is your duty to

21   find her guilty.  On the other hand, evidence of good character

22   alone may create a reasonable doubt as to a defendant's guilt,

23   although without it the other evidence would be convincing.

24   "It is the defendant's theory of the case that she did not

25   assault Agent Bates because she never touched Agent Bates, never

1    attempted to touch Agent Bates, and because she involuntarily

2    reacted in response to what was happening to her.  Even if you

3    found that Ms. Reid did touch and assault Agent Bates, the

4    government must then prove beyond a reasonable doubt that she

5    did not act in self-defense to Officer Liang's assault on her.

6    They have not.

7    "You have no information about Officer Liang's intent and why

8    he believed that he was permitted to exert this amount and kind

9    of force against her.  Because you cannot find both that

10    Ms. Reid assaulted Agent Bates and that she was not acting in

11    self-defense, you must acquit."  And again, what I just read you

12    is the defendant's theory of the case as they drafted it.  It is

13    not an instruction from me.

14    Okay.  Now I will have some additional final instructions

15    after the parties do their closing arguments, but we will now

16    move to the portion of the trial where you'll hear closing

17    arguments from the parties, and the government will begin.

18    And before we begin with closings, is there anything from

19    counsel?

20        (Bench conference.)

21        MR. OHM:  Your Honor, under Rule 30, I think we just

22    have to renew our previously stated objections and theory.

23    Otherwise, we're fine.

24        THE COURT:  Okay, great.  Renewed.

25        MR. WOLF:  Nothing from the government.

1          THE COURT:  Okay.  Thank you.

2       (End of bench conference.)

3          THE COURT:  Please proceed.

4                 GOVERNMENT CLOSING ARGUMENT

5          MR. FACCI:  The defendant crossed the line.  She

6    crossed the line when she went from lawful protest to

7    assaulting federal officers that were just trying to do their

8    jobs.  All of this culminated in a simple assault of FBI Agent

9    Eugenia Bates.

10       There's no debate that she came there to monitor the arrest

11   of two inmates that had immigration violations, and she's

12   allowed to do that.  The defendant took photographs and videos

13   of the agents that were on scene, took pictures of their

14   license plates.  She's allowed to do that.

15       This defendant even cussed out the agents while they were

16   standing at the jail waiting for inmates.  That's freedom of

17   speech.  She's allowed to do that, and the agents allowed her

18   to do that.  But what you cannot do is assault somebody.  That

19   is crossing the line.  That is a crime, and that is why we're

20   here today.

21       Now, the defendant is charged in this case with forcibly

22   assaulting, resisting, or impeding or interfering officers of

23   the United States.  Many of those terms — resisting, impeding,

24   interfering — have their common, everyday meaning.  The only

25   term that has a fancy legal definition is *assault*.  That is

what this entire case is about.  It's when the defendant
attempted to strike Agent Bates with her knee, was that a
simple assault under the law, and the evidence proves that
it was.

So the judge just instructed you on the elements of
forcibly assaulting and resisting and impeding certain
officers.  I'm just going to go through those really quick.
Number one, Ms. Bates was an officer or employee of the United
States; that the defendant forcibly assaulted, resisted,
impeded, or interfered with Ms. Bates; that the defendant's
acts constituted a simple assault; and that the defendant
acted while Ms. Bates was engaged in the performance of her
official duties.  And lastly, the defendant acted with general
intent.

So let's -- well, two of these elements are not up for
debate at all, which are elements 1 and 4.  Ms. Bates was an
officer or an employee of the United States.  She testified
that she's an FBI agent, that on that day she was wearing full
tactical gear, she was wearing her vest, she had her gun, she
had "FBI" displayed on her body, on her body armor.  It was
very clear that she was a federal officer or a federal agent.
So that takes care of element 1.

Element 4.  Ms. Bates was engaged in the performance of her
official duties.  That's not up for debate either.  Agent
Bates testified that she was on scene that day to facilitate

1    the arrest of these two inmates who had immigration violations

2    that were exiting the jail.  There's no dispute that she was

3    engaged in her official duties during this entire time.  The

4    incident in this case occurred moments after the arrest, or in

5    the course of arresting these two individuals.  So element 4

6    is also satisfied.

7         Now, the defendant acted forcibly.  As the judge

8    instructed, that just means a use of force.  An example of

9    that would be using physical force as part of an assault, and

10   it's important to note that no physical contact is required.

11   When somebody suddenly raises their knee at somebody, that

12   requires a physical effort.  That requires some use of force.

13   So, clearly, the raising of the knee here to strike out at

14   somebody would constitute a use of physical force.  So that

15   element that the defendant acted forcibly is also satisfied.

16        Now simple assault.  Simple assault, as the defendant [sic]

17   instructed, is an intentional attempt or threat to inflict

18   physical injury, and I have "injury" in quotes here, because

19   that injury can be just an attempt to commit an offensive

20   touching on somebody that has reasonable sensibility.  No

21   contact is required, and the defendant has to have an apparent

22   ability to do so.  This is a very low bar, ladies and

23   gentlemen.

24        Now, I want to just set the scene again real quick.

25   So what you have up on the screen here, this is where this

1    assault occurred.  This is outside of the D.C. jail.  The glass

2    doors that are straight up from the stairs here, that's where

3    federal agents were all staged waiting for these inmates to exit

4    the jail.  And you heard testimony from Agent Bates that it was

5    Officer Liang's job to set the perimeter there, and that was

6    important for several reasons.

7        They needed to give space to conduct this operation for

8    several reasons, but one of them that she testified to was that

9    they had received notice that these inmates were a fight-or-

10   flight risk, and that's why they had more agents than usual

11   present on the scene.  So there was a safety concern here for

12   everybody involved: for the agents, for the inmates that were

13   leaving, and for members of the public that were around there.

14   They thought that one of these people might fight when they were

15   being arrested.

16       So it was Officer Liang's job to set that perimeter.  You

17   heard testimony and evidence that he was -- you saw testimony

18   and video evidence that the defendant then walked up to this

19   area in front of the stairs exactly where these agents were

20   planning on escorting these individuals out of the jail.  So the

21   plan was to bring these people down this flight of stairs here

22   and into awaiting vehicles.  So it was very important to keep

23   these stairs clear.

24       I'm going to show some CCTV footage from the moment that the

25   defendant walked up on these stairs and was in the exact path

 1      where these agents and inmates were going to be walking.

 2      Starting at the beginning, this is about 7:26 p.m. on July 22.

 3          (Video played.)

 4          You see here the defendant walk up the stairs and Agent Liang

 5      walks her up to the wall and away from the stairs to make sure

 6      those stairs are clear.

 7          Now I'm going to play the BWC which was admitted in this case

 8      from Agent Bates, which showed this event unfold that culminated

 9      in this assault.

10          (Video played.)

11          Ladies and gentlemen, I know you've seen that video several

12      times throughout this case.  I want to just trim down the

13      portion where -- what this case is all about, which was when the

14      defendant struck her -- attempted to strike Agent Bates with her

15      knee, and when you watch this clip, you can see --  you notice

16      several things.

17          (Video played.)

18          I'm going to play that one more time.

19          (Video played.)

20          So the defendant makes this very sudden movement with her

21      knee, out towards Agent Bates.  Agent Bates testified that this

22      knee was in the direction of her groin.  She testified that it

23      came very close to hitting her, that she was actually surprised

24      it didn't make contact with her, and that she had to actually

25      block the knee with her left hand, which you can see in that

1     video.

2       Also, I think the reactions of Agent Bates and Officer Liang

3     are important to note here.  The moment that the defendant

4     throws this knee out at Agent Bates, you hear agent Liang yell

5     "Hey" in response, and you hear Agent Bates say, "Put your foot

6     down."  I think all of that helps corroborate Agent Bates's

7     testimony that the defendant attempted to knee Agent Bates in

8     the groin.

9       So with respect to simple assault, this was an intentional

10     attempt or threat to knee Agent Bates.  That's what she

11     testified to.  The defendant had apparent ability to do this.

12     Her legs were not restrained.  She clearly was able to raise her

13     right knee up at Agent Bates, so she had the ability to do that.

14     It's evidenced by the video itself.

15       And the attempted injury was a touching that would be

16     offensive to a person of reasonable sensibility.  If anybody had

17     a knee coming toward their groin, they would find that to be an

18     offensive touching.  I think that's common sense that that is

19     offensive touching or threat to use offensive touching.  So all

20     of these elements of simple assault have been proven.

21       Now, general intent.  Did the defendant intend to knee Agent

22     Bates?  And in order to prove general intent, we need to show

23     that the knee was voluntary and on purpose, it wasn't by mistake

24     or accident, and that's what the defendant has claimed in their

25     opening statement, that this was just sort of an inadvertent,

1    reflexive action.  And I'm here to tell you that the evidence

2    does not support that whatsoever.

3        Defendant did not have some kind of involuntary reaction

4    here.  She raised her knee in a striking motion at Agent Bates

5    because she was angry, and the video evidence in this case

6    proves that.  The assault here occurs the moment -- in the

7    moment that this second inmate was being arrested and taken into

8    custody and being escorted right past the defendant.  That's

9    shown here.

10       (Video played.)

11       Now you see, the moment that this video starts, this person

12   has already been handcuffed, and the defendant is already on the

13   wall struggling with officers.

14       (Video played.)

15       It was seconds after this happened that the assault occurred.

16       (Video played.)

17       At this point, the defendant had been struggling with Officer

18   Liang and Agent Bates for almost a full minute.  You hear her

19   yelling profanities at officers, telling them to fuck off,

20   talking about stealing people, shouting at people walking by

21   "What's your name?"

22       All of this shows she was clearly frustrated and angry about

23   what was happening here, and that is why she lashed out in

24   assault against Agent Bates.  There was nothing new that

25   happened that prompted to her to, all of a sudden, assault Agent

1    Bates.  It was just the fact that her anger finally boiled over

2    into a moment of simple assault.  So the kneeing was voluntary

3    and on purpose, it was not done by mistake or accident, and

4    therefore we've proven all of the elements of this charge.

5        Now, you heard instructions on self-defense.  Whether or not

6    the defendant was acting voluntary or this was a mistake or

7    accident is in complete opposition with whether she was acting

8    in self-defense.  These are two completely opposite

9    self-defenses that the defendant is putting forward here.  This

10   was not self-defense.

11       Self-defense requires that the defendant actually and

12   reasonably believed that Agent Bates and Officer Liang were

13   using excessive force.  There's zero evidence in this case that

14   the defendant actually and reasonably believed that excessive

15   force was being used on her, and that's because it wasn't.

16   The force that was being used here was reasonable under the

17   circumstances.

18       These officers only used enough force that was actually

19   needed to control this defendant, and that's shown here.  As

20   this video starts, Officer Liang is already struggling to

21   control the defendant.

22       (Video played.)

23       You can see that the defendant's arms are not in control at

24   all, that she's continuing to resist, she's flailing her arms.

25   You heard testimony from Agent Bates that the defendant was

1    pushing back, her muscles were tense during this period.  She

2    was continuing to constantly resist for a minute straight.

3    Agent Bates testified that she saw Officer Liang struggling,

4    and she came to assist to help control her.

5       (Video played.)

6       What were the officers supposed to do here?  They were having

7    this inmate, who was leaving the jail at these very moments,

8    they needed to keep these stairs clear.  They believed that this

9    inmate posed a flight risk, so there was a safety concern here.

10   They needed to keep these stairs clear, and it took two officers

11   to control the defendant here because she constantly was pushing

12   back.  That was completely reasonable force under the

13   circumstances, and Agent Bates even testified that the force

14   that she used is the same amount of force that she was trained

15   to do as an officer and as an FBI agent.

16      The safety concern also is evidenced hare.  You heard Agent

17   Bates' testimony that they were told that this person was

18   possibly going to fight.  That's captured on one of these BWC

19   cameras.

20      (Video played.)

21      I'm going to play that again.

22      (Video played.)

23      He says, "Which one of these did you say was going to fight,

24   this one?"  That corroborates and provides more credibility to

25   Agent Bates's testimony.  She wasn't making this up.  They

believed this person was going to fight, there was a safety
risk, and that's why the officers' conduct here and the force
that they used was completely reasonable under the circumstances.
They needed to make sure that this person could be escorted past
the public in a safe manner and that the defendant just
continued to constantly resist.

So this was not self-defense.  Again, no evidence that she
actually believed this was excessive, and they only used enough
force that was actually needed to control her under the
circumstances.  So there's no self-defense in this case.

Lastly, this case is about the defendant's conduct.  There
was discussion here that there were text messages sent in the
aftermath of all of this, private messages exchanged between the
officers in this case or with close friends using unprofessional
language about the defendant.  We don't condone that behavior,
but the defense wants to make this case about the officers, and
this case is about Ms. Reid's conduct.

What was said in those text messages does not change at all
what occurred in that body worn camera video.  The text messages
are a complete sideshow here and are just distracting you from
what actually occurred in this video.

The defendant also talked about in their opening these agents
were all just being bullies, they just had enough of Ms. Reid at
one point, and that's why they decided to arrest her.  But ask
yourself this:  The two officers that were actually directly

1    involved in this assault, Officer Liang and Agent Bates, were

2    they being bullies?  Is there any evidence here that anywhere

3    on the scene they were being bullies toward the defendant?  No.

4    Absolutely not.

5        In fact, Agent Bates, you can see on her BWC, she approaches

6    in a very calm manner, she calls the defendant  "ma'am," she

7    places her hand on her arm, she says, "When we're done, you'll

8    be good."  When we're done, you'll be good.  You can even hear

9    Officer Liang on there telling her "relax" in a calm voice.

10   Neither of them are shouting.

11       But when the defendant's anger completely boiled over when

12   this inmate was being arrested, she assaulted them.  And that

13   is when everything changed.  They had no intention of arresting

14   her at that point for everything she had done up to that point.

15   Everything changed when she tried to strike Agent Bates with her

16   knee.

17       Ladies and gentlemen, again, these people were just trying to

18   do their jobs, and the judge instructed you at the beginning of

19   this case to be fair and impartial and look at the evidence

20   objectively.  And that is what we are asking you to do today:

21   to look at the law, look at the evidence, and use your common

22   sense.  And if you do that, you should find the defendant guilty

23   of assaulting a federal officer beyond a reasonable doubt.

24   Thank you.

25            THE COURT:  Thank you.  Ms. Abe?

1          MS. ABE:  Your Honor, can we get on the phone?

2          (Bench conference.)

3          MS. ABE:  Your Honor, would you like me to object now

4     or after to the government's repetitive burden shifting in

5     this argument?  We recognize that the court made clear that

6     you did not want us to object during closings; but there's an

7     extreme degree of burden shifting in that argument, so we have

8     pretty strenuous objections to that.

9          THE COURT:  What specifically are you objecting to?

10    And to be clear, I said I would like you guys to work things

11    out so we can avoid objections during closings, but if you

12    have an objection, I did not prohibit anyone from objecting

13    during closings.

14         MS. ABE:  Okay, Your Honor.  I apologize.  I

15    misunderstood.  But specifically I'm objecting to the repeated

16    use of how there was no evidence that Ms. Reid did not act in

17    self-defense.  The government repeatedly referred to how she

18    had to show that she was not acting in self-defense, and

19    that's of course burden shifting.  The government has to prove

20    that Ms. Reid did not act in self-defense beyond a reasonable

21    doubt.  I think one example is AUSA Facci's statement that

22    "is there any evidence that Ms. Reid acted in self-defense."

23    That's burden shifting.

24         THE COURT:  Yeah, hang on.  Let me go back and look at

25    this.  Mr. Facci, I assume you have what you said.  What did

1    you say while I look for this?

2           MR. FACCI:  Your Honor, I never said that the defendant

3    didn't show that -- you know, what her beliefs were.  That's

4    not the language that I used.  I read the line off my

5    PowerPoint which I provided to the defense earlier this

6    morning.  It just said there's no evidence in this case that

7    the defendant actually and reasonably believed there was

8    excessive force.  That's straight from the jury instructions.

9           THE COURT:  Okay.  Let me look up what you said.

10          [Reading back the record]

11    Okay.  Mr. Facci said, "You heard the instructions on

12    self-defense.  Whether or not the defendant was acting

13    voluntarily or this was a mistake or accident is in complete

14    opposition to whether she was acting in defense.  These are

15    two completely opposite self-defenses that the defendant is

16    putting forward here.  This is not self-defense.

17    "Self-defense requires that the defendant actually and

18    reasonably believed that Agent Bates and Officer Liang were

19    using excessive force.  There's zero evidence in this case

20    that the defendant actually and reasonably believe that

21    excessive force was being used on her, and that's because it

22    wasn't.  The force that was being used here was reasonable

23    under the circumstances."

24    What's wrong with that, Ms. Abe?

25          MS. ABE:  I believe, if I'm not mistaken, AUSA Facci

1    makes a statement later.  I don't have the specific --

2             THE COURT:  All right.  Let's take this one in turn.

3    You have no objection from what I just read, which is directly

4    from the instructions.  Correct?

5             MS. ABE:  No, Your Honor.

6             THE COURT:  Okay.  I will keep reading:  "These

7    officers only used enough force that was actually needed to

8    control this defendant, and that's shown here.  As this video

9    starts, Officer Liang is already struggling to control the

10   defendant."  Video played.

11     Then he talks about her arms not being in control,

12   testimony from Agent Bates that defendant was pushing back,

13   her muscles were tense, she was resisting.  And then he goes,

14   "What were the officers supposed to do?"   They were having

15   this inmate -- he talks about fight or flight completely

16   reasonable, the safety concern is captured.  She wasn't making

17   it up, the fight or flight.

18     "Again, no evidence that she actually believed this was

19   excessive, and they only used enough force that was actually

20   needed to control her under the circumstances, so there's no

21   self-defense in this case."  What is wrong with that?

22             MS. ABE:  I mean, Your Honor, it's the defense's

23   position that that implies that there are -- tells to the jury

24   that the defense is required to put on evidence to show that

25   Ms. Reid was acting in self-defense.

```
 1              THE COURT:  Ms. Abe, the instruction that you did not
 2     object to is that she must actually and reasonably believe
 3     that the amount -- she must actually and reasonably believe
 4     that the use of force was necessary, and so you're objecting
 5     to him saying there's no evidence that she actually believed
 6     this was excessive?
 7              MS. ABE:  Yes, Your Honor.
 8              THE COURT:  Okay.  Your objection is overruled.
 9         (End of bench conference.)
10              MS. ABE:  May I proceed?
11              THE COURT:  Please do.
12              MS. ABE:  Thank you.
13                     DEFENSE CLOSING ARGUMENT
14              MS. ABE:  Sydney Reid wasn't going to mind her own
15     business.  Ms. Reid wasn't minding her own business, because
16     like her friend, Katie Campbell-Morrison, testified about
17     yesterday, Ms. Reid cares about her community.
18        Ms. Reid did nothing wrong on July 22, 2025.  She didn't
19     assault Agent Bates.  She's not guilty.  Ms. Reid was
20     exercising a right that all people in this country are
21     supposed to have.  She was bearing witness to the bullying and
22     abuses of the Immigration and Customs Enforcement agents.
23        Because Ms. Reid was looking out for the people in her
24     community, her neighbors, the ICE agents at D.C. jail didn't
25     like it and they punished her for it.  And the U.S. Attorney's
```

1    Office, the United States government, they have their back.

2        Ms. Reid is a veterinarian tech at Friendship animal clinic

3    here in D.C.  In her spare time she trains dogs, as her friend

4    Katie talked about yesterday.  Ms. Reid also works as a

5    bartender.  She's done that for years, as her friend Jessica

6    Mason testified about yesterday.

7        See, Ms. Reid wasn't just a regular, everyday bartender.

8    She was the kind of bartender who was like a big sister to her

9    friends and colleagues at the bar.  Ms. Reid would look out

10   for staff members and for the other women at the bar when the

11   inevitable drunken patron would come and sexually harass other

12   ladies at the bar.

13       Ms. Reid is a tough woman, a compassionate woman.  You

14   heard her.  The government played those videos for you.  But

15   what you heard was compassion.  It was caring for the people

16   in her community.  Ms. Reid is not guilty.

17       I also hear the surprise in her voice that this man was

18   suddenly grabbing her.  You didn't hear evidence of him

19   explaining what was going on.  The government showed you on

20   Tuesday -- they played, I don't know how long, 10 minutes of

21   surveillance video?  And you saw the patrons walking around

22   all through the platform where this alleged perimeter was.

23   What?  Ms. Reid wasn't allowed to do that because she was

24   filming?  Not guilty.

25       And then the government has the audacity to sit here and

1   talk to you about a perimeter when it was Officer Liang who

2   broke a boundary.  He pressed his leg into Ms. Reid's crotch

3   area and then was pushing against her breast.  Not guilty.

4   The government is playing in your face.  Don't let them do

5   that.

6       I apologize for continuing to look at my notes, but this is

7   important for Ms. Reid and I want to get everything right for

8   you guys.

9       Before I talk about the evidence, I want to go through a

10  few principles of law.  The first is the presumption of

11  innocence.  The law requires you to presume that Ms. Reid is

12  innocent.  Everyone in our legal system, every single person

13  accused of a crime, is presumed innocent.  Our American legal

14  system is envied around the world because every person that

15  the government decides to accuse of a crime starts with a

16  clean slate.  Everyone.  Rich, poor, citizen, noncitizen.

17  Presumed innocent.

18      Ms. Reid was presumed innocent when she was arrested on

19  July 22, 2025, when the government charged her on these

20  trumped-up assault charges, when she sat through this trial.

21  Ms. Reid is innocent right now.  And that doesn't change

22  unless the 12 of you decide otherwise.

23      The second principle that I want to talk about is the

24  burden of proof.  The burden of proof lies and stays with the

25  government throughout this entire trial.  It never shifts to

1    Ms. Reid.  The law doesn't require Ms. Reid to prove her

2    innocence.  It requires the government to prove her guilty

3    beyond a reasonable doubt.

4        If you have questions, you look to these guys.  If there

5    was someone else you wanted to hear from?  Them.  Video

6    evidence you wanted to see?  Them.  More questions about

7    what's going on here?  Why on Tuesday they talked to you about

8    Officer Liang and then they don't bring him?  Them.  Why on

9    Tuesday you're told that Ms. Reid is charged with assaulting

10   Officer Liang and Agent Bates, and today the judge informed

11   you that, don't worry about Officer Liang, it's only about

12   Bates now?  Them.

13       The burden is on them.  And if you have questions about why

14   the government's only witness -- you saw her sit up here and

15   lie for hours on the stand, and why we're still here and

16   they're asking you to find Ms. Reid guilty?  You look at them.

17   The government bears the burden.  It never changes.

18       The last principle that I want to talk about is beyond a

19   reasonable doubt.  The beyond a reasonable doubt standard is

20   the highest standard in the law.  It's higher than civil

21   cases, as the judge instructed you.  It's higher than the

22   standard in Apple v. Google, when hundreds of millions or even

23   billions of dollars are at stake.  And the reason is because,

24   in a criminal case, a person's liberty is at stake.  And so

25   the law recognizes that.  It recognizes that you must decide

1    beyond a reasonable doubt that Ms. Reid is guilty of the crime

2    that the government alleges against her.

3         Reasonable doubt, as the judge instructed you earlier, is a

4    doubt for which you have reason, something that makes you

5    pause or hesitate in the graver or more important matters in

6    life.  We ask you to treat this case, this decision, when you

7    go back to deliberate, as you would treat a decision in one of

8    the more important matters in your life, because right now

9    this case is the most important thing in Ms. Reid's life.

10        Ms. Reid stood up to bullies.  That's why we're here.  The

11   government brought you one witness.  Why?  Why did they do

12   that?  Why did AUSA Wolf stand up in front of you on Tuesday

13   and talk about this perimeter, how Officer Liang made a

14   perimeter, how he was trying to make sure that the area stayed

15   clear?  He sat in front of you and did that and then didn't

16   even bring him.  Why?

17        And then you hear Agent Residovic on Agent Bates's body

18   worn camera yelling at Ms. Reid telling her to mind her own

19   business.

20        (Video played.)

21        Where is Agent Residovic?

22        This case started with Officer Liang.  It started because,

23   according to AUSA Wolf, Officer Liang set up a perimeter.  But

24   look at Officer Liang.  Blue plaid.  Agent Bates testified

25   he's wearing khaki pants.  Oh, and remember Officer Liang

1    testified that he was wearing his badge on his chest?

2    Where's that badge?  Where's his identification?  Ms. Reid

3    is not guilty.

4        And then Officer Liang testified at the grand jury that it

5    was Ms. Reid who made first contact with him.  But we showed you

6    surveillance camera, and you'll have it in the back, Government

7    Exhibit 1, camera 137 at around the time stamp 7:26 p.m.

8        Officer Liang testified at the grand jury that it was

9    Ms. Reid who made first contact, but we know that's not true.

10   You can see it for yourself.  The government knew that if they

11   brought Officer Liang in here, their case would only be weaker.

12   So they didn't.  And they're asking you to convict Ms. Reid?  On

13   what?

14       Let's talk about this alleged kneeing innocent, simple

15   assault that the government makes so much of.  As the judge

16   instructed you, in finding that Ms. Reid committed simple

17   assault, you must find that she intentionally attempted or

18   threatened to inflict injury on Agent Bates with the apparent

19   present ability to do so.  Force alone is not enough unless

20   Ms. Reid intended to injure Agent Bates.

21       (Video played.)

22       Officer Liang leans his entire body into Ms. Reid.  Puts his

23   leg between hers.  That's a natural reaction.  He moved closer,

24   he closed the gap.  He had her under control.  You heard Agent

25   Bates testify to that, and you can see it on the video.

1    Now let's turn to Agent Bates, the government's one witness.

2    The government brought you one witness, who's not even

3    trustworthy.  Now, did you notice how Agent Bates is the only

4    woman in the group?  They bring her up here, they have her make

5    a few laughs, tell a few jokes, talk about how she's from

6    Ukraine but can't say "Residovic"?

7    Don't let the government insult your intelligence.  The main

8    point of her testimony, the main allegation in this case, the

9    center of this federal case you find out that it isn't in the

10   original complaint that started it?  And then she lied to you

11   about it.  You have the stipulation from the U.S. attorney who

12   was on this case in the beginning.  He said, I don't remember

13   her mentioning that to me.

14   And then we have Agent Bates's words.  The government tried

15   to take the sting out of them, telling you about how Agent Bates

16   used derogatory language to talk about Ms. Reid, tried to take

17   the sting out of it in opening.  But you can't take the sting

18   out of words and actions like that when you're talking about

19   federal agents.  You just can't.  These guys, this group, Agent

20   Bates, Residovic, Officer Liang -- oh, and don't forget Agent

21   Parodi, who you have a stipulation from him, too, from us and

22   the government.

23   Pepper spray?  And they're saying -- they have the audacity

24   to tell you that there is no evidence that Ms. Reid thought that

25   these men were using excessive force?  With their cowboy

1    behavior?  This goon squad?  Okay.  Don't let them insult your

2    intelligence.

3        Agent Harter tried but failed to activate his body worn

4    camera.  Agent Parodi's battery ran out.  They think they're

5    above the law because the DOJ has their back.  The DOJ had Agent

6    Bates's back.  They still do.  They're asking you to believe

7    her.

8        The government asks you, or they want you to think that Agent

9    Bates was a reasonable person, that the way that Agent Residovic

10   talked to Ms. Reid, the way he came at her, threatened to throw

11   her on the ground, told her to mind her own business -- he

12   didn't tell her, he screamed at her.  He told her "shut the fuck

13   up."  She said she wouldn't do that to an arrestee, but we have

14   her text messages.

15       She told him that he was her favorite on the body worn

16   camera.  She told him she had so much respect for him.  She

17   agreed with him when he said that it was too calm at the federal

18   level when they were reminiscing about their cop days.  But

19   Agent Bates is the reasonable one.  Okay.

20       Agent Bates had a great time.  We know that from her text

21   messages.  And let's not forget, you guys watched as I sat here

22   cross-examining Agent Bates, realizing that the text messages

23   that we had from her were different than the ones we had from

24   Agent Residovic.  Why is that?  Is it because the one that makes

25   her look exactly like one of the guys agreeing wasn't there?

1      We don't know exactly what happened, but we know that the

2      evidence is consistent with her going through her phone, maybe

3      taking screenshots, flipping through, and conveniently the most

4      damning one wasn't there when she sent it to the government, the

5      one that would undermine her testimony that she wouldn't act

6      that way.  Why is that?

7      Agent Bates's testimony is riddled with holes.  She says that

8      she was worried that, while Ms. Reid is up there on the corner,

9      Ms. Reid was going to somehow get from where Officer Liang

10     clearly had her under control, cross this agent over here, Agent

11     Bates herself, and spring the guy who they just put in the car?

12     How's that going to work?

13     Oh, but then when she's on cross-examination, she says, well,

14     that was just one of the concerns.  The other concern was the

15     guy that was still in jail.  As the government likes to tell

16     you, oh, they're worried about fight or flight.  This

17     gentleman's being released from D.C. jail, straight to a door,

18     straight to an ambush.  And you can see it in Government Exhibit

19     6 if you want to watch it.  He walks into five agents.  What

20     fight or flight?  There's no flight risk.  There's no danger

21     from these gentlemen.  They're being processed and released from

22     the D.C. jail.  They didn't have weapons.

23     And then back to credibility, because it matters.  It matters

24     here.  The story doesn't make any sense.  And then we have these

25     agents, these cowboys...

1    (Video played.)

2    You heard these men yourself.  You heard Agent Residovic

3    yourself in this BWC, again Government Exhibit 6.  They knew

4    when these gentlemen were coming out because somebody inside the

5    D.C. jail was tipping them off, in contravention of D.C. law.

6    These are federal agents enabling another person, encouraging

7    another person, to violate the law.  These are cowboys.  This is

8    cowboy behavior.  They want to play outlaw.  And the government

9    is asking you to believe that they were acting in the course of

10   their official duties?  Okay.  Ms. Reid is not guilty.

11   She reacted.  She reacted to an invasion of her perimeter, of

12   her space.  You see it here.  You see it from the bruises.

13   Agent Bates said she was trying to deescalate.  Again, she left

14   bruises.  And these ones, the ones that are a couple of days

15   later, July 25, Jessica Mason testified she took of them?

16   Because Ms. Reid had to sit in jail for two days.

17   I want to end with the most important person in this case:

18   Ms. Reid.  You saw Ms. Mason and Ms. Campbell-Morrison talk

19   about Ms. Reid.  They're friends.  They know her character.

20   Ms. Reid is passionate.  They lit up when they talked about her.

21   She cares about her community.

22   Ms. Reid did nothing wrong.  You should be livid that the

23   government brought this case.  You should be appalled that our

24   tax dollars, in a federal shutdown, are going to prosecute this.

25   The government is seeking to convict Ms. Reid on the word of one

1    witness who's completely incredible.  She can't be trusted.

2        Don't let the government insult your intelligence.  They

3    overplayed their hand on this one.  They're embarrassed, they

4    got egg on their face, and they want you to clean up their mess.

5    They want you to convict Ms. Reid on nothing but the word of

6    Agent Bates.

7        As you go back to deliberate, remember what the judge

8    instructed you:  You, the jurors, are the finders of fact.  It

9    is you, Ms. Reid's peers, who get to hold the government

10    accountable, and we know that when you apply the facts to the

11    law in this case, you'll come back with a two-word verdict,

12    which is not guilty.

13        THE COURT:  Thank you, Ms. Abe.

14      Any rebuttal from the government?

15        MR. WOLF:  Yes, Your Honor.

16        THE COURT:  Let's take a five-minute break.

17      (Recess from 11:10 a.m. to 11:20 a.m.)

18        THE COURT:  Okay.  We will continue with the

19    government's rebuttal.

20        MR. WOLF:  Yes, Your Honor.  Permission to proceed.

21        THE COURT:  Please.

22                    GOVERNMENT REBUTTAL ARGUMENT

23        MR. WOLF:  Good morning.  This case boils down to a

24    simple issue:  When the defendant kicked her knee up at Agent

25    Bates's groin, did that constitute an act of simple assault?

1    That is the heart and soul of this case.  That is the question

2    that the government needs to answer.  That's the question the

3    government has answered based on the video evidence and the

4    testimony in this case.

5        Now, members of the jury, in this case you learned a lot

6    about some other things that were going on, about text

7    messages and private conversations, pejorative language by

8    officers, inappropriate language by officers on the scene

9    after the arrest.  The government does not condone that

10   behavior.  It's not in the best tradition of professional law

11   enforcement in this country.  There's no debating that.  But

12   all of these things do not detract from the central issue of

13   what happened based on what was caught on video of a sample

14   assault.

15       Let's talk about Agent Bates for a second.  The defendant

16   has argued that Agent Bates is fabricating, she has no

17   credibility.  When you go back to the jury room, watch the

18   video.  Watch her behavior on scene.  Watch how she reacts to

19   a fluid situation.  She is calm, she is methodical, she is

20   polite.  She had no intention to arrest the defendant even

21   after she was unlawfully interfering with their operation.

22   She wanted to let the defendant go.  Agent Bates acted

23   appropriately on scene, and that's what's shown on the video.

24   Everything that happened afterwards is just noise.

25       Now, you saw her on the stand for several hours.  You as a

1    jury have the opportunity to determine where you find Agent

2    Bates a credible witness.  You saw her body language, her

3    demeanor.  Did she strike you as someone who was fabricating

4    this, lying to you?  I submit the answer is no.

5        So let's go into what the video shows and what Agent Bates

6    testified to.  What the video shows is that the defendant was

7    forcibly resisting officers as they were trying to arrest an

8    inmate who's being released from jail who's wanted on

9    immigration violations.

10       As that situation unfolded, as the inmate was detained and

11   being walked past the defendant, you can hear the defendant's

12   frustration boil over: "How do you feel about stealing people?"

13   She uses expletives, foul language.  And as this inmate is

14   being walked away, that is when her frustration reaches a

15   tipping point and when she lashes out intentionally at the

16   officers based upon what she sees as an injustice.

17       Now, the defendant had every right to be there, to protest,

18   to video record, to observe, to report.  She could not lash

19   out and physically assault federal officers.  The law does not

20   allow it, even if she disagrees with the policy and even if

21   you disagree with the policy that they were enforcing.  The

22   law protects federal law enforcement officers, period.  That

23   is what happened.  That is why she assaulted Agent Bates by

24   kicking her knee up at her groin.

25       So let's go into another issue in this case, and that is

the issue of self-defense.  Was the defendant acting in
self-defense?  The government has the burden of proving the
defendant did not act in self-defense, and the government
submits there is no evidence that the defendant did act in
self-defense in this case.  And as you heard from the court,
there are really three things at play in a self-defense claim:

    (1)  that the defendant actually believed she was being
subject to excessive force;

    (2) was that belief reasonable?  Basically, that's an
objective standard.  These are both, by the way, under the
facts and circumstances available at the time to the
defendant;

    (3) was the force that was being applied by the police
reasonable and necessary based on the facts available to the
law enforcement officers.

    Those are the three factors interplaying in a self-defense
issue, and the government submits that at no point in this
incident did the defendant have the actual belief that she was
being subject to excessive force, or reasonable belief that
she was being subject to excessive force, or that there was
excessive force in any way whatsoever.  And let's break down
what happened.

    The incident starts -- and you'll have the opportunity in
the jury room to watch the video.  I'm not going to play it at
this point because you've seen it several times during the

course of this trial, and you'll have the opportunity to break
it down in the jury room.

But the incident starts based on Agent Bates's testimony
when the defendant is up on the walkway engaging with Officer
Liang.  She heard raised voices, and then she saw the
defendant leave that walkway, walk back down that walkway and
walk around a bannister towards the steps that were being used
to escort these inmates out of the jail to the waiting car.

Agent Bates expressed her concern as she was walking around
the bannister that defendant could veer off, and that's why
she closed the door.  The defendant showed a point of video
that was well after the fact of closing, which I believe was
deceptive.  What was going on in Agent Bates's mind was about
when the defendant was walking around the bannister, not at
the point when Officer Liang was already struggling with the
defendant.  That was well after the fact.

And so what was going on there was that Officer Liang had
interacted with the defendant up on the walkway, and then the
defendant walks around and begins to go into the precise place
where she cannot go at the precise time when she cannot be
there.

She had been there in that area before.  You saw on the
cell phone video, she walked around the area, walked in the
agents' vicinity as they were waiting on that patio in that
pavilion.  But there was nothing going on there, and they

didn't stop her.  They didn't stop her from recording.  They didn't stop her from hurling expletives at them.  They didn't stop her from doing anything.

But it was at this point, during this inmate transfer, that it was a safety issue to them, the inmate, to the defendant, based on knowledge that this inmate could pose a risk of fleeing or fighting with officers.  They were acting reasonably to make a secure area.

And so when the defendant mounts up the stairs, going to the precise place where she cannot be, Officer Liang had no choice.  And, yes, he put hands on her first, but that force was reasonable under the circumstances available to Officer Liang based on what was going on there, based on the incoming detention of the inmate, and based on the defendant's behavior and based on the proximity and what's happening.

Did the defendant have an actual belief that that initial contact was excessive force?  The evidence in this case says no, and that's illustrated by what happens a few seconds later when the defendant is on the wall.

So Officer Liang moves the defendant with his hands to that wall, and at the wall, listen to the words the defendant is saying.  She's saying, "I'm just as far away over here as I was over there."  She's essentially saying she wants to record in the precise place where she cannot be, based upon her belief it's the same distance.

1      But the problem is she's in the wrong place, and the agents

2   cannot allow it based on her safety, their safety, and the

3   inmate's safety.  She says, I want to the record there; you're

4   not allowing me.  It's not about excessive force.  There's no

5   evidence that she actually believed it was excessive force,

6   and there's no evidence that this belief would have been

7   reasonable under the circumstances based on everything that

8   happened there, based on her behavior, based on what was going

9   on, and based on Officer Liang's actions and that he -- he

10  didn't tackle her, he didn't take her to the ground.  He used

11  his hands to direct the defendant with her arms to the wall,

12  away from the area where they were operating.  That's the

13  initial part of the interaction.

14      At the wall, you can watch the video even more.  Officer

15  Liang, you see his body position relative to the defendant's

16  position.  He's not pressed up against her.  He's holding up

17  her arms, arm's length, and her arms are outstretched and

18  continuing to flail.  That's what's going on at the wall.

19      At no point is there any evidence during any part of the

20  interaction while she's up there up against the wall and

21  Officer Liang is alone that there is any evidence that this is

22  excessive force.  She's still focusing on where she wants to

23  video record.  That is her concern.  That is what the evidence

24  shows.  And there's no evidence that her belief that there was

25  excessive force being applied would have been reasonable based

on the facts there.

Officer Liang, you can hear him as Agent Bates approaches, saying *calm down*, *relax*, *calm down*.  He's not cursing at her. He's not threatening.  He does say, "We might have to cuff you," but he doesn't threaten to take her to the ground, doesn't use language that Agent Residovic does after the fact. He is being a professional law enforcement in a stressful -- professional law enforcement officer in a stressful situation. And his actions are reasonable.  They were necessary.

Now, when Agent Bates approached, you heard her testimony about what was going on in her mind, and it's corroborated by the video.  She walked up to the area, saw that Officer Liang was struggling with the defendant.  She was still moving her arms around, and she saw that the other agents were in the process of arresting that other person.

And Agent Bates knew, based on the prior arrest, that second detainee was going to be walked right past this area and it was important to keep it clear.  And so when Officer Bates arrived and she put her hand on the defendant's arm, that was not an excessive force.

The defendant did not have an actual belief that was excessive force.  The defendant didn't have a reasonable belief that that was excessive force.  Once again, it's based on what her conduct was on the scene and what the evidence shows that she was still focused on being able to record the

1    interaction from the place where she deemed she could be.

2         That was what was going through the defendant's mind, not

3    about excessive force, and any belief that she might have

4    about what was reasonable at that point, Agent Bates's

5    behavior was reasonable.  Agent Bates did not curse at the

6    defendant, did not threaten to take the defendant down.  These

7    were reasonable actions.

8         And then, as this situation escalates, let's think about

9    what's going on there.  You can see the video from Agent

10   Bates's body worn camera, and also Exhibit 6 and 6a, Agent

11   Jankovitz's body worn camera, you can kind of link them up and

12   see what's going on.  You can see the defendant kind of

13   escalate her behavior as the agents start cuffing the second

14   inmate and begin moving that inmate past the defendant.  She

15   is getting angrier and angrier at what she sees.  And maybe

16   she has a right to be angry.  That's fine.  That's her right.

17   But that anger is evidence of motive — motive to strike out at

18   the officers.  That's what's going on there.

19        And so as the agents move the inmate past the defendant,

20   she begins to curse at them, accusing them of stealing people,

21   begins yelling at them.  Once again, during this part, she

22   does not actually believe there is excessive force actually

23   being applied to her.  She is angry at what the other agents

24   are doing with the inmate.  That's all her anger is about,

25   nothing about excessive force.

1      And you can see in Agent Jankovitz's body worn camera, if

2    you walk past, breaking it down second by second, you can see

3    the positioning of the agents.  Agent Bates is not pressed up

4    against the defendant.  There's room there between them.

5    There's room there between Officer Liang and the defendant.

6    She does not actually believe there's excessive force here,

7    and her belief that there would be -- there's no reasonable

8    belief that there was excessive force from her perspective

9    under the circumstances, and the force that was being applied

10   by the officers was not excessive from their point of view,

11   based on all the facts that were going on.

12      And, finally, there is the assault part.  As the agents

13   walked the inmate out to the parking lot as the defendant

14   starts yelling, *what's your name*, *what's your name*, her anger

15   boils over in the form of her struggling.  You heard testimony

16   from Agent Bates that the defendant began to force her arm

17   upwards against Agent Bates's grip, and you see in the video

18   the defendant then kicking her knee up at Agent Bates,

19   sparking her reaction, one to put her hand down to block it,

20   and to spin the defendant around.

21      That use of force was not excessive, and the defendant did

22   not have an actual belief that that use of force was

23   excessive.  All of the evidence in this case shows that the

24   defendant's actual belief was anger at what she was seeing and

25   not what the officers were doing.  And the evidence shows that

1    she didn't have a reasonable belief that this use of force was

2    excessive, and the evidence shows that the officers' force was

3    not excessive from their perspective.

4        That was the most vulnerable point for them, for the

5    inmate, and the defendant, when the inmate is walking out to

6    the parking lot.  That's when everybody is in close proximity,

7    and that is when the defendant is struggling the hardest.

8    That's why they moved closer to the defendant.  That's why

9    Officer Liang moved closer to the defendant, because her

10   struggle escalated.  And the jury instructions specifically

11   say that one of the factors you can consider is whether it was

12   excessive force is whether the defendant was actively

13   resisting, and that's exactly what she did.

14       And so when the defendant, her anger boiled over, she

15   lifted her knee, she raised her knee up at Agent Bates's

16   crotch, at her groin.  That was an act that was intended to

17   threaten Agent Bates, intended to be something that would be a

18   use of force, intended to offend Agent Bates's reasonable

19   sensibility as a person.  That is the evidence in this case,

20   and that is why the government has proven there is no

21   self-defense in this case.

22       Now, members of the jury, soon you're going to start your

23   deliberations.  As you do that, I would encourage you to watch

24   the videos Government Exhibit 1, Government Exhibit 5,

25   Government Exhibit 6, Government Exhibit 6a.  Watch the

1    videos.  Think about what Agent Bates testified to.

2        Members of the jury, at the beginning of this case, as you

3    were being interviewed by the court and the parties, you were

4    asked whether you could be fair and impartial, put aside your

5    political beliefs, and focus objectively on the facts and

6    evidence in this case.

7        It's a tough task, it's a sacred task, and one that only

8    you as jurors have as jurors in this case.  I'm asking you to

9    view this evidence with clear eyes and view it fairly and

10   impartially because, when you do, the only verdict that's fair

11   and impartial, that's fair and consistent with the evidence in

12   this case, is that you find the defendant guilty of the

13   charged offense.  Thank you.

14                         CLOSING INSTRUCTIONS

15        THE COURT:  Thank you, Mr. Wolf.

16   Ladies and gentlemen of the jury, I have some additional

17   instructions, and then we will send you back to deliberate.

18       During the course of this trial, a number of exhibits were

19   admitted into evidence.  Sometimes only portions of exhibits

20   were admitted, such as portions of a longer video, a document

21   with some words or some pictures blacked out or otherwise

22   removed, or a video played without audio.

23       There are a variety of reasons why only a portion of an

24   exhibit is admitted, including that the other portions are

25   inadmissible or implicate an individual's privacy.  As you

examine the exhibits and you see or hear portions where there appear to be omissions, you should consider only the portions that were admitted.  You should not guess as to what has been taken out or why, and you should not hold it against either party.  You are to decide the facts only from the evidence that is before you.

I will be sending you into the jury room with the exhibits that have been admitted into evidence.  You may examine any or all of them as you consider your verdict.  Please keep in mind that exhibits that were marked only for identification but were not admitted into evidence will not be given to you to examine or consider in reaching your verdict.  Also, exhibits that were shown as demonstrative exhibits in the courtroom but not admitted into evidence will not be sent to the jury room.

When you return to the jury room, you must first select a foreperson to preside over your deliberations and to be your spokesperson here in court.  There are no specific rules regarding how you should select a foreperson.  That is up to you.  However, as you go about the task, be mindful of your mission: to reach a fair and just verdict based on the evidence.

Consider selecting a foreperson who will be able to facilitate your discussions, who can help you organize the evidence, who will encourage civility and mutual respect among all of you, who will invite each juror to speak up regarding

his or her views about the evidence, and who will promote a full and fair consideration of that evidence.

The question of possible punishment of the defendant in the event of a conviction is not a concern of yours and should not enter into or influence your deliberations in any way.  The duty of imposing a sentence in the event of a conviction rests exclusively with me.  Your verdict should be based solely on the evidence in this case, and you should not consider the matter of punishment at all.

A verdict must represent the considered judgment of each juror, and in order to return a verdict, each juror must agree on the verdict.  In other words, your verdict must be unanimous.

You will be provided with a verdict form for use when you have concluded your deliberations.  The form is not evidence in this case, and nothing in it should be taken to suggest or convey any opinion by me as to what the verdict should be. Nothing in the form replaces the instructions of law I have already given you, and nothing in it replaces or modifies the instructions about the elements which the government must prove beyond a reasonable doubt.  The form is meant only to assist you in recording your verdict.

I will provide you with a copy of my instructions.  During your deliberations, you may, if you want, refer to these instructions.  While you may refer to any particular portion

1    of the instructions, you are to consider the instructions as a

2    whole, and you may not follow some and ignore others.  If you

3    have any questions about the instructions, you should feel

4    free to send me a note.  Please return your instructions to me

5    when your verdict is rendered.

6        I would like to remind you that in some cases, although not

7    necessarily this one, there may be reports in the newspaper or

8    on the radio, internet, or television concerning this case.

9    If there should be such media coverage in this case, you may

10   be attempted to read, listen to, or watch it.  You must not

11   read, listen to, or watch such reports because you must decide

12   this case solely on the evidence presented in this courtroom.

13   If any publicity about this trial inadvertently comes to your

14   attention, do not discuss it with other jurors or anyone else.

15   Just let me or Ms. Bell-Norwood know as soon as it happens as

16   you can, and then I will briefly discuss it with you.

17       As you retire to the jury room to deliberate, I also wish

18   to remind you of an instruction I gave you at the beginning of

19   the trial.  During deliberations you may not communicate with

20   anyone not on the jury about this case.  This includes any

21   electronic communications such as email or text or any

22   blogging about the case.  In addition, you may not conduct any

23   independent examination during deliberations.  This means you

24   may not conduct any research in person or electronically via

25   the internet or in another way.

1    If it becomes necessary during your deliberations to

2    communicate with me, you may send a note by the deputy clerk,

3    Ms. Bell-Norwood, signed by your foreperson or by one or more

4    members of the jury.  No member of the jury should try to

5    communicate with me except by such a signed note, and I will

6    never communicate with any member of the jury on any matter

7    concerning the merits of this case except in writing or orally

8    here in open court.

9    Bear in mind also that you are never, under any

10   circumstances, to reveal to any person — not the deputy clerk,

11   the marshal, or me — how jurors are voting until after you

12   have reached a unanimous verdict.  This means that you should

13   never tell me in writing or in open court how the jury is

14   divided on any matter, for example, 6/6, 7/5, 11/1, or any

15   other fashion, whether the vote is for conviction or acquittal

16   or any other issue in the case.

17   The attitude and conduct of jurors at the beginning of

18   their deliberations are matters of considerable importance.

19   It may not be useful for a juror, upon entering the jury room,

20   to enter a strong expression of an opinion of the case or to

21   announce a determination to stand for a certain verdict.

22   When one does that at the outset, a sense of pride may

23   cause that juror to hesitate to back away from an announced

24   position until after discussion of the case.  Furthermore,

25   many juries find it useful to avoid an initial vote upon

1    retiring to the jury room.  Calmly reviewing and discussing

2    the case at the beginning of deliberations is often a more

3    useful way to proceed.  Remember that you are not partisans or

4    advocates in this matter, but you are the judges of the facts.

5        The last thing I must do before you begin your

6    deliberations is to excuse the alternate jurors.  As I told

7    you before, the selection of alternates was an entirely random

8    process.  It's nothing personal.  We selected two seats to be

9    the alternate seats before any of you entered the courtroom.

10   Since the rest of you have remained healthy and attentive, I

11   can now excuse those jurors in seats 5 and 11.

12       Before you leave, I'm going to ask you to tear out a page

13   from your notebook and to write down your name and daytime

14   phone number and hand this to the deputy clerk.  I do this

15   because it is possible, though unlikely, that we will need to

16   summon you back to rejoin the jury in case something happens

17   to a regular juror.  Since that possibility exists, I am also

18   going to instruct you not to discuss the case with anyone

19   until we call you.

20       My earlier instruction on use of the internet still

21   applies.  Do not research this case or communicate about it on

22   the internet.  In all likelihood, we will be calling you to

23   tell you that there's been a verdict and you're now free to

24   discuss the case.  There is, however, the small chance that we

25   will need to bring you back onto the jury.

1    Thank you very much for your service, and please report

2    back to the jury office to turn in your badge on the way out.

3         (Alternate jurors exit.)

4         THE COURT:  Counsel, anything else before we send the

5    jury back?

6         (Bench conference.)

7         THE COURT:  Mr. Ohm, what specifically are you

8    objecting to?

9         MR. OHM:  There were several references to what

10   Ms. Reid was thinking and what she was intending at a

11   particular point in time, I think within the context of -- I

12   want to say Mr. Wolf's self-defense argument, just in light of

13   the fact that Agent Bates had testified improperly about --

14   repeatedly improperly about what Ms. Reid was doing and what

15   she was thinking, what she was intending.  And there were even

16   a couple of times when the court admonished Mr. Wolf because

17   his questions were directed towards eliciting that kind of

18   information.  I would ask the court to instruct the jury what

19   they're allowed to consider and what they're not allowed to

20   consider.

21        THE COURT:  So your objection is to what, Mr. Wolf, in

22   his rebuttal, making references to Agent Bates's testimony?

23        MS. ABE:  I think specifically the stricken portions of

24   the testimony, Your Honor.

25        THE COURT:  Just by the way, this is incredibly hard

1    when you wait until the end.  I made clear the last time that

2    I wasn't prohibiting you from doing it when it was happening,

3    when I would know what you were talking about and could

4    sustain or overrule your objections.  So now I'm sitting here

5    trying to go back through the entire rebuttal because I don't

6    know what you're talking about.  Please tell me what it is

7    that he said specifically that you're objecting to.

8         MR. OHM:  When he was discussing what the evidence

9    showed, that Ms. Reid thinking --

10        THE COURT:  Is there a reason why you didn't object

11   while he was speaking?

12        MR. OHM:  Your Honor, I think, generally speaking,

13   attorneys are cautioned not to interrupt the flow of the

14   trial.  My recollection is that yesterday --

15        THE COURT:  Mr. Ohm, even if you misunderstood me

16   yesterday, did you hear me when I told Ms. Abe earlier, after

17   she objected at the end of the closing, that I was not

18   prohibiting anyone from objecting during closings, or did you

19   miss that?

20        MR. OHM:  No, I didn't miss that, Your Honor.  But

21   given the nature of this objection and the amount of time I

22   thought it would take, I thought it would --

23        THE COURT:  But now I don't know what you're talking

24   about.

25        MR. OHM:  I apologize if this is -- a lot of other

CLOSING INSTRUCTIONS

1    judges prefer it this way.  Sorry.

2         THE COURT:  Well, now I don't know what you're talking

3    about.  So you're going to have to help me figure out what

4    you're objecting to, because now I have to read through his

5    entire rebuttal while the jury sits and waits because I don't

6    know what you're talking about.

7         MR. OHM:  I don't know if the court has, I don't know,

8    Control-S options, it was within the first five minutes of his

9    rebuttal.  It happened around 11:34.  I don't know if you have

10   time stamps, but it refers to what Ms. Reid was thinking

11   during the course of the actual conduct up on the wall.

12        THE COURT:  Are you talking about when he's saying did

13   the defendant have an actual belief that initial contact was

14   excessive force, in other words, what they are required to

15   prove with respect to self-defense?

16        MR. OHM:  When he said that Ms. Reid was thinking that

17   she couldn't get any closer and that her objective that she

18   needed to get closer to take more video evidence and that that

19   was her belief.

20        THE COURT:  Okay.  So you're objecting to this portion:

21    "Did the defendant have an actual belief that initial

22   contact was excessive force?  The evidence in this case says

23   no, and that's illustrated by what happens a few seconds later

24   when the defendant is on the wall.

25    "So Officer Liang moves the defendant with his hands to

that wall, and at the wall, listen to the words the defendant

in saying.  She's saying, 'I'm just as far away over here as I

was over there.'  She's essentially saying she wants to record

in the precise place where she cannot be, based upon her

belief it's the same distance.  But the problem is she's in

the wrong place, and the agents cannot allow it based on her

safety, their safety, and the inmates' safety."

    Is that what you're objecting to?

    MR. OHM:  Yes.

    THE COURT:  Why do you think that that goes to the

self-defense instruction that we all agreed on?  And it's

their burden to prove that it was not self-defense — in other

words, that she did not have a reasonable and actual belief

that it was excessive force, that the force was not excessive.

So why is that improper?

    MR. OHM:  The objection isn't based on the subject

matter, Your Honor.  It's based on the government making

unfair inferences about what Ms. Reid thought or intended when

there's no evidence of that in the record.  There are no

statements that she made.  There's no testimony from Officer

Liang.  Agent Bates comes in at the tail end of that, and her

testimony was littered with improper characterizations of what

Ms. Reid said and thought, some of which was elicited by the

government.

    So our objection would be that the government is taking

1    advantage of those things and that the court should clarify to

2    the jury what they're allowed to -- I'm not asking the court

3    to strike that argument.  I'm asking the court to clarify to

4    the jury what they're allowed to consider and what they're not

5    allowed to consider.

6        THE COURT:  Okay.  But all he says is -- and he's using

7    the words "in the video" because you've asked for a self-

8    defense instruction based on the video, because otherwise

9    there's no evidence other than the video because Ms. Reid

10   didn't testify.  And so he is saying in the video she's

11   saying, "I'm just as far away here as I was over there.  She's

12   essentially saying she wants to record in the precise place

13   where she cannot based on this belief" -- he's arguing based

14   on the video, and you as well have argued based on the video.

15   So what's improper about that?

16       MR. OHM:  His argument about -- he's essentially saying

17   -- his, combined with the information that was elicited from

18   the government at trial, that argument --

19       THE COURT:  So first of all, can we limit this to the

20   closing?  Because right now you are objecting to what he said

21   in the closing.

22       MR. OHM:  Right.  But closings are part of arguments,

23   Your Honor.  I have to tie it to other evidence that was --

24   other things that happened within trial I think is --

25       THE COURT:  And he's relying on the video.  He's not

1    relying on any other testimony to make the argument with

2    respect to what I just read to you.  He's relying on the

3    video.

4         MR. OHM:  The video is elicited during Agent Bates's

5    testimony.  The video is elicited and Agent Bates was asked to

6    comment on this portion of this video during her testimony,

7    and during this part is when Bates improperly testified about

8    what Ms. Reid was thinking.  So this is just creating

9    additional harm based upon what occurred at trial when the

10   government improperly elicited that and the agent improperly

11   testified to it.  So I'm just asking that the jury be clear

12   and told what they're allowed to consider and what they're not

13   allowed to consider.

14        THE COURT:  Can I hear from the government?

15        MR. WOLF:  Yes, Your Honor.  During my rebuttal,

16   I argued based on the video based on the self-defense statute.

17   I did not elicit testimony about what Agent Bates believed

18   that the defendant was thinking or doing -- or thinking,

19   excuse me, what her intent was.  I argued that the intent was

20   derived from the circumstances in the video.

21        THE COURT:  Mr. Ohm, looking at what he said in the

22   closing, I do not think anything he said is improper.  The

23   instruction you are now asking me to give -- by the way, while

24   the jury is sitting here waiting to go back to deliberate --

25   is about Agent Bates's testimony.

1          During that testimony, you objected, I sustained

2     objections, and so to the extent this instruction is going to

3     her testimony and which parts of her testimony they can and

4     cannot consider, I dealt with that during the testimony and

5     the closing itself.  I don't think was it improper because

6     it's not even referring to Agent Bates's testimony.

7          You asked for the self-defense instruction.  You told me

8     that the video is your evidence that this was self-defense to

9     get her to a reasonable and actual belief about what was

10    happening, and all the government did in rebuttal is use the

11    words in the video to argue the opposite.

12              MR. OHM:  Okay.

13          (End of bench conference.)

14              THE COURT:  Okay.  I apologize for the delay again.

15    We are going to take you back to begin your deliberations.  We

16    are all going to be on lunch from around 12:30 to 1:30, and

17    lunch will be coming in to the jury room for you at 12:45.  You

18    can take a break for lunch or deliberate over lunch.

19         You can only deliberate when everyone is present and only in

20    the jury room.  So I will leave it to you whether you want to

21    take a break and leave the building between 12:30 and 1:30 for

22    lunch or you want to work through lunch.  Lunch will be

23    provided.

24         You can stay until 5 p.m. today for deliberations.  If you're

25    not finished, you'll come back at 9:30 tomorrow to resume

1      deliberations.  We're not going to come back to dismiss you at

2      five o'clock.  If you're not done at five o'clock, you can

3      leave.  Please just come back at 9:30 a.m. tomorrow to resume.

4      When you're finished, you can record it on the verdict form and

5      provide the verdict form.

6          Thank you again for all of your patience throughout the trial

7      and for the work that you're about to do.

8          (Jury out at 11:58 a.m.)

9              THE COURT:  Okay, counsel.  You can have your seats.

10     You can leave or stay, up to you.  If you're leaving, please

11     leave a number, and please be somewhere that you can get back

12     here within five minutes if we have a verdict.  We will be on

13     break from 12:30 to 1:30, so if a note comes within that

14     period, we'll deal with it at 1:30 so you have a clear hour

15     where you can have lunch and not need to be five minutes from

16     here.  Okay?  Thank you.

17         (Recess from 11:59 a.m. to 1:53 p.m.)

18             THE COURT:  All right.  Counsel, we have received a

19     note from the jury that it has reached a verdict.  Anything

20     before I bring them in?

21             MR. WOLF:  No, Your Honor.

22             MS. ABE:  Not for the defense.  Thank you.

23             THE COURT:  All right.  We'll bring the jury in.

24         (Jury in at 1:54 p.m.)

25

1                              VERDICT

2          THE COURT:  Good afternoon.  Could you tell me who the

3    foreperson is?

4       (Foreperson indicates.)

5          THE COURT:  Thank you.  Can you stand?  Has the jury

6    unanimously agreed on its verdict?

7          FOREPERSON:  Yes.

8          THE COURT:  All right.  Please hand the verdict form to

9    the deputy clerk for the deputy clerk to inspect.

10      (Foreperson complies.)

11         DEPUTY CLERK:  Good afternoon.

12      "As to the charge of Assaulting, Resisting, or Impeding

13   Certain Officers, the jury in the above-captioned case

14   unanimously finds the defendant, Sydney Reid, not guilty."

15         THE COURT:  Okay.  Anything from counsel?

16         MR. WOLF:  Nothing from the government, Your Honor.

17         MR. OHM:  Your Honor, I guess we would ask if the court

18   could ask the jury if they want to --

19         THE COURT:  I will.

20         MR. OHM:  Okay.

21         THE COURT:  Okay.  Ladies and gentlemen of the jury,

22   thank you for your service in this case.  You have been

23   diligent and especially patient throughout this trial.  I know

24   we have often kept you longer than we said we would and taken

25   longer breaks, and I know you spent a fair amount of time

1    waiting for us.  I am very grateful.  Our justice system only

2    works because of the willingness of citizens such as you

3    taking time from what I know are your busy schedules and lives

4    to serve as jurors.

5        Your conscientiousness allows our courts to work fairly and

6    efficiently for the parties with disputes that require

7    resolution.  It is truly an important public service, and on

8    behalf of the United States District Court, I thank you for

9    your service.  I will come back to chat with you in a few

10    minutes once I wrap up with the lawyers.  I promise I will not

11    keep you waiting more than a couple of minutes, but I do want

12    a chance to thank you.

13        (Jury out at 1:57 p.m.)

14        THE COURT:  Okay, counsel.  I'm going to go back and

15    chat with the jury a little, and I will ask them if they want

16    to talk with the lawyers; and if they do, I will invite you

17    back.  Anything else?

18        MR. OHM:  No.

19        THE COURT:  Okay.

20        (Proceedings adjourned at 1:58 p.m.)

21

22

23

24

25

\*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne